UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| TURNKEY OFFSHORE PROJECT SERVICES, LLC ("TOPS") | * * | NO: 2:21-cv-00672 |
|---|---|---|
| | * | JUDGE AFRICK |
| VERSUS | * | |
| | * | |
| JAB ENERGY SOLUTIONS, LLC and BRENT BOUDREAUX, | * * | MAGISTRATE CURRAULT |

* * * * * * * * * * * * * * * * * * * * * * *

## MEMORANDUM IN SUPPORT OF TOPS' MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

As set forth in the attached Motion, TOPS is moving for a temporary restraining order and injunctive relief against the Defendants and JABCO ABC, LLC to prevent them from selling, or otherwise alienating their assets aside from normal business operations. More specifically, TOPS moves for a court order preventing JAB II, Allison Marine Holding, LLC and JABCO ABC from selling JAB II and/or Allison Marine Holding's assets to pay off Allison Marine Holding's debt to the detriment of JAB II creditors.

**I. Background**

TOPS sued JAB Energy Solutions II, LLC and Brent Boudreaux for over $8 million owed to TOPS for offshore platform removal work performed by TOPS for JAB II after being fraudulently induced by Brent Boudreaux to enter the contract with JAB II, when he knew JAB II was not going to pay for the work. This Court recently allowed TOPS to amend to add Allison Marine Holding, LLC and JAB Energy Solutions, LLC as co-defendants because of recently disclosed evidence of comingling of assets among JAB II and other entities, including Allison Marine Holding, LLC (hereinafter Allison Marine).

1

### a. JABCO ABC

As this Court is aware from earlier filings, JAB II's counsel recently notified TOPS counsel that all assets of JAB II were being or had been transferred to a third party entity by the name of JABCO ABC, LLC in Delaware (see attached Exhibit 1); however, neither JAB II, its counsel nor even Boudreaux in his recent deposition could provide any significant specific information regarding this entity. In fact, Boudreaux testified last week that even though he is the President of JAB II, he really did not understand how this JABCO process worked, had never encountered such a situation before, but understood it had been put together and recommended by Allison Marine Holding's attorneys (not the current counsel in this case). He further testified that his basic understanding of what was occurring was that all of JAB II's assets, including the $6+ million in accounts receivable for the High Island platform removals for the work done by TOPS were being assigned and transferred to JABCO ABC, LLC. In fact, Boudreaux testified that he believed that all of JAB II's assets, including office furniture, etc. were being transferred in like fashion. Amazingly, <u>Boudreaux then disclosed that the JABCO ABC administrator will use JAB II's assets to pay off some or all of the loans that Allison Marine Holding, LLC has outstanding without paying any of JAB II's debts</u>! Boudreaux testified that it is his understanding that none of the JAB II debts, including to TOPS, will be paid, but instead JAB II will be left holding its debt and then will be dissolved after JABCO ABC pays off Allison Marine's loans.

The sham of this transaction is laid out in the first page of the General Assignment (Exh. 1) which states that "Assignor (JAB II) has determined that, based upon its business prospects entering into this Assignment is in the <u>best interest of this Assignor's creditors</u>". As discussed below, that statement and their scheme are completely false, as the President of JAB II knows nothing about this process other than it will result in the transfer of all of JAB II's assets to JABCO,

so that Allison Marine's debts can be paid, leaving JAB II a mere shell with no remaining assets to pay TOPS! Notably this document was signed by Sonda Robertson purportedly the "CFO of JAB Energy Solutions II, LLC". As will be shown below, she is <u>actually</u> the CFO of Allison Marine Holding, LLC and according to Boudreaux, President of JAB II, she holds no position with JAB II. Accordingly, not only is the stated purpose of the transfer of assets false, but it was prepared and signed off by Allison Marine representatives, not JAB II.

Clearly this transaction has been devised and confected to divert the assets of JAB II to facilitate preferential treatment to Allison Marine Holding's debt holders, leaving JAB II with no assets but substantial unpaid contractors like TOPS.

b. **Testimony of Brent Boudreaux**

Brent Boudreaux's deposition was taken on July 13. During that testimony Boudreaux disclosed numerous facts pertinent to this Motion. The full transcript has not yet been received, but undersigned counsel will supplement the record with that transcript upon receipt thereof. Accordingly, the following recitation of the facts are premised upon counsel's notes and recollection but will be corroborated from the transcript upon receipt.

