**1**

1    UNITED STATES DISTRICT COURT

2    EASTERN DISTRICT OF LOUISIANA

3

4

5  TURNKEY OFFSHORE PROJECT    NO. 2:21-cv-00672
   SERVICES, LLC ("TOPS")
6  VERSUS                      JUDGE AFRICK

7  JAB ENERGY SOLUTIONS,       MAGISTRATE
   LLC AND BRENT BOUDREAUX     CURRAULT
8

9

10          *  *  *

11

12      Deposition of BRENT BOUDREAUX, taken in

13  the above-entitled cause, pursuant to the

14  following stipulation, before Ann M. Downs,

15  a Certified Court Reporter, authorized to

16  administer oaths of witnesses and to take

17  depositions, pursuant to Title 13 of the

18  State of Louisiana, given in the offices of

19  Nalley and Dew, APLC, 2450 Severn Avenue,

20  Suite 100, Metairie, Louisiana 70001, on the

21  13th day of July, 2021 commencing at 10:00

22  a.m.

23          *  *  *

24

25

---

**2**

1  APPEARANCES:

2

3  Representing Turnkey Offshore Project
      Services, LLC:
4
      NALLEY AND DEW
5      BY:  GEORGE J. NALLEY, JR., ESQ.
       2450 Severn Avenue, Suite 100
6      Metairie, Louisiana 70001

7

8

9  Representing JAB Energy Solutions,
   LLC and Brent Boudreaux:
10
      MILES THOMAS LAW, LLC
11     BY:  MILES CHANNING THOMAS, ESQ.
            PHILLIP ROBINSON, ESQ.
12     8011 Sycamore Street
       New Orleans, Louisiana 70118
13

14

15  Also Present: Jay Henderson
                 Dan Black
16               Ashlyn Mott
                 Collyn DuBose
17

18

19

20

21

22

23  REPORTED BY:

24
   ANN M. DOWNS
25  Certified Court Reporter

---

**3**

1        S T I P U L A T I O N

2      It is hereby stipulated and agreed by

3  and between all parties that the deposition

4  of BRENT BOUDREAUX is hereby being taken

5  pursuant to the Federal Rules of Civil

6  Procedure for all purposes.  That all

7  formalities of sealing, certification and

8  filing are hereby waived.  That the witness

9  reserves the right to read and sign the

10  deposition.  That all objections, save those

11  as to the form of the question and the

12  responsiveness of the answer are reserved

13  until the time of the trial of the cause.

14          *  *  *

15      BRENT BOUDREAUX, 119 Remington

16      Road, Montgomery, Texas 77316, a

17      witness having been first duly

18      sworn in the cause to tell the

19      truth, testified on his oath as

20      follows:

21  BY MR. NALLEY:

22  Q.  Mr. Boudreaux, my name is George Nalley.

23  I'm representing TOPS in this matter.  As you

24  know, we filed a lawsuit against you, JAB,

25  JAB II and Allison Marine now.  We're here to

---

**4**

1  take your deposition.  I assume you've been

2  deposed before; is that correct?

3  A.  Yes.

4  Q.  So you understand the basic guidelines

5  of what we're going to do but just a few

6  clarification points.  I'm going to ask you a

7  lot of questions today.  I'm pretty nosy and

8  I want a lot of information from you and

9  we'll probably be here most of the day on it.

10  If you need to take a break at any time, you

11  let me know.  We'll probably take a lunch

12  break if other people want to do that as

13  well.

14      I do need to have you answer all the

15  questions out loud, loud enough that I can

16  hear and Ann predominantly because she needs

17  to take everything down.  If at any time I

18  ask you a question you don't understand for

19  any reason, probably because I got it phrased

20  funny or I'm not familiar with the area, as

21  familiar as you are and it doesn't make any

22  sense to you, I ask that you let me know and

23  I'll rephrase it.  I'm telling you in advance

24  I'm not trying to trick you or confuse you

25  but I do want a lot of information from you,

**5**

1 okay?

2 A. Yep.

3 Q. Have you had any alcohol or drugs

4 prescription or nonprescription in the last

5 24 hours?

6 A. No.

7 Q. Is there any health reason that you have

8 that would prevent you from being able to

9 understand questions and formulate your

10 answers to them this morning?

11 A. No.

12 Q. What is your date of birth?

13 A. 1/21/71.

14 Q. And you gave the court reporter your

15 home address at the beginning?

16 A. Yes.

17 Q. And would you tell me, please, what your

18 education background is? I want to get some

19 personal information from you first here.

20 A. I have a master's degree in business

21 from Texas A&M.

22 Q. An Aggie, huh?

23 A. Engineering degree from McNeese State

24 University.

25 Q. When did you get your engineering

**6**

1 degree?

2 A. I graduated in '99.

3 Q. And your MBA?

4 A. 2006.

5 Q. What is your marital status?

6 A. Married.

7 Q. And what did you do when you first got

8 out of McNeese before you went back and got

9 your MBA?

10 A. I went to work for Global Industries.

11 Q. What did you do for Global Industries?

12 A. Project manager for their offshore

13 construction division.

14 Q. Where were you based out of?

15 A. Initially in Houma and then in Carlyss,

16 Louisiana.

17 Q. And how long did you stay with Global?

18 A. Approximately five years.

19 Q. And why did you leave there?

20 A. Better opportunity.

21 Q. And who did you go to work for?

22 A. Tetra Applied Technologies.

23 Q. What were you doing for Tetra?

24 A. Same, project engineer, project manager

25 for their offshore construction group.

**7**

1 Q. And I think I know what that job entails

2 but just so there isn't any misunderstanding

3 by me, what did you actually do day-to-day

4 for Global and Tetra?

5 A. Managed the derrick barge fleet, several

6 derrick barges operating in the Gulf of

7 Mexico, removing platforms and putting them

8 in. I planned and executed and managed those

9 jobs.

10 Q. And for Global, how many derrick barges

11 did you all have?

12 A. I was involved with three.

13 Q. At the same time or different times?

14 A. Pretty much the same time.

15 Q. And how about for Tetra?

16 A. I started out with one, ended up with

17 three.

18 Q. And how long were you with Tetra?

19 A. About four years.

20 Q. Same position the entire time?

21 A. No, I ended up when I left there, I was

22 the GM of that group.

23 Q. The GM what?

24 A. The GM of that group.

25 Q. And were you based in the Houma area?

**8**

1 A. No, I was based in Houston in the

2 Woodlands.

3 Q. I take it then you were getting your MBA

4 remotely?

5 A. I did the executive program.

6 Q. Long weekends?

7 A. Long weekends.

8 Q. And why did you leave Tetra?

9 A. Change of the guard, their business

10 model kind of changed a little bit and I

11 decided that I didn't want to be part of that

12 anymore.

13 Q. If I'm tracking the time period right,

14 that would be around 2008?

15 A. Around 2008.

16 Q. And where did you go next?

17 A. I spent a little time, I went to Chevron

18 as a consultant for a little while.

19 Q. In the Gulf of Mexico area?

20 A. Yes.

21 Q. And how long did you stay with Chevron?

22 A. Six months.

23 Q. And then what did you do?

24 A. In January of 2008, my partners and I

25 opened the door to JAB Energy Solutions, LLC.

9

1 Q.   At Global Industries, Tetra and Chevron,
2 did you leave all those jobs voluntarily?
3 A.   Yes.
4 Q.   When you say you and your partners
5 opened JAB Energy Solutions, LLC, who were
6 your partners that you opened it up with?
7 A.   Hank Robards, Steve Orlando and Allan
8 Vando.
9 Q.   What was the last one?
10 A.   Allan Vando.
11 Q.   And are all four of you all still
12 partners in JAB Energy Solutions, LLC?
13 A.   All four of them -- well, JAB Energy
14 Solutions, LLC doesn't exist as an operating
15 company.  It doesn't do business anymore if
16 you will.
17 Q.   When is that as of?
18 A.   As of October 2011.
19 Q.   Tell me what happened -- take me through
20 that.  You opened it in January of '08 with
21 the four of you, correct?
22 A.   Yes.
23 Q.   No other partners at that time?
24 A.   No.
25 Q.   All right.  And what was the objective

10

1 of JAB?
2 A.   JAB's business?
3 Q.   Yes, sir.
4 A.   JAB's business was to perform mainly
5 decommissioning plat -- well P&A and platform
6 removal operations for our clients acting as
7 a general contractor, as a GC.
8 Q.   What was the experience that Hank
9 Robards brought?
10 A.   To that business, not much.  He brought
11 capital.
12 Q.   And Steve Orlando?
13 A.   Same.
14 Q.   And Allan?
15 A.   Allan, I worked with Allan throughout my
16 entire career.
17 Q.   In similar capacity to what you were
18 doing?
19 A.   Yes.
20 Q.   And JAB's business between January of
21 '08 and October of 2011, take me through that
22 progress.  Was it good, bad?  Did you all
23 close it up in October of 2011 because no
24 business?
25 A.   No, it was real good.

11

1 Q.   Why did JAB cease doing business as of
2 that time?
3 A.   It was acquired, majority interest was
4 sold to a private equity group so change of
5 ownership.
6 Q.   And who was it sold to?
7 A.   Lincolnshire Management.
8 Q.   And where are they based out of?
9 A.   New York.
10 Q.   And do you and your original partners
11 still have any ownership interest in JAB?
12 A.   In which JAB?
13 Q.   Well, and that's a good question.  For
14 purposes today so that we can eliminate any
15 confusion on it, I'm going to talk about the
16 JAB, LLC that you formed in January of 2008
17 as JAB and then JAB II I'll refer to as the
18 entity, the other entity.  And if there's
19 another JAB entity out there that I don't
20 have on it, if you'll let me know and we'll
21 have to give them another name, okay?
22    MR. THOMAS:
23        So we had discussed just because
24    there is a potential for confusion that
25    we use full names if you don't mind.

12

1    MR. NALLEY:
2        That what?
3    MR. THOMAS:
4        That we use the full names of the
5    entities just because that is such an
6    integral issue in this case.
7 BY MR. NALLEY:
8 Q.   Okay.  Are there other JAB entities
9 other than JAB Energy Solutions, LLC and JAB
10 II?
11 A.   There only exists JAB Energy Solutions,
12 LLC and JAB Energy Solutions II, LLC.
13    MR. NALLEY:
14        Let's go off the record a second.
15        (Whereupon, a discussion was
16        held off the record.)
17 BY MR. NALLEY:
18 Q.   So JAB Energy Solutions, LLC was sold to
19 Lincolnshire Management in October of 2011,
20 correct?
21 A.   The majority interests of it, yes.
22 Q.   What was the majority percentage?
23 A.   60 percent.
24 Q.   And did you and your partners retain the
25 40 percent ownership?

Exhibit A

13

1 A.  It's more complicated than that.  We
2 retained ownership in a parent company so
3 there was more than one company sold to
4 Lincolnshire in 2008.
5 Q.  What companies other than JAB Energy
6 Solutions, LLC was sold to Lincolnshire?
7 A.  Tarpon Systems International, LLC.
8 Q.  I'm sorry, Tarpon?
9 A.  Tarpon Systems International, LLC,
10 Allison Marine Contractors, LLC, Allison
11 Offshore Services, LLC and I think Allison
12 Land, LLC.  I think that's correct on the
13 land piece of it.
14 Q.  Okay.
15 A.  And Allison Marine Morgan City, LLC.
16 There was another one.
17 Q.  Were you and your three partners the
18 sole owners of these five other entities that
19 you just described?
20 A.  No.
21 Q.  Did you have any ownership interest in
22 them?
23 A.  I did in Tarpon.
24 Q.  And what did Tarpon do?
25 A.  At the time, nothing.

14

1 Q.  What had it been set up to do?
2 A.  Tarpon is a patent of an offshore
3 platform, if you will, so it's a design of an
4 offshore platform.
5 Q.  And did you develop that design?
6 A.  No.
7 Q.  Did you purchase that from somebody?
8 A.  Yes.
9 Q.  And your three partners, did they have
10 any ownership interest in Tarpon?
11 A.  Steve and Hank did.
12 Q.  And when did you form Tarpon Systems?
13 A.  We purchased Tarpon Systems in 2009.
14 Q.  What about the four Allison entities
15 that you listed, did you have any ownership
16 interest in those?
17 A.  No.
18 Q.  Who were the owners of those entities?
19 A.  Steve and Hank owned various percentages
20 of them.  I'm not sure exactly.
21 Q.  So as of October 11th after the sale, 60
22 percent of JAB Energy Solutions, LLC had been
23 sold to Lincolnshire, correct?
24 A.  Yes.
25 Q.  And then how much of that entity did you

15

1 retain ownership of?
2 A.  It's not as simple as that again.  All
3 of those entities were sold to Lincolnshire
4 as a package deal.  They were bundled in a
5 transaction and sold to Lincolnshire.
6 Q.  I thought you told me that Lincolnshire
7 only bought 60 percent of JAB Energy
8 Solutions, LLC.  Did I misunderstand that?
9 A.  You missed -- you asked the wrong
10 question.  They did buy that but the
11 transaction was all of those entities.  It
12 wasn't a single transaction.
13 Q.  I understand that.  You all being you
14 and your partners sold six entities to
15 Lincolnshire Management, correct?
16 A.  Correct.
17 Q.  And if I understood you, included in
18 that bundle of what was sold was 60 percent
19 of JAB Energy Solutions, LLC.  Did I
20 misunderstand that?
21 A.  Well, one of us misspoke.  I'm not sure
22 that that's the accurate -- I'm not sure that
23 that's accurate.
24 Q.  Okay.
25 A.  What is accurate is Lincolnshire owns 60

16

1 percent of the parent company which owns all
2 of the -- well, which owns all of the
3 interests -- I don't know if that's -- so
4 those six companies, five or six companies
5 were bundled up as one entity to make it look
6 like one company because they had some
7 synergies.
8 Q.  Which was called what?
9 A.  It wasn't called anything.  It was
10 called JAB Energy Solutions, LLC, Allison
11 Marine Contractors and so forth.
12 Q.  So it wasn't legally bundled.  You're
13 referencing as a package to be sold?
14 A.  It was a package to be sold as one.
15 Q.  But multiple independent entities?
16 A.  Multiple independent entities, that's
17 correct.
18 Q.  All right.
19 A.  All those entities were sold.
20 Q.  And Lincolnshire bought 60 percent of
21 that bundle?
22 A.  Of that bundle, yes.
23 Q.  So even though it's bundled as a bucket
24 of six companies --
25 A.  Right.

Exhibit A

17

1 Q.   -- was the entire JAB Energy Solutions,
2 LLC in that bucket that was sold or just 60
3 percent of it?
4 A.   Well, I'm not sure how the math works
5 out honestly.  I don't know.  I know what
6 stock I have today in the new company.  I'm
7 not sure how the math trickled down to say
8 that it's totally 60.  I'm not sure.
9 Q.   I'm assuming there was paperwork on this
10 transaction?
11 A.   In 2011, yes, a long time ago.
12 Q.   And do you have a copy of that paper-
13 work?
14 A.   Yeah.
15 Q.   I'm going to ask you to produce that to
16 your lawyer and we'll do a Request for
17 Production to get a copy of that because that
18 can be important as to how that was done on
19 it.
20      Let me see if I can back into this
21 because I'm not following exactly what you're
22 saying on it.  What do you currently own with
23 relation to JAB Energy Solutions, LLC?
24 A.   I'm honestly not sure.  I'm honestly not
25 sure of the percentage of JAB Energy

18

1 Solutions, LLC.
2 Q.   Currently who are the current owners of
3 JAB Energy Solutions, LLC?
4 A.   I'm honestly not sure of that either.
5 Q.   Who's the managing member of the LLC?
6 A.   There's no managing member.  I'm not
7 sure of that because it doesn't do business.
8 There's no business activity with JAB Energy
9 Solutions, LLC.  It exists solely for the
10 ownership of Allison Marine Holdings, LLC,
11 how the ownership flows through.
12 Q.   Does JAB Energy Solutions, LLC file tax
13 returns each year?
14 A.   Yes.
15 Q.   Who prepares those tax returns?
16 A.   Actually, yes.  Yes, they do.
17 Q.   Who prepares those tax returns?
18 A.   I think Mark Bohnet here in New Orleans.
19 Q.   Mark say again?
20 A.   Mark Bohnet.
21 Q.   How do you spell his last name?
22 A.   B-O-H-N-E-T.
23 Q.   And which firm is he with?
24 A.   I'm not sure of the firm.
25 Q.   Where is he located?

19

1 A.   Here in New Orleans.
2 Q.   Do you have copies of the tax returns
3 for JAB Energy Solutions, LLC?
4 A.   I have the K-1 that flows to Brent
5 Boudreaux.
6 Q.   But not the actual return itself?
7 A.   I'm not sure that I get the return.  I
8 don't know that I need it.  I don't know that
9 my CPA needs it.
10 Q.   Who is your CPA?
11 A.   Derrick Trahan.
12 Q.   Where is he located?
13 A.   Sulpher.
14 Q.   Do you know which firm he's with?
15 A.   He's with Mancuso -- McMullen, Mancuso &
16 Trahan.
17 Q.   How long has he been doing your returns?
18 A.   Forever.
19 Q.   I was going to wait till later to get to
20 this but we're already kind of knee deep in
21 it.  Walk me through the relationship
22 structure between Allison Marine, JAB Energy
23 Solutions, LLC and JAB Energy Solutions II,
24 LLC.
25 A.   That's kind of broad on the question.

20

1 Q.   Agreed.  If you were going to do a flow
2 chart of how those companies are inter-
3 related, what would you do?
4 A.   Of which companies again?
5 Q.   JAB Energy Solutions, LLC, JAB Energy
6 Solutions roman numeral 2, LLC and Allison
7 Marine I guess Holding or Allison Marine --
8 A.   Be specific.  There's a lot of Allison
9 Marines.
10 Q.   Both of them.
11 A.   Which ones?
12 Q.   Allison Holding and Allison Marine.
13 A.   Again be specific.  There's -- I named
14 six of them there so --
15 Q.   Let me back it up this way.  Do you have
16 any ownership interest in any of the Allison
17 Marine entities?
18 A.   Technically I have ownership in
19 Holdings, Allison Marine Holdings, LLC.
20 Q.   And when you say technically, what do
21 you -- that seems to me to be an are-you-
22 pregnant-or-not question.  You either are or
23 aren't.  Do you own interest or do you not
24 own interest?
25 A.   Well, you're asking pretty vague

Exhibit A

**21**

1 questions. All I am asking is if you just
2 be specific because it's kind of convoluted.
3 Q. It's very convoluted, okay?
4 A. Yeah.
5 Q. But you all set the structure up. I
6 didn't. I'm trying to understand it.
7 A. Well, Kirkland and Ellis set it up. I
8 didn't neither, okay?
9 Q. At a very modest price I'm sure.
10 A. At a very modest price along with KPMG
11 so yeah.
12 Q. Allison Marine Holdings, LLC, do you own
13 any interest in that?
14 A. Yes.
15 Q. What ownership interest do you have in
16 Allison Marine Holdings, LLC?
17 A. 7 percent and some change.
18 Q. And how long have you owned that
19 interest?
20 A. Since October 2011.
21 Q. Do you know who the other owners of
22 Allison Marine Holdings, LLC is or are?
23 A. I think I know them. I don't know all
24 the percentages.
25 Q. That's fine.

**22**

1 A. I'm pretty sure I know all of them.
2 Q. Okay. Who else?
3 A. Lincolnshire Management, Steve Orlando,
4 Hank Robards, Allan Vando, Dallas Davis.
5 Q. I'm sorry, first name?
6 A. Dallas Davis, Kenny Cefalu and Bill
7 Jackson.
8 Q. Is there a managing member of that
9 group?
10 A. There's a board of directors.
11 Q. Who are on the board of directors?
12 A. Myself, Hank and Lincolnshire, I think
13 three from Lincolnshire.
14 Q. To your knowledge, what is Allison
15 Marine Holdings' business?
16 A. Allison Marine Holdings doesn't
17 technically have a business. They own
18 companies. They're the parent company.
19 Q. Are they the parent company or have any
20 ownership interest in JAB Energy Solutions,
21 LLC?
22 A. No.
23 Q. Do they have any interest, ownership
24 interest in JAB Energy Solutions roman
25 numeral 2, LLC?

**23**

1 A. Yes.
2 Q. And what is their ownership interest?
3 A. A hundred percent.
4 Q. When did they acquire a hundred percent
5 interest of the JAB II entity?
6 A. October 2011.
7 Q. When was JAB Energy Solutions roman
8 numeral 2 established?
9 A. 2011, October 2011.
10 Q. As part of that transaction with
11 Lincolnshire?
12 A. That's correct.
13 Q. What was the purpose of JAB II?
14 A. Well, the transaction was an asset sale
15 so Lincolnshire did not buy the companies of
16 any one of those so you had to establish new
17 companies, and that's what the management
18 team and board of directors or Lincolnshire I
19 guess, Kirkland and Ellis and KPMG decided
20 would be the easiest solution to have a name
21 of a company.
22 Q. Did JAB Energy Solutions II have any
23 assets at that point?
24 A. Yeah.
25 Q. What assets did it have at that point?

**24**

1 A. It had cash.
2 Q. Ballpark as the amount of cash?
3 A. No idea.
4 Q. Where did JAB Energy Solutions II get
5 the cash if it was just formed as part of
6 that transaction?
7 A. Well, again it was a purchase of a
8 company or a purchase of assets of a company
9 so you bought the assets of JAB Energy
10 Solutions, LLC.
11 Q. Who bought it?
12 A. Technically I suppose Allison Marine
13 Holdings, LLC.
14 Q. Was Allison Marine Holdings, LLC formed
15 in October of 2011?
16 A. Yes.
17 Q. And what was your understanding of why
18 Allison Marine Holdings, LLC was being
19 formed?
20 A. To own the entities that we just
21 discussed, Allison Marine Contractors II,
22 LLC, Tarpon Systems International II, LLC,
23 JAB Energy Solutions II, LLC, Allison
24 Offshore Services II, LLC, Allison Marine
25 Morgan City II, LLC I believe and potentially

**Exhibit A**

25

1 Allison Land. I'm not sure about that one.
2 Q. And you mentioned earlier it was an
3 asset sale so they were just -- Allison
4 Marine Holdings was just buying the assets
5 from those entities, not the entities them-
6 selves?
7 A. Not the names of them, correct.
8 Q. So all of those various entities that
9 you just named off now are still out there as
10 entities with names but no assets; is that
11 correct?
12 A. I don't know that all of them exist.
13 I'm not sure.
14 Q. The day after this transaction, they
15 existed simply as shell companies without
16 assets at that point?
17 A. I'm not sure on the dates. I don't
18 know. I know JAB Energy Solutions, LLC still
19 has a name out there, still registered, does
20 not do any business, still exists because
21 that's where my ownership in Allison Marine
22 Holdings lies.
23 Q. When you all did this transaction in
24 October of 2011 and Allison Marine Holdings
25 purchased all of these assets, do you know

26

1 what the purchase price was for all of that?
2 A. Yeah.
3 Q. What was it?
4 A. A hundred percent was 82 million dollars
5 and some change. I'm not sure of the exact
6 number.
7 Q. And did you have to put up capital or
8 payment towards that 82 million dollars?
9 A. No.
10 Q. What did you contribute to this deal to
11 get your 7 percent ownership interest?
12 A. Well, I had already -- I owned JAB
13 Energy Solutions, LLC and I owned a portion
14 of Tarpon Systems, LLC so I was an owner.
15 Q. So you contributed your ownership
16 interest or you agreed to the sale of your
17 ownership interest in those various assets in
18 exchange for 7 percent of the new holding
19 company?
20 A. Correct.
21 Q. And would the same have been true for
22 Steve, Hank and Allan and the others?
23 A. Correct.
24 Q. And after that transaction took place,
25 were these six or seven entities that you

27

1 talked about before that were included in
2 that transaction including JAB Energy
3 Solutions, LLC, were they left with any
4 unpaid liabilities after that transaction
5 occurred?
6 A. No.
7 Q. So there were no debtors or creditors or
8 vendors owed money by any of those entities
9 after that transaction took place?
10 A. No.
11 Q. After that October 2011 transaction, has
12 JAB Energy Solutions, LLC transacted any
13 business?
14 A. No.
15 Q. It is still a viable entity or in good
16 standing; is that correct?
17 A. Yes.
18 Q. Do you know why you all have left it in
19 good standing?
20 A. It's where my ownership -- it's where
21 mine and Allan's, I'm not sure about the
22 rest, our ownership lies in Allison Marine
23 Holdings, LLC for tax purposes during the
24 transaction because we had -- there was six
25 companies with different interests, different

28

1 ownership interests. Between Kirkland and
2 Ellis and KPMG, they determined to structure
3 it for tax reasons and to have ownership flow
4 through Allison Marine Holdings. My owner-
5 ship and Allan's ownership had to stay in JAB
6 Energy Solutions II or excuse me, JAB Energy
7 Solutions, LLC.
8 Q. Okay. So is your 7 percent in Allison
9 Marine Holdings owned by Brent Boudreaux
10 personally or owned by JAB Energy Solutions,
11 LLC?
12 A. That's a good question. Technically I
13 don't know the answer.
14 Q. Every now and then I get lucky.
15 A. I don't know the answer to that. I
16 don't know. It's I don't know.
17 Q. Let me ask you this. Do you get paid --
18 over the last 10 years, have you received any
19 dividend checks or payments from Allison
20 Marine Holdings, LLC?
21 A. Over the last 10 years, yes.
22 Q. When you get a K-1 -- I assume you get a
23 K-1 from Allison Marine Holdings every year.
24 A. I get it from JAB Energy Solutions, LLC.
25 Q. And that's what was going to be my next

**29**

1 question. Do you know whether JAB Energy
2 Solutions, LLC gets a K-1 then from Allison
3 Marine each year?
4 A. Allison Marine Holdings, LLC.
5 Q. Yes, sir.
6 A. Yes, provides JAB Energy Solutions, LLC
7 with a K-1.
8 Q. And then JAB Energy Solutions, LLC in
9 turn issues a K-1 to you individually,
10 correct?
11 A. That is correct.
12 Q. As to Allan as well?
13 A. That's correct.
14 Q. Anybody else?
15 A. I'm not sure.
16 Q. And is the K-1 that is issued by Allison
17 Marine to JAB Energy Solutions, LLC the same
18 amount as the K-1 that is issued by JAB
19 Energy Solutions, LLC to you or are there
20 expenses and benefits like health insurance
21 or other things that are paid by JAB Energy
22 Solutions on your behalf?
23 A. I'll answer the last part. Nothing is
24 paid by JAB Energy Solutions, LLC, zero
25 expenses.

**30**

1 Q. Okay.
2 A. What's the other question?
3 Q. So I assume then that the K-1s when we
4 get those from Allison Marine to JAB Energy
5 Solutions will match the K-1 issued by JAB
6 Energy Solutions to you personally?
7 A. The totals will match.
8 Q. Yeah, the dollars.
9 A. It won't match dollar-for-dollar to
10 Brent but the totals will match.
11 Q. Why will they not match if there are not
12 expenses --
13 A. Because there are separate partners.
14 You would have to add Allan's in.
15 Q. Okay. My mistake, correct. But there's
16 no -- as you indicated, there's no expenses
17 being paid by JAB Energy Solutions, LLC --
18 A. No.
19 Q. -- over the last 10 years. So the
20 entire amount paid by Allison Marine to that
21 entity flows through then to the partners of
22 JAB Energy Solutions, LLC?
23 A. The total amounts will be the same, the
24 paids.
25 Q. I'm going to come back to this because I

**31**

1 want to get into a similar discussion of JAB
2 II but before I do that, I want to clarify
3 something. How are you currently employed?
4 A. By JAB Energy Solutions II, LLC.
5 Q. And how long have you been employed by
6 JAB Energy Solutions II, LLC?
7 A. Since October of 2011.
8 Q. And what is your title or position?
9 A. I'm the president of JAB Energy
10 Solutions II, LLC.
11 Q. And what do you do as president on a
12 day-to-day basis?
13 A. Everything, I wear every hat.
14 Q. I understand that because I'm the
15 president of this law firm and I take the
16 trash out in the evenings.
17 A. Absolutely.
18 Q. So when you say all aspects, what is it
19 that you actually do? You negotiate deals
20 obviously?
21 A. Primarily, yeah. I work with the
22 clients and vendors to negotiate either
23 contracts to perform work or pricing to have
24 work done, handle a lot of the aspects of our
25 HR. I do bidding, I do some project manage-

**32**

1 ment, not a lot of it but some.
2 Q. And who are the other officers of JAB
3 Energy II, LLC?
4 A. I don't believe there's any other
5 officers of JAB Energy Solutions II, LLC.
6 Q. And where is JAB Energy II, LLC
7 incorporated?
8 A. In Delaware.
9 Q. And where is its corporate headquarters?
10 A. In Houston or actually Shenandoah I
11 guess now.
12 Q. What is the street address?
13 A. (No response).
14 Q. 1922 I-45 South?
15 A. Yes, 19221, right? Yeah, I-45 South,
16 Shenandoah, Texas.
17 Q. Suite 324?
18 A. Suite 324.
19 Q. And there are no other officers you
20 said?
21 A. Officers?
22 Q. Yes, sir.
23 A. No, not to my knowledge.
24 Q. And that has been true since October of
25 2011?

Exhibit A

33

1 A.   That's correct.
2 Q.   How many employees does JAB Energy II,
3 LLC have?
4 A.   Today?
5 Q.   Yes, sir.
6 A.   Five.
7 Q.   Who are the other employees?
8 A.   Let me back up.  We'll have more than
9 five.  We'll probably have today, as of today
10 nine or ten.  As of two weeks from now, we'll
11 have five.  Several have been let go.  You
12 want names of all of them?
13 Q.   Yes, sir, and their positions.
14 A.   Allan Vando, senior project manager,
15 Greg Griffith, senior project manager, Johnny
16 Boudreaux, project superintendent, Todd
17 Landry, project superintendent, Tommy
18 Johnson, project manager.  Josh Towns,
19 project engineer, Becky Sandlin, admin,
20 Loretta Greenleaf, admin, Trent Mitchell.
21 Q.   I'm sorry, Becky Sandler and then who is
22 --
23 A.   Sandlin, L-I-N.
24 Q.   Okay.
25 A.   Loretta Greenleaf, admin, Trent

34

1 Mitchell, project superintendent, Roger
2 Williamson, project superintendent, Jason
3 Johnson, project superintendent.  That's more
4 than 10 I guess.
5     MR. THOMAS:
6         What was the one before Jason?  I'm
7 sorry to interrupt.
8     THE WITNESS:
9         Roger Williamson.
10 BY MR. NALLEY:
11 Q.   And who will be the five remaining ones
12 after this round of layoffs?
13 A.   Myself, Allan, Craig, Johnny, Todd and
14 Becky.
15 Q.   And you said Becky and Loretta were
16 admin?
17 A.   Admin.
18 Q.   What does that encompass?  Is it
19 secretaries?
20 A.   Secretarial.
21 Q.   Do they have any other functions?
22 A.   We all have a lot of functions but
23 they're secretarial.
24 Q.   I was asking you about who you're
25 employed by and you told me JAB Energy II,

35

1 LLC.  Are you a payroll employee?
2 A.   Yes.
3 Q.   And so I assume you get a W-2 at the end
4 of each year?
5 A.   Yes.
6 Q.   Are you paid any bonuses from JAB Energy
7 II?
8 A.   From time to time.
9 Q.   How about dividends?
10 A.   From JAB Energy Solutions II?
11 Q.   Yes, sir.
12 A.   No.
13 Q.   Are you employed by or do you have an
14 employment relationship with anybody other
15 than JAB Energy II?
16 A.   No.
17 Q.   So any connection with Allison, any of
18 the Allison entities would not be on a pay-
19 roll basis?
20 A.   That's correct.
21 Q.   Other than as a 7 percent owner of
22 Allison Marine Holdings, LLC, do you have any
23 other business association with them for
24 which you're compensated?
25 A.   For which I'm compensated?

36

1 Q.   Yes, sir.
2 A.   No.
3 Q.   What other businesses are located in the
4 office suite where JAB Energy Solutions II,
5 LLC operates?
6 A.   Allison Marine Holdings.
7 Q.   Okay.  And what employees of Allison
8 Marine Holdings, LLC work out of that office?
9 A.   Sonda Robertson, CFO, and Roger Reyes,
10 accounting.
11 Q.   I'm sorry?
12 A.   Roger Reyes, senior accountant I guess
13 is his title.
14 Q.   Okay.
15 A.   That's it.
16 Q.   Anyone else?
17 A.   Huh-uh, no.
18 Q.   Do you have a business card?
19 A.   Not with me, no, sir.
20 Q.   Do you have them that you provide to
21 people, to customers and stuff?
22 A.   Yes.
23 Q.   I'm going to ask that you produce one of
24 those to your lawyer.
25 A.   Yes.

Exhibit A

**37**

1 Q. I would like to get a copy of that as
2 well. What does your business card say?
3 What is your title on it?
4 A. There's no titles on them.
5 Q. What company is listed?
6 A. JAB Energy Solutions, I don't know that
7 it says II. I think it just says JAB Energy
8 Solutions.
9 Q. And has that been true the entire time
10 you've had those business cards?
11 A. Yes.
12 Q. But in fact, if I'm following this
13 correctly, you are not an employee of JAB
14 Energy Solutions, LLC, correct?
15 A. The card doesn't say JAB Energy
16 Solutions II, LLC.
17 Q. I understand.
18 A. It says JAB Energy Solutions.
19 Q. Going back to my question, though, is
20 you are not an employee of JAB Energy
21 Solutions, LLC, correct?
22 A. That is correct.
23 Q. Do you have an e-mail address?
24 A. I do.
25 Q. And what is that?

**39**

1 Q. And who provides that to the employees?
2 A. I'm not sure.
3 Q. Do you know if it is provided by
4 Allison?
5 A. I'm not sure.
6 Q. Who would have that information?
7 A. Sonda, S-O-N-D-A.
8 Q. What other employee benefits do you all
9 provide?
10 A. Health benefits I guess, insurance, I'm
11 not sure there's anything else.
12 Q. Do you have a company car?
13 A. No.
14 Q. Do you have a company expense account?
15 A. I've got a company credit card, yes.
16 Q. And who provides you the company credit
17 card?
18 A. I think the company, I guess it's JAB
19 Energy Solutions II, LLC. I don't know.
20 Actually I have a corporate card, an Allison
21 Marine Holdings corporate card.
22 Q. And who is that issued by?
23 A. (No response.)
24 Q. Is it a Visa, American Express?
25 A. American Express.

**38**

1 A. B. Boudreaux at JAB Energy Solutions dot
2 com.
3 Q. And how long have you had that e-mail?
4 A. Since 2008.
5 Q. When you and your partners formed JAB
6 Energy Solutions, LLC, correct?
7 A. Correct.
8 Q. And when the transaction occurred in
9 October of 2011, that did not change,
10 correct?
11 A. No, sir. They bought the assets.
12 That's an asset.
13 Q. Do you receive any compensation, cash
14 compensation, payroll, dividends, anything
15 from Allison Marine Holdings, LLC?
16 A. No.
17 Q. Do you have health insurance through
18 your company?
19 A. Yes.
20 Q. Which company provides the health
21 insurance?
22 A. JAB Energy Solutions II, LLC.
23 Q. Do you have a pension plan?
24 A. We do have a -- there is a 401(k). I'm
25 not part of it. I don't participate.

