UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| TURNKEY OFFSHORE PROJECT SERVICES, LLC ("TOPS") | * * * | NO: 2:21-cv-00672 |
| | * | JUDGE AFRICK |
| VERSUS | * * | |
| JAB ENERGY SOLUTIONS, LLC and BRENT BOUDREAUX, | * * | MAGISTRATE CURRAULT |

**<u>SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
TOPS' REQUEST FOR INJUNCTIVE RELIEF</u>**

NOW COMES Turnkey Offshore Project Services, LLC (hereinafter "TOPS"), through undersigned counsel, and submits this Supplemental Memorandum in Support of its request for injunctive relief, as per the Magistrate's directive at the hearing to address specific legal issues.

**I. Facts Underlying TOPS' Breach of Contract, Fraud and Unjust Enrichment Claims**

At the time of Black Elk bankruptcy in 2015, JAB was performing abandonment work for Black Elk. Post Bankruptcy filing JAB II submitted bids to the Black Elk Trustee to perform the plug and abandonment and platform removal work for a number of wells in the Black Elk Bankruptcy, including their takeover after another contractor, MONTCO, was unable to complete their work for the Trustee. These bids included the work for High Island 370A. That bid, which was accepted, was for a total of roughly $9,600,000. Of this, approximately $3,800,000 was allocated to the plug and abandonment portion, with the balance for abandonment.

**a. JAB II Applied for Special Status with The Bankruptcy Court to Classify the Removal of These Platforms as an Administrative Expense of the Bankruptcy Necessary to Preserve the Estate and as a Matter of Public Safety, as well as Compliance With Federal Regulators Like BSEE**

At the time of the Black Elk bankruptcy in 2015, JAB II was in the process of removing multiple platforms for Black Elk; however, the Bureau of Safety and Environmental Engineering

(BSEE) issued a shut-in order to Black Elk. In response, JAB II filed an emergency motion to compel assumption of certain plugging and abandonment agreements in order to comply with regulations, Bridging Agreements, and for protection of their costs as an administrative claim in the Bankruptcy court. JAB II argued to the bankruptcy court that their work in the removal of these platforms was "necessary to protect public health and safety in the environment and was in the best interest of the estate". JAB II further argued that the Bankruptcy Code provides that the actual necessary cost and expenses of preserving the estate are administrative expenses and are entitled to priority payment. 11 U.S.C.§503, 507. As JAB II noted, administrative priority is given to post petition vendors as an inducement to engage business transaction with a debtor's estate. JAB II further noted even debtors must operate their estate in accordance with State and Federal law, including BSEE. Finally, they argued "decommissioning obligations, including bonding on active leases to ensure proper decommissioning, take on particular importance because idle infrastructure poses a potential threat to the OCS environment and the presence of idle platforms may harm the navigation safety" (See JAB II's Motion for Allowance and Payment of Administrative Expenses; Doc. 404, Black Elk Energy Bankruptcy, Exh. 1).

Accordingly, JAB II sought special administrative status from the Bankruptcy Court to perform this work. As such, JAB II was able to be paid in priority, including having access to the Argonaut bond in this case, which encompasses $1+ million of the $6 million in question because of their representations that their work was for the public safety and in compliance with federal regulations. Under no circumstances did the Bankruptcy court anticipate nor would they have approved the payment of these funds to pay off Allison Marine Holdings and/or JAB II's bank debt. Instead, these funds were specifically earmarked by the Bankruptcy court and provided special status of priority to effect that abandonment work, including the removal of this platform.

As JAB II itself argued to the Court when seeking this special status, if the funds were not made available for that purpose no contractor would ever undertake this work for a company in bankruptcy. As JAB II notes in its Motion, the work reduced the estate's exposure to environmental liabilities and regulatory penalties (See JAB II's emergency motion, Black Elk Bankruptcy proceedings, Case 15-34287, Doc. 196, Exh. 2). Interestingly, JAB II argued to the court there that if the court did not authorize the funds, JAB II would be forced to stop work and Black Elk would be faced with additional costs, safety risks, etc.

In this case, in the November, 2020 meeting wherein Brent Boudreaux first disclosed the limited funds available to JAB II to pay for this job, he told Rocky Henderson that if TOPS did not complete the job, they would be paid nothing and then the bankruptcy would then have been forced to incur additional costs by bringing in a new contractor the following season.

