1

2

3

4

5

6

7              Transcription of Audio File

8     JAB Energy Solutions II, LLC Case No. 21-11226-CTG

9                 10.15.21 To be Cont.

10                Audio Runtime: 2:06:39

11

12

13

14

15

16

17

18

19

20

21

22

Exhibit C

23

24

25 ↑

1          (Beginning of Audio Recording.)

2          MR. FOX:  Good morning.  This is Timothy

3    Fox, trial attorney for the Office of the United

4    States Trustee, here for the 341 meeting of creditors

5    to be held telephonically in the JAB Energy Solutions

6    II, LLC, bankruptcy case, case number 21-11226, Judge

7    Goldblatt proceeding.  The petition date for this

8    Chapter 11 debtor was September the 7th, 2021, and

9    today's date is October the 15th, 2021.  The time is

10   approximately 10:31 a.m., Eastern Time.

11          And I'm going to introduce Debtor's counsel

12   to state their appearances for the Debtor momentarily,

13   but before I do, I'm going to read through some

14   instructions for parties that are on the line to help

15   facilitate this telephonic 341 as smoothly as

16   possible.

17          As I noted prior to going on the record, all

18   lines other than my own and the Debtor's

19   representatives have been muted.  Once I have

20   concluded my examination, I will ask that parties that

Exhibit C

21   wish to speak send an email to me at

22   timothy.fox@usdoj.gov to receive instructions to

23   unmute, so that questions may be asked regarding the

24   Debtor's financial condition.  Again, that email

25   address is timothy.fox@usdoj.gov.  ♠

1    Please note that neither my office nor the

2    Debtor can give legal advice to members of the general

3    public.  Additionally, the Debtor may not be able to

4    answer all specific questions regarding individual

5    claims and parties should consider making arrangements

6    off the line with Debtor's counsel to discuss some

7    issues further.

8    To the extent any line of questioning begins

9    to get too far afield of from the purposes of a 341

10   meeting, mainly assessing a financial condition of a

11   debtor, I will ask that party to cease that line of

12   questioning and either move on to more appropriate

13   inquiries or move on to the next party that wishes to

14   examine the Debtor.

15   Although we appreciate everyone's

16   participation, please note that listening to the 341

17   meeting is not required in order to preserve any legal

18   rights a party may have with respect to the Debtor.

Exhibit C

19   If you called in to avoid any impairment of your

20   rights and do not wish to listen to my examination or

21   ask any questions of your own, please feel free to

22   disconnect from the call.

23        Everyone will still be able to listen even

24   though their phone has been muted.  When the 341

25   meeting opens up to other speakers that wish to ⌃

1   examine the Debtor, please identify yourself before

2   speaking.  Please do not put your phone on hold at any

3   time now that the call has been connected.  Once this

4   meeting of Creditors has finished, please hang up your

5   phone.  Should anyone become disconnected before the

6   meeting is finished, please call back in using the

7   dial-in information that you originally used.

8        And please note that this

9   Section 341 meeting of Creditors will recorded by my

10   office, the Office of the United States Trustee, and

11   any other recordings are strictly prohibited.

12        At this time, I'm going to turn things over

13   to Ms. Jones, from the Pachulski Stang Ziehl & Jones

14   firm on behind of the Debtor to introduce herself and

15   the rest of the Debtor's team, and then, we'll

16   proceed.

Exhibit C

17        MS. JONES:  Thank you, Mr. Fox.  Good

18  morning.  Laura Davis Jones, Pachulski Stang Ziehl &

19  Jones, here with my colleague, Colin Robinson.  Also,

20  we have the CRO of the Debtor, Albert Altro on the

21  phone.

22        MR. FOX:  Thank you, Ms. Jones.  Mr. Altro,

23  would you please state your name and spell your last

24  name for the record?

25        MR. ALTRO:  Albert Altro, A-l-t-r-o. ⬆

1        MR. FOX: Okay.  And Mr. Altro, would you

2  please raise your right hand for me and indicate when

3  you've done so?

4        MR. ALTRO:  It's raised.

5        MR. FOX:  Okay.  Thank you.  Do you swear or

6  affirm that the testimony you're about to give will be

7  the truth, the whole truth, and nothing but the truth

8  under penalty of perjury?

9        MR. ALTRO:  I will.

10        MR. FOX:  Thank you, Mr. Altro.

11                EXAMINATION

12  BY MR. FOX:

13     Q.   Mr. Altro, where are you physically located

14  for purposes of today's 341 meeting to be held

Exhibit C

15    telephonically?

16         A.    I am at the company headquarters in

17    Shenandoah, Texas.

18         Q.    And Mr. Altro, is anyone else physically

19    present in the room with you for your participation in

20    this telephonic 341 meeting?

21         A.    No.

22         Q.    And Mr. Altro, to the extent that changes

23    for any reason, please advise me during the

24    examination so that we're aware of other parties in

25    the room. ⬆

1         A.    I will.

2         Q.    Okay.  Mr. Altro, I understand from Ms.

3    Jones' introduction and other information filed in

4    this bankruptcy case that you are the chief

5    restructuring officer of JAB Energy Solutions II, LLC.

6    Is that correct?

7         A.    Yes.

8         Q.    Okay.  And Mr. Altro, how long have you held

9    that position?

10        A.    I've held that position since September 6th,

11    2021.

12        Q.    And prior to taking the role of CRO, have

Exhibit C

13    you held any other prior positions with this debtor?

14         A.   Not with the Debtors, but as disclosed, I

15    was also the assignee appointed to executing the

16    assignment for benefit of creditors for the Debtor.

17         Q.   And with respect to that role as assignee

18    for the assignment for benefit of creditors, did that

19    occur in June of 2021?

20         A.   It did, yes.

21         Q.   With respect to your role as CRO, who made

22    the decision to appoint you to that position?

23         A.   It was the Board of Directors for Allison

24    Holdings, the parent company.

25         Q.   And you mentioned the parent company, ⌃

1    Allison Marine Holdings, through what authority did

2    they act on behalf of JAB Energy Solutions II, LLC?

3         A.   As owners of JAB Energy II, LLC, and to a

4    court resolution appointed me as CRO.

5         Q.   Okay.  And what was the approximate date of

6    that resolution?

7         A.   I believe that that would have been just

8    prior to the filing of the petition.

9         Q.   Thank you.  And Mr. Altro, I understand that

10    your firm, Traverse LLC, has filed a motion seeking

Exhibit C

11    employment in the bankruptcy case.  Since the filing

12    of the bankruptcy petition, your firm has not been

13    compensated, correct?

14         A.   Correct.

15         Q.   Okay.

16         A.   Yes.

17         Q.   But prior to the filing of the bankruptcy

18    petition, your firm was paid by the Debtor or Allison

19    Marine with respect to the services you provided?

20         A.   We -- as assignee, we received a retainer,

21    yes.

22         Q.   And I believe this information is covered in

23    the motion to employ you as CRO and your firm to

24    provide some additional personnel, but as of today,

25    neither you nor your firm, Traverse, LLC, has any ⌃

1    claim against the Debtor?

2         A.   We do not, no.

3         Q.   Okay.  Thank you.  Could you just generally

4    describe your duties in your position as CRO?

5         A.   Right now, the principal duties of -- we're

6    undertaking right now is really just the winddown and

7    liquidation of the two main projects that are part of

8    the Debtor's estate.  We have one where it is

Exhibit C

9  substantially complete, and there is some triggers

10  that we need to overcome to ultimately collect on that

11  project work.

12        And then, we have a second project that is

13  still underway where we have a subcontractor that is

14  engaged to assist with the completion of the project.

15  Once that is done, we will be able to collect, and

16  then, we will commence with any other winddown

17  activities at JAB Energy II.

18        Q.   Thank you.  I have a series of questions

19  that are standard practice for me to ask during a 341

20  meeting of creditors.  Some of your answers have

21  already touched on them, but I'll just go through and

22  ask these questions, nonetheless.  The first being to

23  your knowledge, are you a creditor of the Debtor?

24        A.   I am no, no.

25        Q.   Okay.  Are you a shareholder or an equity ⬆

1  owner of the Debtor?

2        A.   I am not.

3        Q.   Have you ever been indebted to the Debtor,

4  having taken any loans from the Debtor?

5        A.   No.

6        Q.   Have you ever lent funds to the Debtor?

Exhibit C

7      A.   No.

8      Q.   Does the Debtor have any claims against you

9   that you are aware of?

10     A.   No.

11     Q.   And have you ever personally guaranteed any

12   debts to the Debtor at any time?

13     A.   No.

14     Q.   Thank you, Mr. Altro.  What maybe makes the

15   most sense now is I'm going to ask about the other

16   employees, officers, and directors of the Debtor, and

17   it'll be easiest if we turn to the Statement of

18   Financial Affairs momentarily to review that

19   information, and then, I'm going to ask a similar

20   series of questions regarding those parties.  If

21   you've got a copy of the Statement of Financial

22   Affairs that was filed at Docket Item 55 in the

23   bankruptcy case, could you please turn to that

24   document?

25     A.   I have it in front of me. ⌃

1      Q.   Okay.  Thank you, Mr. Altro.  If you would

2   first please turn to Page 10 of 19, according to the

3   document stamp at the top of the document, we'll just

4   start with the signature page.

Exhibit C

5    A.   I'm at Page 10.

6    Q.   Okay.  Thank you, Mr. Altro.  And Mr. Altro,

7    is that your signature on this document?

8    A.   Yes, it is, Mr. Fox.

9    Q.   And Mr. Altro, before you affixed your

10   signature to this document, did you have the

11   opportunity to review the contents therein?

12   A.   I did.

13   Q.   And is the information contained in this

14   document true and correct to the best of your

15   information, knowledge, and belief?

16   A.   It is.

17   Q.   And are you aware of any amendments that

18   need to be made at this time?

19   A.   Not to the (inaudible), not to Form 201 --

20   207, I'm sorry.

21   Q.   Thank you, Mr. Altro.  We'll take each

22   document, including the schedules, in turn, later.

23   I'll also ask about the petition later, but if you

24   could turn first now to Page 8 of 19 and direct your

25   attention specifically to Item 28.  As I indicated, I ⬆

1    just wanted to ask about the other officers and

2    employees of the Debtor before moving on, just a

Exhibit C

3    similar series of questions that I just asked to you.

4         A.    I am at Page 8.

5         Q.    Okay.  And Mr. Altro, are the individuals

6    identified in Item 28 still in each of those roles

7    that they're identified for?

8         A.    They are, yes.

9         Q.    Okay.  And in addition to those five

10   individuals, are there any other employees, officers,

11   or directors of JAB Energy Solutions II, LLC, that we

12   should include for purposes of discussing the officers

13   and employees?

14        A.    There are employees.  The employees are not

15   listed are not officers.

16        Q.    Okay.  And approximately how many other

17   employees are there that are not officers?

18        A.    There are four, two are included on this

19   list, and four are non-officer employees.

20        Q.    So four are included on the list, and then

21   there are two others?

22        A.    The two on the list are employees, Brent

23   Boudreaux and Alan Vando.  And then, there are four

24   other employees of JAB Energy II.

25        Q.    Okay.  I guess I'm not necessarily ⌃

Exhibit C

1   following.  So you identified Mr. Boudreaux --

2        A.   I -- yeah, yeah, there are six employees --

3        Q.   Yes.

4        A.   -- at JAB Energy II, okay?  Two are

5   officers, and the two officers are listed here, Brent

6   Boudreaux and Alan Vando.

7        Q.   And so then, there are four other

8   individuals that are not listed that are employees of

9   JAB Energy Solutions II, LLC?

10       A.   Yes, sir.

11       Q.   Okay.  With respect to the other three

12  individuals that are identified in Item 28, I

13  understand that Mr. Orlando is identified as the

14  chairman and would not necessarily be an employee.