Boudreaux was questioned and testified at length regarding the corporate structure of JAB II and the Allison group of companies, which is as follows. In 2011 a group of companies, including JAB Energy Solutions, LLC, were re-formed with the assets of the former companies being purchased by Allison Marine Holding, LLC and the respective entities renamed with "II" added to each of them. For instance, Brent Boudreaux's earlier company, JAB Energy Solutions, LLC, which was owned by him and 4 partners, was reformed as JAB Energy Solutions II, LLC, which became a wholly owned subsidiary of Allison Marine Holding, LLC. There were approximately 5 other subsidiary companies like JAB II that were reformed in this process. As

part of that transaction a large investment firm, Lincolnshire Management, paid $82 million to Mr. Boudreaux and the other owners of the respective companies to purchase a 60% interest in Allison Marine Holding, LLC. Mr. Boudreaux ended up with a 7% ownership interest in Allison Marine Holding, LLC.

Mr. Boudreaux further testified that the function of Allison Marine Holding, LLC is simply to handle the finances and oversee the operations of the 6 subsidiary companies, including JAB II. Allison Marine Holding, LLC only has 2 employees, including its CFO Sonda Robertson, who control the money and the administrative functions, including HR, insurance, banking, check writing, invoicing, etc. for JAB II and the other subsidiaries. Of particular significance to this issue, Boudreaux testified that when JAB II bills a client for work performed, that billing is reviewed by him but is prepared and issued by Allison Marine. Similarly, when a customer pays JAB II for services performed, Mr. Boudreaux sees the payment but it is deposited, accounted for and utilized by Allison Marine.

Likewise, when JAB II is billed for services by one of its contractors, like TOPS, the bill is received in the office by one of the JAB II administrative personnel, who provides it to Mr. Boudreaux or one of the other engineers to review and approve. At that point the approved invoice is sent to Allison Marine Holding's CFO (Sonda Robertson), who then issues payment or partial payment "depending upon Allison Marine's cash flow". If Allison Marine either does not have adequate cash or deems other bills more pressing (JAB II or other entities), then Allison Marine's CFO determines the priority of payments. Even further entangling these companies, the Allison Marine Holding's Board of Directors reviews the priority of payments schedule for JAB II and all of the other subsidiaries on a weekly basis with the Board having the right to recommend changes

as to how the priority schedule is aligned, although from a practical standpoint that decision is generally made by Allison Marine Holding's CFO.

As a result of this intermingling of JAB II and Allison Marine, all of JAB II's revenues go directly to and are controlled by Allison Marine, as is the payment of JAB II's bills. Mr. Boudreaux confirmed that this situation is exactly how the remaining $6 million JAB II is owed from the Black Elk Trustee for the job that TOPS did was to be handled, as that $6 million when paid would go directly to Allison Marine when JAB II receives that check.

During the course of Boudreaux's testimony, he also discussed Allison Marine's finances somewhat, although the defense attorney instructed Boudreaux not to answer certain questions regarding the finances of Allison Marine, despite Allison Marine now being a party and the obvious intermingling of funds. (see attached 2 pages of the transcript on that issue, Exhibit 2). During the course of that background on Allison Marine, Boudreaux disclosed that Allison Marine Holding, LLC, not JAB II, is obligated on 2 large loans. More particularly, Boudreaux testified that Allison Marine Holding has a $10-15 million loan with Castlegate Financial Company. In addition, they have a second loan for $1+ million with JD Bank. Boudreaux was very specific and affirmative in his testimony that these loans are Allison Marine Holding, LLC's loans, not JAB II's. In fact, he admitted that JAB II has no outstanding loans or financial obligations other than the payment of the contractors for the work on the High Island platform removal job. Nevertheless, this JABCO ABC scheme, which was approved by Allison Marine, and in fact was entered into by Allison Marine's CFO, will siphon all of JAB II's assets away to be used to pay Allison Marine debts, not JAB II creditors.

### c. Interaction Between Brent Boudreaux, JAB II and Allison Marine Holding, LLC

During the course of Brent Boudreaux's recent deposition, he admitted that he has been the President of JAB II since 2011. In addition, he is on the Board of Directors for and owns 7% of Allison Marine Holding, LLC, which actually owns JAB II in its entirety, as well as a handful of other related marine companies. Boudreaux further admitted that he and the other Directors of the Board actively oversee JAB II's operations and receive weekly reports regarding its operations and finances. Notably, he also admitted that Allison Marine Holding, LLC only has 2 employees, who handle the finances and other day to day management of JAB II and the other subsidiaries. Those 2 employees of Allison Marine are housed in the same offices with JAB II and in fact Allison Marine's CFO, Sonda Robertson, actually has her desk very close to Boudreaux's and they regularly interact on a daily basis regarding JAB II's operations and finances, including cash flow, payment of vendors, bids on jobs, etc. Interestingly, Boudreaux also admitted that he has a corporate credit card for all of his business related expenses for JAB II, but when he was asked to actually produce the credit card at the deposition, it was revealed that the credit card is an Allison Marine company credit card for which he is an authorized card holder. He also admitted that Allison Marine pays his monthly American Express bill.