**40**

1 Q. And that is a --
2 A. Actually -- go ahead.
3 Q. If you would take the card back out for
4 a second on it if I can see that for a
5 minute.
6 A. (Witness complies.) This will confuse
7 you.
8 Q. I won't give it to my wife.
9     MR. NALLEY:
10         For the record, this is an American
11         Express corporate platinum card with
12         expiration of January 2022 with the name
13         of Brent Boudreaux on it indicating he's
14         been a member since 2013.
15 BY MR. NALLEY:
16 Q. And underneath Brent Boudreaux, Allison
17 Marine is listed, correct?
18 A. Correct.
19 Q. And we won't put the account number on
20 there.
21     MR. THOMAS:
22         Thank you.
23     MR. NALLEY:
24         What?
25     MR. THOMAS:

Exhibit A

**41**

1    Thank you.  I was getting ready to
2 --
3 BY MR. NALLEY:
4 Q.   I will jot it down for my purposes,
5 though.  I'll call you from Hawaii.  And
6 you've had this since 2013?
7 A.   I've had this one probably longer than
8 that.
9 Q.   Do you have any other corporate credit
10 cards?
11 A.   No, sir.  And that one is not an Allison
12 Marine Holdings credit card.
13 Q.   Who is at Allison Marine?
14 A.   It's a Steve Orlando credit card, Steve
15 Orlando, the owner of Allison Marine
16 Contractors, it was on his account and never
17 got changed.
18 Q.   I'm sorry, say that again.
19 A.   It's never been changed.  It was on
20 Steve Orlando's personal or his account as
21 the owner of Allison Marine prior to 2011 and
22 my card has never been changed.
23 Q.   How did that come about that you ended
24 up with that through Steve Orlando?
25 A.   Needed a credit card when we started JAB

**42**

1 Energy Solutions, LLC in 2008.
2 Q.   Okay.
3 A.   I got a card off of his account that he
4 had, his existing account.
5 Q.   You're confusing me there.
6 A.   I'm confused too.
7 Q.   You say his personal account but it has
8 Allison Marine on it.
9 A.   That he personally guaranteed.  He was
10 the owner of Allison Marine.
11 Q.   So he personally guaranteed it?
12 A.   Yes.
13 Q.   But it is an Allison Marine credit card?
14 A.   That is correct.
15 Q.   And you are an authorized credit card
16 user on that account?
17 A.   That is correct.
18 Q.   What do you use that credit card for?
19 A.   Travel or any expenses that I may have.
20 Q.   Related to your work with JAB Energy
21 Solutions II, LLC?
22 A.   Correct.
23 Q.   And just do you see that credit card
24 bill each month?
25 A.   Yes.

**43**

1 Q.   Ballpark what's the range of
2 expenditures?
3 A.   Because on that bill, our AT&T phone
4 bill in our office actually goes to that
5 credit card and a few other office charges,
6 it probably runs 25 hundred to 35 hundred a
7 month.
8 Q.   And where does that bill come in each
9 month?
10 A.   I'm not sure.
11 Q.   Does it come to you personally?
12 A.   No.
13 Q.   So somebody, one of these entities
14 receives it?
15 A.   Yeah, somebody receives it.  I don't
16 know.
17 Q.   Do you have to approve it?
18 A.   I approve it, yes.
19 Q.   And let's just walk that trail through a
20 little bit.  The credit card bill comes in.
21 Somebody, I assume one of your administrative
22 people open your mail?
23 A.   Yeah.
24 Q.   And they give it to somebody or do they
25 give it to you to approve?

**44**

1 A.   No, my admin takes -- for my expenses,
2 my admin takes the credit card bill and fills
3 out the JAB Energy Solutions II expense
4 report and then provides me with the report
5 and all the backup.  I give her receipts or
6 whatever and she cross checks it and fills
7 out my expense report.
8 Q.   And then when you've checked it, what do
9 you do with it?
10 A.   I give it to -- I give it back to her
11 and she inputs it in the system to be paid.
12 Q.   And who pays it?
13 A.   Sonda pays all the bills, the CFO.
14 Q.   I wrote it down here somewhere.  I don't
15 see it now.  She is the CFO of Allison
16 Marine?
17 A.   Holdings, LLC.
18 Q.   What's her last name again, I'm sorry?
19 A.   Robertson.
20 Q.   And that bill as you said is for the
21 expenses, travel, entertainment, whatever
22 that you have incurred while working -- while
23 doing the work of JAB Energy Solutions II,
24 LLC, correct?
25 A.   That's correct.

**Exhibit A**

45

1 Q.   Why is Sonda for Allison Marine paying
2 that bill then?
3     MR. THOMAS:
4         I'm sorry, can we do the same with
5     the Allison Marine companies?
6     MR. NALLEY:
7         Yeah, Allison Marine Holdings, LLC.
8     MR. THOMAS:
9         Thank you.
10    THE WITNESS:
11        Sonda is the CFO of Allison Marine
12    Holdings, LLC.  Allison Marine Holdings
13    is the owner of JAB Energy Solutions II,
14    LLC.  The accounting function, all of
15    the accounting function is handled at
16    Allison Marine Holdings as the owner of
17    the company.  We have no accounting
18    function at JAB Energy Solutions II,
19    LLC.
20 BY MR. NALLEY:
21 Q.   What do you define as the accounting?
22 A.   AP, receivables, payroll.
23 Q.   Employee benefits?
24 A.   Some employee benefits.
25 Q.   HR functions?

46

1 A.   Some HR, not a lot for JAB Energy
2 Solutions II, LLC.  Insurance, GL.
3 Q.   For the jobs?
4 A.   For the company.
5 Q.   I assume that would include the jobs you
6 perform, correct?
7 A.   Yeah, but they're not individually
8 insured.
9 Q.   So you carry a master insurance policy?
10 A.   Yes.
11 Q.   And that's handled by Allison Marine
12 Holdings, LLC?
13 A.   With all of the entities named, yes.
14 Q.   Does JAB Energy Solutions II, LLC have
15 its own checking account?
16 A.   Yes.
17 Q.   And so it has its own banking?
18 A.   Yes.
19 Q.   When Sonda pays your American Express
20 bill, is that bill paid on a JAB Energy
21 Solutions II or an Allison Marine Holdings,
22 LLC check?
23 A.   I don't know.
24 Q.   Same questions with regard to all of the
25 other issues.  If you get an invoice in from

47

1 a contractor for work that's been performed,
2 I'm assuming you would approve it.  You would
3 check it and approve it, correct?
4 A.   Correct.
5 Q.   Or one of the project engineers.  And
6 then that's forwarded on to Sonda to pay?
7 A.   Correct.
8 Q.   Do you know whether Sonda pays that on
9 an Allison Marine Holdings, LLC check or wire
10 transfer or is that paid on a JAB Energy
11 Solutions II check?
12 A.   All of our vendors are paid JAB Energy
13 Solutions II, LLC, out of that account.
14 Q.   What bank do you all use for JAB Energy
15 Solutions II?
16 A.   JD Bank.
17 Q.   JD Bank?
18 A.   JD Bank.
19 Q.   Where are they located?
20 A.   Out of Jennings and Lafayette I guess.
21 Q.   And other than a checking account, do
22 you have other bank, a bank account with
23 them?
24 A.   For --
25 Q.   For JAB Energy Solutions II?

48

1 A.   Not to my knowledge.
2 Q.   Does JAB Energy Solutions II have a line
3 of credit with any banks?
4 A.   No.
5 Q.   Or financial institutions?
6 A.   No.
7 Q.   Does JAB Energy Solutions II have lines
8 of credit or loans from Allison Marine?
9     MR. THOMAS:
10        Objection.  Which one?
11    MR. NALLEY:
12        Holdings, LLC.
13    MR. THOMAS:
14        Thank you.
15    THE WITNESS:
16        No.
17 BY MR. NALLEY:
18 Q.   When JAB Energy Solutions II is paid for
19 a job, and you get a check mailed to you,
20 where does that check go?
21 A.   It goes to JAB Energy Solutions II, LLC.
22 Q.   Processed I assume by Sonda again?
23 A.   Yes.
24 Q.   Since she's doing the accounting?
25 A.   Yes.

**Exhibit A**

49

1 Q. Is Sonda paid by -- let me ask you this?
2 Is Sonda an employee of JAB Energy Solutions
3 II?
4 A. No.
5 Q. Is she paid anything by JAB Energy
6 Solutions II for the services that she
7 provides?
8 A. Personally?
9 Q. Yes, sir.
10 A. No.
11 Q. Does JAB Energy Solutions II, LLC pay
12 Allison Marine Holdings, LLC any form of
13 compensation for any of the administrative
14 functions that they're performing?
15 A. Yes.
16 Q. Tell me what they're paid and how
17 they're paid.
18 A. Well, I'm not sure what they're paid.
19 Well, it actually changes I guess every year.
20 So the expenses of Allison Marine Holdings
21 are split between the companies so all of the
22 companies that Allison Marine Holdings owns
23 shares in the expense of Allison Marine
24 Holdings, LLC.
25 Q. Does Allison Marine Holdings, LLC

50

1 perform all of these administrative
2 functions, accounting, HR, the issues, the
3 ones we discussed earlier, for all of the
4 other companies that they're the holding
5 company for?
6 A. Yes.
7 Q. Are there any other entities within the
8 Allison Marine Holdings, LLC umbrella that
9 are headquartered in the same office suite
10 where you all are headquartered?
11 A. Yes.
12 Q. Which other ones are headquartered
13 there?
14 A. Tarpon Systems International II, LLC.
15 Q. Okay. That's it?
16 A. That's it.
17     MR. NALLEY:
18         I would like to take about a five-
19         minute break here on it if you don't
20         mind.
21             (Off the record 11:07 a.m.
22             Back on the record 11:19 a.m.)
23 BY MR. NALLEY:
24 Q. Ready, Mr. Boudreaux?
25 A. Yes, sir.

51

1 Q. Okay. Thank you. Who pays the rent on
2 your office suite for JAB Energy Solutions
3 II, LLC?
4 A. JAB Energy Solutions II, LLC.
5 Q. And do you pay it to the landlord or do
6 you pay it to Allison Marine?
7 A. The landlord.
8 Q. And do you all pay the full amount or
9 are you paying a portion of it and Allison
10 Marine is paying another portion?
11 A. I'm not sure. I'm pretty sure we pay
12 the full amount.
13 Q. And does Allison Marine reimburse you
14 all at all for that?
15 A. I do not think so.
16 Q. Do any of the other entities that are
17 housed, Tarpon -- I'm sorry, not any. Does
18 Tarpon Systems International reimburse you
19 anything for it?
20 A. No.
21 Q. Does Tarpon Systems International, LLC
22 pay any expenses, operating expenses or is it
23 simply holding, sitting there dormant?
24 A. It's not dormant. When it has operating
25 expenses, it pays its operating expenses.

52

1 Q. Do you have any other e-mails other than
2 the one you told me about before?
3 A. I think there's one that's a Tarpon
4 e-mail.
5 Q. Let me ask you more specifically, do you
6 have any e-mails that identify you as being
7 with JAB Energy Solutions II?
8 A. You've got my e-mail.
9 Q. And it does not mention JAB Energy
10 Solutions II specifically, correct?
11 A. No.
12 Q. I don't remember if I asked you this
13 before. Does JAB Energy Solutions, LLC have
14 any employees currently, actively currently?
15 A. No.
16 Q. Does JAB Energy Solutions, LLC have an
17 active checking account?
18 A. No.
19 Q. Does JAB Energy Solutions, LLC have any
20 credit facilities?
21 A. No.
22 Q. Does JAB Energy Solutions, LLC have any
23 accounts receivables or accounts payables?
24 A. No.
25 Q. Does JAB Energy Solutions, LLC have any

**Exhibit A**

53

1 operating activity at this point?
2 A.   No.
3 Q.   And has that been true since October of
4 2011?
5 A.   Yes.
6 Q.   Let's talk about Allison Marine
7 Holdings, LLC for a minute.  Other than being
8 -- it is the owner of JAB Energy Solutions II
9 you told me, correct?
10 A.   Yes.
11 Q.   How does Allison Marine Holdings, LLC
12 and JAB Energy Solutions II interact on a
13 daily basis?
14 A.   Other than I sit -- Sonda and I sit 15
15 feet from one another in the same office
16 space.
17 Q.   Do you have any interactions or dealings
18 with any other people who are owners of
19 Allison Marine Holdings, LLC regarding the
20 operations of Allison Marine Holdings, LLC?
21 A.   Well, I'm not sure I understand the
22 question.  Allison Marine Holdings, LLC
23 provides the accounting function for JAB so I
24 talk to Sonda pretty often about our
25 accounting, payables, receivables and

54

1 whatnot.
2 Q.   You mentioned earlier that you and some
3 of the other people are board members.  How
4 often do you all have board meetings?
5 A.   At least once a year, maybe a couple
6 times a year.
7 Q.   And where are those usually conducted?
8 A.   They've been in New York and they've
9 been in Houston.
10 Q.   And do you all publish minutes from
11 those meetings?
12 A.   I'm not sure about published minutes.
13 Q.   Does someone prepare minutes as to what
14 business has been transacted?
15 A.   There's some minutes, yeah, some
16 documentation.
17 Q.   And who keeps those?
18 A.   I believe Sonda.
19 Q.   Does the Allison Marine board get
20 involved in the decision-making or considera-
21 tion of projects that JAB Energy Solution II
22 is going to undertake?
23 A.   Day-to-day projects?
24 Q.   Yes, sir.
25 A.   Not generally.

55

1 Q.   On what occasion do they?
2 A.   Oh, if it's something that I don't have
3 the authority or capacity to undertake, then
4 the board is talked to about it.  But
5 generally speaking, if it's just the normal
6 course of business, I don't have to run it up
7 to the board.
8 Q.   What sort of things would be above -- I
9 don't mean this derogatorily but what would
10 be above your pay grade as far as projects
11 that needed to be reviewed or approved by the
12 board?
13 A.   Something abnormal so it would have to
14 be a fairly large project, you know, some-
15 where upward, you know, 20-, 30-million-
16 dollar-type project.  Some international
17 work, if any, were it to pop up would be
18 something I would confer with the board on.
19 Q.   Have there been large projects for which
20 you have consulted with the board on?
21 A.   Yeah, there have been a couple.  It's
22 been awhile.
23 Q.   Is there some specific threshold amount
24 that triggers that review?
25 A.   No.

56

1 Q.   Do you all make periodic reports,
2 monthly, quarterly, annually to the board as
3 to your business?
4 A.   Yes.
5 Q.   And how is that done?
6 A.   Well, verbally and via e-mails or, you
7 know, spreadsheets or whatnot, presentations.
8 Q.   And is that done on a project-by-project
9 basis or a time basis or what?
10 A.   Yeah, it's done periodically, you know.
11 More recently we're doing it more often,
12 almost weekly we're talking.
13 Q.   And tell me, when you're talking about
14 spreadsheets, what exactly are you reporting?
15 What data are you providing to the board?
16 A.   Me personally?
17 Q.   No, the JAB Energy Solutions II to the
18 board of Allison as to what you all -- what
19 JAB Energy Solutions II is doing?
20 A.   Well, would report on, you know, the
21 status of a project, status of where the
22 company lies at any given time whenever we
23 are having that discussion.  So maybe the
24 status of the projects, project or projects,
25 AP, receivables, any future work, what's the

**Exhibit A**

57
1 outlook.
2 Q.   And are those reports that you're
3 preparing yourself?
4 A.   In some cases.
5 Q.   Who else in the organization would
6 prepare them?
7 A.   In some cases Sonda works with me on
8 them.
9 Q.   Would she be involved in preparing any-
10 thing other than the AP part of it?
11 A.   Yeah, certainly.
12 Q.   What other aspects would she get
13 involved in?
14 A.   Whatever I ask her to.
15 Q.   What would that involve?  Give me some
16 examples of projects that you would get her
17 involved in.
18 A.   Well, not specifically in projects.  You
19 asked about a board presentation.
20 Q.   Yes, sir.
21 A.   So she would be involved in any material
22 related to a board presentation.
23 Q.   So she would be involved in preparing
24 presentations to the board with regard to the
25 status of ongoing projects?

59
1 A.   You would have to ask a lot -- there's a
2 lot smarter people than I am that set that
3 up.
4 Q.   Who might that be?
5 A.   Kirkland and Ellis, KPMG.
6 Q.   Did you question why they were setting
7 it up that way when you were involved in it?
8 A.   Of course not.
9 Q.   You talked earlier about Steve Orlando.
10 What involvement does he have with Allison
11 Marine Holdings, LLC?
12 A.   None currently.
13 Q.   When was the last time you're aware of
14 him having some?
15 A.   Involvement?
16 Q.   Yes, sir.
17 A.   Daily involvement?
18 Q.   Yes, sir.
19 A.   Oh, it's been awhile.
20 Q.   Awhile can mean a lot of different
21 things.  What does it mean to you?
22 A.   More than a year.
23 Q.   When he was involved, what did he do?
24 A.   For what?
25 Q.   On a daily basis?

58
1 A.   From a financial perspective, yes.
2 Q.   Okay.  And she would be involved in
3 presentations being prepared by JAB Energy
4 Solutions II for submission to the Allison
5 Marine Holdings, LLC board for future work
6 and projects that you all were trying to
7 secure?
8 A.   It would normally be in one big
9 presentation encompassing all of the
10 companies.
11 Q.   And she would be actively involved in
12 that with you?
13 A.   Absolutely.
14 Q.   Working hand-in-hand with you?
15 A.   Sure, as a CFO would be.
16 Q.   And you said she was the CFO of Allison
17 Marine Holdings, LLC.  It sounds like she in
18 essence is serving the function as the CFO of
19 JAB Energy Solutions II, LLC in substance if
20 not in name.  Is that a fair statement?
21 A.   Our accounting function is held at
22 Allison Marine Holdings, LLC, the total
23 accounting function.
24 Q.   Do you know why you all set that up to
25 do it that way?

60
1 A.   For who?
2 Q.   For Allison Marine Holdings, LLC.
3 A.   Honestly I'm not sure.
4 Q.   Has Steve Orlando had any involvement on
5 a day-to-day basis in the operation of JAB
6 Energy Solutions II?
7 A.   No.
8 Q.   The checks that are issued on behalf of
9 JAB Energy Solutions II, who signs those?
10 A.   Sonda.
11 Q.   Is she the only one with check-signing
12 privileges?
13 A.   I think I have it.
14 Q.   When was the last time you signed any
15 checks for the company?
16 A.   It's been awhile.
17 Q.   Again more than a year?
18 A.   Yes.
19 Q.   Would it be a correct statement that for
20 the operation of JAB Energy Solutions II,
21 Sonda signs all of the checks effectively
22 although you may have check or you believe
23 you have check-signing privileges but it's
24 not something you exercise on a regular
25 basis?

**61**

1  A.   Yes.
2  Q.   Does Sonda as the CFO of Allison have a
3  right to approval or disapprove expenditures
4  by JAB Energy Solutions II?
5  A.   Not for JAB Energy Solutions II.
6  Q.   Do you know what the current capital
7  amount would be that is in JAB Energy
8  Solutions II, LLC?
9  A.   No.
10 Q.   Do you know what the current checking
11 account balance would be?
12 A.   No.
13 Q.   I assume that would be Sonda?
14 A.   Yes.
15 Q.   Do you know whether JAB Energy Solutions
16 II has any credit lines at the current time?
17 A.   Yes.
18 Q.   And do they?
19 A.   Any debt?
20 Q.   Credit, yes.
21 A.   Debt, yes.
22 Q.   And who is the debt owed to?
23 A.   GarMark.
24 Q.   I'm sorry?
25 A.   GarMark and Castlegate.

**62**

1  Q.   And who are they?
2  A.   And effectively it will be JD Bank as
3  well.
4  Q.   Who is GarMark?
5  A.   A lender.
6  Q.   Where are they based out of?
7  A.   Oh, I'm not sure.
8  Q.   Is that a bank or an independent
9  financial institution?
10 A.   Independent financial.
11 Q.   Do you know how much is owed to them?
12 A.   Over three million dollars.
13 Q.   And what does that debt arise out of?
14 A.   Borrowed money.
15 Q.   For what purposes?
16 A.   For operations.
17 Q.   And how long has that debt been owed?
18 A.   It's two or three years old, two
19 probably, two years old.
20 Q.   Two years old?
21 A.   Probably two years.
22 Q.   And was that debt secured to perform a
23 specific project?
24 A.   No.
25 Q.   What was the three million dollars used

**63**

1  for then for operating expenses?  If it
2  wasn't on a specific project, what was it
3  being used for?
4  A.   It was for operating expenses.  The debt
5  is at the Holdings level that JAB Energy
6  Solutions II has secured for all of the
7  companies have secured it.
8  Q.   I'm sorry, I don't understand that on
9  it.  Can you explain that to me?
10 A.   Well, probably not.  So the debt is
11 Allison Marine Holdings secured by JAB Energy
12 Solutions II, LLC, Allison Marine Contractors
13 II, LLC, and so forth down the line.  So that
14 debt is at the Holdings level secured by all
15 of the assets, receivables, everything is
16 pledged of all of the entities.
17 Q.   This is the problem with me talking to
18 somebody who has an MBA on it.  You're at a
19 level above mine so I'm going to try to
20 stumble through this with you a little bit.
21     So who is the actual -- who has signed
22 off on the three-plus million dollars of debt
23 owed to GarMark?  Is it Allison Marine?  Is
24 it JAB Energy Solutions II or is it all of
25 the above?

**64**

1  A.   Effectively it's all of the above.  I'm
2  not sure how the loan agreement actually
3  reads because I haven't read it but
4  effectively, it's all of the companies have
5  pledged the collateral and assets to that
6  debt.
7  Q.   And you believe that JAB Energy
8  Solutions II signed off on that as well or is
9  obligated as well?
10 A.   Certainly obligated as well.
11 Q.   And did JAB Energy Solutions II receive
12 two-plus years ago a check or a line of
13 credit for the three million dollars?
14 A.   No.
15 Q.   Or did that go to Allison Marine
16 Holdings?
17 A.   Allison Marine Holdings.
18 Q.   And in return, as part of that, JAB
19 Energy Solutions II was then required to
20 assign over or sign off its assets as
21 collateral towards that loan?
22 A.   No, Allison Marine Holdings signed off
23 its assets to that loan and its assets are
24 JAB Energy Solutions II, LLC, Tarpon Systems
25 International II, LLC, Allison Marine

**Exhibit A**

**65**

1 Contractors II, LLC, Allison Industrial
2 Services, LLC, Allison Offshore Services II,
3 LLC and I think Allison Land.
4 Q. Did that arrangement include accounts
5 receivables that the various entities
6 including JAB Energy Solutions II would be
7 receiving until that loan was paid off?
8 A. That is correct.
9 Q. Do you recall or do you know --
10 A. Those loans were paid off.
11 Q. I'm sorry?
12 A. Those loans so it's not just GarMark,
13 it's all of them. It's Castlegate and
14 GarMark.
15 Q. Yeah, we're going to talk about the
16 other one. I'm just trying to keep it as
17 simple as I can.
18 A. Okay.
19 Q. To your knowledge, is that three-
20 million-dollar debt still owed to GarMark?
21 A. Yes.
22 Q. So for the past two years, any accounts
23 receivable coming into JAB Energy Solutions
24 II were I'm going to say liened but were
25 obligated or dedicated as collateral towards

**66**

1 the payment of this loan with GarMark?
2 A. It doesn't work that way.
3 Q. Okay. How does it work?
4 A. Well, they -- you're asking me for a
5 lesson and I'm not a banker.
6 Q. Okay. Let me ask you this. What is
7 your understanding of how it works?
8 A. So as a business, the company is an
9 operating entity. The companies operate. So
10 until such time as you are not making
11 payments or have breached the loan agree-
12 ments, normally the bank doesn't take the
13 receivable from you, right, even though they
14 can. They can take that receivable.
15 Q. Right.
16 A. At whatever point it's determined by the
17 bank that you're in breach of your loan
18 agreement, then they have options. Part of
19 those options is taking receivables.
20 Q. So for the past two years, GarMark has
21 not seized the accounts receivables of JAB
22 Energy Solutions II because that loan is
23 being serviced satisfactorily but they have
24 the ability to do so, correct?
25 A. That would be correct.

**67**

1 Q. Do you know what the balance -- is the
2 balance still three-plus million?
3 A. I'm not sure the exact balance but yes,
4 it's in that range.
5 Q. And then you said the other was -- what
6 was the name of the other bank?
7 A. Castlegate.
8 Q. And is that also a financing company as
9 opposed to a bank?
10 A. Yes.
11 Q. And what amount is owed to them?
12 A. North of 10 million, I think it's close
13 to 15 actually.
14 Q. And is the arrangement with them the
15 same as what you've just been describing to
16 me for GarMark?
17 A. Yes, same type of loan agreement.
18 Q. I'm sorry?
19 A. Same type of loan agreement.
20 Q. And when was that loan for the 10 to 15
21 million dollars secured?
22 A. That's an old loan. That's probably a
23 2011 loan and the balance is now 10 to 15,
24 somewhere in that range.
25 Q. Are there any other debts that you're

**68**

1 aware of to which JAB Energy Solutions II is
2 obligated in one manner or another to pay?
3 A. There's one for JD Bank.
4 Q. And how much is that one for?
5 A. It's going to be a million and some
6 change.
7 Q. And when was that one secured?
8 A. I'm not sure.
9 Q. In the last two years?
10 A. Yeah, fairly recently.
11 Q. And is that loan similar -- is it set up
12 in the same manner as how you've described
13 for GarMark?
14 A. As far as I know.
15 Q. Did JAB Energy Solutions II receive any
16 cash infusion directly from that one million
17 dollar loan?
18 A. Well, that loan -- that loan is part of
19 the PPP program that wasn't forgiven.
20 Q. Now you jumped to Page 7 of my notes so
21 we can just go right to that. Which of these
22 entities that you're associated with, JAB
23 Energy Solutions II, Allison Marine Holdings,
24 LLC or any of the other entities applied for
25 PPP?

69

1 A.  Allison Marine Holdings, LLC.
2 Q.  Were you involved in that application?
3 A.  No.
4 Q.  And how much did they apply for and
5 receive?
6 A.  On the first go-around, I don't remember
7 what was applied for but they received right
8 at five million dollars.
9 Q.  And what about on the second go-around?
10 A.  I'm not sure what was applied for but
11 right around two million dollars.
12 Q.  And that was done by Allison Marine
13 Holdings, LLC?
14 A.  Yes.
15 Q.  And do you know, did you see that
16 application?
17 A.  I don't remember seeing the application.
18 Q.  And what was done with that money?
19 A.  Exactly what it's allowed for, payroll.
20 Q.  What?
21 A.  Payroll.
22 Q.  When did you all receive the five
23 million?
24 A.  I guess it was in 2020.  I'm not sure
25 when, June maybe.  I don't know.

70

1 Q.  And how about the two million?
2 A.  A month ago maybe.
3 Q.  I think I asked you this but don't see
4 where my notes are.  What employees does
5 Allison Marine Holdings have?
6 A.  Sonda and Roger.
7 Q.  Just the two of them?
8 A.  Mm-hmm, yes.
9 Q.  And how much is Sonda paid?
10 A.  Oh, I'm not sure.  I think her salary is
11 200, 225 maybe.
12 Q.  And how about Roger?
13 A.  Probably around 80.
14 Q.  And so just on the five million, what
15 was that money used for other than payroll,
16 anything?
17 A.  What's allowed under the PPP.
18 Q.  Let me ask you this question.  What did
19 Allison Marine Holdings use the five million
20 for?
21 A.  Payroll, rent and whatever other
22 expenses that Allison Marine Holdings saw fit
23 to use it for.  It was a loan so you can use
24 it for anything.
25 Q.  It's your understanding that it can be

71

1 used for anything?
2 A.  It absolutely can be.
3 Q.  Did Allison Marine Holdings, LLC use
4 that five million for anything other than
5 normal operating expenses of payroll, rent,
6 et cetera?
7 A.  Nothing other than normal operating
8 expenses of the business.
9 Q.  Did JAB Energy Solutions II apply for
10 any PPP money separately from Allison Marine
11 Holdings?
12 A.  No.
13 Q.  Have you all had to do any accounting or
14 reporting back to anyone with regard to the
15 use of that money, how you all spent it?
16 A.  Yes.
17 Q.  And how is that reporting been required
18 to be done?
19 A.  Well, the government requires whatever
20 they require.  I'm not sure the complete
21 answer to that question but whatever was
22 required under the PPP program was adhered to
23 and supplied to JD Bank for review.
24 Q.  And is that done by Sonda?
25 A.  Yes.

72

1 Q.  Were you involved in the preparation
2 of that at all?
3 A.  No.
4 Q.  What interaction does or let me ask you,
5 does JAB Energy Solutions II and Allison
6 Marine have any operational interaction on
7 any projects?
8 A.  Again when you say Allison Marine, what
9 are you referring to?
10 Q.  Well, I saw on the Allison Marine web
11 site, and I don't know that I have a copy of
12 it printed out, a -- I don't want to say an
13 advertisement but a web page talking about a
14 successful collaboration between JAB Energy
15 Solutions II and I'm going to say Allison
16 Marine but I don't know if it was one of
17 these entities or not individually on it,
18 talking about several successful projects
19 that you all were touting on it.  Are you
20 familiar with what I'm talking about?
21 A.  Yes.
22 Q.  Okay.
23 A.  So Allison -- from time to time, Allison
24 Marine Contractors II, LLC and Allison
25 Offshore Services, II, LLC and Tarpon Systems

Exhibit A

73

1 II, LLC and I guess Allison Industrial
2 Services, LLC from time to time contract each
3 other to do things. So JAB Energy Solutions
4 II, LLC could be given -- is awarded a
5 project and one of the vendors for that
6 project may, in fact, be Allison Marine
7 Contractors II, LLC depending on whether or
8 not that's a service that that company
9 provides. So there is interaction between
10 the companies at an arm's-length transaction.
11 Q. What does Allison Marine Contractors II
12 do?
13 A. Mainly fabrication.
14 Q. Platforms?
15 A. Yes.
16 Q. And where is that located?
17 A. In Amelia, Louisiana.
18 Q. And it's still an ongoing concern?
19 A. Correct.
20 Q. Who runs that?
21 A. Hank.
22     MR. NALLEY:
23         Off the record a second.
24             (Whereupon, a discussion was
25             held off the record.)

74

1 BY MR. NALLEY:
2 Q. With regard to JAB Energy Solutions II,
3 you told me early on a little bit about what
4 they do. In the last few years, what would
5 have been the types of projects that you've
6 been involved in?
7 A. Well P&A, offshore well P&A, offshore
8 platform removal, some construction and some
9 installation, offshore installation.
10 Q. Does JAB Energy Solutions II have any
11 manufacturing sites itself?
12 A. No.
13 Q. Do you have any employees or sites other
14 than those people who work in the office and
15 names that you told me about earlier, the
16 project engineers?
17 A. No.
18 Q. So everything that you all do on a
19 project that wouldn't be done by that group
20 of 9 or 10 people is contracted out?
21 A. That's correct.
22 Q. Let's talk for a second about the
23 project that TOPS was involved with which is
24 the basis of this lawsuit. When did Brent
25 Boudreaux get involved in that project?

75

1 A. Well, Brent Boudreaux got involved in
2 that project when JAB Energy Solutions II got
3 involved with that project.
4 Q. Okay.
5 A. Do you want to ask your question again?
6 Q. Yeah. When did Brent Boudreaux and JAB
7 Energy Solutions II get involved in that
8 project?
9 A. Probably as early as 2016, maybe even
10 '15.
11 Q. And kind of give me an overview of how
12 you got involved in it and what the scope of
13 what you were looking to do at that point
14 was.
15 A. That project, that particular location
16 was owned by a company called Black Elk
17 Energy. Black Elk Energy and JAB were doing
18 business together. They were a client.
19 Q. JAB?
20 A. Black Elk Energy was a client of JAB.
21 Q. Of JAB?
22 A. Energy Solutions II, LLC, thank you.
23 Q. Okay.
24 A. And that project was on the schedule to
25 be removed. Black Elk Energy went through a

76

1 bankruptcy. That project was part of the
2 bankruptcy. The project was ultimately
3 awarded in the bankruptcy to a company called
4 Montco.
5 Q. How do you spell that?
6 A. M-O-N-T-C-O.
7 Q. Okay.
8 A. That project was part of a larger, a
9 bunch of projects, a bunch of individual
10 projects. Montco failed to perform the work.
11 Montco went into bankruptcy. Black Elk got
12 the contract back from Montco and
13 subsequently awarded it to JAB Energy
14 Solutions II, LLC for High Island amongst 15
15 or 20 other projects.
16 Q. To JAB Energy Solutions II?
17 A. To JAB Energy Solutions II, LLC.
18 Q. Okay. And when did that happen?
19 A. '16-ish, '17, '16 I think.
20 Q. And were those all projects for the
21 removal of platforms?
22 A. For well P&A, pipeline abandonment,
23 platform removal, and site clearance of
24 offshore platforms.
25 Q. Of those, you said there were 15 or 16

Exhibit A

77

1 of them?

2 A.   It was a mess of them.

3 Q.   Did you all get those contracts for a
4 lump sum total or were there amounts for each
5 individual project?

6 A.   Amounts for each individual location.

7 Q.   And how did that come about?  Did you
8 all have to bid into the bankruptcy court or
9 what was the arrangement?

10 A.   Yes, it was submitted on a competitive
11 bid.

12 Q.   And were there other bidders for that
13 work as well?

14 A.   I'm not sure.

15 Q.   Of those -- and let's just call it 15, I
16 understand it might be a few more on it but
17 of those projects, how many of them have been
18 completed?

19 A.   All of them.

20 Q.   Of those projects that have been
21 completed, how many of them has JAB Energy
22 Solutions II been paid for?

23 A.   All but High Island 8370.

24 Q.   Of those 15 projects that have been
25 completed and paid for, other than this one,

78

1 how many of those still have either claims
2 or lawsuits brought by contractors who were
3 working for JAB Energy Solutions II on those
4 projects?

5 A.   None of them.

6 Q.   Is it your testimony then that this High
7 Island project is the only one for which
8 there are still outstanding debts owed to
9 contractors who performed work for JAB Energy
10 Solutions II?

11 A.   Yes.

12 Q.   And on this particular project, what was
13 the bid price by JAB Energy Solutions II for
14 this job?

15 A.   For all of High Island or --

16 Q.   For this particular platform that's in
17 question in this case.

18 A.   Understood, including the well P&A or
19 just the platform removal?

20 Q.   Why don't we do the entire thing first
21 and then we'll break it down.

22 A.   The entire thing was just around 9.6
23 million.

24 Q.   Okay.  And how was that broken down?

25 A.   3.8 for the well P&A and the rest for

79

1 the platform removal and site clearance.

2 Q.   And who did the well P&A work?

3 A.   A bunch of vendors.  I don't remember
4 all of them.

5 Q.   And were you all paid that 3.8 million?

6 A.   Yes.

7 Q.   And who paid you that?

8 A.   I'm not sure.  I'm sure you have the
9 letter agreement because it's going to be
10 very similar to the platform component that
11 you have in that letter agreement.

12 Q.   What are you referencing on that?

13 A.   The letter agreement for the payment of
14 the platform removal.  I think we provided it
15 to you.

16 Q.   Okay.  I have got a lot of documenta-
17 tion.

18 A.   Yeah.

19 Q.   What is your recollection of the sum and
20 substance of that agreement as to who is
21 making the payments?

22 A.   Well, that's what I'm saying.  There was
23 four or five entities and I don't remember
24 all of them and I don't want to tell you
25 incorrectly for who paid for the well P&A.

80

1 But if we had that agreement I could show you
2 that.

3 Q.   I think I have the documents.  Let me
4 make sure and I may not need to go through
5 this.  Are you talking about the agreement
6 laying out where there were multiple entities
7 including Talos?