To allow JAB II to have applied for special status as an administrative expense with priority for its removal of these platforms, especially under the assertions that they made, and then walk away from all of the contractors who performed work to affect that purpose would have a stifling impact not only on TOPS, but the entire industry, as no one going forward would be willing to undertake this work for an estate in bankruptcy. More importantly, if this Court fails to intervene and restrain the distribution of the $6 million, including the bond by Argonaut, which would be a res, the mandates of the bankruptcy court and its orders would be circumvented by JAB II. Accordingly, as this Court noted at the hearing, it has the opportunity to restrain the disbursement of the $6 million, including the Argonaut bond, still remaining with the bankruptcy court, to ensure that such are used for the purpose specified by the bankruptcy court when it granted JAB its priority administrative status. Accordingly, this Court's intervention is pertinent to the enforcement of the integrity of the bankruptcy court proceedings.

### b. Awarding of HI370A to JAB

On June 17, 2016 the Trustee awarded another contractor, MONTCO, the job to remove wells and platforms, including HI370A; however, they were unable to perform the work. On June 9, 2019 the Trustee awarded additional work to JAB after MONTCO's contract was terminated and retained JAB to complete the work, including HI370A. As part of this agreement, JAB had the Trustee acknowledge the assignment of the earlier MSA between JAB and Black Elk so that any future work order for the Trustee would be pursuant to the earlier MSA (Bankruptcy Doc. 2089-1; Dec. 2, 2019, Exh. 3). Pursuant to that assigned MSA, JAB was obligated to "pay all salaries and wages of all of its personnel" (Doc. 2089-1; p. 13).

### c. The High Island Bid and Work Performed

As noted above, the High Island job was to be performed in two phases, plug and abandon, and platform removal. The plug and abandon portion of the High Island 370A well removal was completed, and by 2020, JAB II was paid in full for that portion of the work.[1] Despite being paid the full $3,800,000, not all of JAB II's plug and abandon vendors have been paid for that work with $1,000,000 still outstanding, and that other lawsuits are pending regarding that portion of the project.[2]

The second portion of the bid, the platform removal work was then outsourced by JAB II to TOPS. The term sheet for that work was not signed until September, 2020.[3] TOPS satisfactorily completed its work in December, 2020.[4]

---

[1] *Id.*
[2] Document 29-1, pp. 21-22 of 71.
[3] Document 24-4, pp. 7-13 of 13.
[4] Document 29-1, p. 24 of 71.

According to Mr. Boudreaux, the Black Elk Bankruptcy Trustee, and the other partners to the term sheet, have agreed to pay roughly $5,800,000 for the platform removal.[5] That money, however, some of which is held as collateral for a work completion bond, and some by third-parties, has not yet been paid by the Black Elk Bankruptcy trustee or those third-parties to JAB II.[6] However, Mr. Boudreaux estimates that claims have been asserted against JAB II by TOPS and the other vendors for the platform removal, for more than $11,000,000.[7]

Of significance to this Court's determination of its jurisdictional right to injunctive relief, TOPS submits that as the party actually responsible for the completion of this priority work it has an equitable interest in the funds to be paid by the Bankruptcy Court as an administrative cost for remediation work by virtue of the rights of JAB II vis-à-vis the Bankruptcy Court.

Notwithstanding its representations to the Bankruptcy Court as to the priority status of the work done by TOPS, and its failure to pay TOPS for that work, JAB II has affirmatively, and falsely asserted in its Petition for Assignment of Benefits that "all claims for wages, expense, reimbursements, benefits and other compensation with priority over the Assignor's other creditors have been satisfied in full." Document 21-4, p. 5 of 12 (paragraph 5(d)).

JAB II alleges that Allison's lenders became concerned with JAB II's ongoing cashflow in March, 2021. See Document #: 24, p. 3 of 11. That alleged concern coincides with a demand letter sent by TOPS to Brent Boudreaux and JAB on March 2, 2021 for payment of their outstanding invoices for the work at issue in this litigation (Document 1-8).

When no response was received, this lawsuit was filed on April 1, 2021. According to their pleadings in "mid-April," which would put it roughly two weeks after this lawsuit was filed,

---

[5] Document 29-1, p. 24 of 71.
[6] *Id.*
[7] Document 29-1, pp. 21-22 of 71.