15  But with respect to the other two parties that are

16  identified as either -- I believe it's -- is it chief

17  financial officer and a vice president that are not

18  direct employees?  Is that a correct understanding?

19       A.   That is correct.

20       Q.   Okay.  And so then, Ms. Robertson and Mr.

21  Henry are not direct employees of JAB Energy Solutions

22  II, LLC?

23       A.   That is correct.

24       Q.   Okay.  But they still hold officer titles?

25       A.   Yeah, Sonda Robertson is the chief financial ^

Exhibit C

1   officer of Allison Holdings, and she provides CFO

2   services down to JAB Energy II.

3       Q.   And with respect to Mr. Henry, what is his

4   role as a vice president?

5       A.   To the best of my knowledge, George is an

6   investor in the company.

7       Q.   Thank you, Mr. Altro.  So with that bit of

8   clarification, I'd ask you to focus on the parties

9   identified in Item 28 for this next series of

10  questions, and we can exclude the other four employees

11  that are not officers for the time being.  But with

12  respect to the officers and directors, the parties

13  listed in Item 28, to your knowledge, are any of those

14  officers or other parties creditors of the Debtor?

15      A.   To the best of my knowledge, no.

16      Q.   And do any of those individuals in their

17  individual capacity own any equity of the Debtor?

18      A.   No.

19      Q.   Have any of them been indebted to the

20  Debtor, having taken any loans from the Debtor?

21      A.   To the best of my knowledge, no.

22      Q.   And are you aware if any of them have made

23  any loans to the Debtor?

Exhibit C

24          A.   I am not aware of any, no.

25          Q.   Does the Debtor have any claims against ⌃

1    those officers or other parties listed in Item 28 to

2    your knowledge?

3          A.   No, not to my knowledge, no.

4          Q.   And has any officer or parties in Item 28

5    personally guaranteed any debts of the Debtor?

6          A.   To my knowledge, no.

7          Q.   Okay.  Outside of the four employees that

8    you noted, are the Debtors currently using any

9    independent contractors or consultants or temporary

10   employees specific to the Debtor's business rather

11   than as a subcontractor on the project that you

12   identified earlier or for any other purpose?

13         A.   No, I mean, the other contractors are

14   standalone businesses that we use in the ordinary

15   course, so no.

16         Q.   And just a couple more general questions

17   with respect to the employee count.  With respect to

18   the number of employees, approximately how many were

19   there employed by the Debtor on September 7th of 2020?

20         A.   At one point, we had 12 working on a

21   project, and I can't recall exactly when they were

Exhibit C

22    furloughed, but we had 6 of the 12 that we had to

23    furlough.

24        Q.    Thank you.  And it's my understanding from

25    documents filed in this Chapter 11 case that JAB ⌃

1    Energy Solutions II, LLC, is wholly owned by Allison

2    Marine Holdings, LLC; is that correct?

3        A.    Correct.

4        Q.    If you have the copy of the bankruptcy

5    petition, would you please turn to that at this time?

6        A.    Okay.  I have it in front of me.

7        Q.    And bear with me, I asked you to turn to it,

8    I'm still attempting to find it on my own, as well.

9    So just pardon the delay while I pull that up on my

10    screen, as well.  And if you could turn to Page 4 of

11    13.

12        A.    Okay.  I am here --

13        Q.    Okay.

14        A.    -- on Page 4.

15        Q.    And Mr. Altro, this is a signature block

16    with an electronic signature affixed to this document.

17    Did you authorize your electronic signature to be

18    affixed to this document?

19        A.    I did authorize my signature, yes.

Exhibit C

20      Q.   And before you authorized your electronic

21  signature to be affixed to this document, did you have

22  an opportunity to review the contents therein?

23      A.   I did, yes.

24      Q.   And is the information contained in this

25  bankruptcy petition true and correct to the best of ⌃

1   your information, knowledge, and belief?

2       A.   Yes, it is.

3       Q.   Thank you, Mr. Altro.  We can set aside the

4   petition for now, as well.  Next, if you will turn to

5   the bankruptcy schedules or filed at Docket Item 54.

6   And we could start on Page 1 of this document as your

7   signature pages at the front of this document.

8       A.   I have in front of me, Mr. Fox.

9       Q.   Thank you, Mr. Altro.  And Mr. Altro, is

10  that your signature on this page?

11      A.   Yes, it is.

12      Q.   And before you affixed your signature to

13  this document, did you have the opportunity to review

14  the contents therein?

15      A.   I did, yes.

16      Q.   And is the information contained in this

17  document true and correct to the best of your

Exhibit C

18   information, knowledge, and belief?

19      A.   It is.

20      Q.   And are you aware of any amendments that

21   need to be made at this time?

22      A.   There is one amendment that we need to make

23   in this document.

24      Q.   And could you explain the nature of that

25   amendment? ⬆

1       A.   I can.  On Page 2, Item 11, accounts

2    receivable, let me know when you're there.

3       Q.   I am there, and this is -- according to the

4    document stamp at the top of the document, also Page 4

5    of 20?

6       A.   It is, yes.

7       Q.   Okay.

8       A.   I'm on Item 11, 11b.

9       Q.   Yes.

10      A.   We have listed in accounts receivable, a net

11   amount of $5,676,123.25.  That number -- that amount

12   also includes an amount that we listed on item --

13   Part 11, Item 74, and if you can turn to that, you'll

14   see it.  It's a claim against Black Elk Liquidating

15   Trust, that 445,000.

Exhibit C

16      Q.    Yes.

17      A.    So that's a duplicate.  That is included in

18   Item 11b.

19      Q.    Okay.  Thank you, Mr. Altro.  And outside of

20   that amendment that you're aware of, is there anything

21   else in the schedules that you would like to address

22   at this time?

23      A.    No.

24      Q.    Okay.  Thank you.  If you could turn back to

25   Page 4 of 20 or Page 2 according to the bottom ⬆

1    pagination of the document, I did have some additional

2    questions regarding the information in Item 11.

3       A.    I am back to that page.

4       Q.    Thank you, Mr. Altro.  I note that there are

5    several items here identified as intercompany amounts

6    to various Allison Marine entities and one other,

7    Tarpon Systems International.  Could you explain the

8    nature and the collectability of those accounts

9    receivable identified for the intercompany items?

10      A.    Yeah.  So the intercompany transactions,

11   certainly the one, the most material one of 11.1

12   million is the accumulation of intercompany

13   transactions since the inception of the company.  So

Exhibit C

14    you're probably looking at hundreds, if not thousands,

15    of transactions that may have occurred over a ten-year

16    period.  Most of those transactions are pretty common

17    when you have a relationship between a parent holding

18    company and a wholly owned subsidiary.

19          The way that the transactions work between

20    this parent and JAB Energy II, the Debtor, is certain

21    expenses were paid on behalf of JAB Energy II by the

22    parent company, Allison Holdings.  And when JAB Energy

23    II accumulated cash and distributions had to be made

24    up to the parent that would then -- went against the

25    intercompany payable and receivable.

1     And that's generally the nature of how the

2     intercompanies work.  The smaller amount that you see

3     between the sister companies or what I call the other

4     subsidiaries of Allison Holdings, there would be some

5     (inaudible) transactions or agreements between JAB

6     Energy II when they needed the support of either

7     Allison Marine contractors or Allison Offshore

8     Services.

9           And then, there could be situations where

10    labor would have been used by either an Allison Marine

11    contractor or Allison Offshore Systems and JAB Energy

Exhibit C

12    II and could go both ways.  That's pretty much the

13    nature of the intercompany transactions.

14         Q.    Thank you, Mr. Altro.  And so from a high

15    level, for the -- well, although these are receivables

16    for the Debtor, they would also be potential payables

17    from the Debtor to each of these entities, as well?

18         A.    Yes.  What we have here are the net

19    amounts --

20         Q.    Okay.

21         A.    -- between the other subsidiaries and the

22    parent company.

23         Q.    So you identified that these are the net

24    amounts.  Is collection of these amounts in the near

25    future likely?  I note that the doubtful or ∧

1    uncollectible amounts are identified as zero for each

2    of these.

3         A.    That's correct.  There -- there's --

4    knowledge --  we put zero down for uncollectible.

5    They are uncollectible.  There will be no ability to

6    collect from the parent company.  In fact, due to

7    significant losses at JAB Energy over the course of

8    the last three years, had there been additional

9    earnings at JAB, the investment by the holding company

Exhibit C

10  down into the parent would have been significantly

11  higher, which would have netted out the 11.9 million.

12       Q.   In your answer, you mentioned another parent

13  company of JAB Energy Solutions II, LLC, could you

14  provide a little bit more context on the overall

15  corporate structure?

16       A.   Yeah, I'm sorry.  Could you repeat the

17  question, Mr. Fox?

18       Q.   Not a problem, Mr. Altro.  I said that in

19  your answer, you mentioned another parent company of

20  JAB Energy Solutions and losses up the organizational

21  chain, higher than the Debtor entity, which would

22  impact the ability to collect on these intercompany

23  claims.  Could you provide a more general description

24  of the corporate organizational structure beyond the

25  direct parent of Allison Marine Holdings?   ⬆

1       A.   Yeah, let me recap what I said earlier.  I

2  think we've got a little twisted.  The losses, which

3  would have changed the -- ultimately, the intercompany

4  and the investment that Allison Holdings were incurred

5  at JAB Energy II.  They had some significant losses

6  that drove down the retained earnings of JAB Energy II

7  in 2018 to the present.  And those specifically relate

Exhibit C

8    to the Black Elk bankruptcy and then another project

9    where they had significant non-cash losses.

10        Q.   Okay.  I appreciate that clarification.  I

11   may have some additional questions relating to the

12   organizational structure later on, but we'll focus on

13   the schedules for the time being.  If you could turn

14   to the next page, Page 5 of 20, or Page 3 according to

15   the bottom pagination.

16        A.   Okay.  I'm here.

17        Q.   And if you direct your attention

18   specifically to Item 39.  It identifies that there was

19   an appraisal for furniture and office equipment.  And

20   could you explain when that appraisal occurred and the

21   scope of the property that it covered?

22        A.   Yes.  We did, as part of the assignment, and

23   of course the Delaware law, we're required to obtain

24   two appraisals on the -- what we call the inventory

25   which encompasses all the assets of the Debtor.  And ⬆

1    in so doing, we -- they -- the outside firms that we

2    retained to do the appraisal, they appraised the

3    furniture and office equipment here at the company's

4    headquarters in Shenandoah at that amount that you see

5    listed, $3,110.

Exhibit C

6     Q.   You mentioned that there two appraisals.

7  Did they both come to that number or is that an

8  average of the two appraisals?

9     A.   That's probably just one of the appraisals.

10  We didn't we probably just picked up one of the

11  appraisals and only listed this one.

12     Q.   Okay.

13     A.   But I don't think they were materially

14  different.

15     Q.   If you'll turn to the next page, Item 55

16  identifies the lease and attributes a net book value

17  and current value of zero dollars.  Could you explain

18  the nature of that lease and why it's been valued in

19  that manner?

20     A.   Yes, the lease on the company's corporate

21  offices here in Shenandoah expired on, I believe,

22  October 1st, and it had since been renewed by the

23  company's parent, Allison Marine Holdings, so we

24  don't -- so JAB Energy II, the Debtor, we don't really

25  have a lease at this point. ⌃

1     Q.   With respect to continuing to utilize that

2  space, is there a sublease agreement or any other sort

3  of written agreement between the Debtor and Allison

Exhibit C

4  Marine Holdings with respect to utilization of space

5  at that address?