As this Court may remember from its status conference with the parties a few weeks ago, this Court specifically asked JAB II's attorney who was paying his legal bills and/or would be paying those of JAB and Allison Marine after they were added to the lawsuit. JAB II's attorney refused to answer that question for the Court during the conference, but Brent Boudreaux disclosed in his testimony that the legal fees for the defense of this case, as well as several lawsuits by other contactors on this job against JAB II are in fact being paid by Allison Marine Holding, LLC.

### d. Summary of Facts

As discussed in some detail above and as is being fleshed out more by the day, it is readily apparent that Allison Marine Holding, LLC controls and directs much of the JAB II day to day operations, including all of its finances. Accordingly, the issue as to whether or not Allison Marine Holding is also liable for JAB II's debt to TOPS is much clearer now, as the 2 entities operate interchangeably with Allison Marine actually controlling which contractors to JAB II get paid, and when and how much, as Allison Marine controls the day to day finances and assets of JAB II, and even controls the disposition of all of JAB II's assets.

### e. Requested Relief from this Court

It has now been disclosed through documentation from JAB II, as well as significant testimony last week from its President, Brent Boudreaux, that Allison Marine Holding, LLC, which specifically approved and actually signed the JABCO ABC transaction is plundering the assets of JAB II and is attempting sell them to satisfy debts of Allison Marine Holding, rather than paying TOPS and the other contractors with whom they contracted to perform the work which was done. Now Allison Marine Holding through this scheme of the ABC assignment is attempting to leave JAB II an assetless shell from which there could be no recovery by TOPS. Accordingly, TOPS is requesting that this Court issue a temporary restraining order to prevent JAB II, Allison Marine Holding, LLC, Brent Boudreaux, JABCO ABC, LLC and its director, Albert Altero, or anyone else from alienating or selling any of the JAB II assets that were purportedly assigned to JABCO ABC in this scheme, so as to preserve those assets until this Court can further sort out the liability to TOPS for the amounts owed to it on this contract. TOPS believes that failure to preserve those assets may very well result in irreparable harm to it, as TOPS may be left with no remedy to recover the $8 million plus owed to it, if JAB II and Allison Marine Holding are allowed to

perpetrate this fraudulent transaction upon them in what is believed to have been a nefarious transfer of assets to JABCO ABC, LLC in a poorly veiled effort to move all of JAB II's assets to this third party entity in exchange for financial relief of debt obligations by Allison Marine Holding, LLC with no financial benefit being provided to JAB II. In a nutshell, they have drained all of the assets of JAB II, including apparently even day to day operations, equipment such as furniture, etc., specifically including the $6 million accounts receivable which purportedly is soon to be paid to JAB II by the Black Elk Trustee for the work that was performed by TOPS. This draining of assets from JAB II appears to provide no financial benefit to JAB II but instead inures solely and directly to the benefit of the parent holding company, Allison Marine Holding, LLC.

 **f. Status of Claim**

Of the significant amount owed to TOPS at this time, one can presume that most, if not all of the unpaid balance is in fact owed to TOPS, as there is no question that the work was contracted for through the MSA and Work Order, which JAB II has admitted, that the work was performed and completed, as evidenced by the Certificate of Completion signed by JAB II at the conclusion of the job (see Exh. 3), and JAB II has admitted in discovery responses that there were no claims made against TOPS for the work that had been performed. For the sake of full transparency, undersigned counsel would note that Brent Boudreaux did testify in his deposition and JAB II did produce on the eve of his deposition several documents indicating that BESSE has raised an issue as to whether there was any damage to a reef during the course of the job, but Boudreaux admitted that has just been raised and they are just beginning to investigate, so he has no information at this point to indicate that such actually happened. Accordingly, undersigned counsel submits that one can safely assume that most, if not all, of the amounts sought by TOPS are owed to it.

## II. Law

The court may grant a preliminary injunction if the plaintiff establishes (1) that he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) the injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) (citation omitted).

## III. Analysis

First, is TOPS likely to succeed on the merits? In order to prevail in a breach of contract claim in Louisiana, TOPS must show "(1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation, and (3) the failure to perform resulted in damages to the obligee." *Denhan Homes, LLC v. Teche Federal Bank*, 182 So. 3d 108, 119 (La. Ct. App. 2015). First, TOPS can show that it had a contract with the defendants whereby JAB Energy Solutions II, LLC was obligated to pay TOPS for services performed (see Exhibit A attached to the Complaint). Second, TOPS can show that the obligor has failed to perform because it has not been paid according to the terms of the contract (see Complaint, Exhibit F). Third, TOPS has suffered damages because it is owed nearly $9 million for unpaid work, causing severe distress to the company. Because TOPS has evidence towards all elements of its claim, TOPS can show that it is likely to succeed on the merits and this element supports granting a TRO and injunctive relief.