8 A.   Yes.

9 Q.   And a few others?

10 A.   Yes.

11 Q.   There were about six entities I believe?

12 A.   That's correct.

13 Q.   And how did that arrangement -- how did
14 it come about that I'm going to call it six,
15 those six entities agreed to pay or were
16 committed to pay the 3.8 million for the P&A?

17 A.   That was either part of their ownership
18 in the platform or money that they've had as
19 bond collateral that was pledged for that
20 removal.

21 Q.   And what is your understanding with
22 regard to that P&A work?  Were you all paid
23 that money interim basis or were you paid
24 only upon completion?

25 A.   Upon completion.  And then you had to

Exhibit A

81

1 wait for it.
2 Q. And was it paid individually by those
3 entities in shares or was it paid by a
4 central source to you all?
5 A. Pretty much individually.
6 Q. Did you have to dun and harass them to
7 get your payment?
8 A. Yes, the last money didn't come in for
9 two years.
10 Q. When you submitted your bid for all of
11 this work, was it to the bankruptcy court
12 that you submitted it?
13 A. To the trustee.
14 Q. To the trustee? Okay. How did it get
15 from your bid to the trustee -- let me back
16 up. Was your bid submitted in toto for 9.6
17 or did you do the P&A and the platform
18 removal and site clearance separately?
19 A. Separately.
20 Q. So how did it get from you submitting
21 your bid to the trustee, let's talk about the
22 P&A first, for the 3.8 million to a letter
23 agreement as to how that was going to be
24 paid?
25 A. Well, it wasn't all separate. It was

82

1 all in one.
2 Q. I'm not sure. What do you mean by that?
3 A. We can't just talk about the 3.8. It
4 was all together. It was one bid all
5 together.
6 Q. So you submitted the bid to the trustee
7 for the 9.6 million but for your purposes or
8 when you submitted it to the them, did you
9 break it down?
10 A. For both of them, my purposes and for
11 them.
12 Q. And they accepted that in toto?
13 A. That's correct.
14 Q. So how did it get from submitting that
15 bid to you getting a letter agreement
16 regarding how the 3.8 was going to be paid to
17 you by X dollars by one company, Y by another
18 company?
19 A. Lots of legal fees, lots of lawyers
20 involved, painstakingly.
21 Q. They got kids to support too, you know.
22 A. Yeah.
23 Q. Walk me through in general from your
24 perspective, what was that process on it?
25 A. Well, in general, we submitted a bid.

83

1 The proposal was acceptable so then the terms
2 of the agreement were negotiated, the terms
3 of the agreement meaning the indemnifications
4 or the MSA all the way through payment terms.
5 It was negotiated between JAB Energy
6 Solutions II, LLC, the Black Elk Energy
7 Trust, the bonding company who had the bond
8 collateral and any other entity that was
9 responsible for paying a share.
10 Q. Okay.
11 A. And the government, and the federal
12 government, the DOJ was involved.
13 Q. You don't want to leave them out.
14 A. No, you got to have them.
15 Q. What would have happened if one of those
16 entities had not paid you their percentage
17 for that P&A? What was your remedy?
18 A. I had to sue them.
19 Q. Did you have to pursue anybody legally
20 on that?
21 A. No, pretty close but no, not yet, not
22 yet. I haven't been paid.
23 Q. I thought you said you had been paid
24 that amount.
25 A. If you're only talking well P&A, I've

84

1 been paid.
2 Q. Yes, sir.
3 A. JAB Energy Solutions II, LLC has been
4 paid.
5 Q. And that money, the 3.8 million, when
6 did you receive that?
7 A. Again we didn't get -- JAB Energy
8 Solutions II, LLC did not get all of the 3.8
9 million at once. The majority of it was
10 received in 2017 or probably half in 2017, a
11 large portion in 2018 and I'm just going off
12 memory, I could be wrong a couple of months.
13 And then the remainder of it which ended up
14 being about 10 or 12 percent was paid in
15 2020.
16 Q. Have all of the vendors to JAB Energy
17 Solutions II related to the P&A work been
18 paid?
19 A. No.
20 Q. Who has not been paid for the P&A work?
21 A. I don't know the list.
22 Q. About how much is outstanding for the
23 P&A work?
24 A. I don't -- I don't know the total
25 number.

Exhibit A

85
1 Q.   Can you give me a ballpark?
2 A.   Probably north of a million dollars.
3 Q.   And if all of that has been paid, all of
4 the 3.8 million has been paid to you, why has
5 that not been paid to the vendors or to the
6 contractors to JAB Energy Solutions II?
7 A.   Because the project, one, was over
8 budget and two, a lot of the money was
9 received -- again, a pretty sizable portion
10 of it wasn't received until 2020.
11 Q.   But we're in 2021 now.
12 A.   Yeah, yeah.
13 Q.   So is JAB Energy Solutions II sitting on
14 any portion of that 3.8 million still?
15 A.   No.
16 Q.   Well, I'm at a loss then.  If you got
17 paid the 3.8 million, why is there still a
18 million unpaid, a million plus unpaid?
19 A.   Because we don't have the money.
20 Q.   Well, who was -- I'm missing something
21 here then.  If you got paid everything you
22 bid it for, did your costs then overrun?
23 A.   Yes, that's what I just said, cost
24 overruns.
25 Q.   And were your arrangements with the

86
1 vendors to you all such that that they
2 weren't limited in their costs?
3 A.   That's correct.
4 Q.   Have there been any lawsuits filed by
5 anybody related to the P&A work and the
6 amounts owed to any of those contractors?
7 A.   Only just recently.
8 Q.   And who filed that?
9 A.   H.B. Rentals.
10 Q.   And how much are they owed?
11 A.   Well, their suit is for, I don't
12 remember the total number, six or seven
13 hundred thousand.
14 Q.   And where is that lawsuit filed?
15 A.   Texas, Harris County.
16 Q.   In where?
17 A.   Harris County.
18 Q.   And who is that suit named as
19 defendants?
20 A.   JAB Energy Solutions II -- well,
21 actually --
22     MR. THOMAS:
23        Let me see if I can pull it up.
24     THE WITNESS:
25        Yeah, we'll pull it up.

87
1 BY MR. NALLEY:
2 Q.   Okay.  While we're waiting on that,
3 other than H.B. Rentals, that would be the
4 only one that suit has been brought?
5 A.   Yes.
6 Q.   But there are other contractors who are
7 owed money still?
8 A.   That's correct.
9 Q.   Has JAB Energy Solutions II been the
10 subject of any other lawsuits in the past for
11 nonpayment of their contractors?
12 A.   Yes.
13 Q.   And about how many times has that
14 occurred?
15 A.   Once.
16 Q.   And who is that brought by?
17 A.   Shore Offshore Construction.
18 Q.   And where was that brought?
19 A.   In New Orleans.
20 Q.   Is that in federal court?
21 A.   I think it was federal court.
22 Q.   And how much was Shore owed?
23 A.   Allegedly owed 1.3 million.
24 Q.   Did you all settle or try that?
25 A.   Settled.

88
1 Q.   And how much did you settle it for?
2     MR. THOMAS:
3        I'm just going to object.  The
4     settlement value is confidential.
5 BY MR. NALLEY:
6 Q.   And what was the work that Shore had
7 done for you?
8 A.   Platform removal.
9 Q.   In that case, why have they not been
10 paid?
11 A.   Because they dropped the jacket and they
12 damaged the property so they breached the
13 contract.
14 Q.   One of those oops moments, huh?
15 A.   Oops, yeah.
16     MR. NALLEY:
17        Able to find it yet?
18     MR. THOMAS:
19        I found the date of it so I'm
20     getting there.
21     MR. NALLEY:
22        Okay.
23     MR. THOMAS:
24        What was the question?
25     MR. NALLEY:

Exhibit A

**89**

1      Who the other defendants are.
2    MR. THOMAS:
3      I promise I'll tell you as soon as I
4    have it.  Everybody looking at me makes
5    me nervous.
6    THE WITNESS:
7      Can I go to the restroom while he's
8    looking?
9    MR. NALLEY:
10     Sure.  Let's go off the record.
11     (Off the record 12:20 p.m.
12     Back on the record 12:25 p.m.)
13   BY MR. NALLEY:
14   Q.  Mr. Boudreaux, with regard to the second
15   phase of that then getting away from the P&A
16   for a second.  With regard to the platform
17   removal and site clearance on it, who did you
18   have doing bids on that or who did you
19   receive bids from?
20   A.  Who did we receive bids from to perform
21   the services?
22   Q.  Yes, sir.
23   A.  For which services?
24   Q.  Any of those -- well, who was the
25   primary bidder other than TOPS for the

**90**

1    platform removal?
2    A.  Pretty much TOPS.
3    Q.  As I understand it, you approached TOPS
4    about getting involved in that project,
5    correct?
6    A.  No, we had been talking about that
7    project for three years, probably since 2018.
8    Q.  Why was it so long in the discussions?
9    A.  Because it took so long to get one,
10   permits and two, to get the entities
11   responsible for paying, to get them all on
12   the same page to pay in accordance with a
13   proper term sheet.  Once we did the well P&A
14   and it took so long and it was difficult to
15   get the money, we decided that we needed a
16   different -- we needed everybody on board so
17   we began renegotiating to try to get a better
18   payment plan.
19   Q.  Renegotiating with who?
20   A.  With Black Elk, the trustee, the bond
21   holder, W&T, Talos, Fairways.
22   Q.  Did you renegotiate the amounts at all
23   or just the terms of the payment?
24   A.  Just the terms.
25   Q.  And ultimately secured that agreement

**91**

1    obviously?
2    A.  Yes.
3    Q.  And in general, what was the discussion
4    or what was the outcome of that as far as
5    when you would receive payment?
6    A.  The outcome didn't change.  The
7    partners, I refer to them all as partners,
8    the partners agreeing that they would pay a
9    hundred percent of the number and make up
10   some of the defunct partners portions that
11   weren't getting paid.
12   Q.  Who were the defunct partners?
13   A.  Fairways Exploration.
14   Q.  And how did they split the Fairways
15   portion?
16   A.  I don't remember exactly.  Talos picked
17   up a piece and Black Elk, the trustee picked
18   up a piece.
19   Q.  If it was in bankruptcy, the Black Elk
20   bankruptcy, what was your understanding of
21   why Talos and W&T and the others were
22   involved in the payment of that?
23   A.  Because they had interest in it.
24   Q.  Do you know whether or not they are
25   responsible individually for the full amount

**92**

1    or just as to their percentage interest?
2    A.  That's a trick question.  In whose eyes?
3    Q.  Well, let's start with yours.
4    A.  In mine, they're responsible for the
5    amounts owed under the term sheet.
6    Q.  Why were they willing to, in your
7    discussions with them, renegotiate to end up
8    paying additional amounts if, in fact, they
9    only owed their percentage?
10   A.  Well, that's in my eyes.
11   Q.  I understand.
12   A.  In the government's eyes, they owe a
13   different percentage if the project doesn't
14   get completed.
15   Q.  And what is your understanding of what
16   the government's perception of that is?
17   A.  Well, not a perception.  The
18   government's contract in their lease agree-
19   ment, all of the partners on the lease are
20   net and severally liable for a hundred
21   percent of the liability.
22   Q.  And have you seen that lease agreement
23   in this case?
24   A.  I haven't seen that lease agreement, no.
25   Q.  And where do you get that understanding

**Exhibit A**

**93**

1 from, that each one of them is individually
2 responsible for one hundred percent?
3 A. That's the way leases are -- that's the
4 terms of the lease agreement, sorry.
5 Q. Let me ask you a question and this is
6 going to seem real simple I know but if we
7 fast-forward all these questions two hours,
8 okay? If that's the case, have you had any
9 discussions with any of the partners -- let
10 me back up. Roughly how much is owed or is
11 claimed to be owed by all the contractors who
12 have worked on this project for you?
13 A. You started with a question and then I
14 lost you.
15 Q. Okay.
16 A. Sorry.
17 Q. It was very convoluted. I apologize.
18 Without discussing or acknowledging the
19 merits of any of the claims but you've got a
20 million plus claim you said from the P&A.
21 You've got a lawsuit filed by H.B. Rentals
22 which we just pulled up. It looks like it
23 was against just JAB Energy Solutions, LLC is
24 the only named defendant. You've got the
25 TOPS claim. You've got a few other claims

**94**

1 I'm aware of on it. What's the total amount
2 ballpark that's being claimed to be owed on
3 this job?
4 A. North of 11 probably.
5 Q. And you are anticipating if I got my
6 math right here, about 5.8, 5.9 coming in
7 payments?
8 A. Yes.
9 Q. Have you had any discussions with any of
10 the partners of going back and saying I need
11 11 million dollars?
12 A. No.
13 Q. And why is that?
14 A. Contract doesn't allow for it.
15 Q. Have you had any discussions with the
16 bankruptcy trustee about additional funding?
17 A. No.
18 Q. And why is that?
19 A. Contract doesn't allow for it.
20 Q. And you're talking about your contract
21 with the bankruptcy trustee?
22 A. Correct.
23 Q. What does it say or in general, I know
24 it's a legal document and I'll take a look at
25 it but what is your understanding of what it

**95**

1 says with regard to if you are in a situation
2 like you find yourself with 11 million
3 dollars of claims being made for 6 million
4 dollars, thereabouts?
5 A. Well, it's a fixed-price contract so the
6 amounts being paid are fixed.
7 Q. What is the status of that project right
8 now? Is it completed?
9 A. In my eyes it's completed. In the
10 government's eyes, not yet.
11 Q. From your perspective, was the work done
12 by TOPS completed?
13 A. Yes.
14 Q. Was it completed satisfactorily?
15 A. Other than we spent too much money but
16 yes.
17 Q. And I think there was a certificate of
18 completion filed back in December of 2020,
19 correct?
20 A. Yes.
21 Q. What work is BSEE saying has not yet
22 been completed?
23 A. They're not saying anything has not yet
24 been completed. They won't accept the
25 completion report as provided to them because

**96**

1 the -- because TOPS put anchors in avoidance
2 areas and damaged some pinnacle reefs so BSEE
3 is now --
4 Q. Damaged what? I'm sorry.
5 A. Pinnacle reefs so now BSEE is requesting
6 that a survey be done on those reefs to
7 determine the damage and then they'll
8 determine what a penalty might be for that
9 damage.
10 Q. I take it from your comments you
11 disagree with that assessment?
12 A. No, anchors were placed in a pinnacle
13 reef, yeah. I don't disagree with that. We
14 know that for sure now.
15 Q. And what is your understanding of how
16 long this process is going to take?
17 A. I'm trying to find out.
18 Q. Any ballpark?
19 A. A month to six months, I don't know.
20 Q. And has JAB Energy Solutions II been
21 paid any portion of that six million dollars?
22 A. No.
23 Q. You talked about a bonding company being
24 part of that agreement. What is the bonding
25 company's involvement there?

Exhibit A

97

1 A.   They hold the bond.
2 Q.   For completion of the job?
3 A.   No, so BSEE requires that bonds be
4 placed for offshore leases.  That's a
5 requirement of the CFR, right?
6 Q.   Right.
7 A.   Okay.  That's the bond that we're
8 talking about.
9 Q.   And do you know how much that is?
10 A.   Roughly two million dollars.
11 Q.   And how much is the bonding company
12 contributing towards the payment on this job?
13 A.   The entire -- the face value of the
14 bond.
15 Q.   Explain to me why -- and you know this
16 business far better than I do.  Who was
17 required to post the bond?
18 A.   Black Elk.
19 Q.   And what is your understanding, the bond
20 was to guarantee what?
21 A.   It's not to guarantee anything other
22 than money.  It's a bond for a value with a
23 beneficiary being BOEM, being the government.
24 Q.   And is it your understanding that bond
25 has to be paid by the bonding company at the

98

1 end of the job regardless of whether the job
2 is completed, not completed?
3 A.   No.
4 Q.   What are the terms of that?
5 A.   The terms of the agreement are when the
6 job is completed satisfactorily and BSEE or
7 BOEM releases the bond, then that bond
8 collateral would be provided to JAB Energy
9 Solutions II, LLC and not back to Black Elk
10 trust.
11 Q.   So in essence being basically a down
12 payment or a partial payment on what was the
13 bid price to JAB Energy Solutions II?
14 A.   Well, no, it's just where the money is
15 coming from.  It's just a funding mechanism.
16 Q.   But it's placed with a bonding company
17 for security for you --
18 A.   No.
19 Q.   -- as opposed to -- well, why would
20 Black Elk not just hold on to it themselves
21 then?
22 A.   They can't.  The bond is for BOEM.  So
23 BOEM required the bond.
24 Q.   Right.
25 A.   Black Elk Energy Trust doesn't have any

99

1 money but Black Elk Energy Trust placed the
2 bond so in essence that collateral is for
3 Black Elk Energy, the trustee.  They've
4 agreed that when the work is complete and the
5 bond is released, the collateral for that
6 bond will be provided to JAB Energy Solutions
7 II, LLC rather than the trust.  The trust is
8 paying the bill using the collateral from the
9 bond.
10 Q.   Had Black Elk not gone into bankruptcy,
11 who would have gotten the bond money?
12 A.   Ask Black Elk.
13 Q.   You don't know?
14 A.   No, I do not know.
15 Q.   Have you had any discussions with any of
16 the partners with regard to the six million
17 dollars?  Are you communicating with them as
18 to status of the job?
19 A.   The status of the job hasn't changed.
20 We're waiting on BSEE or BOEM to --
21 Q.   But do you report to them or advise them
22 periodically as to where they stand?
23 A.   Other than the trustee, no.
24 Q.   Let me look at this spreadsheet that you
25 provided to us on it.  I did that last night.

100

1 I've got some extra copies here for your
2 convenience.
3     Tell me, this is a spreadsheet of
4 payments by JAB Energy Solutions II on this
5 particular job; is that correct?
6 A.   Yes.
7 Q.   And it looks like the earliest one was
8 in October -- I'm sorry, in June 2017 to
9 Oceaneering International?
10 A.   Yes.
11 Q.   What did Oceaneering International do?
12 A.   That particular invoice is for the
13 archeological survey, I believe.
14 Q.   The money that was -- let me go through
15 it real quick.  American Eagle did what?
16 A.   They're a trucking company.
17 Q.   And then the next entry is AOS-GJ065, do
18 you know what that's for?
19 A.   No.
20 Q.   Dan Strickland?
21 A.   Dan provides some -- I'm lost for words,
22 dispatch services.
23 Q.   Okay.  And Mad Max Marine?
24 A.   A boat company.
25 Q.   Was Oceaneering --

**Exhibit A**

101

1 A.    Actually Mad Max is the survey company
2 -- I mean the site clearance company, sorry.
3 Q.    Then Oceaneering did what, surveying?
4 A.    They're a survey company.  They provide
5 other services around surveying.
6 Q.    And then United Vision Logistics?
7 A.    Trucking.
8 Q.    And then the Texas Artificial Reef Fund?
9 A.    Yep.
10 Q.    It was a 200-thousand-dollar payment to
11 them, what was that for?
12 A.    Partial reef donation.
13 Q.    And how much is owed to them?
14 A.    800.
15 Q.    Additional?
16 A.    Yes.
17 Q.    With regard to -- and it looks like
18 there was a total of 1 million 193 thousand
19 paid.  Where did the funds come from to make
20 these payments?
21 A.    Well, I'm not sure of the question.
22 Q.    Let me clarify it then.  All of these
23 expenditures shown on JAB II --
24 A.    Yes.
25 Q.    -- Bate's stamp number 1 were related to

102

1 what?
2 A.    Ask the question again?  Sorry.
3 Q.    What were these expenses related to?
4 A.    Expenses related to the High Island 8370
5 platform removal and site clearance.
6 Q.    And so none of that was related to the
7 P&A, correct?
8 A.    Correct.
9 Q.    You told me earlier that JAB Energy
10 Solutions II had not been paid anything by
11 any of the partners towards the platform
12 removal and site clearance work, correct?
13 A.    Correct.
14 Q.    So I'm assuming from what you've
15 provided to us and it shows payment dates and
16 check numbers, that these amounts have all
17 been paid, correct, actually paid?
18 A.    Correct.
19 Q.    And that shows payments of 1,193,801
20 dollars?
21 A.    Correct.
22 Q.    And the vast majority of these payments
23 were made in late 2020 and early 2021,
24 correct?
25 A.    Correct.

103

1 Q.    My question to you is, if JAB Energy
2 Solutions II has not been paid anything,
3 where did basically the 1.2 million dollars
4 come from to make all of these payments?
5 A.    Working capital.
6 Q.    Did JAB II have any other jobs going on
7 at the same time as this job?
8 A.    Yes.
9 Q.    What other jobs did you all have going
10 on?
11 A.    A project in Breton Sound.
12 Q.    Which involved what?
13 A.    Platform removal and pipeline abandon-
14 ment.
15 Q.    And how big was that job?
16 A.    11 million dollars.
17 Q.    And what is its status now?
18 A.    About 70 percent complete.
19 Q.    And how much of that have you been paid?
20 A.    About 70 percent.
21 Q.    How was the determination made -- let me
22 ask you this.  I'm assuming JAB Energy
23 Solutions II is still ongoing then with the
24 remaining four million or so of that other
25 job, correct?

104

1 A.    We do have to complete that other job,
2 yes.
3 Q.    Is work ongoing on it or are you all
4 shut down?
5 A.    No, we're shut down.
6 Q.    And how long have you been shut down
7 for?
8 A.    Since probably December.
9 Q.    And why is that job shut down?
10 A.    Primarily weather in the wintertime and
11 now we're trying to get back on location now.
12 Q.    Were there any other jobs going on in
13 the fall of 2020 and spring of 2021 for JAB
14 Energy Solutions II?
15 A.    No.
16 Q.    So you all had basically 1.2 million
17 dollars extra in your operating funds to make
18 these payments?
19 A.    I don't know the numbers.
20 Q.    Okay.
21 A.    There was obviously enough money to pay
22 that.
23 Q.    Who made the decision as to which
24 invoices were going to be paid and on what
25 time schedule?

Exhibit A

**Page 105**

1  A.   I do.
2  Q.   And how did you determine that they were
3  going to be paid in this order?
4  A.   Well, I don't know that I determined
5  them in an order.  If you want to talk about
6  TOPS, I was called and asked if we could make
7  a payment and we made a payment, simple as
8  that.  To try to get some money out,
9  Oceaneering when they were due and we were
10 able to pay, we paid them.
11 Q.   TOPS has made demand or requested that
12 you pay them additional funds, correct?
13 A.   Yes.
14 Q.   And why has that not been done?
15 A.   Don't have any money.
16 Q.   Do you know how much money you have?
17 A.   Nope.
18 Q.   How do you know you don't have any if
19 you don't know how much you got?
20 A.   Well, I asked Sonda if we can make a
21 payment and we don't have any money.  I do
22 see the cash-flow situation for the company,
23 for Allison Marine Holdings, we talk about
24 cash flows and there's not enough money to
25 pay.

**Page 106**

1  Q.   Okay.  Explain that to me again.
2       MR. NALLEY:
3            Read back that answer first, please.
4            (Whereupon, a portion of the
5            record was read.)
6  BY MR. NALLEY:
7  Q.   So you've talked to Sonda about the cash
8  flow for Allison Marine Holdings and have
9  been told that there's not enough cash to pay
10 the amount that TOPS has requested; is that
11 correct?
12 A.   Yes.
13 Q.   Has she indicated to you whether the
14 cash flow for Allison Marine Holdings, LLC is
15 such that even a partial payment can be made?
16 A.   No payment can be made.  The cash flow
17 is such that no payment can be made.
18 Q.   Do you know why that is for Allison
19 Marine Holdings, LLC?
20 A.   Well, --
21 Q.   Why the cash flow is that situation or
22 in that situation?
23 A.   Well, I don't know the details behind it
24 other than operational and there's for one,
25 six million dollars outstanding, right?  So

**Page 107**

1  there's just business circumstances that
2  have cash flow down.
3  Q.   Do you know whether Allison Marine
4  Holdings, LLC has other projects for some of
5  their other entities that also have been a
6  draw on their cash flow and/or where vendors
7  for other entities are owed money that has
8  compounded those problems?
9  A.   Allison Marine Holdings doesn't have a
10 draw on, the entities do.
11 Q.   Wait, I'm sorry, say that again.
12 A.   You said Allison Marine Holdings has a
13 draw on the cash, right?  Is that what you
14 said.
15 Q.   No, I don't think so but let me rephrase
16 it because that sounds like we're confused
17 between us.  You told me earlier you had
18 talked to Sonda.  Is it Sondra or Sonda?
19 A.   Sonda.
20 Q.   You talked with Sonda and she had told
21 you -- you talked to Sonda about getting
22 another payment or payment to TOPS, correct,
23 for the money they're owed?
24 A.   Correct.
25 Q.   And she told you that the cash flow of

**Page 108**

1  Allison Marine Holdings, LLC would not allow
2  that at this time; is that correct?
3  A.   That's correct but we're not talking
4  about today.  We're talking about it's been
5  awhile.
6  Q.   Yeah, going back to --
7  A.   Going back, yes.
8  Q.   -- November, December of last year?
9  A.   Yes, yes, correct.  Okay.
10 Q.   So my question to you is, is the cash-
11 flow problem with Allison Marine Holdings,
12 LLC simply because of the short fall that has
13 been experienced with this project with JAB
14 Energy II or do you know whether or not they
15 have other projects or other work for any of
16 their other subsidiaries that have also
17 compounded their cash-flow problem?
18 A.   All of the above.  It's a combination of
19 cash-flow problems throughout the other
20 entities.
21 Q.   And I don't need you to name them.  The
22 other six entities I think that are in that
23 holding company have also had cash-flow
24 problems that now make Allison Marine
25 Holdings, LLC's cash-flow problems such that

Exhibit A

109

1 they are unable so far to make a payment to
2 TOPS, LLC for the amounts that are owed on
3 this job with JAB Energy Solutions II?
4 A.   Correct.
5 Q.   Do you know whether or not JAB Energy
6 Solutions II -- well, as president you would
7 know whether JAB Energy Solutions II has made
8 any individual loan applications, correct?
9 A.   Correct.
10 Q.   And am I correct in understanding that
11 the way you all are set up being part of this
12 holding company, that JAB Energy Solutions II
13 would not go out on its own and make a loan
14 application to a bank or a holding company?
15 A.   That is correct.
16 Q.   So any funding for cash that JAB Energy
17 Solutions II is going to need or might need
18 would have to come through actions by Allison
19 Marine Holdings, LLC?
20 A.   That's correct.
21 Q.   Do you know whether or not Allison
22 Marine Holdings, LLC has attempted to take
23 out or make any loans to pay the amounts that
24 are owed to TOPS?
25 A.   No, they have not.

110

1 Q.   Do you know why that is?
2 A.   One, funding is not available.  It's
3 impossible to go get a loan today with the
4 balance sheet that Allison Marine Holdings
5 has.
6 Q.   That would be your opinion.  As far as
7 you know, they have not attempted to do that
8 though?
9 A.   Not my opinion.  There's no way Allison
10 Marine Holdings can go borrow money.  It took
11 enough to be able to borrow the money from
12 GarMark three years ago.  Capital is just not
13 available for the company in the situation
14 the company is in.
15 Q.   Have you had any discussions with Sonda
16 with regard to the payment of TOPS once you
17 get this other job underway again with that
18 additional four million, three and a half,
19 four million that will be coming from that
20 job?
21 A.   Well, no.  Now the assets of JAB are
22 owned by the ABC.  So we don't -- the
23 control, we have no more control of that
24 receivable, of any of the receivable.  It is
25 -- there's been an assignee assigned to the

111

1 assets of JAB Energy Solutions II, LLC.
2 Q.   But the payments for work to be
3 performed in the future is not yet an
4 accounts receivable, is it, or do you
5 consider it to be?
6 A.   For payment to be performed in the
7 future on the Breton Sound project?
8 Q.   Yes, sir.
9 A.   No, it's not a receivable yet.  That is
10 correct.
11 Q.   Has that job and the potential accounts
12 receivable out of that been assigned to JAB
13 ABC?
14 A.   Yes.
15 Q.   I'm going to ask you a lot more
16 questions about JAB ABC down the road but let
17 me ask you this just because I'm real curious
18 about it.  What did JAB Energy Solutions II
19 get out of that assignment?  What was the
20 benefit to you all?
21 A.   JAB Energy Solutions II?
22 Q.   Yes, sir.
23 A.   There was no benefit to us.  The company
24 is dissolved.  At some point JAB Energy
25 Solutions II doesn't exist anymore so there's

112

1 no benefit.  The benefit is to the lender,
2 right?
3 Q.   When did JAB Energy Solutions II
4 dissolve?
5 A.   It didn't dissolve.  It will be
6 dissolved.  The ultimate result of an ABC the
7 way I understand it is a dissolving.  The
8 company is ultimately dissolved.
9 Q.   Why did you all utilize that formula or
10 that process rather than a bankruptcy
11 proceeding?
12 A.   I think it was determined that it was
13 cheaper.
14 Q.   We'll come back to that.  When you made
15 the payment to the Texas reef fund in October
16 of 2020, why did you make an interim payment
17 to them of two hundred thousand at that time?
18 A.   They required it.
19 Q.   In lieu of what?
20 A.   In lieu of making a full payment.  If we
21 didn't make any payment, they were not going
22 to let us do the project.  They were not
23 going to approve the permit.  I think the
24 term is they held us hostage.
25 Q.   I want to talk to you about your

Exhibit A

113

1 relationship with TOPS. How long have you
2 been doing work for TOPS or with TOPS?
3 A. I think we started talking in late 2017
4 or early 2018 about the potential of doing
5 some business together.
6 Q. Is this the first project that you had
7 done with them?
8 A. No.
9 Q. What other project or when did you
10 personally get involved in dealing with TOPS
11 and/or the Hendersons?
12 A. Like I said, I think we started
13 communicating back in either late '17 or
14 early '18 about possibly doing some work
15 together.
16 Q. But before that date, had you ever done
17 work with TOPS before?
18 A. No.
19 Q. And who are you dealing with?
20 A. I think initially mostly it was Dan.
21 Q. And tell me about how that process went
22 from your perspective of getting them on
23 board for this to get -- I know you all did
24 an MSA early on and then it was a couple of
25 years before there was a work order issued,

114

1 correct?
2 A. No.
3 Q. No?
4 A. A work order was issued immediately
5 following the MSA.
6 Q. I thought the MSA had been issued in
7 June of 2018 and this project in the summer
8 of 2020. That's not correct?
9 A. That's not correct, did one in 2018.
10 Q. Did what? I'm sorry.
11 A. Did a project in 2018.
12 Q. Oh, all right. And what was that
13 project, do you recall?
14 A. A removal at West Cam 580.
15 Q. And were there any problems with that
16 project?
17 A. No.
18 Q. And was TOPS paid?
19 A. Yes.
20 Q. And then were there any other projects
21 before this one in between?
22 A. No.
23 Q. How did this one come about about
24 working on this particular project?
25 A. Again this one, we were actually talking

115

1 about this project at the same time. It was
2 just delayed so this project was always on
3 the radar of TOPS. It was just delayed.
4 Q. And how did it come about then that you
5 notified them you were ready to go?
6 A. Well, we never left communication.
7 There's been constant communication about
8 this project throughout '19, '20 or '19 and
9 when we finally were -- finally negotiated
10 the payment agreement with the trustee, et.
11 al., all of them, I called TOPS, called Dan
12 and asked for a schedule and some pricing to
13 do the High Island work.
14 Q. And as I understand it, you were working
15 on a fairly short fuse at that point of
16 having to get the project completed?
17 A. We were working on a fairly short fuse,
18 yes.
19 Q. And at the time that you negotiated the
20 work order for this project, do you remember
21 when that was from your documentation?
22 A. Which work, the work order with TOPS?
23 Q. Yes, sir.
24 A. September maybe.
25 Q. And at that point, what was the

116

1 financial position of JAB II, JAB Energy
2 Solutions II?
3 A. The financial position? I'm not sure
4 the question. You want to know what our
5 balance sheet looked like?
6 Q. Sure.
7 A. Well, I don't know.
8 Q. Was it a viable entity?
9 A. Yeah.
10 Q. Were you having any cash-flow problems
11 at that time?
12 A. No.
13 Q. Were you in any litigation with any of
14 your vendors on other jobs?
15 A. No.
16 Q. Did you have any judgments pending
17 against JAB Energy Solutions II?
18 A. No.
19 Q. Did you fully expect to pay TOPS
20 pursuant to the contract?
21 A. Yes.
22 Q. Do you recall when the work began?
23 A. Early October.
24 Q. And did you personally oversee any of
25 the work?

**Exhibit A**

117

1  A.    No.
2  Q.    Did you have anybody overseeing it for
3  you?
4  A.    Overseeing it for JAB Energy Solutions
5  II, yeah, our project team was running the
6  project or working with them.
7  Q.    And who would have been in charge of
8  that?
9  A.    Allan Vando and Josh Towns.
10 Q.    And did they report to you periodically
11 as to how the project was going?
12 A.    I saw daily reports and we communicate.
13 Q.    And what was your understanding of how
14 that project was proceeding?
15 A.    Proceeding well except that the weather
16 was causing lots of delays.
17 Q.    And that was not a TOPS-caused problem,
18 correct, the weather?
19 A.    Not all of it.
20 Q.    And was TOPS regularly invoicing you all
21 for the work?
22 A.    I don't recall.
23 Q.    And you were advised ultimately that the
24 project was completed and a certificate was
25 issued in early December 2020?

118

1  A.    Correct.
2  Q.    And at that point, was there any problem
3  from your perspective of the work that TOPS
4  had done?
5  A.    The work ultimately, no.  The weather I
6  think was a little bit of a stretch.  I
7  believe there was some wasted time and some
8  delays exaggerated a little bit but --
9  Q.    And why do you say that?
10 A.    Just based on looking at the job as it
11 was happening and the amount of time we left
12 and came back and when we left and came back.
13 It just -- it seemed like it was just a bit
14 exaggerated in my opinion.
15 Q.    Did you ever have any discussions or
16 tell anyone from TOPS?
17 A.    No.
18 Q.    Did you ever refute any of the invoices
19 or dispute any of the invoices for the
20 weather time?
21 A.    Not yet, not ultimately, no.
22 Q.    Let me ask you this.  If you had that
23 thought, why did you not say something or
24 mention something back when all this was
25 occurring six months ago, eight months ago?