Allison's 'secured creditors,' or investors, elected to proceed with an assignment for the benefit of creditors (ABC) action to be filed by JAB II in Delaware. Document #: 24, p. 3 of 11.[8]

On June 2, 2021, months after this suit was filed, JAB II began this process by assigning all of its assets to JABCO ABC, LLC, to be liquidated for AMH and JAB II's creditors' benefit.[9] Those assets allegedly include accounts receivable, including the money owed to JAB II for the platform removal and one other project.[10] JABCO ABC then filed its petition for assignment for the benefit of creditors in the Delaware Chancery Court on June 4, 2021. *Id.*

According to Defendants' counsel, JAB II's assets, including the monies still due from the Bankruptcy Court, which were specifically allocated for payment of the work performed by TOPS, will now be used by JABCO ABC to pay off the general operating loans to AHM and all of the six co-borrowers as opposed to being used as represented to and anticipated by the Bankruptcy Court. After deposing Mr. Boudreaux, TOPS filed the present motion seeking injunctive relief to freeze the assets of the Defendant entities, specifically including the as yet unpaid $6 million from the Trust, thereby preserving the status quo until a judgment can be reached.

## II. Supplemental Briefing Ordered by the Court

### a. "Prior Exclusive Jurisdiction" as cited by Defendants in their Opposition (Rec. D. 24, p. 6, fn.7)

As a preliminary matter, TOPS filed this action on April 1, 2021 seeking an adjudication of its right to the money set aside by the Bankruptcy Court for payment to JAB II for the work performed by TOPS removing the platform at High Island 370A.[11] It wasn't until June 4, 2021, that JAB II file its Petition for Assignment of Benefits For Creditors. Moreover, while

---

[8] See also Document 29-1, pp. 37-38 of 71.
[9] Document 29-1, p. 38-40 of 71.
[10] *Id.*
[11] The Complaint also asserted claims for fraudulent inducement to contract and unjust enrichment.

6

the Defendants argue that the Chancery Court of Delaware has prior exclusive jurisdiction over the distribution of the assets sought to be enjoined by TOPS, the Delaware Chancery Court is not and never has been actually in possession of nor has it had control over distribution of the assets allegedly owned by JAB II. Rather, to the extent that JAB II was in possession of them in the first place, those assets are now in the possession of JABCO ABC, LLC, not the Court. The Chancery Court has no actual authority over the property of JABCO ABC, LLC. The statutory authority allowing for the assignment of benefits for creditors, 10 Del. C. § 7381 et seq., does not give the Court any real power over those assets. This seven-section subchapter, only requires reporting to the Court. It does not, like the Bankruptcy code, give the Court power over the assigned assets.

Under the doctrine of prior exclusive jurisdiction, "when one court is exercising *in rem* jurisdiction over a *res,* a second court will not assume *in rem* jurisdiction over the same *res.*" *Marshall v. Marshall,* 547 U.S. 293, 311, 126 S.Ct. 1735, 164 L.Ed.2d 480 (2006). However, while a federal court may not exercise its jurisdiction

> [t]o disturb or affect the possession of property in the custody of a state court, [internal citations omitted] it may exercise its jurisdiction to adjudicate rights in such property where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court. [12]

Similarly, in the *Commonwealth Trust* case,[13] a national bank receiver consented to the state court's appointment of successor trustee for a mortgage pool trust of which bank had originally been trustee. When the receiver felt the need to question the proposed distribution of those funds it was found that federal court properly exercised jurisdiction over the receiver's suit

---

[12] *Markham v. Allen,* 326 U.S. 490, 494 (1946).
[13] *Commonwealth Trust Co. v. Bradford,* 297 U.S. 619, 56 S.Ct. 602, (1936).

7

to obtain adjudication of his rights in the pool, as against a contention that the suit would unnecessarily interfere with control of a *res* in the state court's custody. The Court stated:

> The trust here involved was created by the Bank's voluntary action, not by the orphans' court. Whatever control the latter possessed resulted solely from appointment of the successor trustee and, for present purposes did not materially differ from that exercised by probate courts over such fiduciaries as guardians, administrators, executors, etc. The jurisdiction of federal courts to entertain suits against the latter is clear, when instituted in order to determine the validity of claims against the estate or claimants' interests therein. <u>Such proceedings are not in rem; they seek only to establish rights; judgments therein do not deal with the property and other distribution; they adjudicate questions which precede distribution.</u>
>
> The final decree produced no interference with the trustee's possession, nor with the power of the orphans' court to order distribution of assets. The receiver's privilege to participate has been declared; only a judgment in personam was rendered. [Emphasis added].[14]