6      A.   We have nothing in place at this point.

7      Q.   Okay.  If you'll skip ahead now to Pages 12

8  and 13 of 20, which is inside Schedule E/F for the

9  creditors that have unsecured claims, beginning with

10  Item 3.3 and continuing through Item 3.5 are claims

11  identified as intercompany claims for Allison Marine

12  Contractors II, LLC, Allison Marine Holdings, LLC, and

13  Allison Offshore Services II, LLC.  Based on our

14  previous discussion, I understood that the items in

15  11b were net amounts.  So could you clarify as to

16  whether or not these claim amounts that are identified

17  in Items 3.3 through 3.5, whether these amounts owed

18  by the Debtor were included in that 11b item?

19      A.   Yeah, so on the -- under Allison Marine

20  companies, these are the actual amounts that are --

21  the payable amounts on JAB Energy II.  The net amount

22  that I was referring to earlier relates to Allison

23  Marine Holdings and netting the investment against the

24  payable.

25      Q.   So to make sure I'm understanding that ⬆

1  correctly, the first item in 11b is the Allison Marine

Exhibit C

2   Holdings items, and that one is net, but with respect

3   to the other entities, at least two of which, I think,

4   are identified in the Items 3.3 and 3.5, those items

5   in 11b were not net and would be impacted by the

6   claims that are reported in 3.3 and 3.5?

7        A.   Correct.

8        Q.   Okay.  Is there a reason that the

9   methodology differed for Allison Marine Holdings as

10  compared to the other Allison entities that we can

11  look at in Items 3.3 and 3.5?

12       A.   Yes, again, the number of transactions from

13  the company's investment, that holding company

14  investment account, were netted against the receivable

15  at JAB Energy II.  So on the parent's books, there is

16  an investment, which represent the undistributed

17  earnings for the wholly owned subsidiary.  And that

18  amount was netted against the receivable on JAB

19  Energy's books.  So when you consolidate the entire

20  enterprise, they would net out.  So that's why we

21  netted them here, as well.

22       Q.   Okay.  And then, for the sister companies,

23  then, the reason those are not netted is because it's

24  a smaller number of transactions and booked in a

25  different manner? ^

Exhibit C

1      A.   Correct.  And at the consolidated level,

2   those would ultimately net out and eliminate, as well.

3   However, we thought that the presentation for the

4   (inaudible) and schedules here would have been more

5   illuminating by showing the gross amounts.

6      Q.   Thank you, Mr. Altro.  If you could turn

7   back to Page 10 of 20, this is Schedule D, creditors

8   who have claims secured by the property.  Just want to

9   take a moment to try to understand the nature of these

10  secured obligations.

11       So it's my understanding from other papers

12  filed in the bankruptcy case that JAB Energy Solutions

13  II, LLC, is not necessarily the direct borrower of the

14  funds from these two secured creditors; do I have that

15  correct?

16      A.   Yeah, my understanding is that they -- and I

17  may have this wrong, but my understanding was that JAB

18  Energy II was the borrower with these two secured

19  lenders.

20      Q.   But in addition to JAB Energy Solutions II,

21  there are other entities in the overall corporate

22  structure that are obligated on these same amounts; is

23  that correct?

24      A.   That is my understanding, yes.

Exhibit C

25      Q.   Could you generally describe what the ↑

1    proceeds of those loaned amounts were utilized by JAB

2    Energy Solutions II for?

3       A.   Yeah, I believe the Garmark SBIC Fund II was

4    used for working capital purposes.  For Castlegate, I

5    think that was a mix of working capital as well as a

6    purchase of a previous debt, previous loan.

7       Q.   Thank you, Mr. Altro.  If you'll turn ahead

8    to Page 17 of 20, this is Schedule G, executory

9    contracts and unexpired leases.  So we discussed the

10   lease of the corporate headquarters, and you indicated

11   that it had expired prior to or in the month of

12   October.  With respect to the other items identified,

13   those do not include the term remaining, but to your

14   knowledge, those are all still executory contracts?

15      A.   Yes.

16      Q.   And with respect to the larger entity

17   structure for the Debtor's parent and sibling

18   entities, are there any additional contracts that the

19   Debtor has a role in that are -- where one of its

20   affiliates is the obligated party?

21      A.   No, not that I know of.

22      Q.   Thank you.  If you can turn ahead now to

Exhibit C

23    Page 19 of 20, just before we set aside the schedules,

24    I just want to understand the nature of each of these

25    codebtors, if you've got information regarding them.  ▲

1    We'll just take them in turn.

2         So in item 2.1 and 2.2, Allison Industrial

3    Services II, LLC is identified as a codebtor on the

4    Garmark obligation and then the Castlegate Credit

5    Opportunities Fund, LLC obligation.  Allison

6    Industrial II, LLC, is that what you would refer to as

7    a sister company?

8         A.   I would refer to it -- I probably wouldn't

9    refer to them as sister company.  I probably misspoke

10   a little bit earlier.  I would just say that they were

11   wholly owned subsidiaries of the parent, Allison

12   Holdings.

13        Q.   Okay.  Thank you for that clarification.

14   And so would that same characterization then apply to

15   Items 2.3 and 2.4 for Allison Land Development II,

16   LLC?

17        A.   Yes.

18        Q.   Okay.  And then, for Item 2.5 and 2.6, for

19   Allison Marine Contractors II, LLC, same

20   characterization accurate?

Exhibit C

```
21          A.   Yes.

22          Q.   For Item 2.7 and 2.8, for Allison Offshore

23   Services II, LLC, same characterization accurate?

24          A.   Yes.

25          Q.   And then for Items 2.9 and 2.10, for Tarpon ⌃
```

```
 1   Systems International II, LLC, same characterization

 2   accurate?

 3          A.   I would say that there is similar management

 4   over Tarpon Systems at the management team at

 5   Allison -- I'm sorry, at the Debtor, JAB Energy II.

 6          Q.   So the management teams have some overlap

 7   between JAB Energy Solutions II, LLC, and Tarpon

 8   Systems International II, LLC; is that correct?  Am I

 9   understanding your answer correct?

10          A.   Yes.

11          Q.   But Tarpon System International II, LLC, is

12   not necessarily a wholly owned subsidiary of Allison

13   Marine Holdings, LLC?

14          A.   No, it is a wholly owned subsidiary of

15   Allison Marine Holdings with -- but managed by the

16   management team at JAB Energy II.

17          Q.   Okay.  So to understand the distinction,

18   then, for instance, Allison Offshore Services II, LLC,
```

**Exhibit C**

19    then, is also a wholly owned subsidiary but has a

20    different management team than JAB Energy Solutions

21    II, LLC, and Tarpon Systems International II, LLC; is

22    that correct?

23        A.   Correct.

24        Q.   Okay.  In terms of each of these entities

25    being obligated on those debts, are you aware if each ⌃

1    entity is represented by separate counsel or how those

2    decisions regarding who would be obligated on the debt

3    were made?

4        A.   Can you repeat that?

5        Q.   Sure.  I apologize for the compound

6    question.  I'm trying to wrap my head around the

7    concept here.  But for the codebtors that are

8    identified, the five other entities, are you aware of

9    how each those parties was represented in terms of

10    becoming obligated on those debts?

11        A.   I am not -- no idea -- I do not know how

12    they became obligated under the debt, no.

13        Q.   Okay.  Thank you.  We can set aside the

14    schedules and return to the Statement of Financial

15    Affairs, which again is docket Item 55 in -- on the

16    bankruptcy docket.  And we already looked at the

Exhibit C

17  signature page and Item 28, but if you could direct

18  your attention to Page 1 of 19, we'll start from the

19  top and work our way through.

20      A.   We're back to Form 207?

21      Q.   That's correct.

22      A.   Yeah, okay, what page?

23      Q.   Page 1 of 19, please.

24      A.   Okay.  I'm there.

25      Q.   Okay.  So could you just generally explain ⬆

1   the nature of the revenue differences that are

2   identified between Year 2019 and Year 2020 on Item 1?

3       A.   Yeah, I mean, this is -- the company is a

4   fixed-price contractor that has various projects, so

5   you can quite a bit of variation probably in the

6   different years, depending on how many projects are

7   underway.  And this is simply just -- they just did

8   not have as many projects in '19 that they had in '20,

9   and then, you see the variation in the subsequent

10  year, '21 to the filing date.

11          So as you know, as I spoke about earlier,

12  the two projects that are underway are -- they're

13  substantially all that's -- that the company currently

14  has and has ceased taking on new business, so you

Exhibit C

15    won't see any new revenue, other than as we finish up

16    the one project called -- what we call Breton Sound,

17    we'll probably have some revenue to report as that

18    project moves towards completion.

19         Q.   Thank you, Mr. Altro.  If you'll turn to the

20    next page, Page 2 of 19, in Item 3, outside of the

21    Blue Cross/Blue Shield payment, there are additional

22    payments identified to what appear to be professional

23    services firms or attorneys and identified as

24    services.  Can you generally describe what the nature

25    of those services is? ⬆

1     A.   I'm not sure on 3.2, but 3.3, Miles Thomas

2     Law assisted us in defense of certain lawsuits pending

3     against the company.

4          Q.   Thank you.  If you'll turn to Page 3, and we

5     have discussed this item in some form previously, but

6     in Item 8, the assignment for the benefit of creditors

7     is identified, which was commenced in June of 2021.

8     Can you describe the present status of that

9     proceeding?  My understanding was from other pleadings

10    that there were efforts underway to dismiss or

11    conclude that proceeding but would ask that you would

12    explain your current understanding of that proceeding.

Exhibit C

13      A.   Yeah, I think we filed a motion to dismiss.

14   I can't recall -- I need to catch up with counsel, but

15   I believe that might have been granted or ordered, but

16   we were moving to extinguish the ABC in the chancery

17   court.

18      Q.   Thank you.  Okay.  If you'll skip ahead to

19   Page 11, oh, sorry, I missed a note in my notes, turn

20   to Page 8, please, if you would.  And I think I

21   touched on this previously, but if you could confirm

22   that there has been a change to the Debtor's officers,

23   directors, managing members, et cetera, identified in

24   Item 28 since the filing of the bankruptcy petition, I

25   would appreciate that. ♠

1      A.   There's been no changes to the list that we

2   have here in Item 28.

3      Q.   And then Item 29 indicates that there were

4   not any of such parties that departed from their

5   position in the year prior to the filing of this

6   bankruptcy case.  Are you aware of any major changes

7   to the Debtor's officers, directors, managing members,

8   et cetera, in the time period three years prior to the

9   filing of the bankruptcy petition?

10      A.   I don't know about three years, but I

Exhibit C

11    certainly would probably believe that the same

12    officers were the same officers for at least one year.

13        Q.    Thank you.  So if you'll now turn ahead to

14    Page 11, and if you'll direct your attention

15    specifically to a line item about a third of the way

16    down the page, identified for December 18th, 2020.

17    This entry appears to be much larger than the others

18    that are identified, and I was just wondering if you

19    knew the nature of this payment.

20        A.    Can you give me any help?

21        Q.    It's $14,485.60.

22        A.    Yeah, I'm not aware of exactly what that is,

23    and I won't venture a guess at this point.

24            MS. JONES:  This is Laura Jones.  We can

25    follow up, Mr. Fox, and provide that information to ⬆

1    you.

2            MR. FOX:  Thank you, Ms. Jones, I'd

3    appropriate that.