Second, is TOPS likely to suffer irreparable harm in the absence of preliminary relief? In order for this element to favor granting an injunction, the plaintiff must show that irreparable harm is likely, not just possible. *Winter*, 555 U.S. at 22. JAB Energy Solutions II, LLC has already filed an assignment for the benefit of creditors (ABC) in Delaware whereby all of its assets are transferred to an assignee, JABCO ABC, LLC, and then will be a shell company with nothing but

unpaid contractors. Based on Brent Boudreaux's deposition testimony as well as the language in the agreement between the assignor, JAB II and the assignee, JABCO II, there is strong reason to believe that the funds will be used to pay the creditors of Allison Marine Holdings, LLC, not JAB II creditors, and the funds will be exhausted before TOPS can get a judgment. If that happens, TOPS will be out nearly $9 million and the company and its employees will greatly suffer, as the net result is likely to be the demise of TOPS and the loss of jobs to 100+ employees. Because TOPS is likely to suffer irreparable harm, the Court should find that this element supports granting the TRO and then injunctive relief.

Third, do the balance of equities tip in favor of TOPS? The balance of equities may be determined by comparing the type and seriousness of harm to be suffered by the plaintiff and the type and seriousness of harm to be suffered by the defendant. *Winter*, 555 U.S. at 26. Here, if the injunctive relief is not granted, TOPS injury will be that the defendants and JABCO ABC, LLC liquidate all of JAB II's assets to pay off Allison Marine Holdings, LLC's creditors, which would likely leave nothing leftover to pay a judgment owed to TOPS. According to the testimony of Brent Boudreaux, the total amount of debt owed to Allison Marine's secured creditors is up to $19 million. Mr. Boudreaux also stated that, as of now, <u>Allison Marine</u> has no cash flow to make any payments to any of JAB II's creditors, including TOPS. If TOPS never gets paid any amount of the debt owed to it, over 100 employees would likely lose their jobs and a local company made up of hardworking individuals would likely be forced to stop operating. On the other hand, if the preliminary injunction is granted, the most serious injury that the defendants and JABCO ABC, LLC would face is a temporary hold on liquidating their assets and therefore, the secured creditors might have to wait a little longer to be paid. When comparing the two, TOPS faces a more serious injury than the defendants and therefore, the balance of equities tips in favor of TOPS.

Fourth, will granting the injunction be in the public interest? Granting the injunction to stop the defendants from quickly liquidating their assets supports the public interest of supporting local businesses, entering contracts in good faith, and preventing injustice to hardworking citizens, as well as discovering the type of manipulation, dishonest activity being perpetrated by the defendants. Denying the injunction would only serve the private interests of the defendants. Granting the injunction may temporarily inconvenience the defendants, but it could very well be the difference between a local business shutting down and over 100 employees being able to support their families.

Also, as the Court has already seen, there appears to have been a significant amount of deception and shenanigans, if not outright fraud, in how Boudreaux, JAB II, and Allison Marine Holding, LLC manipulated the negotiations for this contract with TOPS and even more so now as they try to siphon all of the assets including their payment for that job away from JAB II. This Court should not allow such bad behavior go unchecked.

The United States Court of Appeals for the Fifth Circuit has previously upheld an order granting a preliminary injunction freezing the defendants' assets. *Federal Sav. & Loan Ins. Corp. v. Dixon*, 835 F. 2d 554, 556 (5th Cir. 1987). In that case, the injunction "prohibited the defendants from disposing of any of their property or assets." *Id.* The trial court granted the injunction because it was "'reasonably necessary' in order to preserve the possibility of complete and meaningful relief at the conclusion of the litigation." *Id.* In upholding the injunction, the court of appeals stated that there is significant "flexibility of the equitable powers of federal courts." *Id.* Here, a preliminary injunction is reasonably necessary to preserve the possibility of complete relief at the close of litigation.

## IV. Conclusion

Based on the aforementioned reasons, TOPS respectfully asks the Court to grant it a Temporary Restraining Order until such time as a hearing can be conducted on its requested preliminary injunction, and to then grant TOPS's motion for a preliminary injunction against the defendants and JABCO ABC, LLC preventing them from liquidating the assets of JAB Energy Solutions II, LLC and/or Allison Marine Holding, LLC.

          Respectfully submitted,

          NALLEY AND DEW
          A Professional Law Corporation

          */s/George Nalley*
          _____
          GEORGE J. NALLEY, JR.      (9883)
          Suite 100
          2450 Severn Avenue
          Metairie, LA 70001
          (504) 838-8188
          Attorney for Turnkey Offshore Project Services, LLC

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have on this 21st day of July, 2021 served a copy of the foregoing pleading on counsel for all parties to this proceeding by email, facsimile, and/or by mailing the same by United States mail, properly addressed, and first class postage prepaid.

          */s/George Nalley*
          _____
          NALLEY AND DEW, APLC