119

1  A.    Well, number one, we hadn't been paid.
2  Number two, we had already worked with TOPS
3  and talked to them about the total amount of
4  money that was to be paid to us and had a
5  verbal agreement on a split of those funds
6  amongst the vendors that were on the project.
7  So ultimately it wasn't a conversation that I
8  thought I needed to have at that time.
9  Q.    Who did you have that conversation with
10 that you just described?
11 A.    Dan and Rocky.
12 Q.    And when did that occur?
13 A.    Early December I believe came to the
14 office and we had an ongoing conversation
15 over the course of, I don't know, six or
16 eight weeks, traded some e-mails, traded some
17 spreadsheets, nothing exactly definitive but
18 we were talking about it.
19 Q.    Do you agree TOPS never agreed to take a
20 reduced amount from their invoicing?
21 A.    No, no, no, I don't agree with that.
22 Q.    Okay.  Tell me what you believe TOPS
23 agreed to.
24 A.    I believe they agreed to take a
25 proportionate share of the total money JAB

120

1  was to receive.
2  Q.    And was that ever formalized in any type
3  of writing?
4  A.    No.
5  Q.    You believe that was said when, in this
6  conversation in early December?
7  A.    Yes.
8  Q.    And was that said as a final payment or
9  as an interim payment that they would take a
10 percentage?
11 A.    A final payment.
12 Q.    And what other terms or discussion was
13 had on that?
14 A.    The discussion -- the ongoing discussion
15 was about the amount that was owed for the
16 total of the project.  We provided a spread-
17 sheet to them showing them what our payables,
18 JAB Energy Solutions II, LLC's payables for
19 that project looked like.  The big concern or
20 caveat was the reef donation.  There was some
21 concern about including the reef donation in
22 that proportionate share.
23 Q.    And what was your response to that?
24 A.    My response was the reef donation had to
25 be paid and ultimately that had to be figured

Exhibit A

121

1  out.  We never came to a complete resolution
2  of it but there was some open-ended pieces to
3  the proportionate share.
4  Q.   So that was not a done deal?  That was
5  an ongoing discussion?
6  A.   It was an ongoing discussion, yes.
7  Q.   And why did you believe that the reef
8  fund had to be paid I'm assuming in full?
9  A.   Yes, yes.  Because if it doesn't get
10 paid, JAB Energy Solutions II, LLC doesn't
11 get paid.
12 Q.   Did you ever have any discussions with
13 them of accepting a smaller or proportionate
14 amount as well?
15 A.   It's the government.  No.
16 Q.   No, you did not?
17 A.   No.
18 Q.   When do you recall being the first time
19 that you advised or talked with anyone from
20 TOPS about there being inadequate funds to
21 pay the bills for this platform removal?
22 A.   Early November.
23 Q.   And where did that conversation take
24 place?
25 A.   I was in St. Martinville, Louisiana when

122

1  it took place.
2  Q.   Was it on the phone or --
3  A.   Yes.
4  Q.   And who were you talking with?
5  A.   Dan and Rocky.
6  Q.   Tell me the nature of that conversation
7  or the substance of that conversation?
8  A.   Rocky was concerned about the total
9  amount of the project or the expected
10 completion on High Island 8370 on what that
11 value would be and asked about the total
12 value of the contract that JAB Energy
13 Solutions, LLC had signed with Black Elk.
14 I explained the total funds, the five million
15 or six million dollars to him.
16     He agreed that it was in both parties'
17 best interests to complete the project in
18 order to receive anything because we had felt
19 that if TOPS pulls off the project and JAB
20 doesn't complete it, there's no money coming
21 to JAB Energy Solutions II, LLC so the
22 completion of the project was in the best
23 interest and he understood the total amount
24 of the payment terms.  He asked if I would
25 provide the payment terms to him and I think

123

1  the next day I sent him the payment agreement
2  that was executed by JAB Energy Solutions II,
3  LLC, Black Elk trust and the other parties
4  that executed that agreement.
5  Q.   Was that the first time there had been
6  any discussions about the amount that JAB
7  Energy Solutions II was to be paid for this
8  project?
9  A.   Yes, first that I recall.
10 Q.   At any point in time before that, had
11 you ever told TOPS that you were limited in
12 that amount on this project?
13 A.   No.
14 Q.   At that time, do you recall how much
15 TOPS was already into this project for?  Did
16 you have discussions with Dan or Rocky about
17 that?
18 A.   Yeah, I think we were in and around
19 three and a half or four million bucks.
20 Q.   And you mentioned earlier that you all
21 talked about the fact that if TOPS pulled off
22 the project, you wouldn't get anything on it.
23 And was that discussion by you to them
24 basically telling them if you pull off now,
25 we're not going to pay you anything on it?

124

1  A.   That wasn't said.
2  Q.   That was the message that was given,
3  though, wasn't it?
4  A.   No.
5  Q.   Tell me again the best you recall your
6  side of it, what you told them in that area.
7  A.   I said if they pulled off the project
8  and the project doesn't get finished, JAB
9  Energy Solutions II, LLC will not be paid
10 until that project is finished.
11 Q.   Were you proposing that JAB Energy
12 Solutions II would pay TOPS the three and a
13 half or four million they were owed at that
14 point if the project wasn't completed?
15 A.   I didn't propose that either.
16 Q.   Well, how was the message that you were
17 conveying to TOPS not if you all pull off
18 now, you're getting nothing?
19 A.   I didn't convey that message.  Like I
20 said, the parties all agreed that it was in
21 everybody's best interest to complete the
22 project and move forward.  Nobody was
23 threatened in any way, shape or form about
24 payments or otherwise.
25 Q.   But you did tell them that if they

Exhibit A

**125**

1 pulled off, there wouldn't be any payment --
2 A.  No.
3 Q.  -- to JAB and then correspondingly to
4 TOPS, correct?
5 A.  That's not what I said.  No, sir.
6 You're putting a lot of words into what I
7 said.
8 Q.  And I don't want to confuse you, and
9 tell me one more time and I'll try and write
10 it down this time clearly.
11     MR. THOMAS:
12         Why don't we just have her read it
13         back?
14             (Whereupon, a portion of the
15             record was read.)
16 BY MR. NALLEY:
17 Q.  Okay.  If that had happened, if in that
18 conversation TOPS, Rocky or Dan had told you
19 if you don't have enough money to pay us,
20 we're pulling off, what would you have done
21 at that point?
22     MR. THOMAS:
23         Objection.  Calls for speculation.
24 BY MR. NALLEY:
25 Q.  You can answer.

**126**

1 A.  I don't know.
2 Q.  Would you have paid TOPS at that point,
3 the three and a half, four million they were
4 owed?
5     MR. THOMAS:
6         Same objection.
7 THE WITNESS:
8         I would have probably reviewed the
9         contract and determined if they were in
10        breach of the contract.  Then I would
11        have hired me a lawyer to figure out
12        what the next step would have been.
13 BY MR. NALLEY:
14 Q.  Okay.  So you weren't anticipating
15 simply writing them a check for the work that
16 had already been performed?
17     MR. THOMAS:
18         Same objection.
19 THE WITNESS:
20         Again go back to the contract and if
21         the contract had been breached, then we
22         would have went legal matters and taken
23         that step.
24 BY MR. NALLEY:
25 Q.  Did you offer in that conversation to

**127**

1 TOPS that JAB Energy II would pay them for
2 the work that had been performed at that
3 point?
4 A.  I didn't offer them anything in that
5 conversation.
6 Q.  And it looks like several weeks later,
7 November 16th and November 19th, you did make
8 several interim payments, correct?
9 A.  That is correct.
10 Q.  And why was that that you made those
11 payments at that time?
12 A.  Because Rocky called -- actually let me
13 back up to the conversation we had.  He asked
14 if we could make a payment when we had the
15 telephone conversation.  I said I'll check.
16 I'll do my best and we'll see what we can do.
17 We correspondingly responded and said yes, we
18 can make a payment and I think that's where
19 the 469,970 came from.
20 Q.  Okay.
21 A.  Then the other payments, if I recall
22 right, Rocky called again and asked for a
23 little bit more money and we were able to
24 make another payment.
25 Q.  And when you say we, that goes back to

**128**

1 the conversation you then had to have with
2 Sonda as to whether Allison Marine Holdings,
3 LLC's cash flow would allow you to be able to
4 make those payments?
5 A.  That's correct.
6 Q.  Let me ask you a question.  Why was it
7 that before that date, you did not disclose
8 to TOPS what the cap was on what JAB Energy
9 Solutions II was going to receive for this
10 job?
11 A.  I don't think it was relevant.
12 Q.  Why would you not think that was
13 relevant?
14 A.  JAB's in the business of making money.
15 If JAB has a contract, JAB Energy Solutions
16 II is in the business of making money.  And
17 if it's awarded a contract for a value, why
18 would you tell your vendors how much your
19 contract is?  Kind of letting the fox in the
20 hen house, right?
21 Q.  Except you knew you were undertaking
22 this contract with TOPS in a volatile time of
23 the year as far as platform removal goes,
24 correct?
25 A.  No, I don't agree with that.

**Exhibit A**

129

1 Q. You don't think starting a contract in
2 October in the Gulf of Mexico is a volatile
3 time weather-wise?
4 A. No, sir.
5 Q. Have you done other removals that you
6 start in October?
7 A. Many of them, October is generally a
8 pretty good month actually.
9 Q. And in particular, this time period just
10 ended up being an aberrationally bad weather
11 time?
12 A. Aberrationally bad weather time, just
13 like this past June.
14 Q. And I think you told me before, JAB
15 Energy Solutions II was financially sound at
16 that point in time?
17 A. Yeah.
18 Q. And when did it become apparent to you
19 that JAB Energy Solutions II was not going to
20 be able to pay TOPS?
21 A. When the lenders filed the ABC.
22 Q. Which was just a couple months ago,
23 correct?
24 A. A couple months ago.
25 Q. Before that time, is it your testimony

130

1 that do you believe JAB Energy Solutions II
2 to be viable and solvent financially to be
3 able to pay TOPS for the work that it had
4 done?
5 A. I believe that JAB Energy Solutions II
6 and TOPS would have ultimately agreed to the
7 pro rata share that I referred to earlier of
8 a value for that project and those moneys
9 would have been paid to TOPS and the other
10 vendors.
11 Q. And you had no money concerns or
12 financial concerns for JAB Energy II, JAB
13 Energy Solutions II through the conclusion of
14 this job, correct?
15 A. You always have money concerns but
16 again, the conversation regarding the
17 completion of the project and the total
18 amount of funds and the split pro rata of the
19 six million dollars was what we were banking
20 on in order to fund the rest of this project.
21 Q. Isn't it true, Mr. Boudreaux, that at
22 that time in October of 2020, JAB Energy II
23 was involved in a very heated litigation with
24 Offshore Speciality Fabricators, Fairway
25 Offshore and Offshore Domestic Group?

131

1 A. No, not as you term it, absolutely not,
2 not a very heated conversation.
3 Q. How would you phrase that litigation?
4 A. Well, Fairways Exploration owes JAB
5 Energy Solutions II three and a half million
6 dollars. They were owned by a man called
7 William Kallop. William Kallop also owned
8 Offshore Speciality Fabrication. They
9 performed work. They were a vendor of JAB
10 Energy Solutions II. JAB Energy Solutions II
11 withheld 3.35 million dollars to offset what
12 Fairways Exploration owed to JAB Energy
13 Solutions II. So there was a suit, there was
14 litigation filed between those parties to
15 settle off the lawsuits.
16 Fairways or Offshore Specialties goes
17 into bankruptcy several years ago. The
18 bankruptcy or the plan is accepted and
19 somehow, the JAB payable to Offshore
20 Specialties is acquired by another entity of
21 Mr. Kallop's that's outside of bankruptcy and
22 now they are adversarial in negotiating the
23 split or the offset between the two.
24 Q. And when did that all occur?
25 A. All of it?

132

1 Q. Well, the transformation to the other
2 entity and stuff that you just described.
3 A. I don't know. Maybe it did happen
4 around that time. I don't know. You
5 probably looked it up and seen the document.
6 I don't remember exactly when, when that
7 transfer occurred.
8 Q. But you never mentioned to Dan Black,
9 Rocky or Jay Henderson anything about that
10 litigation?
11 A. Oh, no. We've talked about that because
12 they're well aware of OSF and Fairways and
13 were in Bill Kallop's back pocket for many
14 years so no. We absolutely had that
15 conversation. In fact, Rocky was going to
16 share information about some dealings he had
17 with Fairways and bragged on a transaction
18 where he actually got to Brent Kallop so no,
19 we talked about it absolutely.
20 Q. Isn't it true that you talked about this
21 conversation that you had with Rocky and with
22 Dan in November of 2016. Was it November of
23 2016? Let me see. I'm sorry, October of --
24 I didn't write down. When was the conversa-
25 tion, telephone conversation you talked about

133

1 having with Dan and Rocky?
2 A.   November 2020.
3 Q.   Do you remember about when that was in
4 November?
5 A.   5th or 6th, somewhere in that first
6 week, November.
7 Q.   Isn't it true that just about a week
8 after that, Offshore Domestic Group which I
9 think is the other entity that you were
10 talking about related to Kallop obtained a
11 judgment against JAB Energy Solutions II for
12 over four and a half million dollars?
13 A.   Yes and no.  They actually don't have a
14 judgment.  They got an interlocutory
15 judgment.  I'm not a lawyer.  You all can
16 talk about that but that's not a judgment.
17 They can't collect on that.  And we still --
18 JAB Energy Solutions II still has the
19 receivable from Fairways Exploration.  So
20 what the Judge did, he separated the two
21 cases at that time over a call and gave them
22 an interlocutory judgment.
23    We subsequently went and did a Zoom
24 mediation and couldn't come to resolution.
25 So that interlocutory judgment that you're

134

1 referring to is still out there but it's
2 still not a final judgment.
3 Q.   But it is, in fact, a judgment against
4 JAB Energy Solutions II, correct?
5 A.   Yes, yes.
6 Q.   And you've got an MBA.  You're obviously
7 a sophisticated businessman.  Would you agree
8 that that, in fact, is a substantial
9 liability against JAB Energy Solutions II and
10 its finances?
11 A.   Yes.
12 Q.   And am I correct that you never
13 disclosed that judgment to TOPS?
14 A.   No, never did.
15 Q.   So I am correct in assuming that,
16 correct?  Horrible question.
17    Did you ever disclose to TOPS that Off-
18 shore Domestic Group had obtained a judgment
19 against JAB Energy Solutions II for in excess
20 of four and a half million dollars in October
21 of 2020?
22 A.   No.
23    MR. NALLEY:
24        I think I need to take another break
25 here.

135

1            (Off the record 1:33 p.m.
2             Back on the record 1:45 p.m.)
3 BY MR. NALLEY:
4 Q.   Mr. Boudreaux, I want to go back and
5 clean up something you told me earlier and
6 just get a few more details.  You talked
7 about BSEE having recently raised an issue
8 regarding the pinnacle reef on it.  When did
9 that first come up?
10 A.   A couple of weeks ago.
11 Q.   And have you had any discussions with
12 anybody from TOPS about that?
13 A.   No.
14 Q.   Are you contending that TOPS in any way
15 did something wrong in that regard?
16 A.   Not sure yet but possibly, yeah.
17 Q.   Did you all have your project engineers
18 on site directing what they were doing or how
19 they were doing it?
20 A.   I had project superintendents and no,
21 they do not direct the work.
22 Q.   And just for my clarification, are you
23 still investigating that or have you reached
24 any conclusions?
25 A.   Still investigating it.

136

1 Q.   And I assume once you conclude your
2 investigation, you'll let TOPS know what
3 you're finding?
4 A.   Yes.
5 Q.   Or what you're thinking?
6 A.   If it's adversarial, for sure.  If it's
7 not, then it is what it is but yes.
8 Q.   Going back to the contract that TOPS
9 had, was that a time-and-material contract?
10 A.   Hourly rate, yes.
11 Q.   So they were not under -- even though
12 the intent was for them to complete that job,
13 they were not on a fixed price or fixed bid
14 amount to complete the job, correct?
15 A.   That's correct.
16 Q.   You could have run them off and they
17 would have been owed for whatever work they
18 had done at that point.  Or if some kind of
19 beef had developed between the two of you
20 all, under their contract, they were to be
21 paid for the work completed as of that point,
22 correct?
23 A.   Apart from any breaches or adversarial
24 findings or whatnot, sure.  They were to be
25 paid hourly.

137

1 Q.   And I think there was some sort of
2 agreement as to perhaps a reduction a bit in
3 the price for the downtime on weather if I
4 recall correctly from looking at it.  Do you
5 recall that one way or the other?
6 A.   I don't recall that.
7 Q.   Okay.  We can pull the contract and look
8 at it.  Over the course for the last 10 years
9 or so I guess it is, has Alliance Marine --
10 I'm sorry.  Allison Marine Holdings, LLC, do
11 they fund the JAB Energy Solutions II
12 operations from time to time?
13 A.   I guess the answer is yes.
14 Q.   And by way of example, if you all had
15 operating expenses, all your payroll or if
16 you incurred expenses getting ready for a job
17 or quoting a job and didn't have revenue
18 coming in, Allison Marine Holdings, LLC would
19 finance or pay those expenses until such time
20 as they were later I guess reimbursed or paid
21 or how did that work?
22 A.   Well, to get the details of that, you
23 would have to ask somebody like Sonda to get
24 more of those details.
25 Q.   As a general concept, is that correct,

138

1 though?
2 A.   As a general concept, money goes into
3 JAB which ultimately goes up to the parent
4 company and then it comes back down from the
5 parent company to fund, to pay the expenses
6 of the operating entity.
7 Q.   And so I'm assuming with Allison Marine
8 Holdings, LLC being the parent company and
9 holding company for multiple entities, you
10 were talking earlier about cash flow.  That
11 there is a cash-flow synergy among all of
12 those companies where at some times, either
13 JAB Energy Solutions II or one of the other
14 entities is flush with cash and then there's
15 other times when you don't have cash coming
16 through those entities and Allison Marine
17 Holdings, LLC would pay the bills and
18 operating expenses in that interim period,
19 correct?
20     MR. THOMAS:
21         Objection.  Misstates his testimony.
22     THE WITNESS:
23         Allison Marine Holdings is the cash
24     management mechanism of all of the
25     companies.

139

1 BY MR. NALLEY:
2 Q.   And when you say that, what do you mean
3 by that?
4 A.   It manages the ins and outs, the inflow
5 and outflow of all of the revenue, all of the
6 receivables and all of the payables of all of
7 the entities underneath it.
8 Q.   And if one of those entities like JAB
9 Energy Solutions II doesn't have adequate
10 cash at a particular time, then Allison
11 covers that cash flow in the interim period,
12 correct?
13 A.   Allison -- JAB Energy Solutions II, LLC
14 doesn't maintain the cash.  The cash goes --
15 all of the receivables ultimately go up to
16 the parent company and then they're
17 disseminated, distributed down to the
18 operating entities to pay payables, payroll,
19 whatever.
20 Q.   As Allison sees fit?
21 A.   As Holdings sees fit, Allison Marine
22 Holdings.
23 Q.   Allison Marine Holdings, LLC sees fit?
24 A.   Yes.
25 Q.   And we would need to talk to Sonda about

140

1 that as to how that is done and the decisions
2 made?
3 A.   That's correct.
4 Q.   And does Steve Orlando get involved in
5 any of that?
6 A.   No.
7 Q.   I assume he's even higher up?
8 A.   No, I told you before, Steve hasn't been
9 involved in years.
10 Q.   Who is above Sonda with Allison Marine
11 Holdings?
12 A.   The board of directors.
13 Q.   Do those kinds of decisions on cash flow
14 get to you all at the board of directors?
15 A.   When it gets tight, yes, we start having
16 to pay attention.
17 Q.   And is that something that comes up now
18 in your weekly status reports?
19 A.   Yes, yes.
20 Q.   So the board of directors for Allison
21 Marine Holdings, LLC is actively monitoring
22 and overseeing that cash flow for JAB Energy
23 Solutions II and the other entities within
24 that holding company?
25 A.   The board of directors actively sees and

141

1 discusses with Sonda or some of the board
2 actively sees and discusses with Sonda the
3 cash-flow requirements and needs of all of
4 the entities, yes.
5 Q.   Has there been any discussion among the
6 board or with the board regarding doing an
7 additional cash call or capital contributions
8 by the members of the holding company?
9 A.   We haven't talked about it recently but
10 we've discussed that.
11 Q.   And how has that been received?
12 A.   Not very good.
13 Q.   Nobody stood up first?
14 A.   Nobody raised their hand.
15 Q.   Those are the meetings you don't want to
16 go to the bathroom in.  We talked about this
17 a little bit earlier.  I want to clean it up
18 a little bit though.
19     With regard to billing, and I'll just use
20 the TOPS bill as an example but I'm assuming
21 it could be any of them.  When TOPS submitted
22 an invoice or a bill to JAB Energy Solutions
23 II, it looks like it was submitted by Lisa
24 Hebert who works with TOPS on it, and an
25 invoice and I'm just going to use JAB II,

142

1 document 192 which is a November 19th, 2020
2 invoice from TOPS to JAB Energy Solutions and
3 so it gets submitted.  Walk me through what
4 happens in you all's office.  I don't know if
5 this was mailed or e-mailed or faxed to you
6 all but it's addressed to the office for JAB
7 Energy Solutions, Suite 200.  Is that the
8 right --
9 A.   Old suite.  That's old.
10 Q.   In the Shenandoah, Texas office just so
11 you know what I'm referencing there.
12 A.   Okay.
13 Q.   Take me through physically what happens.
14 That bill comes in either on the fax machine
15 or by mail.  What goes on?
16     MR. THOMAS:
17         Just so there's not any confusion,
18     you're talking about this one specifi-
19     cally or just generally what he thinks?
20     MR. NALLEY:
21         Well, I'm using this one just so he
22     can see the invoice but I'm asking in
23     general, there are several TOPS
24     invoices.
25 BY MR. MR. NALLEY:

143

1 Q.   So this one in particular, what would
2 have happened when it came in or if you don't
3 know, I wouldn't expect you would remember a
4 particular invoice.  So take me through the
5 process of what goes on in you all's office
6 assuming that comes in either on your fax
7 machine or in your mail service.
8 A.   Well, so an invoice is either mailed to
9 you, mailed to JAB Energy Solutions II, LLC
10 or e-mailed.  We have an e-mail solution for
11 our vendors to e-mail invoices to us.  That
12 invoice would then be captured by one of the
13 admins.  The invoice would be put in the
14 accounting system and logged in as received.
15 Then that invoice would be sent to the proper
16 project manager for his review and approval.
17     Once he reviews it and approves it, then
18 it goes back to the admin and the admin would
19 then put it in as an approved invoice, check
20 whatever box in the accounting software.
21 Then it would be on the payables list and I
22 review the payables list each week and
23 determine in discussion with Sonda which ones
24 are due and need attention or need to be paid
25 that week.  Then she would make the check run

144

1 and pay the invoices.
2 Q.   That particular invoice was addressed to
3 JAB Energy Solutions, no roman numeral 2 on
4 it, based on what you said here earlier
5 today.  I'm assuming that simply goes into
6 the system for JAB Energy Solutions II as
7 opposed to a separate account for just the
8 old JAB Energy Solutions, correct, LLC?
9 A.   There's no old account.  The only
10 account that exists is JAB Energy Solutions
11 II, LLC.  Our MSA clearly says to invoice JAB
12 Energy Solutions II, LLC.  Routinely vendors
13 get things wrong and it's just more trouble
14 than it's worth to try to fix every one of
15 them so if the invoice is for services that
16 were rendered and we accept the invoice, then
17 we just accept it.
18 Q.   Right.  I assume that's probably a
19 fairly frequent occurrence?
20 A.   It's fairly frequent.
21 Q.   This is that funding term sheet I
22 believe that we were talking about earlier.
23 I wanted to ask you a couple questions about
24 it.  It says -- if you don't mind, I'm going
25 to walk over there and look over your

145

1 shoulder.
2     They're talking about a High Island A370
3 funding term sheet. I'm sorry. This is on
4 the old lawsuit. But the payment terms were
5 set out as I understand it in connection with
6 the original bid that you put in for the job;
7 is that correct?
8 A.   Yeah.
9 Q.   It looks like many of the questions that
10 I've had tagged we've already gone over.
11 With regard to the lawsuit in Texas, JAB
12 Energy Solutions and Allison Offshore
13 Services versus Offshore Speciality
14 Fabricators, Inc. and Fairway Offshore which
15 Offshore Domestic Group is now a part of, it
16 was filed in Harris County, Texas. JAB has a
17 law firm representing them in that proceed-
18 ing, correct?
19 A.   Yes.
20 Q.   And that litigation is still ongoing?
21 A.   Yes.
22 Q.   And who is paying the law firm in that
23 case?
24 A.   JAB Energy Solutions II.
25 Q.   And how are you all paying -- where are

146

1 the funds coming from to pay that?
2 A.   From Allison Marine Holdings, or any
3 revenue that JAB is getting which hadn't got
4 but put back into JAB Energy Solutions II
5 from Allison Marine Holdings. We haven't
6 spent any money on that by the way, not much,
7 immaterial.
8 Q.   So Allison Marine, this is part of the
9 cash flow that Allison Marine Holdings, LLC
10 funds for JAB Energy Solutions II, correct?
11 A.   Correct.
12 Q.   The payment of the legal fees?
13 A.   Yes.
14 Q.    Is that true for all the litigation in
15 which JAB Energy Solutions II is currently
16 involved?
17 A.   Yes.
18 Q.   Now we get to the part where you can
19 really educate me on it. JABCO ABC, LLC.
20 A.   Okay.
21 Q.   This is according to the discovery
22 responses filed by JAB Energy Solutions II
23 and yourself, it says on June 2nd, 2021, JAB
24 II made a general assignment to JABCO ABC,
25 LLC and trust for the benefit of JAB II's

147

1 creditors of all of JAB II's property. I
2 assume you were involved in preparing that
3 response or providing the information to the
4 lawyers for it?
5 A.   I was involved in it, yes.
6 Q.   Explain to me what your understanding of
7 what has been done by JAB Energy Solutions II
8 with this general assignment to an entity
9 called JABCO ABC, LLC.
10 A.   It's probably better answered by the
11 assignee than me.
12 Q.   Okay. And I appreciate that on it and
13 I'm trying to learn about this stuff, too, on
14 it. And based on the comment you made
15 earlier, I'm assuming you are as well on it.
16 Have you ever had any dealings with one of
17 these assignments like this before?
18 A.   No, sir.
19 Q.   Tell me what your understanding is of
20 what has been done.
21 A.   The lenders have sent a letter of --
22 have reserved their rights against JAB Energy
23 Solutions II, LLC for the loan documents that
24 we discussed earlier, for the loans we
25 discussed earlier. The lenders then hired

148

1 their lawyers and determined the best course
2 of action for them to get their secured debt
3 paid is to call the receivable, if you will,
4 of JAB. That was the best way that they
5 could get paid.
6     In doing that, between all the lawyers
7 involved in it determined that I think the
8 ABC was the most beneficial solution for all
9 of them. The way I understand it, you've got
10 three or four solutions. You can foreclose
11 on a company. You can do a Chapter 7. You
12 can do a Chapter 11 bankruptcy or if the
13 company is a Delaware entity, Delaware allows
14 this thing called an assignment for the
15 benefit of creditors.
16 Q.   Okay.
17 A.   The lawyers did homework, did whatever
18 they do, you all do, and determined that the
19 ABC was the best solution for those lenders
20 and an ABC was filed. I was provided a
21 document from the assignee for the assignment
22 of the assets. Those assets were assigned.
23 It was signed by one of the board members. I
24 didn't execute the assignment because I
25 didn't have the authority to do that. The

Exhibit A

149
1 board had to authorize that to happen.  I
2 can't assign the assets of JAB.  I'm just the
3 president of JAB.  I can't do it myself.
4 Q.   But you're talking about the board
5 members of Allison Marine Holdings, LLC?
6 A.   That's right.
7 Q.   And you are a board member of that
8 though?
9 A.   Yes, but I was not -- I didn't have the
10 authority to do that as that board member.
11 They may have had to -- I'm not sure if we
12 had to do a resolution or not the board.
13 But the board had to agree that the assign-
14 ment would happen.  And then the assignment
15 happens.
16      The assignee files it with Delaware, in
17 the courts in Delaware.  And I'm not aware of
18 the process after that other than all of the
19 assets of JAB Energy Solutions II do not
20 belong to JAB Energy Solutions II anymore.
21 They belong to whatever that is, JAB ABC.
22 Q.   JABCO ABC, LLC?
23 A.   JABCO ABC, LLC.
24 Q.   Okay.
25 A.   So all of the assets belong to that.

150
1 The assignee then does what a trustee
2 similarly does.  He determines what the
3 assets are.  If there's liquid assets, he
4 collects them into the bank account.  If
5 there's physical assets, he liquidates them
6 and then pays the debt or pays the secured
7 debt.
8      Anything left over after the secured
9 debt, if any, I'm not sure what happens to.
10 I would assume it goes back to Holdings and
11 Holdings -- I would assume it goes back to
12 Holdings.
13 Q.   When you say Holdings, you're talking
14 about Allison Marine Holdings, LLC?
15 A.   Allison Marine Holdings, LLC, yes, sir,
16 sorry.
17 Q.   You can't make me do that all day long.
18 A.   Oh, I know.  I'm sorry.
19 Q.   Who is the owner of JABCO ABC, LLC?
20 A.   The lenders.
21 Q.   Okay.
22 A.   The way I understand it.
23 Q.   All right.
24 A.   Actually, no.  I don't think -- I don't
25 think that would be correct.  I don't think

151
1 the lenders own that.  I don't know.  Good
2 question.
3 Q.   And is it your understanding or that
4 you've been told that all of JAB Energy
5 Solution II's assets have been transferred
6 over to JABCO ABC, LLC?
7 A.   Oh, that is official.  That is fact.
8 Q.   And does that include things like your
9 office equipment and property at the offices
10 in Texas?
11 A.   It is now the property of the ABC, yes.
12 They haven't physically taken it but it is
13 the property of the ABC.  That's correct.
14 Q.   Is the anticipated six-million payment
15 from the trustee in the bankruptcy part of
16 the assets even though it's not yet in
17 accounts receivable?
18 A.   It is an account receivable.  It's a
19 receivable.
20 Q.   Is it at this point?
21 A.   On JAB Energy Solutions II, it has been
22 -- it is a receivable.  It absolutely is a
23 receivable.
24 Q.   So is it your understanding that has
25 been transferred to JABCO as well?

152
1 A.   That's correct.
2 Q.   And is it your understanding that all of
3 the liabilities of JAB Energy Solutions II
4 have also been transferred to this entity or
5 just the assets?
6 A.   I'm not sure how that works.  I'm not
7 sure.
8 Q.   Because from the way you're describing
9 it, it sounds like this mechanism somehow has
10 transferred all the assets to protect the
11 lending creditors leaving everybody else out
12 in the cold.
13 A.   Well, it's no different than a -- it's
14 very similar to a bankruptcy the way I under-
15 stand it.  So again, you've got two or three
16 options as the lender.
17 Q.   Okay.
18 A.   That happens to be one.
19 Q.   And what is your understanding of what
20 will happen then with JAB Energy Solutions II
21 once the trustee liquidates and disposes of
22 all the assets leaving whatever debt is
23 behind at that point?
24 A.   An assignee, it's not called a trustee.
25 I'm sorry to correct but it's an assignee.

Exhibit A

153

1 They're different.  JAB Energy Solutions II,
2 it will be dissolved.  It no longer exists.
3 Q.   And I'm not asking you for a legal
4 opinion on this and I appreciate you sharing
5 with me your understanding of it.  Do you
6 know by what authority this action is being
7 taken?  Is it the State of Delaware?
8 A.   It's the State of Delaware, yes.
9 Q.   Who proposed going in this direction to
10 you?
11 A.   Well, don't make it sound like JAB
12 Energy Solutions decided to do this, right?
13 Lenders ultimately decide what to do.
14 They're the ones that decided what solution
15 that they would go down, what path they would
16 go down.  JAB Energy Solutions II didn't say
17 hey, lender, right?  Come bankrupt us or
18 anything.
19 Q.   Allison Marine Holdings, LLC, have all
20 their assets been transferred to JABCO?
21 A.   No.
22 Q.   If I recall correctly, didn't you tell
23 me that the lenders had loaned the money to
24 Allison Marine Holdings, not to JAB Energy
25 Solutions II?

154

1 A.   That is correct.
2 Q.   Okay.  Do you know how it is then that
3 Allison Marine Holdings, LLC through this
4 mechanism of JABCO is going to be able to
5 absolve themselves of significant debt,
6 ten-plus million dollars of debt, and all of
7 JAB Energy Solutions II's debt by offering up
8 just JAB Energy Solutions' assets?
9     MR. THOMAS:
10        Objection.
11 BY MR. NALLEY:
12 Q.   And I'm not asking you for a legal
13 conclusion.
14     MR. THOMAS:
15        And that's confidential and
16     proprietary information.  Allison Marine
17     Holdings has nothing to do with claims
18     by TOPS.  So whatever Allison Marine
19     Holdings' finances are in relation to
20     other debt has nothing to do this
21     lawsuit.
22 BY MR. NALLEY:
23 Q.   Well, that's to be seen but you can
24 answer the question.
25     MR. THOMAS:

155

1        No.  I'm instructing him not to
2     answer that question.  It has nothing to
3     do with this lawsuit.  He's not Allison
4     Marine Holdings.  If you want to send a
5     discovery request to Allison Marine
6     Holdings, we can fight about it at that
7     point.
8 MR. NALLEY:
9        I'm asking him about his knowledge
10     on it.  He's a board member of Allison
11     Marine Holdings, LLC.  He's the
12     president of JAB Energy Solutions II.
13 MR. THOMAS:
14        Certainly.
15 MR. NALLEY:
16        He certainly has -- and it's not a
17     corporate deposition.  I'm asking him
18     for his own personal knowledge.
19 MR. THOMAS:
20        And I'm telling you that's
21     proprietary and confidential information
22     of Allison Marine Holdings.  What it's
23     doing with its debt with unrelated
24     vendors, anything like that, has nothing
25     to do with TOPS or TOPS' claim.

156

1     MR. NALLEY:
2        Bottom line, are you instructing him
3     not to answer that?
4     MR. THOMAS:
5        I am.
6     MR. NALLEY:
7        Okay.  Ann, if you would tag that
8     section and tomorrow if you would send
9     me just that page or two that has that
10     on there, please.
11     MR. THOMAS:
12        Send me a copy too, please, so I can
13     file a motion.  Thank you.
14        (Whereupon, a discussion was
15        held off the record.)
16 BY MR. NALLEY:
17 Q.   Okay.  Following up on that then,
18 Mr. Boudreaux, if I've understood your
19 testimony correctly, and I understand you
20 didn't put this JABCO maneuver together but
21 I'm asking you for your personal under-
22 standing.  At the end of the day, it's your
23 belief that by using this JABCO assignment,
24 that all of the assets from JAB Energy
25 Solutions II have already been transferred to

Exhibit A

157

1 JABCO ABC, LLC, correct?
2 A.   Correct.
3 Q.   Including even furniture, any asset that
4 you all have, correct?
5 A.   Correct.
6 Q.   And that the -- it's not a liquidator,
7 what do you call him?
8 A.   Assignee.
9 Q.   The assignee will then, plans to
10 liquidate the assets, correct?
11 A.   Correct.
12 Q.   And that includes the six-plus million
13 owed to JAB Energy Solutions II for the work
14 on the High Island platform removal that TOPS
15 did and for which they have billed you all
16 approximately nine million dollars, correct?
17 A.   Correct.
18 Q.   And that the assignee is then planning,
19 as far as you know, to pay off the bank loans
20 that were made to Allison Marine Holdings,
21 LLC, correct?
22 A.   Correct.
23 Q.   And then to dissolve JAB Energy
24 Solutions II, correct?
25 A.   Correct.

158

1 Q.   Which in essence would leave all of JAB
2 Energy Solutions II's creditors including
3 TOPS who did this work with no payment,
4 correct?
5 A.   Assuming that there's no additional
6 funds available after the secured debt is
7 paid, that would be correct much like a
8 bankruptcy.
9 Q.   Just based off of what you told me
10 earlier, given -- I mean what assets got
11 transferred to JABCO ABC, LLC other than the
12 six-million-dollar account receivable from
13 the Black Elk trustee?
14 A.   The receivable, the remaining receivable
15 from the Breton Sound project.
16 Q.   Which is three and a half, four million?
17 A.   Yeah.
18 Q.   Okay.
19 A.   An unsecured claim in the Black Elk
20 liquidation trust.
21 Q.   How much is that for?
22 A.   Somewhere between a million dollars and
23 three million dollars.
24 Q.   And it's an unsecured claim though?
25 A.   It's unsecured.