In this case, the decision to create an Assignment For the Benefit of Creditors was a 'voluntary' act on the part of JAB II (though arguably mandated by Allison Marine, see Defendants' Opposition R.Doc.24, p. 3). JAB II and Allison, not the Chancery Court created/appointed the Assignee/Trustee LLC (JABCO ABC, LLC) prior to even filing its Petition For Assignment of Benefits. The *res*, JAB II's assets, at all times remain in the possession and under the control of JABCO ABC, LLC, the Assignee, not the Chancery Court, which merely functions as a repository for and administrator of the paperwork associated with a Petition for Assignment of Benefits. The assignee, not the Court, is tasked with the receipt and distribution of JAB II's assets. Moreover, even if such power can be imputed to the Chancery Court, which is denied, the primary asset is not even in the possession of JABCO ABC, LLC. Rather, the money TOPS seeks to prevent from being alienated is still held by the parties to the Terms Sheet under

---

[14] *Commonwealth Trust Co. supra* at 619.

which this project was to be funded. TOPS' motion also seeks to enjoin the alter-egos of JAB II, none of whom have assigned their assets in a similar manner or placed them into an assignment for the benefit of creditors. Clearly, not only is the Chancery Court action not a prior assertion of jurisdiction, but this Court's granting of a temporary restraining order and injunction to preserve the asset, designated by the Bankruptcy Court to pay for the work which was the subject of the contract sued upon, of an acknowledged insolvent defendant, merely preserves the adequacy of the legal remedy being sought. See, *Deckert v. Independent Shares Corp.*, 311 U.S. 282, 290-291, 61 S.Ct. 229, 85 L.Ed. 189 (U.S.

### b. Anti-Injunction Act

The Anti–Injunction Act, also offered as an objection, forbids a federal court from granting "an injunction to stay proceedings in a State court" except "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283 (2006). TOPS submits that as discussed above under the prior exclusive jurisdiction issue, an injunction in this case is "in aid of" this Court's jurisdiction and serves to protect and effectuate its potential judgment. JAB II, by virtue of its Assignment for the Benefit of Creditors has acknowledged that it has inadequate resources to fulfill its debt obligations and counsel for defendants has admitted to this Court that JABCO ABC, LLC, when it comes into possession of the funds owed to JAB II by the bankruptcy court, fully intends to expend those funds not in payment of TOPS for the removal High Island 370A Platform as intended by the bankruptcy court's allocation, but in payment of defaulted loans on behalf of Allison Marine and its wholly owned subsidiaries, including JAB II. Therefore, without an injunction to prevent the expenditure of those funds to service the defaulted loans, any judgment the Court might render in

favor of TOPS on its Breach of Contract claim will simply be "full of sound and fury" as there will be no funds against which to execute it.

However, there is in fact no need to justify the Court's issuance of an injunction because the Anti-Injunction Act does not apply in this case. TOPS is a third party not a party to or in privity with the parties to the Assignment of Benefits and therefore it is considered a "stranger" to that suit and is accordingly unrestricted by the Anti–Injunction Act. *See Casa Marie, Inc. v. Super. Ct. of Puerto Rico*, 988 F.2d 252, 264 (1st Cir.1993). The Anti–Injunction Act "does not prohibit *third parties* from seeking to enjoin a state proceeding with a federal injunction" if the third party is "*a stranger* to the state proceedings." *Garcia v. Bauza–Salas*, 862 F.2d 905, 909 (1st Cir.1988); *accord Hale v. Bimco Trading, Inc.*, 306 U.S. 375, 377–78, 59 S.Ct. 526, 83 L.Ed. 771 (1939).

### c. *Grupo Mexicano*, *Deckert* and *Animale Group Inc*

The *Grupo Mexicano* case considered the question of whether, in an action for money damages, a United States District Court has the power to issue a preliminary injunction preventing the defendant from transferring assets in which no lien or equitable interest is claimed and ultimately held that: "the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages." Fortunately, this case is distinguishable from *Grupo Mexicana*.

Unlike the *Grupo Mexicana* case, the complaint and amended and supplemental complaint in this matter state alternative causes of action for equitable relief and remedies (as allowed by Rule 18, F.R.C.P.) for unjust enrichment, alter ego relief and fraudulent inducement to contract, which give TOPS an equitable interest in the subject matter of the TRO and justify the Court's jurisdiction to issue the TRO and Injunction.