4    BY MR. FOX:

5        Q.    And then, I had one additional question.

6    And I believe one of your previous answers might have

7    already addressed it.  But the reason that only Mr.

8    Boudreaux and Mr. Vando are identified in this

Exhibit C

9    attachment is that they're the only direct employees

10   from the parties that were listed in Item 28; is that

11   correct?

12        A.   Correct.

13        Q.   If you'll turn ahead to Page 18, and I will

14   acknowledge that this is a fairly busy attachment, and

15   so I'm going to have difficult time identifying

16   exactly what I'm trying to ask about.  But towards the

17   bottom of the page, about five lines up, on October

18   1st, 2020, there's a management fee identified for

19   $17,200.  And I just wanted to --

20        A.   Yes.

21        Q.   -- understand the nature of those management

22   fees.

23        A.   Well, I don't think it's uncommon to have

24   management fees assessed between parent and

25   subsidiaries.  My understanding as to our ⌃

1    investigation that while management fees were reported

2    and it did impact the intercompany, no cash actually

3    changed hands between the parent and the sub.

4         Q.   And Mr. Altro, to your knowledge, were those

5    management fees the subject of a written agreement?

6         A.   No.

Exhibit C

7        Q.   Thank you.

        8             MR. FOX:  So that's the last specific

        9   question I had on the documents.  I have some more

       10   questions as part of my examination, and then, once I

       11   get through those, we'll, then, seek, you know,

       12   interest from parties that wish to examine the Debtor.

       13   So I appreciate everyone's patience.  Again, if you

       14   would wish to examine the Debtor after I conclude my

       15   examination, please send me an email at

       16   timothy.fox@usdoj.gov.

       17   BY MR. FOX:

       18        Q.   Mr. Altro, to your knowledge, when did the

       19   Debtor begin scaling back operations to the point

       20   where it's just winding down these last two

       21   receivables that you identified?

       22        A.   Look, I think the bigger picture here is I

       23   think the Black Elk bankruptcy negatively impacted the

       24   company, and it was unfortunately probably something

       25   that the company couldn't recover from, and so since ♠

        1   the Black Elk bankruptcy, I think that would probably

        2   be when operations started to slow and ultimately made

        3   the decision to wind down operations and close up

        4   shop.

Exhibit C

5      Q.   Thank you.  And so my understanding is -- is

6   that case filed in approximately 2015?  So is that

7   about the relevant time period, sometime after 2015?

8      A.   Yeah, probably if you look at the company's

9   historical financials, you'll probably see the company

10  was last profitable, I think, in 2016, as they were

11  finishing up probably projects in process, and then,

12  things started to move in the opposite direction with

13  fundings coming from parent just to keep JAB Energy II

14  afloat.  So ultimately, the decision to stop funding

15  losses at the subsidiary level.

16     Q.   Mr. Altro, to your knowledge, is the Debtor

17  current on all of its post-petition obligations,

18  including taxes and insurance premiums?

19     A.   We are current on our post-petition

20  obligations.  We did have some assistance from the

21  parent company to fund certain post-petition payroll

22  expenses that we have not yet repaid.

23     Q.   And Mr. Altro, my understanding was the

24  repayment of those obligations is something that was

25  addressed by the interim financial motion; is that ⌃

1   correct?

2      A.   It is probably not covered in the interim

Exhibit C

3    financial motion.  It might have been discussed, but

4    we will definitely address it in the (inaudible).

5         Q.   And are you aware of any post-petition

6    obligations that will not be dealt with the ordinary

7    course?

8         A.   No.

9         Q.   Can you confirm that the Debtor has notified

10   its bank of its status as a Debtor in Possession?

11        A.   We have.

12        Q.   Does the Debtor have any pension plan,

13   401(k) plan, or the like for its employees?

14        A.   We don't have any pension plan.  I had have

15   to follow back up with you on the 401(k).

16        Q.   Thank you.  And again, I noted the Blue

17   Cross/Blue Shield item in the SOFA, but to confirm,

18   does the Debtor have any sort of self-funded

19   healthcare plan?

20        A.   No.

21        Q.   Are the Debtor's books and records

22   maintained at the Shenandoah, Texas corporate

23   headquarters address?

24        A.   Yes.

25        Q.   All right.  Can you generally describe the ⌃

Exhibit C

1    types of insurance the Debtor has in place?

2        A.    The Debtor has customary insurance in place

3    to include general liability and workers' compensation

4    and health.  The health plan, as you noted earlier,

5    carried at the Debtor level.  The general liability

6    and workers' compensation policies are procured at the

7    parent level at Allison Holdings, and the Debtor is

8    the named insured, and certain allocations of those

9    costs are pushed down to the intercompany, to the

10   Debtor.

11       Q.    Thank you.  Could you generally describe the

12   reasons for the Debtor filing its Chapter 11 petition?

13       A.    I alluded to it a little bit earlier the

14   company is in a loss position.  I think there are

15   several years of losses continuously to be funded by

16   investors, however that investment is being made,

17   whether it's through borrowed funds or from other

18   investors.

19           I think as the company's ability to add new

20   projects continued to deteriorate and of course the

21   precipitating Black Elk bankruptcy, which really

22   caused a significant cash drain on the company,

23   ultimately the decision to file had to be made.  And

24   as we talked about earlier, that the petition was made

25   to be effectuated to an ABC, but unfortunately, we ⌃

Exhibit C

1   needed a little bit more breathing space.  Because of

2   the lawsuits that were starting to get in the way of

3   the ABC, we had to file a Chapter 11.

4        Q.   Thank you.  So again, we discussed that the

5   ABC was filed in June of 2021, and your last response

6   identified that there were lawsuits that made the ABC

7   something that couldn't be pursued without additional

8   breathing spell, which the automatic stay from the

9   Chapter 11 filing provided.  Can you generally

10  describe the timeframe where the decision to file the

11  Chapter 11 rather than continue with the ABC was

12  implemented?  At what time was that decision made to

13  file for Chapter 11 and cease the ABC?

14       MS. JONES:  This is Ms. Jones.  I'm just

15  going to jump in to say -- to remind Mr. Altro that he

16  can answer that to the extent it does not infringe on

17  his attorney-client privilege.  There obviously were a

18  lot of factors that went into our decision to dismiss

19  the ABC and start the Chapter 11.  I let Mr. Altro

20  answer the question at a high level, which included

21  the litigation that was during the pending or was

22  during the heating up.  There obviously were other

23  considerations involved.  So Mr. Altro, no problem

Exhibit C

24    with you answering, but please do not reveal any

25    attorney-client privilege. ⬆

1        A.   Right, so the level of intensity of the

2    litigation got to the point, and I think I alluded to

3    it earlier, where we were not going to be effective in

4    the ABC, ultimately to -- the driving concern was

5    cost, right?  So the ABC is certainly a little bit

6    less expensive than a filing of a Chapter 11, and when

7    we realized that we weren't going to be able to,

8    again, be effective in that environment or in that

9    jurisdiction, we had no choice but to take leave of

10   the automatic stay and file a Chapter 11.  So those

11   were our really precipitating factors on why we moved

12   it from an ABC to a Chapter 11.

13   BY MR. FOX:

14       Q.   Thank you, Mr. Altro.

15            MR. FOX:  And thank you, Ms. Jones, again or

16   your clarification before Mr. Altro's answer.

17   BY MR. FOX:

18       Q.   I just did want to follow up on the timing

19   of that, if you could provide a ballpark timeframe

20   where that decision occurred.  Again, not getting into

21   any conversations with counsel or anything regarding

Exhibit C

22    the attorney-client privilege but just the timing of

23    when that decision was made.

24    MS. JONES:  Let me jump in here.  This is Ms. Jones

25    again.  We had the ABC -- it was filed in June.  The ⌃

1    Chapter 11 was filed in September, suffice to say a

2    short period of time in between there, but I would

3    suspect it was the latter of that period in which our

4    decisions with Mr. Altro and others ramped up, that we

5    don't -- that the Chapter 11 was appropriate.

6    Obviously, the decision is in the resolution that's

7    attached to the petition.  Until such time as that

8    resolution was actually executed, that's when that

9    decision was made.

10    MR. FOX:  Thank you, Ms. Jones.

11    BY MR. FOX:

12        Q.   Mr. Altro, does the Debtor intend to file a

13    plan of reorganization in this case?

14        A.   I don't think we've concluded on a plan of

15    reorganization at this point.

16            MS. JONES:  I will confirm for the record,

17    Mr. Fox, this is Ms. Jones again, that those

18    discussions do continue.

19            MR. FOX:  Thank you, both.

Exhibit C

```
20    BY MR. FOX:

21        Q.   Okay.  And at present, are there any plans

22    or attempt to sell of the company's assets through a

23    Section 363 sale or a sale otherwise outside the

24    ordinary course of business?

25        A.   We've had some discussions.  I don't think ⌃
```

```
1     those discussions have moved materially yet to a point

2     where we would consider that.

3         Q.   Thank you, Mr. Altro.  And at present, are

4     there any plans for the officers or employees of the

5     Debtor to receive any bonuses during the pendency of

6     this Chapter 11 case?

7         A.   No.

8         Q.   Thank you.  I don't believe I noted this in

9     the SOFA, so apologies if I missed it, but are there

10    any environmental problems that the Debtor faces that

11    could be of concern during this Chapter 11 case?

12        A.   No.

13        Q.   And to confirm, JAB Energy Solutions II,

14    LLC, hasn't filed any prior bankruptcy cases?

15        A.   No.

16        Q.   And Mr. Altro, have you received U.S.

17    Trustee guidelines for Chapter 11 debtors?
```

Exhibit C

18      A.   I have, yes.

19      Q.   And to your knowledge, are you in compliance

20  with those guidelines?

21      A.   Yes.

22      Q.   And you understand the obligations regarding

23  the filing of monthly operating reports and the

24  payment of quarterly fees for the United States

25  Trustee? ▲

1      A.   I am familiar, yes.

2      Q.   And you understand that the first monthly

3  operating report will be due on October the 21st?

4      A.   Yes.

5      Q.   Okay.  And will you be the person primarily

6  responsible for preparing that monthly operating

7  report?

8      A.   I will have assistance in preparing it, and

9  I will ultimately submit it, yes.

10      Q.   And I believe that you'll also have your

11  first quarterly fee payment due, given the end of

12  quarter 3 for which the Debtor was a debtor from

13  September 7th through September 30th.  I'll again note

14  for your benefit that the invoice that will be

15  generated and sent to the Debtor will be an estimated

Exhibit C

16    amount, but the Debtor should pay its quarterly fee

17    based on the disbursements that were made for the

18    period that it was a debtor in that previous quarter.

19    I apologize for any sort of inconvenience that that

20    causes.  It's just the nature of our systems.

21        A.   Understood.

22        Q.   Okay.  As I noted, I understand that your

23    firm is subject to a motion before the Bankruptcy

24    Court to employ it and you as well as -- as chief

25    restructuring officer, and that Ms. Jones' firm has ⬆

1     also submitted its retention application, as well.

2     Does the Debtor intend to retain any other

3     professionals other than those that I've identified as

4     having motions or applications to employ them?

5         A.   No.

6         Q.   And will you be reviewing the invoices for

7     professional fees submitted in this bankruptcy case

8     for the Debtor?

9         A.   Yes.

10        Q.   Okay.  And subject to appropriate contact

11    with counsel, are you willing to speak with and/or

12    meet with representatives of my office regarding those

13    fees from time to time through the case?