159

1 Q.   A low likelihood of that --
2 A.   No, a high likelihood of getting paid.
3 Q.   Okay.
4 A.   Timing is -- who knows when that will
5 happen and that's probably it.
6 Q.   And if I recall correctly, the secured
7 bank lending institutions' amounts are 15 to
8 18 million dollars, somewhere around there?
9 A.   Yes, sir.
10 Q.   And growing by the day?
11 A.   And growing by the day.
12 Q.   So as far as you know, that's the plan
13 that this JABCO ABC is supposed to effect?
14 A.   The assignee liquidates the assets and
15 then pays off the secured debt and then the
16 unsecured debt.
17 Q.   Before we got copies of this ABC entity
18 a few weeks ago from your lawyer, had you
19 ever picked up the phone and spoken with
20 Rocky Henderson, Dan Black or Jay Henderson
21 regarding this proposed move?
22 A.   No.
23 Q.   And why is that?
24 A.   One, you had sued me already.  Two, I
25 didn't have an obligation to.

160

1 Q.   In the responses to the discovery that
2 we had sent, I had done one, a request for
3 admission about not disclosing to TOPS during
4 the negotiations for the removal of the
5 platform that JAB Energy Solutions II had
6 limited funds to pay for the removal of the
7 platform.  Part of the response that you all
8 made was TOPS was well aware that payment for
9 the removal of the platform would originate
10 from sources other than JAB II including but
11 not limited to the Black Elk liquidation
12 trust.  Do you recall assisting your lawyer
13 in providing that information?
14 A.   Yes.
15 Q.   What sources for payment other than the
16 Black Elk liquidation trust were you
17 referencing there?
18 A.   Well, any other funds that JAB Energy
19 Solutions II might have received or anything
20 that Allison Marine Holdings would have
21 allowed JAB Energy Solutions II to use.
22 Q.   Who would make that decision other than
23 Sonda as to what other Allison Marine
24 Holdings, LLC assets might be used to pay
25 those debts or is it just a decision she

Exhibit A

161

1 makes?

2 A. Again it's cash management. She doesn't
3 say I'm going to fund one without the other
4 nor do I or the board. It's just about cash
5 management. Whatever comes into the company
6 is then sent out, comes into Allison Marine
7 Holdings is then used to pay the debt of all
8 of the operating entities under the shell.

9 Q. But if you get into a situation like it
10 appears you are now where you've got more
11 demands for payment than you have cash, who
12 makes the decision who's going to get paid
13 and who doesn't get paid or who's going to
14 get paid part and who's going to get paid in
15 whole?

16 A. Well, it's a collective decision between
17 whoever is running the business, me or Hank
18 on the other side and Sonda and even, you
19 know, up to some of the board.

20 Q. Some of the board of Allison Marine?

21 A. Allison Marine Holdings, LLC, yeah.

22 Q. So theoretically if you went to the
23 board and pitched a fit that TOPS wasn't
24 getting paid and you had a personal assurance
25 to them that they were going to get paid,

162

1 that that would be a decision that the board
2 could then evaluate and decide and they might
3 say we're not going to pay them. We're going
4 to pay something else or we're not going to
5 pay anybody or they might decide hey, we're
6 going to bump TOPS up in front of somebody
7 else that we were thinking about paying,
8 correct?

9 A. Other than I don't make personal
10 assurances to any vendors, but yeah, it all
11 depends on the cash flow of it. So you're
12 studying cash flow and deciding what vendors
13 are critical. When you get into a cash
14 crunch, every company does it, right? You
15 have to see who's critical, who's not and you
16 manage your cash accordingly.

17 Q. Do you consider TOPS to be a critical
18 vendor to you all or did you?

19 A. Yeah, at the time absolutely. That's
20 why we made the payments we made.

21 Q. I may have asked you a little bit about
22 this before but in your 10 years or so with
23 JAB Energy Solutions II, have there been
24 other vendors other than that Shore situation
25 who have not gotten paid by you all?

163

1 A. Other than -- no, other than what we
2 talked about for High Island 8370, no.

3 Q. Are you familiar with this Albert Altro
4 who is involved with JABCO ABC?

5 A. I think he's the assignee, yeah.

6 Q. Have you ever dealt with him before?

7 A. No.

8 Q. Do you know what expertise or experience
9 he brought to the table as to why he got
10 involved in this?

11 A. No. Again, I didn't make that decision.
12 That's the lenders that decide the assignee.

13 Q. I understand. In looking at a lot of
14 the e-mails among or with various people on
15 your side, it looks like all of the people in
16 your group have Energy Solutions dot com
17 e-mails on it. Are you aware of anybody
18 having an Energy Solutions II dot com?

19 A. No, doesn't exist.

20 Q. I'm sorry?

21 A. That doesn't exist.

22 Q. And we talked earlier about all these
23 various entities Allison Marine's got and
24 there's a lot. And like with JAB Energy
25 Solutions II, there's a lot of them that have

164

1 the original name and then that same name II
2 on it. Were those entities all reorganized
3 and renamed as whatever II as a result of
4 that 2011 transaction?

5 A. Yes.

6 Q. I noticed in some of the correspondence
7 from Becky Sandlin, S-A-N-D-L-I-N, that she
8 is listed as an administrative assistant for
9 JAB Energy Solutions, LLC and Allison Marine
10 Holdings as late as just a few months ago.
11 Do you know why that is?

12    MR. THOMAS:

13       Can you show him what you're
14    referring to?

15 BY MR. NALLEY:

16 Q. Sure. It's marked JAB II, document 202
17 Bate's stamp and at the top, it is an e-mail
18 from Jay Henderson to Becky Sandlin and
19 accounts payable, Brent Boudreaux, Allan
20 Vando regarding a credit memo. And then down
21 at the bottom in that stream is an e-mail
22 from Becky Sandlin dated January 20th, 2021
23 to Lisa Hebert with carbon copy going to
24 Sonda Robertson, accounts payable and it's
25 down here at the bottom.

165

1 A.    Yeah, you're just referring to her
2 signature block?
3 Q.    Yes, sir.
4 A.    Because I never noticed it or I would
5 have corrected it.  It's incorrect.
6 Q.    But she is, in fact, listed as an
7 administrative assistant for JAB Energy
8 Solutions, LLC and Allison Marine Holdings,
9 correct?
10 A.    No, she's an administrative assistant
11 for JAB Energy Solutions II, LLC.
12 Q.    That's not what the document -- I'm not
13 asking you on -- I'm saying from the document
14 standpoint, it says JAB Energy Solutions LLC,
15 not II?
16 A.    From her signature block, yes, you're
17 correct.
18 Q.    And for Allison Marine Holdings?
19 A.    For her signature block, you're correct.
20 Q.    And Becky, who is she actually paid by?
21 A.    JAB Energy Solutions II, LLC.
22 Q.    Do you know why her signature block
23 includes Allison Marine Holdings?
24 A.    Because I never corrected it.  I never
25 noticed it and corrected it.

166

1 Q.    I want to pull some corporate documents
2 and registrations.  JAB Energy Solutions, LLC
3 that we've talked about at some length here
4 has listed as the officers Henry Robards,
5 Steve Orlando and yourself as a member
6 manager.  Agree or disagree?
7 MR. THOMAS:
8         Objection.  Show him the document
9     you're looking at.
10 MR. NALLEY:
11         The top half.
12 MR. THOMAS:
13         Where's it from?
14 MR. NALLEY:
15         Secretary of State documentation I
16     believe.
17 MR. THOMAS:
18         When did you pull it?
19 MR. NALLEY:
20         Huh?
21 MR. THOMAS:
22         When you did pull it?
23 MR. NALLEY:
24         Within the last few weeks.
25 MR. THOMAS:

167

1         I'm just going to object because the
2     authenticity, I have no idea what that
3     is.
4 MR. NALLEY:
5         That's fine.
6 THE WITNESS:
7         That's probably accurate when it was
8     formed, registered in 2008.
9 BY MR. NALLEY:
10 Q.    And even though it's inactive, is that
11 still the situation as far as you know?
12 A.    As far as I know, probably so.  I don't
13 know that we changed it.
14 Q.    And with regard to JAB Energy Solutions
15 II, LLC, you are listed as the member
16 manager, agree or disagree, on the bottom
17 there?
18 A.    Okay.  That's what the document --
19 that's what this says.
20 Q.    Do you agree or disagree that that is
21 correct?
22 A.    I have no idea.
23 Q.    Okay.
24 A.    I don't know.
25 Q.    What does Allison Offshore Services do?

168

1 A.    Allison Offshore Services, LLC doesn't
2 do anything.
3 Q.    What about Allison Offshore Services II,
4 LLC?
5 A.    They provide offshore labor and some
6 small fabrication.
7 Q.    And what kind of fabrication?
8 A.    Small fabrication.
9 Q.    And Allison Marine Morgan City II, what
10 do they do?
11 A.    Nothing anymore.
12 Q.    What did they do?
13 A.    Operated the shale dock in Morgan City,
14 shale offshore.
15 Q.    Let me go through and kind of fill in
16 some gaps.  I didn't ask you this before and
17 I don't mean nothing personal by it.  Have
18 you ever been convicted of any felonies?
19 A.    DUI.
20 Q.    Anything other than that?
21 A.    No.
22 Q.    Did that involve a fatality or bad
23 accident --
24 A.    No.
25 Q.    -- that resulted in being a felony?

169

1  A.   No.

2  Q.   Mr. Boudreaux, I'm going to take about a

3  five-minute break and talk with people who

4  are much smarter than I am, see what I missed

5  and then I'll be back for just a few more

6  questions.

7       MR. THOMAS:

8            I thought you meant me.

9            (Off the record 2:43 p.m.

10           Back on the record 2:50 p.m.)

11 BY MR. NALLEY:

12 Q.   Going back to earlier this morning,

13 Mr. Boudreaux, you were telling me about who

14 the owners and board members were on Allison

15 Marine Holdings, LLC, and you said is it

16 Lincoln --

17 A.   Lincolnshire.

18 Q.   Shire?

19 A.   Yeah.

20 Q.   And to your knowledge, had they loaned

21 any money to Allison Marine?

22 A.   No.

23 Q.   And do you know, are the three board

24 members always the same from Lincolnshire or

25 do they just rotate people in and out?

170

1  A.   No, they stay the same.  There have been

2  some changes but the changes are because

3  somebody left the company or whatnot but I

4  think we've had the same board members for

5  quite some time.

6  Q.   Can you give me the names of who those

7  people are?

8  A.   I will send them to Miles.

9  Q.   Okay.  That will be fine.  Sir, I think

10 that's all the questions I have.  I

11 appreciate your time and your patience.

12 A.   Okay.

13 Q.   Enjoyed meeting you.

14 A.   Thank you.

15      MR. NALLEY:

16           Do you all want to read and sign?

17      MR. THOMAS:

18           I think he ought to read, yeah.  And

19      no questions.

20           (Deposition ends 2:52 p.m.)

21

22

23

24

25

171

1           C E R T I F I C A T E

2       I, ANN M. DOWNS, Certified Court

3  Reporter, in and for the State of Louisiana,

4  as an officer before whom this testimony was

5  taken, do hereby certify that BRENT

6  BOUDREAUX, after having been duly sworn by me

7  upon authority of R.S. 37:2554, did testify

8  as hereinbefore set forth in the foregoing

9  170 pages; that this testimony was reported

10 by me in the stenotype reporting method, was

11 prepared and transcribed by me or under my

12 personal direction and supervision, and is a

13 true and correct transcript to the best of my

14 ability and understanding.

15      That the transcript has been prepared in

16 compliance with transcript format guidelines

17 required by the statute or by rules of the

18 board, and that I am informed about the

19 complete arrangement, financial or otherwise,

20 with the person or entity making arrangements

21 for deposition services; that I have acted in

22 compliance with the prohibition on

23 contractual relationships, as defined by

24 Louisiana Code of Civil Procedure Article

25 1434 and in rules and advisory opinions of

172

1  the board; that I have no actual knowledge

2  of any prohibited employment or contractual

3  relationship, direct or indirect, between a

4  court reporting firm and any party litigant

5  in this matter nor is there any such

6  relationship between myself and a party

7  litigant in this matter.  I am not related to

8  counsel or to the parties herein, nor am I

9  otherwise interested in the outcome of this

10 matter.

11      This certification is valid only for a

12 transcript accompanied by my original

13 signature and original stamped seal on this

14 page.

15

16

17

18

19

20

21

22

23           _____
             ANN M. DOWNS
             Certified Court Reporter

24           State of Louisiana
             Certificate Number 81041

25

**- 1 -**

**1,193,801** [1] 102:19
**11TH** [1] 14:21
**13TH** [1] 1:21
**1434** [1] 171:25
**16-ISH** [1] 76:19
**16TH** [1] 127:7
**1922** [1] 32:14
**19221** [1] 32:15
**19TH** [2] 127:7; 142:1

**- 2 -**

**200-THOUSAND-D OLLAR** [1] 101:10
**2006** [1] 6:4
**2008** [8] 8:14, 15, 24; 11:16; 13:4; 38:4; 42:1; 167:8
**2009** [1] 14:13
**2011** [19] 9:18; 10:21, 23; 12:19; 17:11; 21:20; 23:6, 9; 24:15; 25:24; 27:11; 31:7; 32:25; 38:9; 41:21; 53:4; 67:23; 164:4
**2013** [2] 40:14; 41:6
**2016** [3] 75:9; 132:22, 23
**2017** [4] 84:10; 100:8; 113:3
**2018** [6] 84:11; 90:7; 113:4; 114:7, 9, 11
**2020** [13] 69:24; 84:15; 85:10; 95:18; 102:23; 104:13; 112:16; 114:8; 117:25; 130:22; 133:2; 134:21; 142:1

**2021** [6] 1:21; 85:11; 102:23; 104:13; 146:23; 164:22
**2022** [1] 40:12
**20TH** [1] 164:22
**21-CV-00672** [1] 1:5
**2450** [2] 1:19; 2:5
**2554** [1] 171:7

**- 3 -**

**3.35** [1] 131:11
**30-MILLION** [1] 55:15

**- 4 -**

**469,970** [1] 127:19

**- 7 -**

**70001** [2] 1:20; 2:6
**70118** [1] 2:12
**77316** [1] 3:16

**- 8 -**

**8011** [1] 2:12
**81041** [1] 172:24
**8370** [4] 77:23; 102:4; 122:10; 163:2

**- A -**

**A.M.** [3] 1:22; 50:21, 22
**A370** [1] 145:2
**ABANDON** [1] 103:13
**ABANDONMENT** [1] 76:22
**ABERRATIONALL Y** [2] 129:10, 12

**ABILITY** [2] 66:24; 171:14
**ABNORMAL** [1] 55:13
**ABOVE** [7] 55:8, 10; 63:19, 25; 64:1; 108:18; 140:10
**ABOVE-ENTITLED** [1] 1:13
**ABSOLUTELY** [8] 31:17; 58:13; 71:2; 131:1; 132:14, 19; 151:22; 162:19
**ABSOLVE** [1] 154:5
**ACCEPT** [3] 95:24; 144:16, 17
**ACCEPTABLE** [1] 83:1
**ACCEPTED** [2] 82:12; 131:18
**ACCEPTING** [1] 121:13
**ACCIDENT** [1] 168:23
**ACCOMPANIED** [1] 172:12
**ACCORDANCE** [1] 90:12
**ACCORDING** [1] 146:21
**ACCORDINGLY** [1] 162:16
**ACCOUNT** [20] 39:14; 40:19; 41:16, 20; 42:3, 4, 7, 16; 46:15; 47:13, 21, 22; 52:17; 61:11; 144:7, 9, 10; 150:4; 151:18; 158:12
**ACCOUNTANT** [1] 36:12
**ACCOUNTING** [14] 36:10; 45:14, 15, 17, 21;

48:24; 50:2; 53:23, 25; 58:21, 23; 71:13; 143:14, 20
**ACCOUNTS** [10] 52:23; 65:4, 22; 66:21; 111:4, 11; 151:17; 164:19, 24
**ACCURATE** [4] 15:22, 23, 25; 167:7
**ACKNOWLEDGIN G** [1] 93:18
**ACQUIRE** [1] 23:4
**ACQUIRED** [2] 11:3; 131:20
**ACTED** [1] 171:21
**ACTING** [1] 10:6
**ACTION** [2] 148:2; 153:6
**ACTIONS** [1] 109:18
**ACTIVE** [1] 52:17
**ACTIVELY** [5] 52:14; 58:11; 140:21, 25; 141:2
**ACTIVITY** [2] 18:8; 53:1
**ACTUAL** [3] 19:6; 63:21; 172:1
**ACTUALLY** [20] 7:3; 18:16; 31:19; 32:10; 39:20; 40:2; 43:4; 49:19; 64:2; 67:13; 86:21; 101:1; 102:17; 114:25; 127:12; 129:8; 132:18; 133:13; 150:24; 165:20
**ADDITIONAL** [7] 92:8; 94:16; 101:15; 105:12;

**Exhibit A**

110:18; 141:7; 158:5

**ADDRESS** [3] 5:15; 32:12; 37:23

**ADDRESSED** [2] 142:6; 144:2

**ADEQUATE** [1] 139:9

**ADHERED** [1] 71:22

**ADMIN** [9] 33:19, 20, 25; 34:16, 17; 44:1, 2; 143:18

**ADMINISTER** [1] 1:16

**ADMINISTRATIVE** [6] 43:21; 49:13; 50:1; 164:8; 165:7, 10

**ADMINS** [1] 143:13

**ADMISSION** [1] 160:3

**ADVANCE** [1] 4:23

**ADVERSARIAL** [3] 131:22; 136:6, 23

**ADVERTISEMENT** [1] 72:13

**ADVISE** [1] 99:21

**ADVISED** [2] 117:23; 121:19

**ADVISORY** [1] 171:25

**AFRICK** [1] 1:6

**AFTER** [12] 14:21; 25:14; 26:24; 27:4, 9, 11; 34:12; 133:8; 149:18; 150:8; 158:6; 171:6

**AGGIE** [1] 5:22

**AGREE** [10] 66:11; 92:18; 119:19, 21; 128:25; 134:7;

149:13; 166:6; 167:16, 20

**AGREED** [11] 3:2; 20:1; 26:16; 80:15; 99:4; 119:19, 23, 24; 122:16; 124:20; 130:6

**AGREEING** [1] 91:8

**AGREEMENT** [25] 64:2; 66:18; 67:17, 19; 79:9, 11, 13, 20; 80:1, 5; 81:23; 82:15; 83:2, 3; 90:25; 92:22, 24; 93:4; 96:24; 98:5; 115:10; 119:5; 123:1, 4; 137:2

**AHEAD** [1] 40:2

**ALBERT** [1] 163:3

**ALCOHOL** [1] 5:3

**ALL'S** [2] 142:4; 143:5

**ALLAN** [12] 9:7, 10; 10:14, 15; 22:4; 26:22; 29:12; 33:14; 34:13; 117:9; 164:19

**ALLAN'S** [3] 27:21; 28:5; 30:14

**ALLEGEDLY** [1] 87:23

**ALLIANCE** [1] 137:9

**ALLISON** [179] 3:25; 13:10, 11, 15; 14:14; 16:10; 18:10; 19:22; 20:6, 7, 8, 12, 16, 19; 21:12, 16, 22; 22:14, 16; 24:12, 14, 18, 21, 23, 24; 25:1, 3, 21, 24; 27:22; 28:4,

8, 19, 23; 29:2, 4, 16; 30:4, 20; 35:17, 18, 22; 36:6, 7; 38:15; 39:4, 20; 40:16; 41:11, 13, 15, 21; 42:8, 10, 13; 44:15; 45:1, 5, 7, 11, 12, 16; 46:11, 21; 47:9; 48:8; 49:12, 20, 22, 23, 25; 50:8; 51:6, 9, 13; 53:6, 11, 19, 20, 22; 54:19; 56:18; 58:4, 16, 22; 59:10; 60:2; 61:2; 63:11, 12, 23; 64:15, 17, 22, 25; 65:1, 2, 3; 68:23; 69:1, 12; 70:5, 19, 22; 71:3, 10; 72:5, 8, 10, 15, 23, 24; 73:1, 6, 11; 105:23; 106:8, 14, 18; 107:3, 9, 12; 108:1, 11, 24; 109:18, 21; 110:4, 9; 128:2; 137:10, 18; 138:7, 16, 23; 139:10, 13, 20, 21, 23; 140:10, 20; 145:12; 146:2, 5, 8, 9; 149:5; 150:14, 15; 153:19, 24; 154:3, 16, 18; 155:3, 5, 10, 22; 157:20; 160:20, 23; 161:6, 20, 21; 163:23; 164:9; 165:8, 18, 23; 167:25; 168:1, 3, 9; 169:14, 21

**ALLOW** [4] 94:14, 19; 108:1; 128:3

**ALLOWED** [3] 69:19; 70:17; 160:21

**ALLOWS** [1] 148:13

**ALMOST** [1] 56:12

**ALONG** [1] 21:10

**ALREADY** [8] 19:20; 26:12; 119:2; 123:15; 126:16; 145:10; 156:25; 159:24

**ALTHOUGH** [1] 60:22

**ALTRO** [1] 163:3

**ALWAYS** [3] 115:2; 130:15; 169:24

**AMELIA** [1] 73:17

**AMERICAN** [5] 39:24, 25; 40:10; 46:19; 100:15

**AMONG** [3] 138:11; 141:5; 163:14

**AMONGST** [2] 76:14; 119:6

**AMOUNT** [23] 24:2; 29:18; 30:20; 51:8, 12; 55:23; 61:7; 67:11; 83:24; 91:25; 94:1; 106:10; 118:11; 119:3, 20; 120:15; 121:14; 122:9, 23; 123:6, 12; 130:18; 136:14

**AMOUNTS** [12] 30:23; 77:4, 6; 86:6; 90:22; 92:5, 8; 95:6; 102:16; 109:2, 23; 159:7

**ANCHORS** [2] 96:1, 12

**Exhibit A**

**ANNUALLY** [1] 56:2

**ANOTHER** [11] 11:19, 21; 13:16; 51:10; 53:15; 68:2; 82:17; 107:22; 127:24; 131:20; 134:24

**ANSWER** [12] 3:12; 4:14; 28:13, 15; 29:23; 71:21; 106:3; 125:25; 137:13; 154:24; 155:2; 156:3

**ANSWERED** [1] 147:10

**ANSWERS** [1] 5:10

**ANTICIPATED** [1] 151:14

**ANTICIPATING** [2] 94:5; 126:14

**ANYMORE** [5] 8:12; 9:15; 111:25; 149:20; 168:11

**AOS-GJ065** [1] 100:17

**APART** [1] 136:23

**APLC** [1] 1:19

**APOLOGIZE** [1] 93:17

**APPARENT** [1] 129:18

**APPEARANCES** [1] 2:1

**APPEARS** [1] 161:10

**APPLICATION** [4] 69:2, 16, 17; 109:14

**APPLICATIONS** [1] 109:8

**APPLIED** [4] 6:22; 68:24; 69:7, 10

**APPLY** [2] 69:4; 71:9

**APPRECIATE** [3] 147:12; 153:4; 170:11

**APPROACHED** [1] 90:3

**APPROVAL** [2] 61:3; 143:16

**APPROVE** [6] 43:17, 18, 25; 47:2, 3; 112:23

**APPROVED** [2] 55:11; 143:19

**APPROVES** [1] 143:17

**APPROXIMATELY** [2] 6:18; 157:16

**ARCHEOLOGICAL** [1] 100:13

**ARE-YOU** [1] 20:21

**AREA** [4] 4:20; 7:25; 8:19; 124:6

**AREAS** [1] 96:2

**ARISE** [1] 62:13

**ARM'S-LENGTH** [1] 73:10

**AROUND** [9] 8:14, 15; 69:11; 70:13; 78:22; 101:5; 123:18; 132:4; 159:8

**ARRANGEMENT** [5] 65:4; 67:14; 77:9; 80:13; 171:19

**ARRANGEMENTS** [2] 85:25; 171:20

**ARTICLE** [1] 171:24

**ARTIFICIAL** [1] 101:8

**ASHLYN** [1] 2:16

**ASPECTS** [3] 31:18, 24; 57:12

**ASSESSMENT** [1] 96:11

**ASSET** [4] 23:14; 25:3; 38:12; 157:3

**ASSETS** [37] 23:23, 25; 24:8, 9; 25:4, 10, 16, 25; 26:17; 38:11; 63:15; 64:5, 20, 23; 110:21; 111:1; 148:22; 149:2, 19, 25; 150:3, 5; 151:5, 16; 152:5, 10, 22; 153:20; 154:8; 156:24; 157:10; 158:10; 159:14; 160:24

**ASSIGN** [3] 64:20; 149:2, 13

**ASSIGNED** [3] 110:25; 111:12; 148:22

**ASSIGNEE** [13] 110:25; 147:11; 148:21; 149:16; 150:1; 152:24, 25; 157:8, 9, 18; 159:14; 163:5, 12

**ASSIGNMENT** [8] 111:19; 146:24; 147:8; 148:14, 21, 24; 149:14; 156:23

**ASSIGNMENTS** [1] 147:17

**ASSISTANT** [3] 164:8; 165:7, 10

**ASSISTING** [1] 160:12

**ASSOCIATED** [1] 68:22

**ASSOCIATION** [1] 35:23

**ASSUME** [14] 4:1; 28:22; 30:3; 35:3; 43:21; 46:5; 48:22; 61:13; 136:1; 140:7; 144:18;

**ASSUMING** [12] 17:9; 47:2; 102:14; 103:22; 121:8; 134:15; 138:7; 141:20; 143:6; 144:5; 147:15; 158:5

**ASSURANCE** [1] 161:24

**ASSURANCES** [1] 162:10

**ATTEMPTED** [2] 109:22; 110:7

**ATTENTION** [2] 140:16; 143:24

**AUTHENTICITY** [1] 167:2

**AUTHORITY** [5] 55:3; 148:25; 149:10; 153:6; 171:7

**AUTHORIZE** [1] 149:1

**AUTHORIZED** [2] 1:15; 42:15

**AVAILABLE** [3] 110:2, 13; 158:6

**AVENUE** [2] 1:19; 2:5

**AVOIDANCE** [1] 96:1

**AWARDED** [4] 73:4; 76:3, 13; 128:17

**AWARE** [7] 59:13; 68:1; 94:1; 132:12; 149:17; 160:8; 163:17

**AWAY** [1] 89:15

**AWHILE** [5] 55:22; 59:19, 20; 60:16; 108:5

147:2; 150:10, 11

---

- B -

**B-O-H-N-E-T** [1] 18:22

**Exhibit A**

**BACK** [42] 6:8; 17:20; 20:15; 30:25; 33:8; 37:19; 40:3; 44:10; 50:22; 71:14; 76:12; 81:15; 89:12; 93:10; 94:10; 95:18; 98:9; 104:11; 106:3; 108:6, 7; 112:14; 113:13; 118:12, 24; 125:13; 126:20; 127:13, 25; 132:13; 135:2, 4; 136:8; 138:4; 143:18; 146:4; 150:10, 11; 169:5, 10, 12

**BACKGROUND** [1] 5:18

**BACKUP** [1] 44:5

**BALANCE** [7] 61:11; 67:1, 2, 3, 23; 110:4; 116:5

**BALLPARK** [5] 24:2; 43:1; 85:1; 94:2; 96:18

**BANK** [18] 47:14, 16, 17, 18, 22; 62:2, 8; 66:12, 17; 67:6, 9; 68:3; 71:23; 109:14; 150:4; 157:19; 159:7

**BANKER** [1] 66:5

**BANKING** [2] 46:17; 130:19

**BANKRUPT** [1] 153:17

**BANKRUPTCY** [19] 76:1, 2, 3, 11; 77:8; 81:11; 91:19, 20; 94:16, 21; 99:10; 112:10; 131:17, 18, 21; 148:12; 151:15; 152:14; 158:8

**BANKS** [1] 48:3

**BARGE** [1] 7:5

**BARGES** [2] 7:6, 10

**BASED** [9] 6:14; 7:25; 8:1; 11:8; 62:6; 118:10; 144:4; 147:14; 158:9

**BASIC** [1] 4:4

**BASICALLY** [4] 98:11; 103:3; 104:16; 123:24

**BASIS** [10] 31:12; 35:19; 53:13; 56:9; 59:25; 60:5, 25; 74:24; 80:23

**BATE'S** [2] 101:25; 164:17

**BATHROOM** [1] 141:16

**BECKY** [8] 33:19, 21; 34:14, 15; 164:7, 18, 22; 165:20

**BECOME** [1] 129:18

**BEEF** [1] 136:19

**BEGAN** [2] 90:17; 116:22

**BEGINNING** [1] 5:15

**BEHALF** [2] 29:22; 60:8

**BEHIND** [2] 106:23; 152:23

**BELIEF** [1] 156:23

**BELIEVE** [17] 24:25; 32:4; 54:18; 60:22; 64:7; 80:11; 100:13; 118:7; 119:13, 22, 24; 120:5; 121:7; 130:1, 5; 144:22; 166:16

**BELONG** [3] 149:20, 21, 25

**BENEFICIAL** [1] 148:8

**BENEFICIARY** [1] 97:23

**BENEFIT** [6] 111:20, 23; 112:1; 146:25; 148:15

**BENEFITS** [5] 29:20; 39:8, 10; 45:23, 24

**BEST** [9] 122:17, 22; 124:5, 21; 127:16; 148:1, 4, 19; 171:13

**BETTER** [4] 6:20; 90:17; 97:16; 147:10

**BIDDER** [1] 89:25

**BIDDERS** [1] 77:12

**BIDDING** [1] 31:25

**BIDS** [3] 89:18, 19, 20

**BILL** [16] 22:6; 42:24; 43:3, 4, 8, 20; 44:2, 20; 45:2; 46:20; 99:8; 132:13; 141:20, 22; 142:14

**BILLED** [1] 157:15

**BILLING** [1] 141:19

**BILLS** [3] 44:13; 121:21; 138:17

**BIRTH** [1] 5:12

**BLACK** [26] 2:15; 75:16, 17, 20, 25; 76:11; 83:6; 90:20; 91:17, 19; 97:18; 98:9, 20, 25; 99:1, 3, 10, 12; 122:13; 123:3; 132:8; 158:13, 19;

159:20; 160:11, 16

**BLOCK** [4] 165:2, 16, 19, 22

**BOARD** [45] 22:10, 11; 23:18; 54:3, 4, 19; 55:4, 7, 12, 18, 20; 56:2, 15, 18; 57:19, 22, 24; 58:5; 90:16; 113:23; 140:12, 14, 20, 25; 141:1, 6; 148:23; 149:1, 4, 7, 10, 12, 13; 155:10; 161:4, 19, 20, 23; 162:1; 169:14, 23; 170:4; 171:18; 172:1

**BOAT** [1] 100:24

**BOEM** [5] 97:23; 98:7, 22, 23; 99:20

**BOHNET** [2] 18:18, 20

**BOND** [19] 80:19; 83:7; 90:20; 97:1, 7, 14, 17, 19, 22, 24; 98:7, 22, 23; 99:2, 5, 6, 9, 11

**BONDING** [6] 83:7; 96:23, 24; 97:11, 25; 98:16

**BONDS** [1] 97:3

**BONUSES** [1] 35:6

**BORROW** [2] 110:10, 11

**BORROWED** [1] 62:14

**BOTH** [3] 20:10; 82:10; 122:16

**BOTTOM** [4] 156:2; 164:21, 25; 167:16

**BOUDREAUX** [24] 1:8, 12; 2:9; 3:4, 15, 22; 19:5;

**Exhibit A**

28:9; 33:16; 38:1; 40:13, 16; 50:24; 74:25; 75:1, 6; 89:14; 130:21; 135:4; 156:18; 164:19; 169:2, 13; 171:6

**BOUGHT** [5] 15:7; 16:20; 24:9, 11; 38:11

**BRAGGED** [1] 132:17

**BREACH** [2] 66:17; 126:10

**BREACHED** [3] 66:11; 88:12; 126:21

**BREACHES** [1] 136:23

**BREAK** [7] 4:10, 12; 50:19; 78:21; 82:9; 134:24; 169:3

**BRENT** [16] 1:8, 12; 2:9; 3:4, 15; 19:4; 28:9; 30:10; 40:13, 16; 74:24; 75:1, 6; 132:18; 164:19; 171:5

**BRETON** [3] 103:11; 111:7; 158:15

**BROAD** [1] 19:25

**BROKEN** [1] 78:24

**BROUGHT** [7] 10:9, 10; 78:2; 87:4, 16, 18; 163:9

**BSEE** [7] 95:21; 96:2, 5; 97:3; 98:6; 99:20; 135:7

**BUCKET** [2] 16:23; 17:2

**BUCKS** [1] 123:19

**BUDGET** [1] 85:8

**BUMP** [1] 162:6

**BUNCH** [3] 76:9; 79:3

**BUNDLE** [3] 15:18; 16:21, 22

**BUNDLED** [4] 15:4; 16:5, 12, 23

**BUSINESS** [31] 5:20; 8:9; 9:15; 10:2, 4, 10, 20, 24; 11:1; 18:7, 8; 22:15, 17; 25:20; 27:13; 35:23; 36:18; 37:2, 10; 54:14; 55:6; 56:3; 66:8; 71:8; 75:18; 97:16; 107:1; 113:5; 128:14, 16; 161:17

**BUSINESSES** [1] 36:3

**BUSINESSMAN** [1] 134:7

**BUYING** [1] 25:4

── - C - ──

**CALL** [7] 41:5; 77:15; 80:14; 133:21; 141:7; 148:3; 157:7

**CALLED** [14] 16:8, 9, 10; 75:16; 76:3; 105:6; 115:11; 127:12, 22; 131:6; 147:9; 148:14; 152:24

**CALLS** [1] 125:23

**CALLY** [1] 142:19

**CAPACITY** [2] 10:17; 55:3

**CAPITAL** [6] 10:11; 26:7; 61:6; 103:5; 110:12; 141:7

**CAPTURED** [1] 143:12

**CARBON** [1] 164:23

**CARD** [21] 36:18; 37:2, 15; 39:15, 17, 20, 21; 40:3, 11; 41:12, 14, 22, 25; 42:3, 13, 15, 18, 23; 43:5, 20; 44:2

**CARDS** [2] 37:10; 41:10

**CAREER** [1] 10:16

**CARLYSS** [1] 6:15

**CARRY** [1] 46:9

**CASE** [6] 12:6; 78:17; 88:9; 92:23; 93:8; 145:23

**CASES** [3] 57:4, 7; 133:21

**CASH** [37] 24:1, 2, 5; 38:13; 68:16; 105:24; 106:7, 9, 14, 16, 21; 107:2, 6, 13, 25; 108:10; 109:16; 128:3; 138:10, 14, 15, 23; 139:10, 11, 14; 140:13, 22; 141:7; 146:9; 161:2, 4, 11; 162:11, 12, 13, 16