TOPS has alleged that JAB, JAB II and Allison Marine were acting as one and the same entity, and thereby under the doctrine of alter-egos, Allison Marine is equally liable for the debts owed to TOPS in this matter. See Document #: 19, p. 2 of 4. The doctrine of alter-ego sounds in equity and seeks an equity remedy. *Matter of S.I. Acquisitions, Inc.*, 817 F.2d 1142, 1152 (5th Cir. 1987); *In Re: Atlas Financial Mortgage Co.*, 2014 WL 172283, *4 (Bankr. N.D.Tex. 2014). TOPS' original and amended Complaints also both assert alternative equitable claims; a claim for fraudulent inducement to contract and a claim for unjust enrichment by the use of TOPS equipment, personnel and services without pay, and by assigning all of JAB II's assets, allegedly including the yet to be paid Black Elk Bankruptcy trustee accounts receivable, from JAB II to JABCO ABC, LLC. See Document # 1, p. 7 of 8; Document # 19, pp. 1-3 of 4; Document # 29-1, p. 38-40 of 71. Such claims sound in equity, not law, and seek an equitable remedy of restitution.[15]

In addition, TOPS asserts that by virtue of its need, in the face of JAB's failure to pay its invoices in a timely manner and its disclosure that no payment would be forthcoming from the Bankruptcy Court until the platform removal was entirely complete, to incur additional personal debt to allow it to complete the job, it has not only a contractual but also an equitable interest in the funds which are the subject of its TRO and request for Injunctive Relief.

However, should this Court find that TOPS does not have an equitable interest in the subject matter of the TRO sufficient to distinguish it from the *Grupo* case, the Supreme Court's ruling in *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) is still good law, <u>allowing for injunctive relief when an equitable remedy is being sought</u>. In *Deckert, supra*, after finding

---

[15] See *Louisiana v. Rowan Companies, Inc.*, 728 F.Supp.2d 896, 904 (S.D.Tex. 2010) (finding that equitable claims unjust enrichment exist under general maritime law); *Jim Walter Homes, Inc. v. Jenssen*, 732 So.2d 699 (La.App. 3Rd 1999); see also *R.M. Dudley Const. Co., Inc. v. Dawson*, 258 S.W.3d 694 (Tex.App. Waco, 2008); *F.D.I.C. v. Lewis*, 21 F.3d 89, 91 (5th Cir. 1994); *In re Okedokun*, 593 B.R. 469, 580 (Bankr. S.D. Tex. 2018); *Winston Research Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.3d 134 (9th Cir. 1965).

that the claim stated a cause of action for the equitable remedies of rescission of the contracts and restitution of the consideration paid, *id.*, at 287–288, 61 S.Ct. 229, the Court ruled that a preliminary injunction "was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill," *id.*, at 290, 61 S.Ct. 229.

Much as in this case, in Deckert the Court found that:

> As already stated, there were allegations that Independence was insolvent and its assets in danger of dissipation or depletion. This being so, the legal remedy against Independence, without recourse to the fund in the hands of Pennsylvania, would be inadequate.

*Id.* at 290

Subsequent to *Deckert*, the Fifth Circuit in *Animale Group Inc. v. Sunny's Perfume, Inc.*, 256 Fed. Appx. 707, 709 (5th Cir. 2007) has gone on to recognize this distinction in the holdings from *Grupo* and *Deckert,* and held that "[b]ecause Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze."

TOPS' pleadings, in addition to seeking monetary damages for the Defendants breach of contract, also pleads a number of equitable claims, which, under *Deckert*, still provide for pre-judgment Rule 65 remedies.

### d. Federal Rule of Civil Procedure, Rule 64, and State Remedies Available

Alternatively, the Federal Rules of Civil Procedure for the United States District Courts, Rule 64, "Seizing a Person or Property," provides in part that "at the commencement and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the <u>potential judgment</u>." Rule 64(a), (emphasis added). The rule goes on to state that the remedies available under this rule include, "however designated and regardless of whether state procedure requires an independent

action: arrest, attachment, replevin, sequestration, and other corresponding or equivalent remedies." Rule 64(b).[16]

Even in cases sounding in Admiralty, the Court is able to apply the remedies of the state where the Court is located <u>prior to judgment</u>. *See e.g. Tate v. S S Suzanne*, 58 F.R.D. 522 (E.D.La. 1970); *Bergesen d.y. A/S v. Lindholm*, 760 F.Supp. 976 (D.Conn. 1991); *Cordoba Shipping Co., Ltd. v. Maro Shipping Ltd.*, 494 F.Supp. 183 (D.C.Conn. 1980).