**Exhibit C**

14      A.   Yes, as discussed with counsel.

15      Q.   Thank you, Mr. Altro.

16           MR. FOX:  So I understand that there are

17  parties that wish to examine the Debtor.  I'm going to

18  turn to my email and send instructions to those

19  parties on a rolling basis, so that they can identify

20  themselves and begin asking questions.

21           Again, as a reminder, when it's your first

22  time speaking, please identify yourself for the

23  record, including what party you represent, if you're

24  appearing on behalf of a party.  And please, again, be

25  aware that this may be a little bit less -- this may ⌃

1   be a little less smooth than if we were physically in

2   person, so I appreciate everyone's patience in dealing

3   with these issues telephonically.  I'm going to go

4   ahead and send an email with -- I'm giving

5   instructions to the first party that I received

6   interest from, and I believe that's Mr. Aguillard, so

7   I will send you an email, and then, once you have

8   those instructions, if you could please announce

9   yourself and identify yourself and your client for the

10  record.

11           Again, apologies for having to deal with the

Exhibit C

12    delay for emails to make their way through the

13    internet.  Mr. Aguillard, have you received my email

14    and been unable to unmute yet?  Is Ms. Newmeyer

15    additionally on the line, and can you unmute and

16    identify yourself if you're present on the line?  You

17    were copied on Mr. Aguillard's email.

18            MR. AGUILLARD:  This is Kent Aguillard.  Can

19    you hear me now?

20            MR. FOX:  Yes, Mr. Aguillard.  I apologize

21    for mispronouncing your name.

22            MR. AGUILLARD:  That's okay.  I'm from south

23    Louisiana.  Everybody mispronounces it when I leave

24    home.

25            MR. FOX:  Okay.  Excellent. ⬆

1            MR. AGUILLARD:  I just have a few questions,

2     and I'll be done, if that's okay.

3            MR. FOX:  Yes, please just go ahead and

4     state your name and any client you represent for the

5     record, and then, the virtual podium is yours.

6            MR. AGUILLARD:  Thank you.  My name is H.

7     Kent Aguillard.  I represent DLS, LLC, who's a

8     creditor in this case, and I have a few questions

9     about a platform and the operations in the Gulf of

Exhibit C

10    Mexico as they may be right now.

11             EXAMINATION

12    BY MR. AGUILLARD:

13        Q.   Earlier there was a question by Mr. Fox

14    about environmental issues.  I'm assuming that you

15    weren't addressing the status of the platform that's

16    in Breton South 53 as it sits in the Gulf; is that

17    correct?

18        A.   That is correct.

19        Q.   Okay.  And do you know if the platform has

20    navigation aids and functioning right now?

21        A.   I do not know.

22        Q.   Okay.  So you don't know if has foghorn,

23    lights, or anything like that, correct?

24        A.   I do not, I do not.  (Inaudible).

25        Q.   Have you had any discussions or is anything ⬆

1    underway to remove that platform or have it salvaged?

2        A.   Yes, we have a contractor prepared to head

3    out there as soon as he can get access to the Gulf to

4    remove that platform.

5        Q.   Okay.  And who is that?

6        A.   That's Tom's Marine and Salvage.

7        Q.   Tom's Marine and Salvage.  Okay.  Do you

Exhibit C

8    have any -- you don't have a timeframe, I guess?

9         A.   Not -- we -- not a precise timeframe.

10   Hurricane Ida created some problems for --

11        Q.   Right.

12        A.   -- the salvage company, and (inaudible)

13   right now in (inaudible), can't get out, but we do

14   believe that it might be cleared up in the next two

15   weeks.

16        Q.   I understand that there's a bond in place

17   pursuant to Federal regulations requirements for that

18   project in Breton South.  Do you know if that bonding

19   company may be paying contractors or others that are

20   owed money for work they did in Breton South 53?

21        A.   I'm not aware of any bond on that project,

22   no.  I'd have to look into that.

23        Q.   Okay.  So is anyone going out and inspecting

24   that platform right now, you know, just to see what

25   condition it's in, to your knowledge? ♠

1         A.   It's -- Tom -- Tom's Marine and Salvage was

2    out there a couple of months ago.  They were onsite,

3    and they had evaluated what needed to be done in order

4    to remove the barge.  I think that was pretty --

5    pretty common knowledge ahead of time.  The management

Exhibit C

6  team, I believe, had also been out there from JAB, but

7  Tom was out there onsite to do the work, to remove the

8  barge, but again, bad weather forced him to return.

9      Q.  Okay.  Give me one second.  I may be

10  finished.  Okay.  So you haven't had any conversations

11  with any counsel like Philip Eisenberg at Locke Lord

12  in Houston about the bond in place?

13      A.  No.

14      Q.  Okay.  That's all the questions I have.

15  Thank you very much.

16          MR. FOX:  Thank you.  I just sent unmuting

17  instructions to the next party, and when you have

18  those and have been able to unmute, please announce

19  yourself and identify yourself and your client for the

20  record, please.

21          MR. NALLEY:  This is George Nalley.  Can you

22  hear me, Tim?

23          MR. FOX:  Yes, I can hear you, Mr. Nalley.

24          MR. NALLEY:  Okay.  This is George Nalley

25  and Richard Martinez here in New Orleans on behalf of ⬆

1  TOPS.  Mr. Altro, I have a number of questions for

2  you.

3          EXAMINATION

Exhibit C

BY MR. NALLEY:

Q.  Just following up on what Mr. Aguillard was just asking you, though, do you have a contract for the removal of that barge on the bottom of Breton Sound?

A.  We -- we do.  I don't know if it's on the bottom of Breton Sound, but we do.

Q.  Okay.  And do you know how much that's going to cost to remove that?

A.  We have some cost estimates, yes.

Q.  And how much would that be?

A.  Right now, we estimate the removal of the barge through Tom's Marine Salvage plus some surveys that have to be done subsequent to that at about 450,000.

Q.  And how do you propose -- how does JAB II propose to pay that?

A.  Through the Debtor in Possession financing.

Q.  Okay.  The -- you were also asked some questions earlier by Mr. Fox as to whether you had any environmental issues or concerns, I think, and -- and Mr. Aguillard followed up on that.  Isn't that in

49

connection with the High Island project you are

Exhibit C

2    awaiting environmental issues related to BSEE?

3        A.   We -- we are awaiting for site clearance

4    from BSEE.  I wouldn't necessarily say specifically

5    what that site clearance entails at this point, if

6    that includes environmental or not.

7        Q.   You don't know one way or the other?

8        A.   I do know that the site clearance that we

9    were waiting on had -- had to do with certain damage

10   that was done to -- based on some anchors that were

11   dropped in the wrong place.  And that was the basis of

12   the most recent survey that went out there.

13       Q.   Okay.  I'm going to go back to the beginning

14   because I have a number of questions on that I'll kind

15   of take this through and (inaudible) if I can.  You

16   indicated example you've been on board with JAB II

17   since June of 2021, correct?

18       A.   I was the assignee as of June, correct.

19       Q.   Okay.  And as assignee, how much were you

20   paid?

21       A.   Right now, we're still reconciling the final

22   bills, but it'll be somewhere between 60- and $70,000.

23       Q.   Okay.  And that was for several months of

24   work?

25       A.   Correct.   ↑

Exhibit C

1    Q.    And in connection with your position with --

2    as assignee, you received -- you had access to the

3    books and information, correct, as to the company

4    operation?

5         A.    Of JAB Energy II.

6         Q.    Yes, sir.  And since you started with JAB

7    II, assignee, what work have they actually done?

8         A.    As far as the two projects go?  Is your

9    question on High Island and Breton Sound?

10        Q.    Well, have they done any other work, other

11   than in connection with those two projects?

12        A.    Not -- not to my knowledge, no.

13        Q.    Has JAB II been paid any -- any money since

14   that time?

15        A.    No.

16        Q.    And I think on the schedule I saw, you had

17   listed that they had been paid I think about $76,000

18   in 2021; is that -- is my memory correct on that?

19        A.    Correct.  Well, that was what revenue was

20   recorded.  I wouldn't necessarily say that that was

21   cash.

22        Q.    Okay.  And what was that for?

23        A.    It predated me.  I don't know.

24        Q.    Okay.  Do you know whether or not that cash

Exhibit C

25    was actually received or not? ♠

1         A.    I do not.

2         Q.    When was the last time JAB II actually got

3    paid for a job?

4         A.    Couldn't tell you.

5         Q.    And according to the books that you

6    submitted -- the records you've submitted, they

7    recorded revenue in 2020 of approximately -- is it 14

8    million, if I recall that correctly?

9         A.    That's right.  Approximately 14 million.

10        Q.    Okay.  And do you know what work that was

11   from that -- for that 14 million?

12        A.    I do not.

13        Q.    Do you know whether that was actually cash

14   paid to them?

15        A.    I do not.

16        Q.    Do you know -- do you have access to

17   their -- to their bank accounts, bank records?

18        A.    I could get them, yes.

19        Q.    Do you know -- if you don't know whether

20   they got paid for it, it's just you're showing it

21   booked as revenue; is that correct?

22        A.    It's certainly booked as revenue, and when

Exhibit C

23    you do project accounting, there's -- there's times

24    where you could record non-cash revenue, certainly.

25        Q.    (Inaudible). ⬆

1        A.    On costs -- typically based on costs

2    incurred.

3        Q.    Okay.  Did you review any of the banking

4    records before you made -- in preparation for today?

5        A.    In preparation today for -- I don't think I

6    understand the question.

7        Q.    Preparation for being here testifying under

8    oath, did you review their bank records for 2020?

9        A.    No, I didn't -- there's no need to.

10        Q.    Okay.  Where did the -- where did the

11    information come for those revenue -- come from for

12    those revenue figures?

13        A.    From the company's general ledger.

14        Q.    Okay.  Was that prepared by you or by

15    someone else?

16        A.    No, these are -- these were prepared by the

17    chief financial officer of the company.

18        Q.    Of which company?  Allison or JAB II?

19        A.    So the chief financial officer covers down

20    on all the subsidiaries of Allison Holdings to include

Exhibit C

21    JAB Energy II.

22         Q.   Okay.  And that's Ms. Sonda, correct?

23         A.   Sonda Robertson, yes.

24         Q.   All right.  You said earlier, I believe -- I

25    kind of jumped around on you a little bit, but since ⬆

1    you touched on it, you said -- and she's listed as the

2    CFO of JAB II on the filings that you all made,

3    correct?

4         A.   We did.  Yep.

5         Q.   That, in fact, is not correct, is it?  She's

6    actually not employed by JAB II.  She's employed by

7    Allison Marine and has no title with JAB II, does she?

8              MS. JONES:  This is Laura Jones.  I'm going

9    to interrupt at this point on that question.  Counsel,

10    you do know that Mr. Altro is not an attorney.  I am

11    trying to be extremely patient with your -- appears to

12    be trying to get out a line of questioning that I'm

13    not sure is appropriate for a 341.

14              But with respect to that question that you

15    asked, I'm not sure if you're looking for a legal

16    answer on that or if you're just asking for his

17    understanding.  But I think, as he mentioned earlier

18    in his discussion with Mr. Fox, that individual does

Exhibit C

19    act as the CFO at JAB II, as well.  Whether she's

20    employed at that level or provides those services, you

21    and I can have a legal discussion about what that

22    means in terms of employment or not.

23          But I think he's already testified earlier

24    today that she is serving in the function of doing the

25    CFO work at JAB II.  And Mr. Altro, please confirm for ⬆

1    me in case I was incorrect.