**CASH-FLOW** [8] 105:22; 108:17, 19, 23, 25; 116:10; 138:11; 141:3

**CASTLEGATE** [3] 61:25; 65:13; 67:7

**CAUSE** [3] 1:13; 3:13, 18

**CAUSING** [1] 117:16

**CAVEAT** [1] 120:20

**CEASE** [1] 11:1

**CEFALU** [1] 22:6

**CENTRAL** [1] 81:4

**CERTAINLY** [4] 57:11; 64:10; 155:14, 16

**CERTIFICATE** [3] 95:17; 117:24; 172:24

**CERTIFICATION** [2] 3:7; 172:11

**CERTIFIED** [4] 1:15; 2:25; 171:2; 172:23

**CERTIFY** [1] 171:5

**CETERA** [1] 71:6

**CHANGE** [7] 8:9; 11:4; 21:17; 26:5; 38:9; 68:6; 91:6

**CHANGED** [6] 8:10; 41:17, 19, 22; 99:19; 167:13

**CHANGES** [3] 49:19; 170:2

**CHANNING** [1] 2:11

**CHAPTER** [2] 148:11, 12

**CHARGE** [1] 117:7

**CHARGES** [1] 43:5

**CHART** [1] 20:2

**CHEAPER** [1] 112:13

**CHECK** [13] 46:22; 47:3, 9, 11; 48:19, 20; 60:22; 64:12; 102:16; 126:15; 127:15; 143:19, 25

**CHECK-SIGNING** [2] 60:11, 23

**CHECKED** [1] 44:8

**CHECKING** [4] 46:15; 47:21; 52:17; 61:10

**CHECKS** [5] 28:19; 44:6; 60:8, 15, 21

**CHEVRON** [3] 8:17, 21; 9:1

**CIRCUMSTANCES** [1] 107:1

**CITY** [4] 13:15; 24:25; 168:9, 13

**CIVIL** [2] 3:5; 171:24

**CLAIM** [5] 93:20, 25; 155:25; 158:19, 24

**CLAIMED** [2] 93:11; 94:2

**CLAIMS** [5] 78:1; 93:19, 25; 95:3; 154:17

**CLARIFICATION** [2] 4:6; 135:22

**CLARIFY** [2] 31:2; 101:22

**CLEAN** [2] 135:5; 141:17

**CLEARANCE** [7] 76:23; 79:1; 81:18; 89:17; 101:2; 102:5

**CLEARLY** [2] 125:10; 144:11

**CLIENT** [2] 75:18, 20

**CLIENTS** [2] 10:6; 31:22

**CLOSE** [3] 10:23; 67:12; 83:21

**CODE** [1] 171:24

**COLD** [1] 152:12

**COLLABORATION** [1] 72:14

**COLLATERAL** [9] 64:5, 21; 65:25; 80:19; 83:8; 98:8; 99:2, 5, 8

**COLLECT** [1] 133:17

**COLLECTIVE** [1] 161:16

**COLLECTS** [1] 150:4

**COLLYN** [1] 2:16

**COMBINATION** [1] 108:18

**COMMENCING** [1] 1:21

**COMMENT** [1] 147:14

**COMMENTS** [1] 96:10

**COMMITTED** [1] 80:16

**COMMUNICATE** [1] 117:12

**COMMUNICATING** [2] 99:17; 113:13

**COMMUNICATION** [2] 115:6, 7

**COMPANIES** [22] 13:5; 16:4, 24; 20:2, 4; 22:18; 23:15, 17; 25:15; 27:25; 45:5; 49:21, 22; 50:4; 58:10; 63:7; 64:4; 66:9; 73:10; 138:12, 25

**COMPANY** [62] 9:15; 13:2, 3; 16:1, 6; 17:6; 22:18, 19; 23:21; 24:8; 26:19; 37:5; 38:18, 20; 39:12, 14, 15, 16, 18; 45:17; 46:4; 50:5; 56:22; 60:15; 66:8; 67:8; 73:8; 75:16; 76:3; 82:17, 18; 83:7; 96:23; 97:11, 25; 98:16; 100:16, 24; 101:1, 2, 4;

105:22; 108:23; 109:12, 14; 110:13, 14; 111:23; 112:8; 138:4, 5, 8, 9; 139:16; 140:24; 141:8; 148:11, 13; 161:5; 162:14; 170:3

**COMPANY'S** [1] 96:25

**COMPENSATED** [2] 35:24, 25

**COMPENSATION** [3] 38:13, 14; 49:13

**COMPETITIVE** [1] 77:10

**COMPLETE** [11] 71:20; 99:4; 103:18; 104:1; 121:1; 122:17, 20; 124:21; 136:12, 14; 171:19

**COMPLETED** [17] 77:18, 21, 25; 92:14; 95:8, 9, 12, 14, 22, 24; 98:2, 6; 115:16; 117:24; 124:14; 136:21

**COMPLETION** [8] 80:24, 25; 95:18, 25; 97:2; 122:10, 22; 130:17

**COMPLIANCE** [2] 171:16, 22

**COMPLICATED** [1] 13:1

**COMPLIES** [1] 40:6

**COMPONENT** [1] 79:10

**COMPOUNDED** [2] 107:8; 108:17

**CONCEPT** [2] 137:25; 138:2

**CONCERN** [3] 73:18; 120:19, 21

**CONCERNED** [1] 122:8

**CONCERNS** [3] 130:11, 12, 15

**CONCLUDE** [1] 136:1

**CONCLUSION** [2] 130:13; 154:13

**CONCLUSIONS** [1] 135:24

**CONDUCTED** [1] 54:7

**CONFER** [1] 55:18

**CONFIDENTIAL** [3] 88:4; 154:15; 155:21

**CONFUSE** [3] 4:24; 40:6; 125:8

**CONFUSED** [2] 42:6; 107:16

**CONFUSING** [1] 42:5

**CONFUSION** [3] 11:15, 24; 142:17

**CONNECTION** [2] 35:17; 145:5

**CONSIDER** [2] 111:5; 162:17

**CONSIDERA** [1] 54:20

**CONSTANT** [1] 115:7

**CONSTRUCTION** [4] 6:13, 25; 74:8; 87:17

**CONSULTANT** [1] 8:18

**CONSULTED** [1] 55:20

**CONTENDING** [1] 135:14

**CONTRACT** [23] 73:2; 76:12; 88:13; 92:18;

**Exhibit A**

94:14, 19, 20; 95:5; 116:20; 122:12; 126:9, 10, 20, 21; 128:15, 17, 19, 22; 129:1; 136:8, 9, 20; 137:7

**CONTRACTED** [1] 74:20

**CONTRACTOR** [2] 10:7; 47:1

**CONTRACTORS** [16] 13:10; 16:11; 24:21; 41:16; 63:12; 65:1; 72:24; 73:7, 11; 78:2, 9; 85:6; 86:6; 87:6, 11; 93:11

**CONTRACTS** [2] 31:23; 77:3

**CONTRACTUAL** [2] 171:23; 172:2

**CONTRIBUTE** [1] 26:10

**CONTRIBUTED** [1] 26:15

**CONTRIBUTING** [1] 97:12

**CONTRIBUTIONS** [1] 141:7

**CONTROL** [2] 110:23

**CONVENIENCE** [1] 100:2

**CONVERSA** [1] 132:24

**CONVERSATION** [18] 119:7, 9, 14; 120:6; 121:23; 122:6, 7; 125:18; 126:25; 127:5, 13, 15; 128:1; 130:16; 131:2; 132:15, 21, 25

**CONVEY** [1] 124:19

**CONVEYING** [1] 124:17

**CONVICTED** [1] 168:18

**CONVOLUTED** [3] 21:2, 3; 93:17

**COPIES** [3] 19:2; 100:1; 159:17

**COPY** [6] 17:12, 17; 37:1; 72:11; 156:12; 164:23

**CORPORATE** [7] 32:9; 39:20, 21; 40:11; 41:9; 155:17; 166:1

**CORRECTED** [3] 165:5, 24, 25

**CORRECTLY** [5] 37:13; 137:4; 153:22; 156:19; 159:6

**CORRESPONDEN CE** [1] 164:6

**CORRESPONDING LY** [2] 125:3; 127:17

**COST** [1] 85:23

**COSTS** [2] 85:22; 86:2

**COUNSEL** [1] 172:8

**COUNTY** [3] 86:15, 17; 145:16

**COUPLE** [8] 54:5; 55:21; 84:12; 113:24; 129:22, 24; 135:10; 144:23

**COURSE** [5] 55:6; 59:8; 119:15; 137:8; 148:1

**COURT** [11] 1:1, 15; 2:25; 5:14; 77:8; 81:11; 87:20, 21; 171:2; 172:4, 23

**COURTS** [1] 149:17

**COVERS** [1] 139:11

**CRAIG** [1] 34:13

**CREDIT** [20] 39:15, 16; 41:9, 12, 14, 25; 42:13, 15, 18, 23; 43:5, 20; 44:2; 48:3, 8; 52:20; 61:16, 20; 64:13; 164:20

**CREDITORS** [5] 27:7; 147:1; 148:15; 152:11; 158:2

**CRITICAL** [3] 162:13, 15, 17

**CROSS** [1] 44:6

**CRUNCH** [1] 162:14

**CURIOUS** [1] 111:17

**CURRAULT** [1] 1:7

**CURRENT** [4] 18:2; 61:6, 10, 16

**CURRENTLY** [7] 17:22; 18:2; 31:3; 52:14; 59:12; 146:15

**CUSTOMERS** [1] 36:21

- D -

**DAILY** [4] 53:13; 59:17, 25; 117:12

**DALLAS** [2] 22:4, 6

**DAMAGE** [2] 96:7, 9

**DAMAGED** [3] 88:12; 96:2, 4

**DATA** [1] 56:15

**DATE** [4] 5:12; 88:19; 113:16; 128:7

**DATED** [1] 164:22

**DATES** [2] 25:17; 102:15

**DAVIS** [2] 22:4, 6

**DAY-TO-DAY** [4] 7:3; 31:12; 54:23; 60:5

**DEAL** [3] 15:4; 26:10; 121:4

**DEALING** [2] 113:10, 19

**DEALINGS** [3] 53:17; 132:16; 147:16

**DEALS** [1] 31:19

**DEALT** [1] 163:6

**DEBT** [26] 61:19, 21, 22; 62:13, 17, 22; 63:4, 10, 14, 22; 64:6; 65:20; 148:2; 150:6, 7, 9; 152:22; 154:5, 6, 7, 20; 155:23; 158:6; 159:15, 16; 161:7

**DEBTORS** [1] 27:7

**DEBTS** [3] 67:25; 78:8; 160:25

**DECEMBER** [6] 95:18; 104:8; 108:8; 117:25; 119:13; 120:6

**DECIDE** [4] 153:13; 162:2, 5; 163:12

**DECIDED** [5] 8:11; 23:19; 90:15; 153:12, 14

**DECIDING** [1] 162:12

**DECISION** [7] 104:23; 160:22, 25; 161:12, 16; 162:1; 163:11

**DECISION-MAKIN G** [1] 54:20

**Exhibit A**

**DECISIONS** [2] 140:1, 13

**DECOMMISSIONING** [1] 10:5

**DEDICATED** [1] 65:25

**DEEP** [1] 19:20

**DEFENDANT** [1] 93:24

**DEFENDANTS** [2] 86:19; 89:1

**DEFINE** [1] 45:21

**DEFINED** [1] 171:23

**DEFINITIVE** [1] 119:17

**DEFUNCT** [2] 91:10, 12

**DEGREE** [3] 5:20, 23; 6:1

**DELAWARE** [7] 32:8; 148:13; 149:16, 17; 153:7, 8

**DELAYED** [2] 115:2, 3

**DELAYS** [2] 117:16; 118:8

**DEMAND** [1] 105:11

**DEMANDS** [1] 161:11

**DEPENDING** [1] 73:7

**DEPENDS** [1] 162:11

**DEPOSED** [1] 4:2

**DEPOSITION** [7] 1:12; 3:3, 10; 4:1; 155:17; 170:20; 171:21

**DEPOSITIONS** [1] 1:17

**DEROGATORILY** [1] 55:9

**DERRICK** [4] 7:5, 6, 10; 19:11

**DESCRIBED** [4] 13:19; 68:12; 119:10; 132:2

**DESCRIBING** [2] 67:15; 152:8

**DESIGN** [2] 14:3, 5

**DETAILS** [4] 106:23; 135:6; 137:22, 24

**DETERMINATION** [1] 103:21

**DETERMINE** [4] 96:7, 8; 105:2; 143:23

**DETERMINED** [8] 28:2; 66:16; 105:4; 112:12; 126:9; 148:1, 7, 18

**DETERMINES** [1] 150:2

**DEVELOP** [1] 14:5

**DEVELOPED** [1] 136:19

**DIFFERENT** [8] 7:13; 27:25; 59:20; 90:16; 92:13; 152:13; 153:1

**DIFFICULT** [1] 90:14

**DIRECT** [2] 135:21; 172:3

**DIRECTING** [1] 135:18

**DIRECTION** [2] 153:9; 171:12

**DIRECTLY** [1] 68:16

**DIRECTORS** [7] 22:10, 11; 23:18; 140:12, 14, 20, 25

**DISAGREE** [5] 96:11, 13; 166:6; 167:16, 20

**DISAPPROVE** [1] 61:3

**DISCLOSE** [2] 128:7; 134:17

**DISCLOSED** [1] 134:13

**DISCLOSING** [1] 160:3

**DISCOVERY** [3] 146:21; 155:5; 160:1

**DISCUSSED** [6] 11:23; 24:21; 50:3; 141:10; 147:24, 25

**DISCUSSES** [2] 141:1, 2

**DISCUSSING** [1] 93:18

**DISCUSSION** [14] 12:15; 31:1; 56:23; 73:24; 91:3; 120:12, 14; 121:5, 6; 123:23; 141:5; 143:23; 156:14

**DISCUSSIONS** [12] 90:8; 92:7; 93:9; 94:9, 15; 99:15; 110:15; 118:15; 121:12; 123:6, 16; 135:11

**DISPATCH** [1] 100:22

**DISPOSES** [1] 152:21

**DISPUTE** [1] 118:19

**DISSEMINATED** [1] 139:17

**DISSOLVE** [3] 112:4, 5; 157:23

**DISSOLVED** [4] 111:24; 112:6, 8; 153:2

**DISSOLVING** [1] 112:7

**DISTRIBUTED** [1] 139:17

**DISTRICT** [2] 1:1, 2

**DIVIDEND** [1] 28:19

**DIVIDENDS** [2] 35:9; 38:14

**DIVISION** [1] 6:13

**DOCK** [1] 168:13

**DOCUMENT** [9] 94:24; 132:5; 142:1; 148:21; 164:16; 165:12, 13; 166:8; 167:18

**DOCUMENTA** [1] 79:16

**DOCUMENTATION** [3] 54:16; 115:21; 166:15

**DOCUMENTS** [3] 80:3; 147:23; 166:1

**DOLLAR** [1] 68:17

**DOLLAR-FOR-DOLLAR** [1] 30:9

**DOLLAR-TYPE** [1] 55:16

**DOLLARS** [34] 26:4, 8; 30:8; 62:12, 25; 63:22; 64:13; 67:21; 69:8, 11; 82:17; 85:2; 94:11; 95:3, 4; 96:21; 97:10; 99:17; 102:20; 103:3, 16; 104:17; 106:25; 122:15; 130:19; 131:6, 11; 133:12; 134:20; 154:6; 157:16; 158:22, 23; 159:8

**DOMESTIC** [4] 130:25; 133:8; 134:18; 145:15

**DONATION** [4] 101:12; 120:20, 21, 24

**DOOR** [1] 8:25

**DORMANT** [2] 51:23, 24

**DOWN** [23] 4:17; 17:7; 41:4; 44:14; 63:13; 78:21, 24; 82:9; 98:11; 104:4, 5, 6, 9; 107:2; 111:16; 125:10; 132:24; 138:4; 139:17; 153:15, 16; 164:20, 25

**DOWNS** [4] 1:14; 2:24; 171:2; 172:22

**DOWNTIME** [1] 137:3

**DRAW** [3] 107:6, 10, 13

**DROPPED** [1] 88:11

**DRUGS** [1] 5:3

**DUBOSE** [1] 2:16

**DULY** [2] 3:17; 171:6

**DURING** [2] 27:23; 160:3

--- E ---

**E-MAIL** [8] 37:23; 38:3; 52:4, 8; 143:10, 11; 164:17, 21

**E-MAILED** [2] 142:5; 143:10

**E-MAILS** [6] 52:1, 6; 56:6; 119:16; 163:14, 17

**EAGLE** [1] 100:15

**EARLIER** [20] 25:2; 50:3; 54:2; 59:9; 74:15; 102:9; 107:17; 123:20; 130:7; 135:5; 138:10; 141:17; 144:4, 22; 147:15, 24, 25; 158:10; 163:22; 169:12

**EARLIEST** [1] 100:7

**EARLY** [11] 74:3; 75:9; 102:23; 113:4, 14, 24; 116:23; 117:25; 119:13; 120:6; 121:22

**EASIEST** [1] 23:20

**EASTERN** [1] 1:2

**EDUCATE** [1] 146:19

**EDUCATION** [1] 5:18

**EFFECT** [1] 159:13

**EFFECTIVELY** [4] 60:21; 62:2; 64:1, 4

**EIGHT** [2] 118:25; 119:16

**ELIMINATE** [1] 11:14

**ELLIS** [4] 21:7; 23:19; 28:2; 59:5

**EMPLOYED** [4] 31:3, 5; 34:25; 35:13

**EMPLOYEE** [7] 35:1; 37:13, 20; 39:8; 45:23, 24; 49:2

**EMPLOYEES** [7] 33:2, 7; 36:7; 39:1; 52:14; 70:4; 74:13

**EMPLOYMENT** [2] 35:14; 172:2

**ENCOMPASS** [1] 34:18

**ENCOMPASSING** [1] 58:9

**ENDED** [5] 7:16, 21; 41:23; 84:13; 129:10

**ENDS** [1] 170:20

**ENERGY** [266] 1:7; 2:9; 8:25; 9:5, 12, 13; 12:9, 11, 12, 18; 13:5; 14:22; 15:7, 19; 16:10; 17:1, 23, 25; 18:3, 8, 12; 19:3, 22, 23; 20:5; 22:20, 24; 23:7, 22; 24:4, 9, 23; 25:18; 26:13; 27:2, 12; 28:6, 10, 24; 29:1, 8, 17, 19, 21, 24; 30:4, 6, 17, 22; 31:4, 6, 9; 32:3, 5, 6; 33:2; 34:25; 35:6, 10, 15; 36:4; 37:6, 7, 14, 15, 18, 20; 38:1, 6, 22; 39:19; 42:1, 20; 44:3, 23; 45:13, 18; 46:1, 14, 20; 47:10, 12, 14, 25; 48:2, 7, 18, 21; 49:2, 5, 11; 51:2, 4; 52:7, 9, 13, 16, 19, 22, 25; 53:8, 12; 54:21; 56:17, 19; 58:3, 19; 60:6, 9, 20; 61:4, 5, 7, 15; 63:5, 11, 24; 64:7, 11, 19, 24; 65:6, 23; 66:22; 68:1, 15, 23; 71:9; 72:5, 14; 73:3; 74:2, 10; 75:2, 7, 17, 20, 22, 25; 76:13, 16, 17; 77:21; 78:3, 9, 13; 83:5, 6; 84:3, 7, 16; 85:6, 13; 86:20; 87:9; 93:23; 96:20; 98:8, 13, 25; 99:1, 3, 6; 100:4; 102:9; 103:1, 22; 104:14; 108:14; 109:3, 5, 7, 12, 16; 111:1, 18, 21, 24; 112:3; 116:1, 17; 117:4; 120:18; 121:10; 122:12, 21; 123:2, 7; 124:9, 11; 127:1; 128:8, 15; 129:15, 19; 130:1, 5, 12, 13, 22; 131:5, 10, 12; 133:11, 18; 134:4, 9, 19; 137:11; 138:13; 139:9, 13; 140:22; 141:22; 142:2, 7; 143:9; 144:3, 6, 8, 10, 12; 145:12, 24; 146:4, 10, 15, 22; 147:7, 22; 149:19, 20; 151:4, 21; 152:3, 20; 153:1, 12, 16, 24; 154:7, 8; 155:12; 156:24; 157:13, 23; 158:2; 160:5, 18, 21; 162:23; 163:16, 18, 24; 164:9; 165:7, 11, 14, 21; 166:2; 167:14

**ENGINEER** [2] 6:24; 33:19

**ENGINEERING** [2] 5:23, 25

**ENGINEERS** [3] 47:5; 74:16; 135:17

**ENJOYED** [1] 170:13

**ENOUGH** [6] 4:15; 104:21; 105:24; 106:9; 110:11; 125:19

**ENTAILS** [1] 7:1

**ENTERTAINMENT** [1] 44:21

**Exhibit A**

**ENTIRE** [8] 7:20; 10:16; 17:1; 30:20; 37:9; 78:20, 22; 97:13

**ENTITIES** [52] 12:5, 8; 13:18; 14:14, 18; 15:3, 11, 14; 16:15, 16, 19; 20:17; 24:20; 25:5, 8, 10; 26:25; 27:8; 35:18; 43:13; 46:13; 50:7; 51:16; 63:16; 65:5; 68:22, 24; 72:17; 79:23; 80:6, 11, 15; 81:3; 83:16; 90:10; 107:5, 7, 10; 108:20, 22; 138:9, 14, 16; 139:7, 8, 18; 140:23; 141:4; 161:8; 163:23; 164:2

**ENTITY** [20] 11:18, 19; 14:25; 16:5; 23:5; 27:15; 30:21; 66:9; 83:8; 116:8; 131:20; 132:2; 133:9; 138:6; 147:8; 148:13; 152:4; 159:17; 171:20

**ENTRY** [1] 100:17

**EQUIPMENT** [1] 151:9

**EQUITY** [1] 11:4

**ESSENCE** [4] 58:18; 98:11; 99:2; 158:1

**ESTABLISH** [1] 23:16

**ESTABLISHED** [1] 23:8

**EVALUATE** [1] 162:2

**EVENINGS** [1] 31:16

**EVERYBODY'S** [1] 124:21

**EXACT** [2] 26:5; 67:3

**EXACTLY** [7] 14:20; 17:21; 56:14; 69:19; 91:16; 119:17; 132:6

**EXAGGERATED** [2] 118:8, 14

**EXAMPLE** [2] 137:14; 141:20

**EXAMPLES** [1] 57:16

**EXCEPT** [2] 117:15; 128:21

**EXCESS** [1] 134:19

**EXCHANGE** [1] 26:18

**EXCUSE** [1] 28:6

**EXECUTE** [1] 148:24

**EXECUTED** [3] 7:8; 123:2, 4

**EXECUTIVE** [1] 8:5

**EXERCISE** [1] 60:24

**EXIST** [5] 9:14; 25:12; 111:25; 163:19, 21

**EXISTED** [1] 25:15

**EXISTING** [1] 42:4

**EXISTS** [5] 12:11; 18:9; 25:20; 144:10; 153:2

**EXPECT** [2] 116:19; 143:3

**EXPECTED** [1] 122:9

**EXPENDITURES** [3] 43:2; 61:3; 101:23

**EXPENSE** [4] 39:14; 44:3, 7; 49:23

**EXPENSES** [24] 29:20, 25; 30:12, 16; 42:19; 44:1, 21; 49:20; 51:22, 25; 63:1, 4; 70:22; 71:5, 8; 102:3, 4; 137:15, 16, 19; 138:5, 18

**EXPERIENCE** [2] 10:8; 163:8

**EXPERIENCED** [1] 108:13

**EXPERTISE** [1] 163:8

**EXPIRATION** [1] 40:12

**EXPLAIN** [4] 63:9; 97:15; 106:1; 147:6

**EXPLAINED** [1] 122:14

**EXPLORATION** [4] 91:13; 131:4, 12; 133:19

**EXPRESS** [4] 39:24, 25; 40:11; 46:19

**EXTRA** [2] 100:1; 104:17

**EYES** [5] 92:2, 10, 12; 95:9, 10

- F -

**FABRICATION** [5] 73:13; 131:8; 168:6, 7, 8

**FABRICATORS** [2] 130:24; 145:14

**FACE** [1] 97:13

**FACILITIES** [1] 52:20

**FACT** [9] 37:12; 73:6; 92:8; 123:21; 132:15;

134:3, 8; 151:7; 165:6

**FAILED** [1] 76:10

**FAIR** [1] 58:20

**FAIRLY** [6] 55:14; 68:10; 115:15, 17; 144:19, 20

**FAIRWAY** [2] 130:24; 145:14

**FAIRWAYS** [9] 90:21; 91:13, 14; 131:4, 12, 16; 132:12, 17; 133:19

**FALL** [2] 104:13; 108:12

**FAMILIAR** [4] 4:20, 21; 72:20; 163:3

**FAST-FORWARD** [1] 93:7

**FATALITY** [1] 168:22

**FAXED** [1] 142:5

**FEDERAL** [4] 3:5; 83:11; 87:20, 21

**FEES** [2] 82:19; 146:12

**FEET** [1] 53:15

**FELONIES** [1] 168:18

**FELONY** [1] 168:25

**FELT** [1] 122:18

**FIGHT** [1] 155:6

**FIGURE** [1] 126:11

**FIGURED** [1] 120:25

**FILE** [2] 18:12; 156:13

**FILED** [11] 3:24; 86:4, 8, 14; 93:21; 95:18; 129:21; 131:14; 145:16; 146:22; 148:20

**FILES** [1] 149:16

**Exhibit A**

**FILING** [1] 3:8

**FILL** [1] 168:15

**FILLS** [2] 44:2, 6

**FINAL** [3] 120:8, 11; 134:2

**FINALLY** [2] 115:9

**FINANCE** [1] 137:19

**FINANCES** [2] 134:10; 154:19

**FINANCIAL** [8] 48:5; 58:1; 62:9, 10; 116:1, 3; 130:12; 171:19

**FINANCIALLY** [2] 129:15; 130:2

**FINANCING** [1] 67:8

**FIND** [3] 88:17; 95:2; 96:17

**FINDING** [1] 136:3

**FINDINGS** [1] 136:24

**FINE** [3] 21:25; 167:5; 170:9

**FINISHED** [2] 124:8, 10

**FIRM** [7] 18:23, 24; 19:14; 31:15; 145:17, 22; 172:4

**FIRST** [15] 3:17; 5:19; 6:7; 22:5; 69:6; 78:20; 81:22; 106:3; 113:6; 121:18; 123:5, 9; 133:5; 135:9; 141:13

**FIVE** [15] 6:18; 13:18; 16:4; 33:6, 9, 11; 34:11; 50:18; 69:8, 22; 70:14, 19; 71:4; 79:23; 122:14

**FIVE-MINUTE** [1] 169:3

**FIXED** [3] 95:6; 136:13

**FIXED-PRICE** [1] 95:5

**FLEET** [1] 7:5

**FLOW** [18] 20:1; 28:3; 106:8, 14, 16, 21; 107:2, 6, 25; 108:11; 128:3; 138:10; 139:11; 140:13, 22; 146:9; 162:11, 12

**FLOWS** [4] 18:11; 19:4; 30:21; 105:24

**FLUSH** [1] 138:14

**FOLLOWING** [5] 1:14; 17:21; 37:12; 114:5; 156:17

**FOLLOWS** [1] 3:20

**FORECLOSE** [1] 148:10

**FOREGOING** [1] 171:8

**FOREVER** [1] 19:18

**FORGIVEN** [1] 68:19

**FORM** [4] 3:11; 14:12; 49:12; 124:23

**FORMALITIES** [1] 3:7

**FORMALIZED** [1] 120:2

**FORMAT** [1] 171:16

**FORMED** [6] 11:16; 24:5, 14, 19; 38:5; 167:8

**FORMULA** [1] 112:9

**FORMULATE** [1] 5:9

**FORTH** [3] 16:11; 63:13; 171:8

**FORWARD** [1] 124:22

**FORWARDED** [1] 47:6

**FOUND** [1] 88:19

**FOUR** [16] 7:19; 9:11, 13, 21; 14:14; 79:23; 103:24; 110:18, 19; 123:19; 124:13; 126:3; 133:12; 134:20; 148:10; 158:16

**FREQUENT** [2] 144:19, 20

**FRONT** [1] 162:6

**FULL** [7] 11:25; 12:4; 51:8, 12; 91:25; 112:20; 121:8

**FULLY** [1] 116:19

**FUNCTION** [7] 45:14, 15, 18; 53:23; 58:18, 21, 23

**FUNCTIONS** [5] 34:21, 22; 45:25; 49:14; 50:2

**FUND** [7] 101:8; 112:15; 121:8; 130:20; 137:11; 138:5; 161:3

**FUNDING** [6] 94:16; 98:15; 109:16; 110:2; 144:21; 145:3

**FUNDS** [12] 101:19; 104:17; 105:12; 119:5; 121:20; 122:14; 130:18; 146:1, 10; 158:6; 160:6, 18

**FUNNY** [1] 4:20

**FURNITURE** [1] 157:3

**FUSE** [2] 115:15, 17

**FUTURE** [4] 56:25; 58:5; 111:3, 7

- G -

**GAPS** [1] 168:16

**GARMARK** [12] 61:23, 25; 62:4; 63:23; 65:12, 14, 20; 66:1, 20; 67:16; 68:13; 110:12

**GENERAL** [10] 10:7; 82:23, 25; 91:3; 94:23; 137:25; 138:2; 142:23; 146:24; 147:8

**GENERALLY** [4] 54:25; 55:5; 129:7; 142:19

**GEORGE** [2] 2:5; 3:22

**GLOBAL** [6] 6:10, 11, 17; 7:4, 10; 9:1

**GO-AROUND** [2] 69:6, 9

**GOOD** [9] 10:22, 25; 11:13; 27:15, 19; 28:12; 129:8; 141:12; 151:1

**GOVERNMENT** [5] 71:19; 83:11, 12; 97:23; 121:15

**GOVERNMENT'S** [4] 92:12, 16, 18; 95:10

**GRADE** [1] 55:10

**GRADUATED** [1] 6:2

**GREENLEAF** [2] 33:20, 25

**GREG** [1] 33:15

**GRIFFITH** [1] 33:15

**GROUP** [11] 6:25; 7:22, 24;

**Exhibit A**

11:4; 22:9; 74:19; 130:25; 133:8; 134:18; 145:15; 163:16

**GROWING** [2] 159:10, 11

**GUARANTEE** [2] 97:20, 21

**GUARANTEED** [2] 42:9, 11

**GUARD** [1] 8:9

**GUESS** [14] 20:7; 23:19; 32:11; 34:4; 36:12; 39:10, 18; 47:20; 49:19; 69:24; 73:1; 137:9, 13, 20

**GUIDELINES** [2] 4:4; 171:16

**GULF** [3] 7:6; 8:19; 129:2

- H -

**H.B.** [3] 86:9; 87:3; 93:21

**HALF** [10] 84:10; 110:18; 123:19; 124:13; 126:3; 131:5; 133:12; 134:20; 158:16; 166:11

**HAND** [1] 141:14

**HAND-IN-HAND** [1] 58:14

**HANDLE** [1] 31:24

**HANDLED** [2] 45:15; 46:11

**HANK** [9] 9:7; 10:8; 14:11, 19; 22:4, 12; 26:22; 73:21; 161:17

**HAPPEN** [6] 76:18; 132:3; 149:1, 14; 152:20; 159:5

**HAPPENED** [4] 9:19; 83:15; 125:17; 143:2

**HAPPENING** [1] 118:11

**HAPPENS** [5] 142:4, 13; 149:15; 150:9; 152:18

**HARASS** [1] 81:6

**HARRIS** [3] 86:15, 17; 145:16

**HASN'T** [2] 99:19; 140:8

**HAWAII** [1] 41:5

**HEADQUARTERED** [3] 50:9, 10, 12

**HEADQUARTERS** [1] 32:9

**HEALTH** [5] 5:7; 29:20; 38:17, 20; 39:10

**HEAR** [1] 4:16

**HEATED** [2] 130:23; 131:2

**HEBERT** [2] 141:24; 164:23

**HELD** [5] 12:16; 58:21; 73:25; 112:24; 156:15

**HENDERSON** [5] 2:15; 132:9; 159:20; 164:18

**HENDERSONS** [1] 113:11

**HENRY** [1] 166:4

**HEREBY** [4] 3:2, 8; 171:5

**HEREIN** [1] 172:8

**HEREINBEFORE** [1] 171:8

**HIGH** [11] 76:14; 77:23; 78:6, 15; 102:4; 115:13; 122:10; 145:2; 157:14; 159:2; 163:2

**HIGHER** [1] 140:7

**HIRED** [2] 126:11; 147:25

**HOLD** [2] 97:1; 98:20

**HOLDER** [1] 90:21

**HOLDING** [11] 20:7, 12; 26:18; 50:4; 51:23; 108:23; 109:12, 14; 138:9; 140:24; 141:8

**HOLDINGS** [119] 18:10; 20:19; 21:12, 16, 22; 22:15, 16; 24:13, 14, 18; 25:4, 22, 24; 27:23; 28:4, 9, 20, 23; 29:4; 35:22; 36:6; 38:15; 39:21; 41:12; 44:17; 45:7, 12, 16; 46:12, 21; 47:9; 48:12; 49:12, 20, 22, 24, 25; 50:8; 53:7, 11, 19, 20, 22; 58:5, 17, 22; 59:11; 60:2; 63:5, 11, 14; 64:16, 17, 22; 68:23; 69:1, 13; 70:5, 19, 22; 71:3, 11; 105:23; 106:8, 14, 19; 107:4, 9, 12; 108:1, 11, 25; 109:19, 22; 110:4, 10; 128:2; 137:10, 18; 138:8, 17, 23; 139:21, 22, 23; 140:11, 21; 146:2, 5, 9; 149:5; 150:10, 11, 12, 13, 14, 15; 153:19, 24; 154:3, 17, 19;

155:4, 6, 11, 22; 157:20; 160:20, 24; 161:7, 21; 164:10; 165:8, 18, 23; 169:15

**HOME** [1] 5:15

**HOMEWORK** [1] 148:17

**HONESTLY** [5] 17:5, 24; 18:4; 60:3

**HORRIBLE** [1] 134:16

**HOSTAGE** [1] 112:24

**HOUMA** [2] 6:15; 7:25

**HOURLY** [2] 136:10, 25

**HOURS** [2] 5:5; 93:7

**HOUSE** [1] 128:20

**HOUSED** [1] 51:17

**HOUSTON** [3] 8:1; 32:10; 54:9

**HUNDRED** [10] 23:3, 4; 26:4; 43:6; 86:13; 91:9; 92:20; 93:2; 112:17

- I -

**I-45** [2] 32:14, 15

**IDEA** [3] 24:3; 167:2, 22

**IDENTIFY** [1] 52:6

**II'S** [5] 146:25; 147:1; 151:5; 154:7; 158:2

**IMMATERIAL** [1] 146:7

**IMMEDIATELY** [1] 114:4

**IMPORTANT** [1] 17:18

**Exhibit A**

**IMPOSSIBLE** [1] 110:3

**INACTIVE** [1] 167:10

**INADEQUATE** [1] 121:20

**INCLUDE** [3] 46:5; 65:4; 151:8

**INCLUDED** [2] 15:17; 27:1

**INCLUDES** [2] 157:12; 165:23

**INCLUDING** [8] 27:2; 65:6; 78:18; 80:7; 120:21; 157:3; 158:2; 160:10

**INCORPORATED** [1] 32:7

**INCORRECT** [1] 165:5

**INCORRECTLY** [1] 79:25

**INCURRED** [2] 44:22; 137:16

**INDEMNIFICATIO NS** [1] 83:3

**INDEPENDENT** [4] 16:15, 16; 62:8, 10

**INDICATED** [2] 30:16; 106:13

**INDICATING** [1] 40:13

**INDIRECT** [1] 172:3

**INDIVIDUAL** [4] 76:9; 77:5, 6; 109:8

**INDIVIDUALLY** [7] 29:9; 46:7; 72:17; 81:2, 5; 91:25; 93:1

**INDUSTRIAL** [2] 65:1; 73:1

**INDUSTRIES** [3] 6:10, 11; 9:1

**INFLOW** [1] 139:4

**INFORMATION** [9] 4:8, 25; 5:19; 39:6; 132:16; 147:3; 154:16; 155:21; 160:13

**INFORMED** [1] 171:18

**INFUSION** [1] 68:16

**INITIALLY** [2] 6:15; 113:20

**INPUTS** [1] 44:11

**INSTALLATION** [2] 74:9

**INSTITUTION** [1] 62:9

**INSTITUTIONS** [2] 48:5; 159:7

**INSTRUCTING** [2] 155:1; 156:2

**INSURANCE** [6] 29:20; 38:17, 21; 39:10; 46:2, 9

**INSURED** [1] 46:8

**INTEGRAL** [1] 12:6

**INTENT** [1] 136:12

**INTER** [1] 20:2

**INTERACT** [1] 53:12

**INTERACTION** [3] 72:4, 6; 73:9

**INTERACTIONS** [1] 53:17

**INTEREST** [23] 11:3, 11; 13:21; 14:10, 16; 20:16, 23, 24; 21:13, 15, 19; 22:20, 23, 24; 23:2, 5; 26:11, 16, 17; 91:23; 92:1; 122:23; 124:21