Louisiana law provides for a number of the remedies specifically identified in FRCP Rule 64. Specifically, Louisiana's Code of Civil Procedure, Book VII, provides for provisional remedies including garnishment, attachment and sequestration. *See* articles 3503, 3511, 3541-45.[17]

### e. An Equitable Remedy of Attachment Exists Under Louisiana Law

One of the remedies explicitly listed under Federal Rule of Civil Procedure, Rule 64(b), as available to a federal district court when provided by the law of the state court where the district court is located, is a writ of attachment. In Louisiana, code of civil procedure articles 3541 and 3542, provide for and govern attachment. Article 3542 states that "a writ of attachment may be obtained in any action for a money judgment." La. Code Civ. Proc. art. 3542. To qualify for a writ of attachment in Louisiana, three elements must be met based on the facts alleged in the verified petition: (1) the nature of the claim, (2) the amount thereof, (3) and the ground for issuance of the writ. *WPC III, Inc v. Benetech LLC*, No. 11-2920, 2012 WL 1580929 (E.D. La. May 04, 2012).

---

[16] *See also United States ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 489, 501 (4th Cir. 1999) ("[W]e conclude that the scope of Federal Rule of Civil Procedure 64 incorporates state procedures authorizing any meaningful interference with property to secure satisfaction of a judgment, including any state-authorized injunctive relief for freezing assets to aid in satisfying the ultimate judgment in a case."); *see also CBF Industria de Gusa v. AMCI Holdings, Inc.*, No. 13-2581-PKC, Order Confirming *Ex Parte* Order of Prejudgment Attachment and Granting Injunctive Relief, ECF No. 286 (S.D.N.Y. July 16, 2019) (granting plaintiff's New York state attachment order under Rule 64).

[17] Similarly, while not the state where the where the Court is located, Texas law also allows for attachment remedies pre-judgment. *See* V.T.C.A, Civil Practice & Remedies Code § 61.001. *See also 3 Kids, Inc. v. American Jewel, LLC*, 2019 WL 462781 (ND TX 1/15/19); *EE. Maxwell Co. Inc. v. Arti Décor, Ltd*, 638 F.Supp. 749 (N.D. Tx 1986)

Such elements may also be satisfied based on facts from a separate affidavit of the petitioner, his counsel, or his agent. La Code Civ. Proc. Art. 3501 (See attached Affidavit of Counsel, Exh. 4). The grounds for issuance of the writ are laid out in article 3541 as follows:

> A writ of attachment may be obtained when the defendant:
> (1) Has concealed himself to avoid service of citation;
> (2) Has granted a security interest under Chapter 9 of the Louisiana Commercial Laws (R.S. 10:9-101, et seq.), or has mortgaged, assigned, or disposed of his property or some part thereof, or is about to do any of these acts, with intent to defraud his creditors or give an unfair preference to one or more of them;
> (3) Has converted or is about to convert his property into money or evidences of debt, with intent to place it beyond the reach of his creditors;
> (4) Has left the state permanently, or is about to do so before a judgment can be obtained and executed against him; or
> (5) Is a nonresident who has no duly appointed agent for service of process within the state.

For the first element, TOPS' Complaint clearly states that one of its claims is for breach of contract and fraud. Additionally, TOPS' Complaint also clearly states the amount of the claim owed. Further, TOPS has grounds for attachment as alleged in the amended Complaint whereby they assert "the money has been improperly transferred elsewhere by some or all of the defendants as to deprive TOPS of its payments for its work."

Furthermore, TOPS has grounds for attachment under 3541(2) because the defendants have assigned or disposed of property, or are going to dispose of property, with the alleged intent to defraud their creditors or give unfair preference to one or more of them. A preference is given when a transaction gives the creditor a greater percentage of debt than other creditors of the same class. *Am. Steele Bldg v. Brezner*, 158 So. 2d 623, 627 (La. Ct. App. 1963). Additionally, when a creditor knows the debtor is insolvent and the transaction results in the creditor getting an advantage over other creditors, the preference is considered unfair *Id.* "Unfair preference may result as a matter of law," *Id.* (citing *Swift v. Bonvillian*, 71 So. 849, 857 (La. 1916), but the debtor

14

"must be presumed to have intended the necessary consequence of his acts", *Swift*, 71 So. at 858. It has been established that a defendant who is disposing of property in the interest of their creditors must place them 'on a footing of equality and fairness.' *Lehman v. Mcfarland*, 35 La. Ann. 624, 626 (La. 1883).