2          MR. ALTRO:  No, no, that's it.  I mean, she

3    provides -- she -- she is not an employee of JAB.  She

4    provided CFO services as a holding company would do to

5    all of its subsidiary holdings, simply to provide

6    purchasing power over its investees.

7    BY MR. NALLEY:

8          Q.   And you relied on the information she

9    provided you in connection with your -- your activity

10   and your appearance here today, correct?

11         A.   Yes.

12         Q.   Okay.  You answered Mr. Fox's questions

13   earlier, and I just want to confirm.  According to the

14   sworn statement and signatures of yours on the

15   paperwork, it's your testimony that all of the

16   information and documents provided to the Bankruptcy

Exhibit C

17    Court by JAB II has been truthful and accurate,

18    correct?

19         A.   Yes.

20         Q.   Okay.  Is it true that the only connection

21    of JAB II to Delaware is is that JAB II is

22    incorporated there?

23         A.   I believe that's the case.

24         Q.   Okay.  The corporate office where I believe

25    you are sitting is located in Shenandoah, Texas, right ⬆

1    outside of Houston, correct?

2         A.   Correct.

3         Q.   That is JAB II's only office and where its

4    employees, the six remaining employees, are officed,

5    correct?

6         A.   Yes.

7         Q.   Okay.  And that is an office that JAB II

8    shares with the parent company, Allison Marine

9    Holding?

10        A.   Correct.

11        Q.   Is it also correct that if I look at your --

12    your paperwork here on the finances that the only

13    tangible assets that JAB II has are the used equipment

14    and used office furniture in that Shenandoah office,

Exhibit C

15    which you have valued at $3,100.

16         A.   If you -- if that's what you defined as

17    tangible equipment, our tangible assets, yes.  We also

18    have the accounts receivable related to High Island as

19    well as the work in process on Breton Sound.

20         Q.   Right.  And the furniture and the actual --

21    what I call the tangible assets were all located just

22    in that Houston, Texas, office, correct?

23         A.   The -- the -- the -- yes, the furniture and

24    equipment, yes.

25         Q.   Okay.  And in the -- the Delaware bankruptcy ⬆

1     proceeding, as I appreciate it, JAB II has represented

2     that it's the owner of all that equipment and the --

3     and has a claim for payment on the two projects, we'll

4     call it, the Breton Sound and High Island platforms,

5     correct?

6          A.   Correct.

7          Q.   Okay.  And just so we're clear on this, the

8     Black Elk project is the removal of platform HI370A,

9     correct?

10         A.   Correct.

11         Q.   And that -- in ballpark figures, the claim

12    asserted by JAB II on those funds is for about 5.8

Exhibit C

13      million?

14          A.    5.7, yes.

15          Q.    Okay.   And isn't the funds, the actual cash

16      for that job, which is still -- is still under the

17      control of the Black Elk liquidation trust in Houston,

18      the Southern District of Texas Bankruptcy Court in

19      Houston, correct?

20              MS. JONES:   I'm going to interrupt on that

21      question.   We're now referring to -- ask again for a

22      legal conclusion.   I appreciate that Counsel is, my

23      guess, working through his list of documents he has

24      for a motion that I expect to be coming from him, and

25      again, Mr. Fox, I'm being very patient in letting this ⌃

1      go forward as it is factual information that he's

2      looking for, somehow tangential to the (inaudible)

3      schedules, but I am sure more in connection with a

4      motion that he's bringing.

5              So Counsel, my tolerance for free discovery

6      does have some limits.   So I would ask you to move it

7      forward.

8              MR. NALLEY:   I understand, but I believe

9      that y'all have it that JAB II has that 5.7 or 5.8

10      million listed as an asset or -- and I simply want

Exhibit C

11  confirmation that that is not in -- in JAB II's

12  possession at this point but still remains with the

13  Bankruptcy Court in -- in Houston.

14          MS. JONES:  And --

15      Q.  Correct, Mr. Altro?

16          MS. JONES:  And Mr. Altro, to the extent you

17  know that from your factual knowledge, I have no

18  problem with you answering it.  Obviously, reserve all

19  rights on whether Mr. Altro is legally correct in his

20  answer.

21      A.  Yeah, my opinion is, no, except to the

22  extent of the 445,000 that the Black Elk liquidating

23  trust owes to -- pursuant to High Island.  I think

24  once we receive site clearance on the project, we will

25  be free to pursue the remaining receivables from the ♠

1   other payors to include the bonding company.

2       Q.  Okay.  Are they not all subject -- do you

3   know whether or not those entities are subject to the

4   Bankruptcy Court in Houston's order as to when those

5   funds will be paid, which will be made by the

6   Bankruptcy Trustee?

7           MS. JONES:  Counsel, that's, again, asking

8   for a legal conclusion.  I don't think Mr. Altro can

Exhibit C

9   answer that.  If -- Mr. Altro, if you have some

10  thoughts about it, I have no problem with you

11  answering that, but obviously, you are not a lawyer.

12  And Counsel, I'm just letting you know it's not going

13  to be a legal answer.

14      A.   I would tell you this that I -- I do not

15  recognize that the Bankruptcy Court has jurisdiction

16  over those -- those receivables on our books, and I

17  would pursue those with utmost diligence, directly

18  with those that owe it to include the 445,000 that is

19  owed by the liquidating trust.

20  BY MR. NALLEY:

21      Q.   And just so we're clear, the money you're

22  talking about is the 5.7 or 5.8 from that bankruptcy

23  job, divvied up according to the term sheet, correct?

24      A.   Correct.

25      Q.   Okay.  And that's the term sheet that was ↑

1   issued by the bankruptcy liquidation trust for Black

2   Elk, correct?

3       A.   Correct.

4       Q.   Okay.  In connection with that, isn't it

5   true, sir, that -- that JAB II did not actually do the

6   platform removal for that job?

Exhibit C

7      A.   I don't think I understand that -- that

8  question.

9      Q.   All right, I'll rephrase it.  And certainly

10  if I ask you any questions (inaudible) or you don't

11  understand it, let me know.  Isn't it true, sir, that

12  our client, TOPS, actually did the platform removal,

13  along with the assistance of some other contractors

14  like CDOB (phonetic) and OTS (phonetic) and others, as

15  opposed to JAB II's personnel removing the platform?

16      A.   I think I would disagree with that

17  characterization.  I think JAB Energy II is the

18  general contractor, and JAB Energy II then

19  subcontracts out work, and I believe your client was a

20  subcontractors.  I would say JAB Energy II was

21  responsible for it.

22      Q.   Did JAB Energy II do any physical work on

23  the removal of that platform?

24      A.   That, I don't know.

25      Q.   Okay.  They did not have a single personnel ⌃

1  show up on that platform during its removal, did they,

2  sir?

3      A.   That, I don't know.  That's your

4  representation.  I don't know.

Exhibit C

5      Q.   Okay.  And --

 6           MS. JONES:  Mr. Fox, I do have to say we are

 7      getting quite far afield.  I understand Counsel

 8      litigation against this Debtor.  I also know that they

 9      have their own issues I'm sure that they want to

10      explore in this case and so forth.  But we are getting

11      quite far afield from that which is appropriate for a

12      341 meeting.

13           MR. FOX:  Thank you, Ms. Jones.  Mr. Nalley,

14      can you please move on to a different topic that

15      relates to the financial condition of the Debtor?

16           MR. NALLEY:  Sure.

17      BY MR. NALLEY:

18      Q.   Mr. Altro, let's talk about JABCO ABC, LLC.

19      You indicated you were appointed via -- what was the

20      title?  Assignee or --

21      A.   Yes.

22      Q.   -- what was your -- on that?

23      A.   Assignee, correct.

24      Q.   Okay.  All right.

25      A.   The managing -- JABCO ABC, LLC, technically ⌃

 1      was the assignee, and I'm the managing member of that

 2      LLC.  Correct.

Exhibit C

3      Q.   Okay.  And the -- the -- and that was filed,

4  I believe, on June 4th, 2020.  June 4th, 2021,

5  correct?

6      A.   Correct.

7      Q.   All right.  And you were involved in the

8  filing of that paperwork, correct?  There was a

9  petition for assignment of the benefit of the

10  Creditors?

11      A.   Yes, with counsel, yes.

12      Q.   Okay.  And JABCO ABC, LLC, was set up as a

13  Delaware LLC but with its offices located in JAB's

14  office in Shenandoah where you're sitting today,

15  correct?

16          MS. JONES:  I'm going to interrupt again.

17  Mr. Fox, I -- with due respect to Counsel, again, he's

18  trying to use your 341 meeting for discovery on a

19  motion that I expect he's trying to file.  The ABC is

20  not before this Court.  The ABC we disclosed in

21  fullness in our papers.  The idea of a 341 meeting is

22  for the -- for creditors to ask general questions

23  about the financial affairs of a company and also

24  specific questions as to the schedules and statements.

25  This is really going on a little too long and too far ∧

62

Exhibit C

```
 1   afield.

 2            MR. NALLEY:  Mr. Fox, I'll move on.  I'll

 3   get right to it -- I'm going -- that was a little

 4   preface, I think.  And I appreciate Counsel's

 5   comments.

 6   BY MR. NALLEY:

 7       Q.   In connection with that ABC company, isn't

 8   it true, Mr. Altro, that there was a general

 9   assignment made by JAB Energy Solution II to JABCO

10   ABC, LLC, on June 2nd, 2021?

11            MS. JONES:  And Mr. Altro, again, calls for

12   a legal conclusion.  If you have a point of view of

13   what you think is a factual matter was done, I have no

14   problem with you answering it.  I, again, advise

15   Counsel that Mr. Altro is not an attorney and may have

16   a very different perspective from a legal analysis of

17   what his response will be.  But I have no problem with

18   him giving you his thoughts, if he has any.

19       A.   Yeah, can you repeat the question, Mr.

20   Nalley?  I -- there was a lot of crosstalk there,

21   yeah.

22   BY MR. NALLEY:

23       Q.   Let me -- maybe I can jump right to the end.

24   There is a general assignment filed on June 2nd, 2021,

25   by JAB II -- JAB Energy Solutions II, which I'm ↑
```

Exhibit C

1    referring to as JAB II throughout this -- to the ABC

2    entity, JABCO ABC, LLC, on June 2nd, 2021.  Correct?

3         A.   Yes.

4         Q.   And you actually signed that on behalf of

5    JABCO ABLC (phonetic), along with Ms. Robertson on

6    behalf of JAB Energy Solutions, correct?

7         A.   I -- I signed it on behalf of -- yes, on

8    behalf of JAB ABC, LLC, correct.

9         Q.   Okay.  I'm sitting here looking at it.  So

10   the -- isn't it true, sir, that as part of that

11   document, that general assignment, that JAB Energy

12   Solutions II assigned all of its assets on that date

13   on June 2nd, 2021, to JABCO ABC?

14        MS. JONES:  Counsel, you're looking at a

15   document.  You just told me you're looking at a

16   document.  The document speaks for itself --

17        MR. NALLEY:  I am.  General assignment --

18        MS. JONES:  The document speaks for itself.

19   Mr. Fox, we are very far afield from a 341 meeting.  I

20   would ask that we move on, and in any event, I'm going

21   to ask Mr. Altro to quit answering questions here

22   because this has nothing to do with a 341 meeting, and

23   instead, it's Counsel, again, trying to work through

Exhibit C

24    his discovery for a motion he's planning on bringing.

25              MR. NALLEY:  I don't think it -- Mr. Fox, if ⬆

1    you'll give me just a few minutes, I think I'll get

2    right to the -- to the heart of this, and I think it

3    goes directly to the assets and the financial

4    condition of -- of JAB II in the bankruptcy

5    proceeding.