**INTERESTED** [1] 172:9

**INTERESTS** [5] 12:21; 16:3; 27:25; 28:1; 122:17

**INTERIM** [6] 80:23; 112:16; 120:9; 127:8; 138:18; 139:11

**INTERLOCUTORY** [3] 133:14, 22, 25

**INTERNATIONAL** [10] 13:7, 9; 24:22; 50:14; 51:18, 21; 55:16; 64:25; 100:9, 11

**INTERRUPT** [1] 34:7

**INVESTIGATING** [2] 135:23, 25

**INVESTIGATION** [1] 136:2

**INVOICE** [16] 46:25; 100:12; 141:22, 25; 142:2, 22; 143:4, 8, 12, 13, 15, 19; 144:2, 11, 15, 16

**INVOICES** [6] 104:24; 118:18, 19; 142:24; 143:11; 144:1

**INVOICING** [2] 117:20; 119:20

**INVOLVE** [2] 57:15; 168:22

**INVOLVED** [35] 7:12; 54:20; 57:9, 13, 17, 21, 23; 58:2, 11; 59:7, 23; 69:2; 72:1; 74:6, 23, 25; 75:1, 3, 7, 12; 82:20; 83:12; 90:4; 91:22; 103:12; 113:10; 130:23; 140:4, 9; 146:16; 147:2, 5; 148:7; 163:4, 10

**INVOLVEMENT** [5] 59:10, 15, 17; 60:4; 96:25

**ISLAND** [10] 76:14; 77:23; 78:7, 15; 102:4; 115:13; 122:10; 145:2; 157:14; 163:2

**ISSUE** [2] 12:6; 135:7

**ISSUED** [9] 29:16, 18; 30:5; 39:22; 60:8; 113:25; 114:4, 6; 117:25

**ISSUES** [3] 29:9; 46:25; 50:2

**ITSELF** [2] 19:6; 74:11

- J -

**JAB'S** [4] 10:2, 4, 20; 128:14

**JABCO** [16] 146:19, 24; 147:9; 149:22, 23; 150:19; 151:6, 25; 153:20; 154:4; 156:20, 23; 157:1; 158:11; 159:13; 163:4

**JACKET** [1] 88:11

**JACKSON** [1] 22:7

**JANUARY** [6] 8:24; 9:20; 10:20; 11:16; 40:12; 164:22

**JASON** [2] 34:2, 6

**JENNINGS** [1] 47:20

**JOBS** [8] 7:9; 9:2; 46:3, 5; 103:6, 9; 104:12; 116:14

**Exhibit A**

**JOHNNY** [2] 33:15; 34:13

**JOHNSON** [2] 33:18; 34:3

**JOSH** [2] 33:18; 117:9

**JUDGE** [2] 1:6; 133:20

**JUDGMENT** [10] 133:11, 14, 15, 16, 22, 25; 134:2, 3, 13, 18

**JUDGMENTS** [1] 116:16

**JULY** [1] 1:21

**JUMPED** [1] 68:20

**JUNE** [5] 69:25; 100:8; 114:7; 129:13; 146:23

---

- K -

**K-1S** [1] 30:3

**KALLOP** [4] 131:7; 132:18; 133:10

**KALLOP'S** [2] 131:21; 132:13

**KENNY** [1] 22:6

**KIDS** [1] 82:21

**KIND** [9] 8:10; 19:20, 25; 21:2; 75:11; 128:19; 136:18; 168:7, 15

**KINDS** [1] 140:13

**KIRKLAND** [4] 21:7; 23:19; 28:1; 59:5

**KNEE** [1] 19:20

**KNOWLEDGE** [8] 22:14; 32:23; 48:1; 65:19; 155:9, 18; 169:20; 172:1

**KPMG** [4] 21:10; 23:19; 28:2; 59:5

---

- L -

**L-I-N** [1] 33:23

**LABOR** [1] 168:5

**LAFAYETTE** [1] 47:20

**LAND** [4] 13:12, 13; 25:1; 65:3

**LANDLORD** [2] 51:5, 7

**LANDRY** [1] 33:17

**LARGE** [3] 55:14, 19; 84:11

**LARGER** [1] 76:8

**LAST** [17] 5:4; 9:9; 18:21; 28:18, 21; 29:23; 30:19; 44:18; 59:13; 60:14; 68:9; 74:4; 81:8; 99:25; 108:8; 137:8; 166:24

**LATE** [4] 102:23; 113:3, 13; 164:10

**LATER** [3] 19:19; 127:6; 137:20

**LAWSUIT** [8] 3:24; 74:24; 86:14; 93:21; 145:4, 11; 154:21; 155:3

**LAWSUITS** [4] 78:2; 86:4; 87:10; 131:15

**LAWYER** [6] 17:16; 36:24; 126:11; 133:15; 159:18; 160:12

**LAWYERS** [5] 82:19; 147:4; 148:1, 6, 17

**LAYING** [1] 80:6

**LAYOFFS** [1] 34:12

**LEARN** [1] 147:13

**LEASE** [5] 92:18, 19, 22, 24; 93:4

**LEASES** [2] 93:3; 97:4

**LEAST** [1] 54:5

**LEAVE** [5] 6:19; 8:8; 9:2; 83:13; 158:1

**LEAVING** [2] 152:11, 22

**LEFT** [8] 7:21; 27:3, 18; 115:6; 118:11, 12; 150:8; 170:3

**LEGAL** [6] 82:19; 94:24; 126:22; 146:12; 153:3; 154:12

**LEGALLY** [2] 16:12; 83:19

**LENDER** [4] 62:5; 112:1; 152:16; 153:17

**LENDERS** [9] 129:21; 147:21, 25; 148:19; 150:20; 151:1; 153:13, 23; 163:12

**LENDING** [2] 152:11; 159:7

**LENGTH** [1] 166:3

**LESSON** [1] 66:5

**LETTER** [6] 79:9, 11, 13; 81:22; 82:15; 147:21

**LETTING** [1] 128:19

**LEVEL** [3] 63:5, 14, 19

**LIABILITIES** [2] 27:4; 152:3

**LIABILITY** [2] 92:21; 134:9

**LIABLE** [1] 92:20

**LIENED** [1] 65:24

**LIES** [3] 25:22; 27:22; 56:22

**LIEU** [2] 112:19, 20

**LEASES** [2] 93:3; 97:4

**LIKELIHOOD** [2] 159:1, 2

**LIMITED** [4] 86:2; 123:11; 160:6, 11

**LINCOLN** [1] 169:16

**LINCOLNSHIRE** [19] 11:7; 12:19; 13:4; 14:23; 15:3, 5, 6, 15, 25; 16:20; 22:3, 12, 13; 23:11, 15, 18; 169:17, 24

**LINE** [4] 48:2; 63:13; 64:12; 156:2

**LINES** [2] 48:7; 61:16

**LIQUID** [1] 150:3

**LIQUIDATE** [1] 157:10

**LIQUIDATES** [3] 150:5; 152:21; 159:14

**LIQUIDATION** [3] 158:20; 160:11, 16

**LIQUIDATOR** [1] 157:6

**LISA** [2] 141:23; 164:23

**LIST** [3] 84:21; 143:21, 22

**LISTED** [7] 14:15; 37:5; 40:17; 164:8; 165:6; 166:4; 167:15

**LITIGANT** [2] 172:4, 7

**LITIGATION** [7] 116:13; 130:23; 131:3, 14; 132:10; 145:20; 146:14

**LITTLE** [12] 8:10, 17, 18; 43:20; 63:20; 74:3; 118:6, 8;

**Exhibit A**

127:23; 141:17, 18; 162:21

**LLC'S** [3] 108:25; 120:18; 128:3

**LOAN** [22] 64:2, 21, 23; 65:7; 66:1, 11, 17, 22; 67:17, 19, 20, 22, 23; 68:11, 17, 18; 70:23; 109:8, 13; 110:3; 147:23

**LOANED** [2] 153:23; 169:20

**LOANS** [6] 48:8; 65:10, 12; 109:23; 147:24; 157:19

**LOCATED** [5] 18:25; 19:12; 36:3; 47:19; 73:16

**LOCATION** [3] 75:15; 77:6; 104:11

**LOGGED** [1] 143:14

**LOGISTICS** [1] 101:6

**LONG** [18] 6:17; 7:18; 8:6, 7, 21; 17:11; 19:17; 21:18; 31:5; 38:3; 62:17; 90:8, 9, 14; 96:16; 104:6; 113:1; 150:17

**LONGER** [2] 41:7; 153:2

**LOOKED** [3] 116:5; 120:19; 132:5

**LOOKING** [7] 75:13; 89:4, 8; 118:10; 137:4; 163:13; 166:9

**LOOKS** [7] 93:22; 100:7; 101:17; 127:6;

141:23; 145:9; 163:15

**LORETTA** [3] 33:20, 25; 34:15

**LOSS** [1] 85:16

**LOST** [2] 93:14; 100:21

**LOUD** [2] 4:15

**LOUISIANA** [11] 1:2, 18, 20; 2:6, 12; 6:16; 73:17; 121:25; 171:3, 24; 172:23

**LUCKY** [1] 28:14

**LUMP** [1] 77:4

**LUNCH** [1] 4:11

- M -

**M-O-N-T-C-O** [1] 76:6

**MACHINE** [2] 142:14; 143:7

**MAGISTRATE** [1] 1:7

**MAIL** [3] 43:22; 142:15; 143:7

**MAILED** [4] 48:19; 142:5; 143:8, 9

**MAINLY** [2] 10:4; 73:13

**MAINTAIN** [1] 139:14

**MAJORITY** [5] 11:3; 12:21, 22; 84:9; 102:22

**MAKES** [3] 89:4; 161:1, 12

**MAKING** [6] 66:10; 79:21; 112:20; 128:14, 16; 171:20

**MANAGE** [2] 31:25; 162:16

**MANAGED** [2] 7:5, 8

**MANAGEMENT** [8] 11:7; 12:19; 15:15; 22:3;

23:17; 138:24; 161:2, 5

**MANAGER** [8] 6:12, 24; 33:14, 15, 18; 143:16; 166:6; 167:16

**MANAGES** [1] 139:4

**MANAGING** [3] 18:5, 6; 22:8

**MANCUSO** [2] 19:15

**MANEUVER** [1] 156:20

**MANNER** [2] 68:2, 12

**MANUFACTURING** [1] 74:11

**MARINE** [155] 3:25; 13:10, 15; 16:11; 18:10; 19:22; 20:7, 12, 17, 19; 21:12, 16, 22; 22:15, 16; 24:12, 14, 18, 21, 24; 25:4, 21, 24; 27:22; 28:4, 9, 20, 23; 29:3, 4, 17; 30:4, 20; 35:22; 36:6, 8; 38:15; 39:21; 40:17; 41:12, 13, 15, 21; 42:8, 10, 13; 44:16; 45:1, 5, 7, 11, 12, 16; 46:11, 21; 47:9; 48:8; 49:12, 20, 22, 23, 25; 50:8; 51:6, 10, 13; 53:6, 11, 19, 20, 22; 54:19; 58:5, 17, 22; 59:11; 60:2; 63:11, 12, 23; 64:15, 17, 22, 25; 68:23; 69:1, 12; 70:5, 19, 22; 71:3, 10; 72:6, 8, 10, 16, 24; 73:6, 11; 100:23; 105:23;

106:8, 14, 19; 107:3, 9, 12; 108:1, 11, 24; 109:19, 22; 110:4, 10; 128:2; 137:9, 10, 18; 138:7, 16, 23; 139:21, 23; 140:10, 21; 146:2, 5, 8, 9; 149:5; 150:14, 15; 153:19, 24; 154:3, 16, 18; 155:4, 5, 11, 22; 157:20; 160:20, 23; 161:6, 20, 21; 164:9; 165:8, 18, 23; 168:9; 169:15, 21

**MARINE'S** [1] 163:23

**MARINES** [1] 20:9

**MARITAL** [1] 6:5

**MARK** [3] 18:18, 19, 20

**MARKED** [1] 164:16

**MARRIED** [1] 6:6

**MARTINVILLE** [1] 121:25

**MASTER** [1] 46:9

**MASTER'S** [1] 5:20

**MATCH** [5] 30:5, 7, 9, 10, 11

**MATERIAL** [1] 57:21

**MATH** [3] 17:4, 7; 94:6

**MATTER** [4] 3:23; 172:5, 7, 10

**MATTERS** [1] 126:22

**MCMULLEN** [1] 19:15

**MCNEESE** [2] 5:23; 6:8

**Exhibit A**

**MEANING** [1] 83:3

**MEANT** [1] 169:8

**MECHANISM** [4] 98:15; 138:24; 152:9; 154:4

**MEDIATION** [1] 133:24

**MEETING** [1] 170:13

**MEETINGS** [3] 54:4, 11; 141:15

**MEMBER** [9] 18:5, 6; 22:8; 40:14; 149:7, 10; 155:10; 166:5; 167:15

**MEMBERS** [7] 54:3; 141:8; 148:23; 149:5; 169:14, 24; 170:4

**MEMO** [1] 164:20

**MEMORY** [1] 84:12

**MENT** [4] 32:1; 92:19; 103:14; 149:14

**MENTION** [2] 52:9; 118:24

**MENTIONED** [4] 25:2; 54:2; 123:20; 132:8

**MENTS** [1] 66:12

**MERITS** [1] 93:19

**MESS** [1] 77:2

**MESSAGE** [3] 124:2, 16, 19

**METAIRIE** [2] 1:20; 2:6

**METHOD** [1] 171:10

**MEXICO** [3] 7:7; 8:19; 129:2

**MILES** [3] 2:10, 11; 170:8

**MILLION** [64] 26:4, 8; 62:12, 25; 63:22;

64:13; 67:2, 12, 21; 68:5, 16; 69:8, 11, 23; 70:1, 14, 19; 71:4; 78:23; 79:5; 80:16; 81:22; 82:7; 84:5, 9; 85:2, 4, 14, 17, 18; 87:23; 93:20; 94:11; 95:2, 3; 96:21; 97:10; 99:16; 101:18; 103:3, 16, 24; 104:16; 106:25; 110:18, 19; 122:14, 15; 123:19; 124:13; 126:3; 130:19; 131:5, 11; 133:12; 134:20; 154:6; 157:12, 16; 158:16, 22, 23; 159:8

**MILLION-DOLLAR** [1] 65:20

**MIND** [3] 11:25; 50:20; 144:24

**MINE** [3] 27:21; 63:19; 92:4

**MINUTE** [3] 40:5; 50:19; 53:7

**MINUTES** [4] 54:10, 12, 13, 15

**MISSED** [2] 15:9; 169:4

**MISSING** [1] 85:20

**MISSPOKE** [1] 15:21

**MISSTATES** [1] 138:21

**MISTAKE** [1] 30:15

**MISUNDERSTAND** [2] 15:8, 20

**MISUNDERSTANDING** [1] 7:2

**MITCHELL** [2] 33:20; 34:1

**MODEL** [1] 8:10

**MODEST** [2] 21:9, 10

**MOMENTS** [1] 88:14

**MONEY** [43] 27:8; 62:14; 69:18; 70:15; 71:10, 15; 80:18, 23; 81:8; 84:5; 85:8, 19; 87:7; 90:15; 95:15; 97:22; 98:14; 99:1, 11; 100:14; 104:21; 105:8, 15, 16, 21, 24; 107:7, 23; 110:10, 11; 119:4, 25; 122:20; 125:19; 127:23; 128:14, 16; 130:11, 15; 138:2; 146:6; 153:23; 169:21

**MONEYS** [1] 130:8

**MONITORING** [1] 140:21

**MONTCO** [4] 76:4, 10, 11, 12

**MONTGOMERY** [1] 3:16

**MONTH** [6] 42:24; 43:7, 9; 70:2; 96:19; 129:8

**MONTHLY** [1] 56:2

**MONTHS** [8] 8:22; 84:12; 96:19; 118:25; 129:22, 24; 164:10

**MORGAN** [4] 13:15; 24:25; 168:9, 13

**MORNING** [2] 5:10; 169:12

**MOST** [2] 4:9; 148:8

**MOSTLY** [1] 113:20

**MOTION** [1] 156:13

**MOTT** [1] 2:16

**MOVE** [2] 124:22; 159:21

**MULTIPLE** [4] 16:15, 16; 80:6; 138:9

---

**- N -**

**NALLEY** [56] 1:19; 2:4, 5; 3:21, 22; 12:1, 7, 13, 17; 34:10; 40:9, 15, 23; 41:3; 45:6, 20; 48:11, 17; 50:17, 23; 73:22; 74:1; 87:1; 88:5, 16, 21, 25; 89:9, 13; 106:2, 6; 125:16, 24; 126:13, 24; 134:23; 135:3; 139:1; 142:20, 25; 154:11, 22; 155:8, 15; 156:1, 6, 16; 164:15; 166:10, 14, 19, 23; 167:4, 9; 169:11; 170:15

**NAME** [13] 3:22; 11:21; 18:21; 22:5; 23:20; 25:19; 40:12; 44:18; 58:20; 67:6; 108:21; 164:1

**NAMED** [5] 20:13; 25:9; 46:13; 86:18; 93:24

**NAMES** [7] 11:25; 12:4; 25:7, 10; 33:12; 74:15; 170:6

**NATURE** [1] 122:6

**NEEDED** [5] 41:25; 55:11; 90:15, 16; 119:8

**NEEDS** [3] 4:16; 19:9; 141:3

**NEGOTIATE** [2] 31:19, 22

**NEGOTIATED** [4] 83:2, 5; 115:9, 19

**NEGOTIATING** [1] 131:22

**NEGOTIATIONS** [1] 160:4

**NEITHER** [1] 21:8

**NERVOUS** [1] 89:5

**NEVER** [12] 41:16, 19, 22; 115:6; 119:19; 121:1; 132:8; 134:12, 14; 165:4, 24

**NEXT** [5] 8:16; 28:25; 100:17; 123:1; 126:12

**NIGHT** [1] 99:25

**NINE** [2] 33:10; 157:16

**NOBODY** [3] 124:22; 141:13, 14

**NONE** [3] 59:12; 78:5; 102:6

**NONPAYMENT** [1] 87:11

**NONPRESCRIPTI ON** [1] 5:4

**NOPE** [1] 105:17

**NORMAL** [3] 55:5; 71:5, 7

**NORMALLY** [2] 58:8; 66:12

**NORTH** [3] 67:12; 85:2; 94:4

**NOSY** [1] 4:7

**NOTES** [2] 68:20; 70:4

**NOTHING** [11] 13:25; 29:23; 71:7; 119:17; 124:18; 154:17, 20; 155:2, 24; 168:11, 17

**NOTICED** [3] 164:6; 165:4, 25

**NOTIFIED** [1] 115:5

**NOVEMBER** [10] 108:8; 121:22; 127:7; 132:22; 133:2, 4, 6; 142:1

**NUMBER** [9] 26:6; 40:19; 84:25; 86:12; 91:9; 101:25; 119:1, 2; 172:24

**NUMBERS** [2] 102:16; 104:19

**NUMERAL** [4] 20:6; 22:25; 23:8; 144:3

- O -

**OATH** [1] 3:19

**OATHS** [1] 1:16

**OBJECT** [2] 88:3; 167:1

**OBJECTION** [7] 48:10; 125:23; 126:6, 18; 138:21; 154:10; 166:8

**OBJECTIONS** [1] 3:10

**OBJECTIVE** [1] 9:25

**OBLIGATED** [4] 64:9, 10; 65:25; 68:2

**OBLIGATION** [1] 159:25

**OBTAINED** [2] 133:10; 134:18

**OBVIOUSLY** [4] 31:20; 91:1; 104:21; 134:6

**OCCASION** [1] 55:1

**OCCUR** [2] 119:12; 131:24

**OCCURRED** [4] 27:5; 38:8; 87:14; 132:7

**OCCURRENCE** [1] 144:19

**OCCURRING** [1] 118:25

**OCEANEERING** [5] 100:9, 11, 25; 101:3; 105:9

**OCTOBER** [24] 9:18; 10:21, 23; 12:19; 14:21; 21:20; 23:6, 9; 24:15; 25:24; 27:11; 31:7; 32:24; 38:9; 53:3; 100:8; 112:15; 116:23; 129:2, 6, 7; 130:22; 132:23; 134:20

**OFFER** [2] 126:25; 127:4

**OFFERING** [1] 154:7

**OFFICE** [14] 36:4, 8; 43:4, 5; 50:9; 51:2; 53:15; 74:14; 119:14; 142:4, 6, 10; 143:5; 151:9

**OFFICER** [1] 171:4

**OFFICERS** [5] 32:2, 5, 19, 21; 166:4

**OFFICES** [2] 1:18; 151:9

**OFFICIAL** [1] 151:7

**OFFSET** [2] 131:11, 23

**OFFSHORE** [32] 1:5; 2:3; 6:12, 25; 13:11; 14:2, 4; 24:24; 65:2; 72:25; 74:7, 9; 76:24; 87:17; 97:4; 130:24, 25; 131:8, 16, 19; 133:8; 145:12, 13, 14, 15; 167:25; 168:1, 3, 5, 14

**OFTEN** [3] 53:24; 54:4; 56:11

**ONES** [6] 20:11; 34:11; 50:3, 12; 143:23; 153:14

**ONGOING** [9] 57:25; 73:18; 103:23; 104:3; 119:14; 120:14; 121:5, 6; 145:20

**OOPS** [2] 88:14, 15

**OPEN** [1] 43:22

**OPEN-ENDED** [1] 121:2

**OPENED** [4] 8:25; 9:5, 6, 20

**OPERATE** [1] 66:9

**OPERATED** [1] 168:13

**OPERATES** [1] 36:5

**OPERATING** [17] 7:6; 9:14; 51:22, 24, 25; 53:1; 63:1, 4; 66:9; 71:5, 7; 104:17; 137:15; 138:6, 18; 139:18; 161:8

**OPERATION** [2] 60:5, 20

**OPERATIONAL** [2] 72:6; 106:24

**OPERATIONS** [4] 10:6; 53:20; 62:16; 137:12

**Exhibit A**

**OPINION** [4] 110:6, 9; 118:14; 153:4

**OPINIONS** [1] 171:25

**OPPORTUNITY** [1] 6:20

**OPPOSED** [3] 67:9; 98:19; 144:7

**OPTIONS** [3] 66:18, 19; 152:16

**ORDER** [8] 105:3, 5; 113:25; 114:4; 115:20, 22; 122:18; 130:20

**ORGANIZATION** [1] 57:5

**ORIGINAL** [5] 11:10; 145:6; 164:1; 172:12, 13

**ORIGINATE** [1] 160:9

**ORLANDO** [10] 9:7; 10:12; 22:3; 41:14, 15, 24; 59:9; 60:4; 140:4; 166:5

**ORLANDO'S** [1] 41:20

**ORLEANS** [4] 2:12; 18:18; 19:1; 87:19

**OTHERS** [3] 26:22; 80:9; 91:21

**OTHERWISE** [3] 124:24; 171:19; 172:9

**OUGHT** [1] 170:18

**OUTCOME** [3] 91:4, 6; 172:9

**OUTFLOW** [1] 139:5

**OUTLOOK** [1] 57:1

**OUTS** [1] 139:4

**OUTSIDE** [1] 131:21

**OUTSTANDING** [3] 78:8; 84:22; 106:25

**OVERRUN** [1] 85:22

**OVERRUNS** [1] 85:24

**OVERSEE** [1] 116:24

**OVERSEEING** [3] 117:2, 4; 140:22

**OVERVIEW** [1] 75:11

**OWED** [29] 27:8; 61:22; 62:11, 17; 63:23; 65:20; 67:11; 78:8; 86:6, 10; 87:7, 22, 23; 92:5, 9; 93:10, 11; 94:2; 101:13; 107:7, 23; 109:2, 24; 120:15; 124:13; 126:4; 131:12; 136:17; 157:13

**OWES** [1] 131:4

**OWNED** [10] 14:19; 21:18; 26:12, 13; 28:9, 10; 75:16; 110:22; 131:6, 7

**OWNER** [10] 26:14; 28:4; 35:21; 41:15, 21; 42:10; 45:13, 16; 53:8; 150:19

**OWNERS** [6] 13:18; 14:18; 18:2; 21:21; 53:18; 169:14

**OWNERSHIP** [26] 11:5, 11; 12:25; 13:2, 21; 14:10, 15; 15:1; 18:10, 11; 20:16, 18; 21:15; 22:20, 23; 23:2; 25:21;

26:11, 15, 17; 27:20, 22; 28:1, 3, 5; 80:17

**OWNS** [4] 15:25; 16:1, 2; 49:22

- P -

**P.M.** [7] 89:11, 12; 135:1, 2; 169:9, 10; 170:20

**PACKAGE** [3] 15:4; 16:13, 14

**PAGE** [5] 68:20; 72:13; 90:12; 156:9; 172:14

**PAGES** [1] 171:9

**PAID** [84] 28:17; 29:21, 24; 30:17, 20; 35:6; 44:11; 46:20; 47:10, 12; 48:18; 49:1, 5, 16, 17, 18; 65:7, 10; 70:9; 77:22, 25; 79:5, 7, 25; 80:22, 23; 81:2, 3, 24; 82:16; 83:16, 22, 23; 84:1, 4, 14, 18, 20; 85:3, 4, 5, 17, 21; 88:10; 91:11; 95:6; 96:21; 97:25; 101:19; 102:10, 17; 103:2, 19; 104:24; 105:3, 10; 114:18; 119:1, 4; 120:25; 121:8, 10, 11; 123:7; 124:9; 126:2; 130:9; 136:21, 25; 137:20; 143:24; 148:3, 5; 158:7; 159:2; 161:12, 13, 14, 24, 25; 162:25; 165:20

**PAIDS** [1] 30:24

**PAINSTAKINGLY** [1] 82:20

**PAPER** [1] 17:12

**PAPERWORK** [1] 17:9

**PARENT** [8] 13:2; 16:1; 22:18, 19; 138:3, 5, 8; 139:16

**PART** [20] 8:11; 23:10; 24:5; 29:23; 38:25; 57:10; 64:18; 66:18; 68:18; 76:1, 8; 80:17; 96:24; 109:11; 145:15; 146:8, 18; 151:15; 160:7; 161:14

**PARTIAL** [3] 98:12; 101:12; 106:15

**PARTICIPATE** [1] 38:25

**PARTICULAR** [11] 75:15; 78:12, 16; 100:5, 12; 114:24; 129:9; 139:10; 143:1, 4; 144:2

**PARTIES** [6] 3:3; 122:16; 123:3; 124:20; 131:14; 172:8

**PARTNERS** [23] 8:24; 9:4, 12, 23; 11:10; 12:24; 13:17; 14:9; 15:14; 30:13, 21; 38:5; 91:7, 8, 10, 12; 92:19; 93:9; 94:10; 99:16; 102:11

**PARTY** [2] 172:4, 6

**PAST** [4] 65:22; 66:20; 87:10; 129:13

**PATENT** [1] 14:2

**PATH** [1] 153:15

**Exhibit A**

**PATIENCE** [1] 170:11

**PAYABLE** [3] 131:19; 164:19, 24

**PAYABLES** [8] 52:23; 53:25; 120:17, 18; 139:6, 18; 143:21, 22

**PAYING** [10] 45:1; 51:9, 10; 83:9; 90:11; 92:8; 99:8; 145:22, 25; 162:7

**PAYMENT** [47] 26:8; 66:1; 79:13; 81:7; 83:4; 90:18, 23; 91:5, 22; 97:12; 98:12; 101:10; 102:15; 105:7, 21; 106:15, 16, 17; 107:22; 109:1; 110:16; 111:6; 112:15, 16, 20, 21; 115:10; 120:8, 9, 11; 122:24, 25; 123:1; 125:1; 127:14, 18, 24; 145:4; 146:12; 151:14; 158:3; 160:8, 15; 161:11

**PAYMENTS** [17] 28:19; 66:11; 79:21; 94:7; 100:4; 101:20; 102:19, 22; 103:4; 104:18; 111:2; 124:24; 127:8, 11, 21; 128:4; 162:20

**PAYROLL** [10] 35:1; 38:14; 45:22; 69:19, 21; 70:15, 21; 71:5; 137:15; 139:18

**PAYS** [9] 44:12, 13; 46:19; 47:8; 51:1, 25; 150:6; 159:15

**PENALTY** [1] 96:8

**PENDING** [1] 116:16

**PENSION** [1] 38:23

**PEOPLE** [13] 4:12; 36:21; 43:22; 53:18; 54:3; 59:2; 74:14, 20; 163:14, 15; 169:3, 25; 170:7

**PERCENT** [22] 12:23, 25; 14:22; 15:7, 18; 16:1, 20; 17:3; 21:17; 23:3; 26:4, 11, 18; 28:8; 35:21; 84:14; 91:9; 92:21; 93:2; 103:18, 20

**PERCENTAGE** [7] 12:22; 17:25; 83:16; 92:1, 9, 13; 120:10

**PERCENTAGES** [2] 14:19; 21:24

**PERCEPTION** [2] 92:16, 17

**PERFORM** [7] 10:4; 31:23; 46:6; 50:1; 62:22; 76:10; 89:20

**PERFORMED** [7] 47:1; 78:9; 111:3, 6; 126:16; 127:2; 131:9

**PERFORMING** [1] 49:14

**PERHAPS** [1] 137:2

**PERIOD** [4] 8:13; 129:9; 138:18; 139:11

**PERIODIC** [1] 56:1

**PERIODICALLY** [3] 56:10; 99:22; 117:10

**PERMIT** [1] 112:23

**PERMITS** [1] 90:10

**PERSON** [1] 171:20

**PERSONAL** [9] 5:19; 41:20; 42:7; 155:18; 156:21; 161:24; 162:9; 168:17; 171:12

**PERSONALLY** [9] 28:10; 30:6; 42:9, 11; 43:11; 49:8; 56:16; 113:10; 116:24

**PERSPECTIVE** [5] 58:1; 82:24; 95:11; 113:22; 118:3

**PHASE** [1] 89:15

**PHILLIP** [1] 2:11

**PHONE** [3] 43:3; 122:2; 159:19

**PHRASE** [1] 131:3

**PHRASED** [1] 4:19

**PHYSICAL** [1] 150:5

**PHYSICALLY** [2] 142:13; 151:12

**PICKED** [3] 91:16, 17; 159:19

**PIECE** [3] 13:13; 91:17, 18

**PIECES** [1] 121:2

**PINNACLE** [4] 96:2, 5, 12; 135:8

**PIPELINE** [2] 76:22; 103:13

**PERIODIC** [1] 56:1

**PITCHED** [1] 161:23

**PLACE** [4] 26:24; 27:9; 121:24; 122:1

**PLACED** [4] 96:12; 97:4; 98:16; 99:1

**PLAN** [4] 38:23; 90:18; 131:18; 159:12

**PLANNED** [1] 7:8

**PLANNING** [1] 157:18

**PLANS** [1] 157:9

**PLAT** [1] 10:5

**PLATFORM** [24] 10:5; 14:3, 4; 74:8; 76:23; 78:16, 19; 79:1, 10, 14; 80:18; 81:17; 88:8; 89:16; 90:1; 102:5, 11; 103:13; 121:21; 128:23; 157:14; 160:5, 7, 9

**PLATFORMS** [4] 7:7; 73:14; 76:21, 24

**PLATINUM** [1] 40:11

**PLEDGED** [3] 63:16; 64:5; 80:19

**PLUS** [2] 85:18; 93:20

**POCKET** [1] 132:13

**POINT** [21] 23:23, 25; 25:16; 53:1; 66:16; 75:13; 111:24; 115:15, 25; 118:2; 123:10; 124:14; 125:21; 126:2; 127:3; 129:16; 136:18, 21; 151:20; 152:23; 155:7

**Exhibit A**

POINTS [1] 4:6

POLICY [1] 46:9

PORTION [10] 26:13; 51:9, 10; 84:11; 85:9, 14; 91:15; 96:21; 106:4; 125:14

PORTIONS [1] 91:10

POSITION [4] 7:20; 31:8; 116:1, 3

POSITIONS [1] 33:13

POST [1] 97:17

POTENTIAL [3] 11:24; 111:11; 113:4

POTENTIALLY [1] 24:25

PREDOMINANTLY [1] 4:16

PREGNANT-OR-NOT [1] 20:22

PREPARATION [1] 72:1

PREPARE [2] 54:13; 57:6

PREPARED [3] 58:3; 171:11, 15

PREPARES [2] 18:15, 17

PREPARING [4] 57:3, 9, 23; 147:2

PRESCRIPTION [1] 5:4

PRESENT [1] 2:15

PRESENTATION [3] 57:19, 22; 58:9

PRESENTATIONS [3] 56:7; 57:24; 58:3

PRESIDENT [6] 31:9, 11, 15; 109:6; 149:3; 155:12

PRETTY [11] 4:7; 7:14; 20:25; 22:1; 51:11; 53:24; 81:5; 83:21; 85:9; 90:2; 129:8

PREVENT [1] 5:8

PRICE [7] 21:9, 10; 26:1; 78:13; 98:13; 136:13; 137:3

PRICING [2] 31:23; 115:12

PRIMARILY [2] 31:21; 104:10

PRIMARY [1] 89:25

PRINTED [1] 72:12

PRIOR [1] 41:21

PRIVATE [1] 11:4

PRIVILEGES [2] 60:12, 23

PROBLEM [5] 63:17; 108:11, 17; 117:17; 118:2

PROBLEMS [6] 107:8; 108:19, 24, 25; 114:15; 116:10

PROCEDURE [2] 3:6; 171:24

PROCEED [1] 145:17

PROCEEDING [3] 112:11; 117:14, 15

PROCESS [6] 82:24; 96:16; 112:10; 113:21; 143:5; 149:18

PROCESSED [1] 48:22

PRODUCE [2] 17:15; 36:23

PRODUCTION [1] 17:17

PROGRAM [3] 8:5; 68:19; 71:22

PROGRESS [1] 10:22

PROHIBITED [1] 172:2

PROHIBITION [1] 171:22

PROJECT [89] 1:5; 2:3; 6:12, 24; 31:25; 33:14, 15, 16, 17, 18, 19; 34:1, 2, 3; 47:5; 55:14, 16; 56:21, 24; 62:23; 63:2; 73:5, 6; 74:16, 19, 23, 25; 75:2, 3, 8, 15, 24; 76:1, 2, 8; 77:5; 78:7, 12; 85:7; 90:4, 7; 92:13; 93:12; 95:7; 103:11; 108:13; 111:7; 112:22; 113:6, 9; 114:7, 11, 13, 16, 24; 115:1, 2, 8, 16, 20; 117:5, 6, 11, 14, 24; 119:6; 120:16, 19; 122:9, 17, 19, 22; 123:8, 12, 15, 22; 124:7, 8, 10, 14, 22; 130:8, 17, 20; 135:17, 20; 143:16; 158:15

PROJECT-BY-PROJECT [1] 56:8

PROJECTS [24] 54:21, 23; 55:10, 19; 56:24; 57:16, 18, 25; 58:6; 72:7, 18; 74:5; 76:9, 10, 15, 20; 77:17, 20, 24; 78:4; 107:4; 108:15; 114:20