At the time the JAB II's Assignment for the Benefit of Creditors action was filed on June 4, 2021, the defendants were aware of TOPS' lawsuit against them, another lawsuit by Offshore Technical Services, and a judgment already rendered against them in Houston, Texas. With the knowledge that JAB II owed a significant amount of money to unsecured creditors and inability to make any payments, JAB II entered into this assignment of its assets. Based on Brent Boudreaux's deposition and the arguments of his attorney at the hearing on July 23, the accounts receivable regarding this project has already been transferred to the assignee in Delaware. Based on the loan documents suggesting the amount of secured debt owed by JAB II and the value of the assets transferred to the ABC, it is Brent Boudreaux and his attorney's belief that nothing will likely be left over to pay TOPS Additionally, Brent Boudreaux and his attorney both made statements that the secured creditors of the defendants chose the ABC proceeding because it would be more beneficial to them. Choosing to go forward with this assignment would only benefit the secured creditors giving them an unfair advantage over TOPS. The defendants, upon executing this assignment, intended these consequences. The defendants intended to use JAB II's assets, particularly the $6 million reserved for this job, to pay the secured debt. Although JAB II may be legally obligated for the full amount of the secured debt, neither Allison Marine Holdings nor any of the other borrowers have entered into an ABC/bankruptcy proceeding or are actively contributing to payment of the secured debt that we are aware of. If this set up is legal, as it undoubtedly results in unfair preference to the secured creditors. Although the assignment is

supposed to be the for the benefit of creditors, according to Mr. Boudreaux and his attorney's statement, TOPS would not be put on a footing of equality and fairness because the secured debt would be wholly paid for by JAB II by funds reserved for project completed by TOPS. In the event that Allison Marine Holdings, LLC is found not solidarily responsible for the debt owed to TOPS, Allison Marine would no longer be liable for the secured debt, and JAB II would have no money to pay TOPS. To do so would be unfair and is grounds for a writ of attachment.

### III. CONCLUSION

TOPS submits that neither the Prior Exclusive Jurisdiction doctrine nor the Anti-Injunction Act are applicable in this case to prevent the Court from granting TOPS' Motion for TRO and Injunction. In addition, recourse to Rule 64, F.R.C.P. would allow for the issuance of a Writ of Attachment under Louisiana law. However, TOPS submits that the facts of this case are distinguishable from those in the *Grupo Mexicana* case and allow for the issuance of a TRO and Injunction under Rule 65, F.R.C.P.

The Fifth Circuit has recognized the District Court's jurisdiction to maintain the status quo through a TRO and/or Injunction when equitable relief is sought. *Animale Group Inc. v. Sunny's Perfume, Inc.*, 256 Fed. Appx. 707, 709 (5th Cir. 2007). Recognizing and distinguishing *Deckert*, the *Animale* Court found that where an asset freeze is narrowly drawn to sequester only those funds necessary to satisfy the potential judgment, that it is well settled that the granting of a temporary injunction is within the sound discretion of the trial court. *Animale*, 256 Fed.Appx. at 708. As the *Grupo* Court acknowledged, under *Deckert*, when equitable relief is sought, a preliminary injunction "was a reasonable measure to preserve the status quo pending final determination of the questions raised by the bill." *Grupo*, 527 U.S. at 325; *citing Deckert*, 311 U.S. at 290.

Respectfully submitted,

NALLEY AND DEW
A Professional Law Corporation

_____
GEORGE J. NALLEY, JR.          (9883)
DONA J. DEW                    (1329)
ANDREW J. MINER                (34682)
Suite 100
2450 Severn Avenue
Metairie, LA 70001
(504) 838-8188

## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 28th day of July, 2021 served a copy of the foregoing pleading on counsel for all parties to this proceeding by email, facsimile, and/or by mailing the same by United States mail, properly addressed, and first class postage prepaid.

_____
NALLEY AND DEW, APLC