6              MR. FOX:  Mr. Nalley and Ms. Jones, I am not

7    a judge, and I'm not here to referee disputes on this,

8    but I do preside over the meeting, and I agree with

9    Ms. Jones that we're a little too far afield from

10   examining the financial condition of the Debtor.

11              I -- I understand that, Mr. Nalley, you have

12   questions relating to the ABC proceeding and the

13   issues related thereto and what they might mean for

14   the Debtor, but I'd ask that, you know, you -- you've

15   got a couple more questions you can ask, if they're

16   related to the Debtor.  But I mean, I -- I think

17   you've made your point for purposes of the 341 on --

18   on those items, and we should proceed.  So if -- if --

19              MR. NALLEY:  (Inaudible) --

20              MR. FOX:  -- if there was a summation of

21   this question that relates to the financial condition

Exhibit C

22     of the Debtor, please ask that, and then move on to

23     any other topics you have.

24              Again, I appreciate everyone's patience and

25     understand that this process is difficult when we get ⌃

1      into disputes like this in person.  It's even more

2      difficult over the phone but appreciate everyone's

3      effort thus far in having in proceed rather smoothly.

4              So, Mr. Nalley, is there a question relating

5      to the financial condition of the Debtor that you

6      would like to ask based on the previous line of

7      questioning, or do we need to move on to another

8      topic?

9              MR. NALLEY:  No, sir, I have just a couple

10     more on this, and I think it'll -- it will be very

11     clear as to why it's directly pertinent to this

12     proceeding.

13     BY MR. NALLEY:

14         Q.  Mr. Altro, in connection with that ABC

15     proceeding, you filed an -- a second amended affidavit

16     regarding the inventory that was transferred from JAB

17     II, LLC, to JABCO ABC, LLC, in that proceeding on June

18     4th, 2021.  And isn't it true, sir, that as part of

19     that assignment, the JAB II assigned over to the ABC

Exhibit C

20    entity all of its ownership rights and all of its

21    interest in the office furniture there and the

22    computers where you are in Shenandoah, as well as you

23    specifically listed the two projects, the Black Elk --

24    I believe it's all rights to payments under the master

25    service agreement for the Black Elk High Island 8370 ▲

1     platform removal, which was estimated at $5,676,412,

2     as well as the Brenton Sound project that you talked

3     about earlier.  So I -- I

4              MS. JONES:  This is counsel, I --

5         Q.   -- my question is, isn't it true, sir, that

6     -- that as part of that ABC proceeding, all of JAB

7     II's rights and ownership in those assets was

8     transferred to a completely different entity, the

9     JABCO ABS LLC, as per the documents you filed with the

10    Chancery Court in Delaware?

11             MS. JONES:  This is Laura Jones.  You are

12    asking a legal conclusion.  You are obviously reading

13    from a legal document.  The document speaks for

14    itself.  If you have issues about that document, I am

15    sure we will hear about them in the Bankruptcy Court.

16    Mr. Altro is not an attorney.  I'm going to instruct

17    him not to answer any legal -- any legal concludes or

Exhibit C

18    any questions such as that.  Also, it does impinge on

19    attorney/client privilege.  Again, the document does

20    speak for itself.  You looked -- I'm glad to hear you

21    have all this information in front of you as you are

22    reading from it.  I'm going to instruct him not to

23    answer, and I think we need to move on.

24    BY MR. NALLEY:

25        Q.   Mr. Altro, could you please explain to us -- ↑

1    to the -- to the -- to Mr. Fox, as well as all the --

2    the -- the Creditors as to how JAB II is claiming to

3    have assets in the bankruptcy proceeding that you

4    yourself signed off on the documents transferring to a

5    completely separate entity, JABCO ABC, LLC?

6            MS. JONES:  Counsel, again, you're asking

7    for a legal conclusion.

8            MR. NALLEY:  No, I'm asking him for --

9            MS. JONES:  No, I am telling you, you are,

10    and you can disagree with me.  And indeed, sir, you

11    can contact the Court, and I'll be glad to have this

12    conversation with the Court.  You are now trying to

13    make your closing arguments for some motion you're

14    presenting.

15            You're, also, trying to get discovery.

Exhibit C

16    You're trying to get admissions against interest.  I'm

17    not sure what else you're trying to do, but you've

18    gone long far away from a 341 meeting.  I appreciate,

19    sir, that your client has an agenda, and I appreciate

20    you're a very good lawyer and are adequately and very

21    succinctly trying to pursue that agenda.  But the 341

22    meeting is not the place.

23           It is not appropriate, also, sir, for you to

24    continue to ask my client for legal conclusions and

25    response to legal conclusions when I have told you now ↟

1    for the sixth time that he is not counsel, and I am

2    objecting and -- and instructing him not to answer

3    your legal conclusory questions.

4           MR. FOX:  Mr. Nalley, do you have --

5           MR. NALLEY:  (Inaudible) --

6           MR. FOX:  So this is Tim Fox on behalf of

7    the United States Trustee.  Mr. Nalley, do you have

8    any other questions relating to the financial

9    condition of the Debtor that are not relevant on -- or

10   predicated on questions relating to the ABC or legal

11   conclusions?  Or is -- is that the end of your -- your

12   questions?

13           MR. NALLEY:  Sir, I have -- I have a few

Exhibit C

14    more on it.

15            MR. FOX:  Okay.  And -- and I'll just --

16            MR. NALLEY:  (Inaudible) --

17            MR. FOX:  Mr. Nalley, I'll just note that,

18    you know, as Ms. Jones has identified the Debtor's

19    view and position going forward, please again refrain

20    from asking questions relating to potential legal

21    conclusions.

22            Again, my office takes no position on the

23    propriety of those questions and whether or not they

24    can be asked in another forum, but again, you know, to

25    the extent that they do not relate to the financial ⬆

1    condition of the Debtor, they -- they're not

2    appropriate, and again, Ms. Jones has voiced the

3    Debtor's position on those questions.  So in the

4    interest of efficiency, please refrain from, you know,

5    continuing to hammer home some of those points that

6    you -- you've made clear for -- for all parties that

7    are listening on this 341 meeting of Creditors.

8            MR. NALLEY:  Okay.

9    BY MR. NALLEY:

10      Q.   Mr. Altro, you said earlier that the -- the

11    -- that there had been a transfer of the assets back

Exhibit C

12     to JAB II, if I understood you correctly.  Do you know

13     when that was done?

14          A.   I -- I don't understand the context.  You'll

15     have to -- you'll have to repeat what I said --

16          Q.   I thought --

17          A.   -- because that -- that doesn't ring a bell.

18          Q.   I thought you had said earlier that you had

19     thought that JABCO ABC was transferring or had

20     transferred assets back to JAB II.  Do you -- did I

21     understand that correctly or not?

22          A.   No, I don't -- I --

23               MS. JONES:  Again, counsel, you're asking

24     for a legal -- you're asking for a legal conclusion.

25     First of all, that's not what he said.  Secondly, the ⌃

1     legal dynamics --

2               MR. NALLEY:  (Inaudible) --

3               MS. JONES:  -- the legal dynamics -- I'm

4     just going to go ahead and finish my sentence now.

5     The legal dynamics of what happens in an ABC, how you

6     get into an ABC, how you terminate an ABC, whether you

7     can rightfully, then, file a Chapter 11, all of those

8     issues, sir, if you have an issue on them, I am sure

9     you will bring them before this Bankruptcy Court, but

Exhibit C

10    that is not appropriate for a 341.  I appreciate you

11    have an audience here, and you're using it, but we

12    need to move forward.

13    BY MR. NALLEY:

14        Q.   Mr. Altro, you were asked some questions

15    earlier by Mr. Fox on the timing of the filing of the

16    bankruptcy and the -- I think the ABC entity.  And I

17    want to ask you prior to -- well, you were already on

18    board as the assignee for the ABC company before the

19    filing of the bankruptcy.  Were you -- did you receive

20    or did you become aware that there had been a

21    proceeding in federal court in New Orleans and that

22    the federal court in New Orleans issued an injunction

23    in connection with the funds for the High Island 378

24    platform?

25        A.   So we -- as we entered into the ABC, we were ⬆

1     not aware of the -- the litigation with your client.

2     We became aware of it, and then subsequently, we did

3     become aware of an injunction in that -- in that

4     court, yep.

5         Q.   Okay.  And the bankruptcy proceeding was

6     filed shortly after that, correct?

7         A.   Correct.

Exhibit C

8      Q.   The -- do you know when you were talking

9  about the assets from the -- in the other entities

10  under that term sheet for that money, do you know or

11  are you aware of whether or not those entities are

12  subject to that federal court injunction from the New

13  Orleans Court or not?

14      MS. JONES:  Again, that's calling for a

15  legal conclusion.  I'm sorry, for the record, this is

16  Laura Davis Jones.  Calling for legal conclusion.

17  Again, I have no problem with Mr. Altro telling you as

18  a factual matter what he kind of thinks as a

19  nonlawyer.

20      Again, Mr. Altro, I'd advise you on

21  attorney/client privilege and, also, remind you you're

22  not a lawyer, so you can't answer a question that

23  requires a legal conclusion.

24      A.   Right.  Yeah, as a nonlawyer, we did

25  understand -- or I understood that there would be -- ♠

1  it would be difficult to collect from those payers in

2  light of the injunction.

3      Q.   Okay.  And is it your understanding as the

4  CRO for -- for JAB II that that injunction remains in

5  effect to this day?

Exhibit C

6          MS. JONES:  There's a -- that again calling

7     for a legal conclusion.  This company has its own

8     bankruptcy.  The effects of that injunction obviously

9     call for a legal conclusion.  I would tell that I

10    think it has no impact at all on this case, but again,

11    Mr. Fox, I am -- I'm getting to the point where I'm

12    going to instruct that this examination of Mr. Altro

13    needs to be completed.  This is, again, a free

14    discovery attempt.  If -- we've gone way far afield.

15    I think you have been extremely patient.  Starting to

16    really test my patience, and I'd ask that you'd

17    instruct everyone to move forward.

18         MR. FOX:  Mr. -- Mr. Nalley, do you have any

19    questions relating to the financial condition of the

20    Debtor?

21         MR. NALLEY:  I do.  I'll move to another

22    area.

23    BY MR. NALLEY:

24         Q.   You were asked, Mr. Altro, about your

25    employment and your application by your company ↑

1     Traverse LLC to be the chief restructuring officer,

2     correct?

3         A.   Correct.

Exhibit C

4      Q.   As I appreciate the documents you filed in

5   the earlier testimony, there are six employees still

6   working for JAB II there in the Houston office,

7   including two corporate officers, correct?

8      A.   Correct.

9      Q.   One of whom is the president, Brent

10   Boudreaux, and the vice president, as well, correct?

11      A.   Correct.

12      Q.   Okay.  And the other four employees do

13   what -- are on payroll, as well?

14      A.   Yes.

15      Q.   Okay.  And according to your -- and from

16   what you told me earlier, as I appreciate it, there's

17   no business of JAB II currently taking place, other

18   than efforts to collect money from these two projects,

19   one of which is completed with the Black Island -- I

20   mean, the Black Elk High Island platform and the other

21   one, which is -- you said you had a contractor lined

22   up, right?