PROMISE [1] 89:3

PROPER [2] 90:13; 143:15

PROPERTY [5] 88:12; 147:1; 151:9, 11, 13

PROPORTIONATE [4] 119:25; 120:22; 121:3, 13

PROPOSAL [1] 83:1

PROPOSE [1] 124:15

PROPOSED [2] 153:9; 159:21

PROPOSING [1] 124:11

PROPRIETARY [2] 154:16; 155:21

PROTECT [1] 152:10

PROVIDE [5] 36:20; 39:9; 101:4; 122:25; 168:5

PROVIDED [9] 39:3; 79:14; 95:25; 98:8; 99:6, 25; 102:15; 120:16; 148:20

PROVIDES [9] 29:6; 38:20; 39:1, 16; 44:4; 49:7; 53:23; 73:9; 100:21

PROVIDING [3] 56:15; 147:3; 160:13

PUBLISH [1] 54:10

PUBLISHED [1] 54:12

PULL [8] 86:23, 25; 123:24; 124:17; 137:7; 166:1, 18, 22

**Exhibit A**

**PULLED** [4] 93:22; 123:21; 124:7; 125:1

**PULLING** [1] 125:20

**PULLS** [1] 122:19

**PURCHASE** [4] 14:7; 24:7, 8; 26:1

**PURCHASED** [2] 14:13; 25:25

**PURPOSE** [1] 23:13

**PURPOSES** [7] 3:6; 11:14; 27:23; 41:4; 62:15; 82:7, 10

**PURSUANT** [4] 1:13, 17; 3:5; 116:20

**PURSUE** [1] 83:19

---

- Q -

**QUARTERLY** [1] 56:2

**QUICK** [1] 100:15

**QUITE** [1] 170:5

**QUOTING** [1] 137:17

---

- R -

**R.S.** [1] 171:7

**RADAR** [1] 115:3

**RAISED** [2] 135:7; 141:14

**RANGE** [3] 43:1; 67:4, 24

**RATA** [2] 130:7, 18

**RATE** [1] 136:10

**RATHER** [2] 99:7; 112:10

**REACHED** [1] 135:23

**READ** [8] 3:9; 64:3; 106:3, 5;

125:12, 15; 170:16, 18

**READS** [1] 64:3

**READY** [4] 41:1; 50:24; 115:5; 137:16

**REAL** [4] 10:25; 93:6; 100:15; 111:17

**REASON** [2] 4:19; 5:7

**REASONS** [1] 28:3

**RECALL** [15] 65:9; 114:13; 116:22; 117:22; 121:18; 123:9, 14; 124:5; 127:21; 137:4, 5, 6; 153:22; 159:6; 160:12

**RECEIPTS** [1] 44:5

**RECEIVABLE** [18] 65:23; 66:13, 14; 110:24; 111:4, 9, 12; 133:19; 148:3; 151:17, 18, 19, 22, 23; 158:12, 14

**RECEIVABLES** [10] 45:22; 52:23; 53:25; 56:25; 63:15; 65:5; 66:19, 21; 139:6, 15

**RECEIVE** [12] 38:13; 64:11; 68:15; 69:5, 22; 84:6; 89:19, 20; 91:5; 120:1; 122:18; 128:9

**RECEIVED** [8] 28:18; 69:7; 84:10; 85:9, 10; 141:11; 143:14; 160:19

**RECEIVES** [2] 43:14, 15

**RECEIVING** [1] 65:7

**RECENTLY** [5] 56:11; 68:10; 86:7; 135:7; 141:9

**RECOLLECTION** [1] 79:19

**RECORD** [17] 12:14, 16; 40:10; 50:21, 22; 73:23, 25; 89:10, 11, 12; 106:5; 125:15; 135:1, 2; 156:15; 169:9, 10

**REDUCED** [1] 119:20

**REDUCTION** [1] 137:2

**REEF** [9] 96:13; 101:8, 12; 112:15; 120:20, 21, 24; 121:7; 135:8

**REEFS** [3] 96:2, 5, 6

**REFER** [2] 11:17; 91:7

**REFERENCING** [4] 16:13; 79:12; 142:11; 160:17

**REFERRED** [1] 130:7

**REFERRING** [4] 72:9; 134:1; 164:14; 165:1

**REFUTE** [1] 118:18

**REGARD** [15] 46:24; 57:24; 71:14; 74:2; 80:22; 89:14, 16; 95:1; 99:16; 101:17; 110:16; 135:15; 141:19; 145:11; 167:14

**REGARDING** [7] 53:19; 82:16; 130:16; 135:8;

141:6; 159:21; 164:20

**REGARDLESS** [1] 98:1

**REGISTERED** [2] 25:19; 167:8

**REGISTRATIONS** [1] 166:2

**REGULAR** [1] 60:24

**REGULARLY** [1] 117:20

**REIMBURSE** [2] 51:13, 18

**REIMBURSED** [1] 137:20

**RELATED** [11] 20:3; 42:20; 57:22; 84:17; 86:5; 101:25; 102:3, 4, 6; 133:10; 172:7

**RELATION** [2] 17:23; 154:19

**RELATIONSHIP** [5] 19:21; 35:14; 113:1; 172:3, 6

**RELATIONSHIPS** [1] 171:23

**RELEASED** [1] 99:5

**RELEASES** [1] 98:7

**RELEVANT** [2] 128:11, 13

**REMAINDER** [1] 84:13

**REMAINING** [3] 34:11; 103:24; 158:14

**REMEDY** [1] 83:17

**REMINGTON** [1] 3:15

**REMOTELY** [1] 8:4

**REMOVAL** [22] 10:6; 74:8; 76:21, 23; 78:19; 79:1, 14; 80:20;

**Exhibit A**

81:18; 88:8; 89:17; 90:1; 102:5, 12; 103:13; 114:14; 121:21; 128:23; 157:14; 160:4, 6, 9

**REMOVALS** [1] 129:5

**REMOVED** [1] 75:25

**REMOVING** [1] 7:7

**RENAMED** [1] 164:3

**RENDERED** [1] 144:16

**RENEGOTIATE** [2] 90:22; 92:7

**RENEGOTIATING** [2] 90:17, 19

**RENT** [3] 51:1; 70:21; 71:5

**RENTALS** [3] 86:9; 87:3; 93:21

**REORGANIZED** [1] 164:2

**REPHRASE** [2] 4:23; 107:15

**REPORT** [7] 44:4, 7; 56:20; 95:25; 99:21; 117:10

**REPORTED** [2] 2:23; 171:9

**REPORTER** [5] 1:15; 2:25; 5:14; 171:3; 172:23

**REPORTING** [5] 56:14; 71:14, 17; 171:10; 172:4

**REPORTS** [4] 56:1; 57:2; 117:12; 140:18

**REPRESENTING** [4] 2:3, 9; 3:23; 145:17

**REQUEST** [3] 17:16; 155:5; 160:2

**REQUESTED** [2] 105:11; 106:10

**REQUESTING** [1] 96:5

**REQUIRE** [1] 71:20

**REQUIRED** [7] 64:19; 71:17, 22; 97:17; 98:23; 112:18; 171:17

**REQUIREMENT** [1] 97:5

**REQUIREMENTS** [1] 141:3

**REQUIRES** [2] 71:19; 97:3

**RESERVED** [2] 3:12; 147:22

**RESERVES** [1] 3:9

**RESOLUTION** [3] 121:1; 133:24; 149:12

**RESPONDED** [1] 127:17

**RESPONSE** [6] 32:13; 39:23; 120:23, 24; 147:3; 160:7

**RESPONSES** [2] 146:22; 160:1

**RESPONSIBLE** [5] 83:9; 90:11; 91:25; 92:4; 93:2

**RESPONSIVENESS** [1] 3:12

**REST** [3] 27:22; 78:25; 130:20

**RESTROOM** [1] 89:7

**RESULT** [2] 112:6; 164:3

**RESULTED** [1] 168:25

**RETAIN** [2] 12:24; 15:1

**RETAINED** [1] 13:2

**RETURN** [3] 19:6, 7; 64:18

**RETURNS** [5] 18:13, 15, 17; 19:2, 17

**REVENUE** [3] 137:17; 139:5; 146:3

**REVIEW** [4] 55:24; 71:23; 143:16, 22

**REVIEWED** [2] 55:11; 126:8

**REVIEWS** [1] 143:17

**REYES** [2] 36:9, 12

**RIGHTS** [1] 147:22

**ROAD** [2] 3:16; 111:16

**ROBARDS** [4] 9:7; 10:9; 22:4; 166:4

**ROBERTSON** [3] 36:9; 44:19; 164:24

**ROBINSON** [1] 2:11

**ROCKY** [12] 119:11; 122:5, 8; 123:16; 125:18; 127:12, 22; 132:9, 15, 21; 133:1; 159:20

**ROGER** [6] 34:1, 9; 36:9, 12; 70:6, 12

**ROLL** [1] 35:19

**ROMAN** [4] 20:6; 22:24; 23:7; 144:3

**ROTATE** [1] 169:25

**ROUGHLY** [2] 93:10; 97:10

**ROUND** [1] 34:12

**ROUTINELY** [1] 144:12

**RULES** [3] 3:5; 171:17, 25

**RUNNING** [2] 117:5; 161:17

**RUNS** [2] 43:6; 73:20

- S -

**S-A-N-D-L-I-N** [1] 164:7

**S-O-N-D-A** [1] 39:7

**SALARY** [1] 70:10

**SALE** [4] 14:21; 23:14; 25:3; 26:16

**SANDLER** [1] 33:21

**SANDLIN** [5] 33:19, 23; 164:7, 18, 22

**SATISFACTORILY** [3] 66:23; 95:14; 98:6

**SAVE** [1] 3:10

**SCHEDULE** [3] 75:24; 104:25; 115:12

**SCOPE** [1] 75:12

**SEAL** [1] 172:13

**SEALING** [1] 3:7

**SECOND** [7] 12:14; 40:4; 69:9; 73:23; 74:22; 89:14, 16

**SECRETARIAL** [2] 34:20, 23

**SECRETARIES** [1] 34:19

**SECRETARY** [1] 166:15

**SECTION** [1] 156:8

**SECURE** [1] 58:7

**SECURED** [14] 62:22; 63:6, 7,

**Exhibit A**

11, 14; 67:21; 68:7; 90:25; 148:2; 150:6, 8; 158:6; 159:6, 15

**SECURITY** [1] 98:17

**SEEN** [4] 92:22, 24; 132:5; 154:23

**SEIZED** [1] 66:21

**SELVES** [1] 25:6

**SEND** [4] 155:4; 156:8, 12; 170:8

**SENIOR** [3] 33:14, 15; 36:12

**SENSE** [1] 4:22

**SENT** [5] 123:1; 143:15; 147:21; 160:2; 161:6

**SEPARATE** [3] 30:13; 81:25; 144:7

**SEPARATED** [1] 133:20

**SEPARATELY** [3] 71:10; 81:18, 19

**SEPTEMBER** [1] 115:24

**SERVICE** [2] 73:8; 143:7

**SERVICED** [1] 66:23

**SERVICES** [19] 1:5; 2:3; 13:11; 24:24; 49:6; 65:2; 72:25; 73:2; 89:21, 23; 100:22; 101:5; 144:15; 145:13; 167:25; 168:1, 3; 171:21

**SERVING** [1] 58:18

**SETTING** [1] 59:6

**SETTLE** [3] 87:24; 88:1; 131:15

**SETTLED** [1] 87:25

**SETTLEMENT** [1] 88:4

**SEVEN** [2] 26:25; 86:12

**SEVERAL** [7] 7:5; 33:11; 72:18; 127:6, 8; 131:17; 142:23

**SEVERALLY** [1] 92:20

**SEVERN** [2] 1:19; 2:5

**SHALE** [2] 168:13, 14

**SHAPE** [1] 124:23

**SHARE** [6] 83:9; 119:25; 120:22; 121:3; 130:7; 132:16

**SHARES** [2] 49:23; 81:3

**SHARING** [1] 153:4

**SHEET** [7] 90:13; 92:5; 110:4; 116:5; 120:17; 144:21; 145:3

**SHELL** [2] 25:15; 161:8

**SHENANDOAH** [3] 32:10, 16; 142:10

**SHIP** [1] 28:5

**SHIRE** [1] 169:18

**SHORE** [5] 87:17, 22; 88:6; 134:18; 162:24

**SHORT** [3] 108:12; 115:15, 17

**SHOULDER** [1] 145:1

**SHOW** [3] 80:1; 164:13; 166:8

**SHOWING** [1] 120:17

**SHOWN** [1] 101:23

**SHOWS** [2] 102:15, 19

**SHUT** [4] 104:4, 5, 6, 9

**SIDE** [3] 124:6; 161:18; 163:15

**SIGN** [3] 3:9; 64:20; 170:16

**SIGNATURE** [5] 165:2, 16, 19, 22; 172:13

**SIGNED** [6] 60:14; 63:21; 64:8, 22; 122:13; 148:23

**SIGNIFICANT** [1] 154:5

**SIGNS** [2] 60:9, 21

**SIMILAR** [5] 10:17; 31:1; 68:11; 79:10; 152:14

**SIMILARLY** [1] 150:2

**SIMPLE** [4] 15:2; 65:17; 93:6; 105:7

**SIMPLY** [5] 25:15; 51:23; 108:12; 126:15; 144:5

**SINCE** [10] 21:20; 31:7; 32:24; 38:4; 40:14; 41:6; 48:24; 53:3; 90:7; 104:8

**SINGLE** [1] 15:12

**SITE** [9] 72:11; 76:23; 79:1; 81:18; 89:17; 101:2; 102:5, 12; 135:18

**SITES** [2] 74:11, 13

**SITTING** [2] 51:23; 85:13

**SITUATION** [8] 95:1; 105:22;

106:21, 22; 110:13; 161:9; 162:24; 167:11

**SIX-MILLION** [1] 151:14

**SIX-MILLION-DOL LAR** [1] 158:12

**SIX-PLUS** [1] 157:12

**SIZABLE** [1] 85:9

**SMALL** [2] 168:6, 8

**SMALLER** [1] 121:13

**SMARTER** [2] 59:2; 169:4

**SOFTWARE** [1] 143:20

**SOLD** [14] 11:4, 6; 12:18; 13:3, 6; 14:23; 15:3, 5, 14, 18; 16:13, 14, 19; 17:2

**SOLE** [1] 13:18

**SOLELY** [1] 18:9

**SOLUTION** [7] 23:20; 54:21; 143:10; 148:8, 19; 151:5; 153:14

**SOLUTIONS** [247] 1:7; 2:9; 8:25; 9:5, 12, 14; 12:9, 11, 12, 18; 13:6; 14:22; 15:8, 19; 16:10; 17:1, 23; 18:1, 3, 9, 12; 19:3, 23; 20:5, 6; 22:20, 24; 23:7, 22; 24:4, 10, 23; 25:18; 26:13; 27:3, 12; 28:6, 7, 10, 24; 29:2, 6, 8, 17, 19, 22, 24; 30:5, 6, 17, 22; 35:10; 36:4; 37:6, 8, 14, 16, 18, 21; 38:1, 6, 22; 39:19; 42:1,

**Exhibit A**

21; 44:3, 23; 45:13, 18; 46:2, 14, 21; 47:11, 13, 15, 25; 48:2, 7, 18, 21; 49:2, 6, 11; 51:2, 4; 52:7, 10, 13, 16, 19, 22, 25; 53:8, 12; 56:17, 19; 58:4, 19; 60:6, 9, 20; 61:4, 5, 8, 15; 63:6, 12, 24; 64:8, 11, 19, 24; 65:6, 23; 66:22; 68:1, 15, 23; 71:9; 72:5, 15; 73:3; 74:2, 10; 75:2, 7, 22; 76:14, 16, 17; 77:22; 78:3, 10, 13; 83:6; 84:3, 8, 17; 85:6, 13; 86:20; 87:9; 93:23; 96:20; 98:9, 13; 99:6; 100:4; 102:10; 103:2, 23; 104:14; 109:3, 6, 7, 12, 17; 111:1, 18, 21, 25; 112:3; 116:2, 17; 117:4; 120:18; 121:10; 122:13, 21; 123:2, 7; 124:9, 12; 128:9, 15; 129:15, 19; 130:1, 5, 13; 131:5, 10, 13; 133:11, 18; 134:4, 9, 19; 137:11; 138:13; 139:9; 140:23; 141:22; 142:2, 7; 143:9; 144:3, 6, 8, 10, 12; 145:12, 24; 146:4, 10, 15, 22; 147:7, 23; 148:10; 149:19, 20; 151:21;

152:3, 20; 153:1, 12, 16, 25; 154:7, 8; 155:12; 156:25; 157:13, 24; 158:2; 160:5, 19, 21; 162:23; 163:16, 18, 25; 164:9; 165:8, 11, 14, 21; 166:2; 167:14

**SOLVENT** [1] 130:2

**SONDA** [40] 36:9; 39:7; 44:13; 45:1, 11; 46:19; 47:6, 8; 48:22; 49:1, 2; 53:14, 24; 54:18; 57:7; 60:10, 21; 61:2, 13; 70:6, 9; 71:24; 105:20; 106:7; 107:18, 19, 20, 21; 110:15; 128:2; 137:23; 139:25; 140:10; 141:1, 2; 143:23; 160:23; 161:18; 164:24

**SONDRA** [1] 107:18

**SOON** [1] 89:3

**SOPHISTICATED** [1] 134:7

**SOUND** [5] 103:11; 111:7; 129:15; 153:11; 158:15

**SOUNDS** [3] 58:17; 107:16; 152:9

**SOURCE** [1] 81:4

**SOURCES** [2] 160:10, 15

**SOUTH** [2] 32:14, 15

**SPACE** [1] 53:16

**SPEAKING** [1] 55:5

**SPECIALITY** [3] 130:24; 131:8; 145:13

**SPECIALTIES** [2] 131:16, 20

**SPECIFI** [1] 142:18

**SPECIFIC** [6] 20:8, 13; 21:2; 55:23; 62:23; 63:2

**SPECIFICALLY** [3] 52:5, 10; 57:18

**SPECULATION** [1] 125:23

**SPELL** [2] 18:21; 76:5

**SPENT** [4] 8:17; 71:15; 95:15; 146:6

**SPLIT** [5] 49:21; 91:14; 119:5; 130:18; 131:23

**SPOKEN** [1] 159:19

**SPREAD** [1] 120:16

**SPREADSHEET** [2] 99:24; 100:3

**SPREADSHEETS** [3] 56:7, 14; 119:17

**SPRING** [1] 104:13

**STAMP** [2] 101:25; 164:17

**STAMPED** [1] 172:13

**STAND** [2] 99:22; 152:15

**STANDING** [3] 27:16, 19; 156:22

**STANDPOINT** [1] 165:14

**START** [3] 92:3; 129:6; 140:15

**STARTED** [5] 7:16; 41:25; 93:13; 113:3, 12

**STARTING** [1] 129:1

**STATE** [7] 1:18; 5:23; 153:7, 8; 166:15; 171:3; 172:23

**STATEMENT** [2] 58:20; 60:19

**STATES** [1] 1:1

**STATUS** [10] 6:5; 56:21, 24; 57:25; 95:7; 99:18, 19; 103:17; 140:18

**STATUTE** [1] 171:17

**STAY** [4] 6:17; 8:21; 28:5; 170:1

**STENOTYPE** [1] 171:10

**STEP** [2] 126:12, 23

**STEVE** [15] 9:7; 10:12; 14:11, 19; 22:3; 26:22; 41:14, 20, 24; 59:9; 60:4; 140:4, 8; 166:5

**STILL** [24] 9:11; 11:11; 25:9, 18, 19, 20; 27:15; 65:20; 67:2; 73:18; 78:1, 8; 85:14, 17; 87:7; 103:23; 133:17, 18; 134:1, 2; 135:23, 25; 145:20; 167:11

**STIPULATED** [1] 3:2

**STIPULATION** [1] 1:14

**STOCK** [1] 17:6

**STOOD** [1] 141:13

**STREAM** [1] 164:21

Exhibit A

STREET [2] 2:12; 32:12

STRETCH [1] 118:6

STRICKLAND [1] 100:20

STRUCTURE [3] 19:22; 21:5; 28:2

STUDYING [1] 162:12

STUFF [3] 36:21; 132:2; 147:13

STUMBLE [1] 63:20

SUBJECT [1] 87:10

SUBMISSION [1] 58:4

SUBMITTED [10] 77:10; 81:10, 12, 16; 82:6, 8, 25; 141:21, 23; 142:3

SUBMITTING [2] 81:20; 82:14

SUBSEQUENTLY [2] 76:13; 133:23

SUBSIDIARIES [1] 108:16

SUBSTANCE [3] 58:19; 79:20; 122:7

SUBSTANTIAL [1] 134:8

SUCCESSFUL [2] 72:14, 18

SUED [1] 159:24

SUIT [4] 86:11, 18; 87:4; 131:13

SUITE [9] 1:20; 2:5; 32:17, 18; 36:4; 50:9; 51:2; 142:7, 9

SULPHER [1] 19:13

SUMMER [1] 114:7

SUPERINTENDEN T [5] 33:16, 17; 34:1, 2, 3

SUPERINTENDEN TS [1] 135:20

SUPERVISION [1] 171:12

SUPPLIED [1] 71:23

SUPPORT [1] 82:21

SUPPOSE [1] 24:12

SUPPOSED [1] 159:13

SURVEY [4] 96:6; 100:13; 101:1, 4

SURVEYING [2] 101:3, 5

SWORN [2] 3:18; 171:6

SYCAMORE [1] 2:12

SYNERGIES [1] 16:7

SYNERGY [1] 138:11

SYSTEM [3] 44:11; 143:14; 144:6

SYSTEMS [11] 13:7, 9; 14:12, 13; 24:22; 26:14; 50:14; 51:18, 21; 64:24; 72:25

- T -

TABLE [1] 163:9

TAGGED [1] 145:10

TAKES [2] 44:1, 2

TALK [13] 11:15; 53:6, 24; 65:15; 74:22; 81:21; 82:3; 105:5, 23;

112:25; 133:16; 139:25; 169:3

TALKED [21] 27:1; 55:4; 59:9; 96:23; 106:7; 107:18, 20, 21; 119:3; 121:19; 123:21; 132:11, 19, 20, 25; 135:6; 141:9, 16; 163:2, 22; 166:3

TALKING [24] 56:12, 13; 63:17; 72:13, 18, 20; 80:5; 83:25; 90:6; 94:20; 97:8; 108:3, 4; 113:3; 114:25; 119:18; 122:4; 133:10; 138:10; 142:18; 144:22; 145:2; 149:4; 150:13

TALOS [4] 80:7; 90:21; 91:16, 21

TARPON [18] 13:7, 8, 9, 23, 24; 14:2, 10, 12, 13; 24:22; 26:14; 50:14; 51:17, 18, 21; 52:3; 64:24; 72:25

TEAM [2] 23:18; 117:5

TECHNICALLY [5] 20:18, 20; 22:17; 24:12; 28:12

TECHNOLOGIES [1] 6:22

TELEPHONE [2] 127:15; 132:25

TEN-PLUS [1] 154:6

TERM [6] 90:13; 92:5; 112:24; 131:1; 144:21; 145:3

TERMS [12] 83:1, 2, 4; 90:23, 24; 93:4; 98:4,

5; 120:12; 122:24, 25; 145:4

TESTIFIED [1] 3:19

TESTIFY [1] 171:7

TESTIMONY [6] 78:6; 129:25; 138:21; 156:19; 171:4, 9

TETRA [7] 6:22, 23; 7:4, 15, 18; 8:8; 9:1

TEXAS [10] 3:16; 5:21; 32:16; 86:15; 101:8; 112:15; 142:10; 145:11, 16; 151:10

THEMSELVES [2] 98:20; 154:5

THEORETICALLY [1] 161:22

THEREABOUTS [1] 95:4

THEY'LL [1] 96:7

THEY'RE [18] 22:18; 34:23; 46:7; 49:14, 16, 17, 18; 50:4; 92:4; 95:23; 100:16; 101:4; 107:23; 132:12; 139:16; 145:2; 153:1, 14

THINKING [2] 136:5; 162:7

THINKS [1] 142:19

THOMAS [37] 2:10, 11; 11:22; 12:3; 34:5; 40:21, 25; 45:3, 8; 48:9, 13; 86:22; 88:2, 18, 23; 89:2; 125:11, 22; 126:5, 17; 138:20; 142:16;

154:9, 25;
155:13, 19;
156:4, 11;
164:12; 166:7,
12, 17, 21, 25;
169:7; 170:17
**THOUGHT** [6]
15:6; 83:23;
114:6; 118:23;
119:8; 169:8
**THOUSAND** [3]
86:13; 101:18;
112:17
**THREATENED** [1]
124:23
**THREE** [22] 7:12,
17; 13:17; 14:9;
22:13; 62:12, 18,
25; 64:13;
65:19; 90:7;
110:12, 18;
123:19; 124:12;
126:3; 131:5;
148:10; 152:15;
158:16, 23;
169:23
**THREE-PLUS** [2]
63:22; 67:2
**THRESHOLD** [1]
55:23
**THROUGHOUT** [3]
10:15; 108:19;
115:8
**TIGHT** [1] 140:15
**TILL** [1] 19:19
**TIME** [60] 3:13;
4:10, 17; 7:13,
14, 20; 8:13, 17;
9:23; 11:2;
13:25; 17:11;
35:8; 37:9; 56:9,
22; 59:13;
60:14; 61:16;
66:10; 72:23;
73:2; 103:7;
104:25; 108:2;
112:17; 115:1,
19; 116:11;
118:7, 11, 20;
119:8; 121:18;

123:5, 10, 14;
125:9, 10;
127:11; 128:22;
129:3, 9, 11, 12,
16, 25; 130:22;
132:4; 133:21;
137:12, 19;
139:10; 162:19;
170:5, 11
**TIME-AND-MATER
IAL** [1] 136:9
**TIMES** [5] 7:13;
54:6; 87:13;
138:12, 15
**TIMING** [1] 159:4
**TION** [3] 54:21;
79:17; 132:25
**TITLE** [4] 1:17;
31:8; 36:13;
37:3
**TITLES** [1] 37:4
**TODAY** [9] 4:7;
11:14; 17:6;
33:4, 9; 108:4;
110:3; 144:5
**TODD** [2] 33:16;
34:13
**TOGETHER** [6]
75:18; 82:4, 5;
113:5, 15;
156:20
**TOMMY** [1] 33:17
**TOMORROW** [1]
156:8
**TOPS** [70] 1:5;
3:23; 74:23;
89:25; 90:2, 3;
93:25; 95:12;
96:1; 105:6, 11;
106:10; 107:22;
109:2, 24;
110:16; 113:1, 2,
10, 17; 114:18;
115:3, 11, 22;
116:19; 117:20;
118:3, 16; 119:2,
19, 22; 121:20;
122:19; 123:11,
15, 21; 124:12,
17; 125:4, 18;

126:2; 127:1;
128:8, 22;
129:20; 130:3, 6,
9; 134:13, 17;
135:12, 14;
136:2, 8; 141:20,
21, 24; 142:2,
23; 154:18;
155:25; 157:14;
158:3; 160:3, 8;
161:23; 162:6,
17
**TOPS-CAUSED**
[1] 117:17
**TOTAL** [15]
30:23; 58:22;
77:4; 84:24;
86:12; 94:1;
101:18; 119:3,
25; 120:16;
122:8, 11, 14, 23;
130:17
**TOTALLY** [1]
17:8
**TOTALS** [2] 30:7,
10
**TOTO** [2] 81:16;
82:12
**TOUTING** [1]
72:19
**TOWARDS** [5]
26:8; 64:21;
65:25; 97:12;
102:11
**TOWNS** [2]
33:18; 117:9
**TRACKING** [1]
8:13
**TRADED** [2]
119:16
**TRAHAN** [2]
19:11, 16
**TRAIL** [1] 43:19
**TRANSACTED** [2]
27:12; 54:14
**TRANSACTION**
[19] 15:5, 11, 12;
17:10; 23:10, 14;
24:6; 25:14, 23;
26:24; 27:2, 4, 9,

11, 24; 38:8;
73:10; 132:17;
164:4
**TRANSCRIBED**
[1] 171:11
**TRANSCRIPT** [4]
171:13, 15, 16;
172:12
**TRANSFER** [2]
47:10; 132:7
**TRANSFERRED**
[7] 151:5, 25;
152:4, 10;
153:20; 156:25;
158:11
**TRANSFORMATIO
N** [1] 132:1
**TRASH** [1] 31:16
**TRAVEL** [2]
42:19; 44:21
**TRENT** [2] 33:20,
25
**TRIAL** [1] 3:13
**TRICK** [2] 4:24;
92:2
**TRICKLED** [1]
17:7
**TRIGGERS** [1]
55:24
**TROUBLE** [1]
144:13
**TRUCKING** [2]
100:16; 101:7
**TRUE** [9] 26:21;
32:24; 37:9;
53:3; 130:21;
132:20; 133:7;
146:14; 171:13
**TRUST** [11] 83:7;
98:10, 25; 99:1,
7; 123:3;
146:25; 158:20;
160:12, 16
**TRUSTEE** [17]
81:13, 14, 15, 21;
82:6; 90:20;
91:17; 94:16, 21;
99:3, 23; 115:10;
150:1; 151:15;

**Exhibit A**

152:21, 24; 158:13

**TRUTH** [1] 3:19

**TURN** [1] 29:9

**TURNKEY** [2] 1:5; 2:3

**TWO-PLUS** [1] 64:12

**TYPE** [3] 67:17, 19; 120:2

**TYPES** [1] 74:5

- U -

**ULTIMATE** [1] 112:6

**ULTIMATELY** [12] 76:2; 90:25; 112:8; 117:23; 118:5, 21; 119:7; 120:25; 130:6; 138:3; 139:15; 153:13

**UMBRELLA** [1] 50:8

**UNABLE** [1] 109:1

**UNDER** [9] 70:17; 71:22; 92:5; 136:11, 20; 152:14; 156:21; 161:8; 171:11

**UNDERNEATH** [2] 40:16; 139:7

**UNDERSTAND** [19] 4:4, 18; 5:9; 15:13; 21:6; 31:14; 37:17; 53:21; 63:8; 77:16; 90:3; 92:11; 112:7; 115:14; 145:5; 148:9; 150:22; 156:19; 163:13

**UNDERSTANDING** [21] 24:17; 66:7; 70:25; 80:21; 91:20; 92:15, 25; 94:25; 96:15; 97:19, 24;

109:10; 117:13; 147:6, 19; 151:3, 24; 152:2, 19; 153:5; 171:14

**UNDERSTOOD** [4] 15:17; 78:18; 122:23; 156:18

**UNDERTAKE** [2] 54:22; 55:3

**UNDERTAKING** [1] 128:21

**UNDERWAY** [1] 110:17

**UNITED** [2] 1:1; 101:6

**UNIVERSITY** [1] 5:24

**UNPAID** [3] 27:4; 85:18

**UNRELATED** [1] 155:23

**UNSECURED** [4] 158:19, 24, 25; 159:16

**UNTIL** [6] 3:13; 65:7; 66:10; 85:10; 124:10; 137:19

**UPWARD** [1] 55:15

**USER** [1] 42:16

**USING** [3] 99:8; 142:21; 156:23

**USUALLY** [1] 54:7

**UTILIZE** [1] 112:9

- V -

**VAGUE** [1] 20:25

**VALID** [1] 172:11

**VALUE** [7] 88:4; 97:13, 22; 122:11, 12; 128:17; 130:8

**VANDO** [6] 9:8, 10; 22:4; 33:14; 117:9; 164:20

**VARIOUS** [6] 14:19; 25:8; 26:17; 65:5; 163:14, 23

**VAST** [1] 102:22

**VENDOR** [2] 131:9; 162:18

**VENDORS** [19] 27:8; 31:22; 47:12; 73:5; 79:3; 84:16; 85:5; 86:1; 107:6; 116:14; 119:6; 128:18; 130:10; 143:11; 144:12; 155:24; 162:10, 12, 24

**VERBAL** [1] 119:5

**VERBALLY** [1] 56:6

**VERSUS** [2] 1:6; 145:13

**VIABLE** [3] 27:15; 116:8; 130:2

**VISA** [1] 39:24

**VISION** [1] 101:6

**VOLATILE** [2] 128:22; 129:2

**VOLUNTARILY** [1] 9:2

- W -

**WAIT** [3] 19:19; 81:1; 107:11

**WAITING** [2] 87:2; 99:20

**WAIVED** [1] 3:8

**WALK** [5] 19:21; 43:19; 82:23; 142:3; 144:25

**WASTED** [1] 118:7

**WEAR** [1] 31:13

**WEATHER** [8] 104:10; 117:15, 18; 118:5, 20;

129:10, 12; 137:3

**WEATHER-WISE** [1] 129:3

**WEEK** [4] 133:6, 7; 143:22, 25

**WEEKENDS** [2] 8:6, 7

**WEEKLY** [2] 56:12; 140:18

**WEEKS** [6] 33:10; 119:16; 127:6; 135:10; 159:18; 166:24

**WEST** [1] 114:14

**WHATNOT** [4] 54:1; 56:7; 136:24; 170:3

**WHENEVER** [1] 56:22

**WHERE'S** [1] 166:13

**WHEREUPON** [5] 12:15; 73:24; 106:4; 125:14; 156:14

**WHO'S** [6] 18:5; 161:12, 13, 14; 162:15

**WHOLE** [1] 161:15

**WHOSE** [1] 92:2

**WIFE** [1] 40:8

**WILLIAM** [2] 131:7

**WILLIAMSON** [2] 34:2, 9

**WILLING** [1] 92:6

**WINTERTIME** [1] 104:10

**WIRE** [1] 47:9

**WITHHELD** [1] 131:11

**WITHIN** [3] 50:7; 140:23; 166:24

**WITHOUT** [3] 25:15; 93:18; 161:3

**WITNESS** [12] 3:8, 17; 34:8;

40:6; 45:10;
48:15; 86:24;
89:6; 126:7, 19;
138:22; 167:6
**WITNESSESS** [1]
1:16
**WOODLANDS** [1]
8:2
**WORDS** [2]
100:21; 125:6
**WORK** [58] 6:10,
21; 17:13;
31:21, 23, 24;
36:8; 42:20;
44:23; 47:1;
55:17; 56:25;
58:5; 66:2, 3;
74:14; 76:10;
77:13; 78:9;
79:2; 80:22;
81:11; 84:17, 20,
23; 86:5; 88:6;
95:11, 21; 99:4;
102:12; 104:3;
108:15; 111:2;
113:2, 14, 17, 25;
114:4; 115:13,
20, 22; 116:22,
25; 117:21;
118:3, 5; 126:15;
127:2; 130:3;
131:9; 135:21;
136:17, 21;
137:21; 157:13;
158:3
**WORKED** [3]
10:15; 93:12;
119:2
**WORKING** [8]
44:22; 58:14;
78:3; 103:5;
114:24; 115:14,
17; 117:6
**WORKS** [5] 17:4;
57:7; 66:7;
141:24; 152:6
**WORTH** [1]
144:14
**WRITE** [2] 125:9;
132:24

**WRITING** [2]
120:3; 126:15
**WRONG** [4] 15:9;
84:12; 135:15;
144:13
**WROTE** [1] 44:14

─────────────

- Y -

**YEAR** [11] 18:13;
28:23; 29:3;
35:4; 49:19;
54:5, 6; 59:22;
60:17; 108:8;
128:23
**YEARS** [23] 6:18;
7:19; 28:18, 21;
30:19; 62:18, 19,
20, 21; 64:12;
65:22; 66:20;
68:9; 74:4; 81:9;
90:7; 110:12;
113:25; 131:17;
132:14; 137:8;
140:9; 162:22
**YORK** [2] 11:9;
54:8

─────────────

- Z -

**ZERO** [1] 29:24
**ZOOM** [1] 133:23

**Exhibit A**