23      A.   We do, yes.

24      Q.   Okay.  And given the limited assets of JAB

25   II, whether it has -- whether it ultimately has access ⬆

1   to the Black Elk funds or not, which is obviously in

Exhibit C

2   dispute, but without even addressing that, but

3   regardless of whether those funds are included or not,

4   JAB II has limited resources.  Would you mind

5   explaining to me what is it that -- that JAB II -- or

6   what is it that you are going to be doing for JAB II

7   or --

8           MS. JONES:  Counsel, I'm going to --

9       Q.   -- (inaudible) --

10          MS. JONES:  Counsel, I'm going to -- I'm

11  going to interrupt, Counsel.  And I apologize.  If you

12  have an issue with the retention of Traverse, please

13  do what is appropriate and visit on the Bankruptcy

14  Court in Delaware in connect with his application.  We

15  will not use this 341 for you to explore the

16  application to retain his firm.

17          MR. NALLEY:  I'm just asking how the

18  resources are going to be used, what is --

19          MS. JONES:  I understand, Counsel.  But

20  again, very far afield.  Mr. Fox mentioned in context

21  that there was an application to retain Mr. Altro's

22  firm pending so that all parties on the phone would

23  understand he is the CRO, and he has application

24  pending for that position.  If you have an issue with

25  Mr. Altro, his retention, or his firm's retention, ⌃

Exhibit C

1    sir, do the appropriate thing and respond to the

2    pleading.

3              MR. NALLEY:  Okay.

4    BY MR. NALLEY:

5        Q.   Mr. Altro, would you please look at Document

6    Number 54 that you talked -- that you talked about

7    earlier, the summary -- I believe the summary of

8    assets and liabilities.

9        A.   Okay.

10       Q.   And if you go to Page 4 of 20.  Let me know

11   when you're there, if you would please.

12       A.   Page 4 -- yeah, okay.

13       Q.   Okay.  And I have some questions for you in

14   particular with regard to the intercompany transfer to

15   Allision -- with Allison Marine Holdings for $11.9

16   million.  You have that listed as an accounts

17   receivable to JAB II Energy Solutions, correct?

18       A.   Correct.

19       Q.   Okay.  And I did not understand what you

20   said earlier about it.  How is it that -- that Allison

21   Marine Holdings, which is the parent company of -- of

22   JAB II, correct?

23       A.   Correct.

24       Q.   Okay.  How is it that Allison Marine

Exhibit C

25    Holdings owes JAB II $11.9 million? ⬆

1       A.   That's the accumulation of numerous,

2    numerous intercompany transactions over the life of

3    the two businesses, since their creation.  It's

4    probably ten years' worth of transactions that have

5    netted out over the years, and this is the resulting

6    balance between the two companies.

7       Q.   So this -- when you were talking earlier

8    about the net and the -- and the non-net for the other

9    subsidiary companies, so if I understand it, this is a

10   net amount owed by Allison Marine Holdings to JAB II

11   after ten years of business, correct?

12      A.   Correct.

13      Q.   Okay.  And is that because when JAB II

14   received payments from customers or on jobs that they

15   did, that that money went to Allison Marine, as

16   opposed to JAB II?  Or do you know --

17           MS. JONES:  Mr. Altro --

18      Q.   Do you know --

19           MS. JONES:  Mr. Altro, you can answer that

20   to the extent you know.  And please do not speculate.

21      A.   Yes, in -- in -- collections from customers

22   would be received by JAB II and then periodically

Exhibit C

23    distributions would be -- would flow up to the parent.

24        Q.   Didn't the -- did the distribute -- did the

25    cash flow that would come in -- if JAB II -- let's ⬆

1    look at the books for 2020.  You said JAB II had

2    revenues of $14 million-something, correct?

3        A.   Correct.

4        Q.   Okay.  And yet it's showing almost no -- no

5    cash or -- or money in its account, correct?

6        A.   Correct.

7        Q.   Okay.  So in your work as the restructuring

8    officer, are you able to determine form what you look

9    at of those transactions, did that 14 million that

10   came into JAB II -- or the revenues for JAB II in 2020

11   go into the Allison Marine account, now -- so now

12   becoming an account receivable for -- for JAB II?

13       A.   No.  No, in 2020, the company, in fact,

14   received benefits from the hold- -- from the holding

15   company and nothing flowed up to Allison in 2020.

16   There hadn't been -- the funding down to JAB has gone

17   pretty much one way for the last several years.

18       Q.   The --

19       A.   So the -- so the receivable itself -- the

20   net receivable that you see --

Exhibit C

```
21        Q.   Um-hum.

22        A.   -- has -- has -- has actually declined over

23   the last three years simply because that was something

24   that existed I think probably in 2017.  So that was

25   the last time that there was -- there was anything ⌃
```

```
1    significant going upstream from JAB II to Holdings.

2         Q.   Is it your -- if I'm understand- -- I want

3    to make sure I understand what you're saying

4    correctly.

5         A.   Yep.

6         Q.   Is it your -- is your -- is it your

7    testimony that in 2020 and in 2021 when they --

8    they're showing -- JAB II's showing revenue of 70-some

9    thousand, that those funds when received by JAB II

10   were not turned over to Allison Marine for

11   disbursement by Allison Marine as they deemed fit?

12        A.   What I would tell you is, I don't know how

13   much of it was cash that came into the business.  I

14   can tell you that the company has lost money and had

15   to receive funding from the parent to continue on as a

16   going concern.  Our -- our review of the records of

17   the company would show that, while there was a

18   receivable outstanding -- a net receivable outstanding
```

Exhibit C

19    between holdings and -- and sub up until 2017 which

20    continued, every receivable has continued to decline

21    as the fundings continued into '18, '19, '20, and '21.

22         Q.   Doesn't all of JAB II's funding come from

23    Allison Marine?

24         A.   It -- well, hold on.  Let me just -- let me

25    just finish. ⬆

1          Q.   I'm sorry.  I thought you were

2     (inaudible) --

3          A.   (Inaudible) --

4          Q.   I didn't mean to interrupt you.

5          A.   Yeah.  It's the phone thing.  And that's

6     just based on our review of the company's general

7     ledger.  I want to be clear on that.

8          Q.   Okay.  Based upon your review --

9               MR. FOX:  Mr. -- Mr. Nalley, this is Tim Fox

10    from the Office of the United States Trustee.  I just

11    want to ask about approximately how much do you have

12    left because we've -- we've been going at it for about

13    two hours, and it might be appropriate to adjourn and

14    set a continued date, if necessary.  But if you're

15    going to wrap up in the next ten minutes or so, then

16    that won't be necessary.  Can you give us an estimate

Exhibit C

17    on how much you have left?

18        MR. NALLEY:  I was thinking about a half

19    hour or so.

20        MR. FOX:  Ms. -- Ms. Jones --

21        MS. JONES:  Mr. Fox, I -- I am going to ask

22    that we continue it, then, if that's the case.  I have

23    a hearing before Judge Goldblatt at 1:00 p.m. that

24    I -- I cannot miss.  I'm lead counsel on the case.

25    And it sounds like -- what I've heard so far, every ⬆

1    time we've had -- said we've had just a couple

2    questions, it's led to another 15-20 minutes, so

3    respectfully to counsel, my guess is a half hour is

4    probably lawyer's time, and it's probably a little

5    more than that.

6        So more than willing to have the 341

7    continue to another date, and I would ask counsel at

8    that time maybe to be able to get his -- his questions

9    directed and focused on what is appropriate at this

10    341 so that we can finish this out.

11        MR. NALLEY:  I appreciate those comments,

12    and I apologize if I've -- I've been a little slow.

13    Some of us are a little slow down here.  So I don't --

14    don't mean to offend you.

Exhibit C

15          MR. FOX:  Mr. Nalley, I did -- I did --

16          MS. JONES:  You didn't offend me at all.

And in -- indeed, I have family in your area, so I --

I appreciate the slow comment, but probably not well-

taken with some of my family.

20          MR. FOX:  And thank you, Ms. Jones and Mr.

Nalley.  Mr. Nalley, I did interrupt you.  Before you

were asking one question, and it might have been

related to that last train of that.  If -- if that's

one last question that you need to ask, and then we

can adjourn to a date to be determined, we can do ⬆

1    that.

2          For any other parties that are listening and

wish to ask questions, they'll have the opportunity at

that continued date, as well.  But, Mr. Nalley, is --

is there one last question that needs to be asked to

wrap up the thought you were on, or is now a good time

to just take our break, and we'll adjourn to a date to

be determine, which will be filed on the docket in

this bankruptcy case?

10          MR. NALLEY:  I'll take my opportunity for

one more question, if you don't mind.

12          MR. FOX:  Okay.  Again, be mindful that Ms.

Exhibit C

13    Jones has her upcoming engagement at 1 o'clock, and

14    other parties may, also, have other obligations that

15    they didn't expect to be coming up so quickly.  But

16    please proceed with your last question for purposes of

17    today, Mr. Nalley.

18    BY MR. NALLEY:

19        Q.   Mr. Altro, isn't it correct that in 2020,

20    2021, and I believe in preceding years, all of the

21    revenues generated by JAB II's work activities went to

22    Allison Marine, and then the funding back to JAB II

23    was done at the discretion of the CFO of -- of Allison

24    Marine?

25        A.   Now -- ♠

1             MS. JONES:  Mr. Altro, I -- yes, I think you

2    already answered that.  If you want to repeat your

3    answer, you can.  But boy, that assumes a lot of facts

4    --

5             MR. ALTRO:  Yeah --

6             MS. JONES:  -- not in evidence, Counsel.

7        A.   Yeah, I mean, you have to understand project

8    accounting a little bit here.  While -- while

9    they're -- the driver of revenue under project

10    accounting and -- and standards of revenue recognition

Exhibit C

11    is cost.  And it's very possible and probably very

12    likely -- and I can certainly get back to you on

13    this -- that the company lost money in 2020, and that

14    even the revenue that is recorded was not -- the

15    company did not cash -- the company did not collect

16    cash in an equal amount of revenue that was recorded.

17    And because it produced losses, it required funding

18    from the parent company, not the other way around.

19        MR. FOX:  Okay.  Thank -- thank you, Mr.

20    Altro.  Again, this is Timothy Fox, trial attorney for

21    the Office of the United States Trustee.  And -- and

22    thank you again to -- to everyone that's participating

23    in this telephonic 341 meeting of Creditors.  As was

24    noted, we're going to continue this 341 meeting of

25    Creditors to a date to be determined with that ⌃

1    information filed on the Bankruptcy Court docket.

2    Again, this is the JAB Energy Solutions II LLC

3    bankruptcy case, case number 21-11226, Judge Goldblatt

4    presiding.  The petition date for this Debtor, again,

5    was September the 7th, 2021.  Today's date is October

6    the 15th, 2021, and the time is now approximately

7    12:36 p.m. Eastern Time.

8        For -- for those parties that wish to

Exhibit C

9    participate in the continued 341 meeting, if you would

10   like to just send me an email with your contact

11   information, I can make sure that I additionally get

12   you some advance notice of that date to be selected.

13   But again, that information will be filed on the

14   docket.

15          I am going to end the recording and take us

16   off the record for this 341 meeting of Creditors, but

17   again, thank you, all, for your patience and

18   cooperation in making this run as smoothly as possible

19   over the phone.  We do -- we do really appreciate

20   everyone's efforts in that regard.  So we are

21   officially off the record now.

22          (End of Audio Recording.)

23

24

25          ☗

1

2

3                    CERTIFICATE

4

5          I, Wendy Sawyer, do hereby certify that I

     was authorized to and transcribed the foregoing

6

     recorded proceedings and that the transcript is a true

Exhibit C

7

record, to the best of my ability.

8

9

10
            DATED this 16th day of November, 2021.

11

12

13
        _____

14

WENDY SAWYER, CDLT

15

16

17

18

19

20

21

22

23

24

25 ♠

**Exhibit C**