1

2

3

4

5

6

7            Transcription of Audio File

8     JAB Energy Solutions II, LLC Case No. 21-11226-CTG

9                Cont. 341 11.12.21

10              Audio Runtime: 1:15:21

11

12

13

14

15

16

17

18

19

20

21

22

Exhibit D

1          (Beginning of Audio Recording.)

2          MR. FOX:  Good morning, everyone.  This is

3    Timothy Fox (phonetic), trial attorney with the Office of

4    the United States Trustee.  Today's date is November the

5    12th, 2021, and the time is 10:30 a.m. Eastern Time.  This

6    is the continued 341 meeting of Creditors in the JAB Energy

7    Solutions II LLC bankruptcy case, case number 21-11226,

8    Judge Goldblatt presiding.  The petition date for this

9    Debtor was September the 7th, 2021, and the initial 341

10   meeting of Creditors was commenced on October the 15th,

11   2021.  This is, again, a continued meeting of Creditors and

12   is occurring telephonically.

13          I will turn thing over momentarily to Debtor's

14   counsel, Ms. Jones, at the Pachulski Firm to introduce

15   herself and the Debtor's witness and proceed to swear in

16   the witness.  And then Mr. Nalley on behalf of the Creditor

17   referred to as TOPS was in the midst of an examination when

18   we continued during the initial 341, and I will yield the

19   podium to him.  But at this time, I'd ask Ms. Jones to

Exhibit D

20    identify herself for the record and introduce the rest of

21    the Debtor's team, and I'll proceed to swear in the

22    witness.

23         MS. JONES:  Thank you, Mr. Fox.  Good morning.

24    This is Laura Davis Jones of Pachulski Stang Ziehl & Jones

25    on behalf of the Debtors.  I'm joined by my colleague,

1    Colleague Robinson, and also Robert Altro, the CRO, is on

2    the phone.

3         MR. FOX:  Thank you, Ms. Jones.  Mr. Altro, could

4    you note your appearance and spell your last name again for

5    the record?

6         MR. ALTRO:  Yes, Mr. Fox.  My name is Albert

7    Altro, last name A-L-T-R-O.

8         MR. FOX:  Thank you, Mr. Altro.  And could you

9    raise your right hand for me and indicate for me when

10    you've done so?

11         MR. ALTRO:  My hand is raised.

12         MR. FOX:  Thank you.  Do you swear or affirm that

13    the testimony you're about to give will be the truth, the

14    whole truth, nothing but the truth under penalty of

15    perjury?

16         MR. ALTRO:  I will.

17          MR. FOX:  And Mr. Altro, at -- at this point in

18    time, where are you physically located?

19          MR. ALTRO:  Orange County, California.

20          MR. FOX:  And, Mr. Altro, is there anyone

21    physically present in the room with you as you are

22    providing your telephonic testimony?

23          MR. ALTRO:  No.

24          MR. FOX:  And should that change for any reason,

25    would you just please just update the meeting of Creditors

1    by announcing that change in circumstances?

2          MR. ALTRO:  I will.

3          MR. FOX:  Thank you, Mr. Altro.  As I noted, I

4    concluded my examination at the initial 341, and Mr.

5    Nalley, attorney on behalf of the Creditor referred to as

6    TOPS was in the midst of his examination.  Mr. Nalley is on

7    the line.  I'd ask him to note his appearance, and then

8    we'll turn things over to Mr. Nalley.  Mr. Nalley?

9          MR. Nalley:  Thank you, Mr. Fox.  This is George

10    Nalley on behalf of TOPS.

11          MR. FOX:  Thank you, Mr. Nalley.  And you -- you

12    -- you may proceed when you're ready.

13          MR. NALLEY:  Thank you very much.

Exhibit D

```
14                    EXAMINATION

15   BY MR. NALLEY:

16        Q.   Good morning, Mr. Altro.

17        A.   Good morning, Mr. Nalley.

18        Q.   Can you hear me okay?

19        A.   I can.

20        Q.   Okay.  I -- I last talked to about a month ago,

21   as you know.  I just want to update a couple things here

22   initially.  Has there been any change in JAB's -- JAB II's

23   status with regard to number of employees currently working

24   for JAB II?

25        A.   No, we are still with six employees.

                              ⬆
```

```
1         Q.   Okay.  And are they doing anything -- is there

2    any work going on with JAB, other than the collection of

3    whatever accounts receivable might be available to them?

4         A.   Yes, we just finished up the Under Water Survey

5    on High Island 8370 and submitted that.  So they were --

6    the employees were very supportive of that project and that

7    process.

8              While you still don't have site clearance, they

9    are continuing to assist and advise in that capacity.  We

10   still have Breton Sound in process, and we're going to
```

Exhibit D

11  probably need the employees to stay in place until we can

12  get that project going and ultimately completed.

13      Q.  All right.  And what was the status of the -- or

14  what was the result of the Under Water Survey for High

15  Island 8370?

16      A.  Well, I'm not expert on reading the BSEE report,

17  so I'll do it from probably a negative confirmation.  I

18  didn't see anything in the report that gave me pause

19  that -- that would be any issues with BSEE providing

20  (inaudible) clearance.  And we have received no

21  communication in the interim from BSEE giving us any

22  indication that they have a problem.

23      Q.  All right.  And do you have any timeline from

24  BSEE as to when the site clearance may be granted?

25      A.  I do not.  I don't think BSEE has any obligation

                    ⌃

1  to provide us any communication in that respect.

2      Q.  Okay.  And I didn't mean to imply they did.  I

3  was just wondering if you knew.  What about your --

4      A.  (Inaudible).

5      Q.  I'm sorry?

6      A.  I said I do not.

7      Q.  Okay.  And what about the Breton Sound job?  What

Exhibit D

8    is that status of that now?

 9         A.   Yeah, that status is the intercoastal access to

10    the Gulf of Mexico is now open to our subcontractor on that

11    project, and I spoke to the subcontractor last week.  And

12    while he can now access the Gulf and get out to the barge,

13    he is in need of a piece of equipment to -- that he'll --

14    he needs to be effective in completing the project.  And

15    that piece of equipment right now has been ordered.

16    Unfortunately, it is coming from China.

17         Q.   Okay.  And do you know what it is they're

18    awaiting?

19         A.   Yeah, it's a -- it's a -- it's a diamond cutter

20    so that he can detach the pylons from the barge.

21         Q.   Okay.  And do you have any timeline on when that

22    job will be completed?

23         A.   I do -- I do not at this point.  Once -- once he

24    gets out on site, it's about 30 days on site.  Then they'll

25    probably be some level of site clearance.  So we're

                    ↟

 1    probably -- you know, until -- until we can get him out

 2    there, we really don't have a good, fixed time to finish

 3    that project.

 4         Q.   Okay.  And is that -- is the contractor still

Exhibit D

5    Tom's Marine and Salvage?

6         A.    It is.

7         Q.    Okay.  All right.  I would like to ask you some

8    question now.  I'll be referring this morning to Documents

9    54 and 55.  Do you have those in front of you?

10        A.    I believe so, if you're talking about the -- the

11   statement of financial affairs and the schedules filed with

12   the U.S. Trustee, then yes.

13        Q.    Okay.  If you would look, please, at Document 54,

14   which is a 24-page document.  And if you would go to Page 4

15   of that document.

16        A.    Okay.

17        Q.    Go to Line 11B, and it is for accounts

18   receivable.  And the first entry is for 8,338,000, less a

19   2.6 million, leaving a 5.6 million rough numbers amount.

20   Am I current in assuming that that is the High Island

21   platform removal job?

22        A.    Yes.

23        Q.    Okay.  And the 2.6 million is an amount already

24   paid to JAB, as I understand it -- is that correct -- for

25   the well work?

                        ⬆

1         A.    No.  That is -- that's not already paid.  That's

Exhibit D

2    just the difference between what the face amount of the

3    receivable was and what we're ultimately going to collect.

4        Q.   Okay.  And why is there a differential of 2.6

5    million?

6        A.   The 2.6 million is simply -- if you go to the MSA

7    with the Black Elk trustee, we were only going to collect

8    5.6 million even though 8.3 was ultimately billed.

9        Q.   Okay.  If you would go to -- and the 5.6 million

10   is the amount you're hoping to collect from the trustee?

11       A.   Well, there are a number of payers associated

12   with the 5.6 million.

13       Q.   Correct.

14       A.   The Trustee is just one.

15       Q.   Okay.  If you look at the next line, then.  We

16   talked about this briefly when you were talking to Mr. Fox

17   in the first session.  And I -- I did not really follow

18   your explanation on this, so I -- I don't mean to go back

19   over what was done before, but I -- if you could explain

20   that to me again, please, what that --

21       A.   Yeah, so the --

22       Q.   -- $11.9 million is.

23       A.   Yeah, so the 11.9 is the historical transactions

24   between the parent company Allison Marine Holdings and the

25   -- and JAB Energy II.  It's really the -- the number of

↑

Exhibit D

1   cash transactions over approximately ten/eleven year

2   period.  And ultimately, this is the net amount, and it's

3   really a bookkeeping amount to track the cash between the

4   two companies, and this is the balance at the date of the

5   petition.  So it's a historical number with probably

6   hundreds of -- of entries.

7      Q.    Okay.  And this as shown on here by JAB II is an

8   account receivable owed to JAB II by Allison Marine

9   Holdings; is that correct?

10      A.    It is.  It is.  It's -- and a lot of that

11   receivable was generated in the early days of JAB Energy

12   II, predominantly in its first four years.  They generated

13   about over -- I think over $40 million in profit.  And then

14   some of that profit, then, needs to be moved up into the

15   parent company because it is a pass-through entity.

16        It was the -- I believe the parent company is,

17   also, a pass-through entity, so ultimately, taxes need to

18   be paid.  So that's really the foundation or a big chunk of

19   why you see that receivable here today.  And again, it's a

20   bookkeeping entry, so if you were to look at the

21   consolidated balance sheet of Allison Marine Holdings,

22   you'd probably find that everything would eliminate in

23   consolidation.

Exhibit D

24    Q.   Okay.  How is it eliminated in consolidation?

25    A.   Because for every -- for the -- the accounts --

⬆

1    for the intercompany payable and the intercompany

2    receivables are on each companies' books, and when you add

3    them across, they eliminate in consolidation.

4    Q.   Okay.  You said earlier that this is the

5    compilation of years and hundreds of transactions between

6    JAB II and Allison Marine Holdings; is that correct?  Did

7    you hear my question, sir?

8         MS. JONES:  This is Laura Jones.  Could you

9    repeat the question?  I'm sorry.

10        MR. NALLEY:  Okay.  Mr. Altro, can you hear me?

11        MR. FOX:  Mr. Altro, this is Tim Fox, the Office

12   of the United States Trustee.  Are you still on the line?

13   Ms. Jones or Mr. --

14        MS. JONES:  (Inaudible) might have a mechanical

15   problem.  Let me -- let's give him a minute or two to see

16   if he comes back on.  I'm not --

17        MR. FOX:  Thank -- thank you, Ms. Jones.  And

18   this is Tim Fox for the --

19        MR. ALTRO:  I apologize -- I apologize.  My

20   phone, for whatever reason, the call dropped.  I'm back.

Exhibit D

MR. FOX:  Thank you, Mr. Altro.  Understood, and
thank you for rejoining.  Mr. Nalley, if you could restate
your question so that both Mr. Altro can hear it again or
hear for it for the first time, if he cut out before you
asked it, and so that Ms. Jones can hear it.  And thank

you, all, for your patience.  I understand that proceeding
telephonically presents its own challenges, so I appreciate
everyone's patience and cooperation as we make our way
through the process.  Mr. Nalley?

MR. NALLEY:  Yes, sir.

BY MR. NALLEY:

Q.   Mr. Altro, this is George again.  The $11.9
million is a compilation or a net total -- am I correct --
over -- from what you said -- of hundreds of transactions
over a number of years between Allison Marine Holdings and
JAB II?

A.   Somewhere between, yeah, 2009 all the way to the
petition date, correct.

Q.   Okay.  And would I be correct in understanding
that -- that those transactions are -- came about from
money -- revenue generated by JAB II, which would be
deposited into the Allison Marine Holding account -- or

Exhibit D

18    bank accounts -- and then disbursements made by Allison

19    Marine in part for expenses of JAB II but resulting in now

20    a net amount of 11.9 million still showing as an AR on the

21    books?

22              MS. JONES:  And Mr. Altro, I --

23        A.    (Inaudible).

24              MS. JONES:  -- I -- I'm going to say to the

25    extent you can -- one, you understand that question, please

                              ⬆

                                                            12


1    answer, and two, just answer to the best of your factual

2    knowledge on that.

3              MR. ALTRO:  Correct, yes.

4        A.    So the answer would be no.  JAB II had its own

5    separate bank accounts.  In general, these cash

6    transactions were at arm's length, so if revenues were

7    generated at JAB Energy II, the cash receipts would have

8    come into JAB Energy II, and JAB Energy II would maintain

9    those bank accounts and that cash, until such time as they

10   had to distribute moneys to the parent, again, in the early

11   days of -- of JAB's existence when profits were high.

12   BY MR. NALLEY:

13       Q.    Okay.  In your role as the CRO, have you gone

14   back and -- what is the factual basis that you provide that

15    explanation to me for?  Is that -- you obviously were not

16    there in the earlier days.  Have you spoken with people at

17    JAB II and/or Allison Marine Holdings to provide that

18    information or that explanation?

19         A.   Yes.  I -- we have access to the company's

20    general ledger.  I have interviewed Allison Marine

21    Holdings' CFO, and through our discussions determined, you

22    know, what the -- the nature of the intercompany balances

23    and how they were ultimately derived and where we are today

24    in order to -- to allow the -- the information that we

25    provided in the schedules that we're reviewing today.

1          Q.   Okay.  And the -- can you give me any further

2     explanation as to how, then, under that scenario JAB II has

3     come to be -- to have an accounts receivable from the

4     holding company of that $11.9 million?

5          A.   I think -- I think pretty much it relates to

6     taxes on the -- again, early on in the days of

7     profitability at JAB Energy II from 2011 through 2014

8     generating over $40 million in net income, those -- that

9     bill has to be paid.  The cash is sitting at JAB II,

10    needing to move up.  And it's really a matter of debits and

11    credits at that point, creating the accounts payable -- or

12    the intercompany payable and receivable between two

13    companies.  That's just the nature of a pass-through

14    entity.

15        Q.   Okay.  And have you reviewed the tax returns for

16    JAB II and/or Allison Marine Holdings for that time period?

17        A.   No.  The -- it's probably out of my scope.

18    Allison Marine Holdings would have filed a consolidated

19    (inaudible) and issued probably K-1s to their investors

20        Q.   Okay.  Do you know whether or not they -- they --

21    JAB II and/or Allison Marine issued W-9s between each

22    other.

23        A.   I do not know.

24        Q.   Have you -- in your work as a CRO, have you seen

25    any W-9s between those entities?

                    ☛

1        A.   No, have not -- I have not even investigated any

2    W-9s.

3        Q.   Okay.  Moving further down on Page 4, there is a

4    -- what appears to be a similar entry for -- for an

5    intercompany account receivable from Tarpon Systems

6    International for 66,000.  Can you tell me what that is?

7        A.   I don't have a lot of details on Tarpon.  It's --

8    I believe it's an older accounts receivable, intercompany.

Exhibit D

9      Tarpon was a related company to JAB II Energy where they

10     partnered on, I think, some overseas projects using some

11     intellectual property what they had purchased their own on

12     a type of platform.  And so I think it goes back pretty

13     far.

14         Q.  Okay.  If you would move on to -- let me ask you

15     one thing.  Before I get off of that $11.9 million, do you

16     have a schedule showing -- you said you reviewed hundreds

17     of transactions.  Do you have a schedule that shows that?

18         A.  Yes.

19         MS. JONES:  My -- I -- again, I know Mr. Nalley

20     is, again, trying to work through his individual agenda of

21     litigation.  Again, I'm going to be very patient, and I

22     think Mr. Altro has been very patient, but this obviously

23     has gone well beyond a 341.

24         I do appreciate that Mr. -- Mr. Nalley has now

25     scoped his questions to follow the schedule, and I expect

              ⬆

1      we'll do it to statement of financial affairs.  But I think

2      some initial questions as to each is fine.  To go into

3      (inaudible) deposition as to each answer, I think is unfair

4      for the Debtor's use of time, the U.S. Trustee's use of

5      time, and also is well beyond the scope of what a 341

Exhibit D

6      meeting is for.

7             MR. NALLEY:  I'm simply asking whether or not he

8      has a schedule showing where he got this $11.0 million sum

9      total that he's already indicated comes from his review of

10     hundreds of transactions.

11            MS. JONES:  I understand, Mr. Nalley, and I

12     believe he's going to answer that shortly.  I am just

13     starting to suggest that, again, like last time, we not

14     abuse the 341 process.

15     BY MR. NALLEY:

16        Q.   I believe that means you can answer the question,

17     Mr. Altro.

18        A.   Yes, we -- we have a recap.

19        Q.   I'm sorry?

20        A.   We have a recap.  We have a schedule, yes.

21        Q.   Okay.  Has that been submitted or attached to

22     your filings?

23        A.   No.

24        Q.   I'm going to ask that you -- you do so and do so

25     through your counsel so that she can, also, distribute that

                          ⬆

1      among us.

2             MS. JONES:  And -- and again, Mr. Fox, this is

Exhibit D

3    where now -- thank you, Mr. Nalley, for making my case.

4    This is now your individual litigation deposition.  One, I

5    will not respond to that request unless it is done properly

6    through the Federal Rules of Civil Procedure, not through a

7    341 meeting.

8          And Mr. Fox, I would at this point ask you again

9    to remind Mr. Nalley what a 341 meeting is.  I do not want

10   to go into the position of instructing the witness not to

11   answer, as I had to do last time after two and a half

12   hours.

13         And I would ask Mr. Nalley, again, that if he has

14   an issue on -- a particular targeted issue, to please

15   follow the Federal Rules of Civil Procedure, issue with

16   discovery he believes is appropriate, and we will deal with

17   it at the appropriate time.

18         MR. FOX:  Thank you, Ms. Jones.  This is Timothy

19   Fox for (inaudible) the United States Trustee.

20         Mr. Nalley, as -- as I indicated in my email that

21   shared the -- the instructions for unmuting, again, this

22   341 meeting of Creditors is designed to allow questioning

23   regarding the Debtor's financial condition.  Your -- your

24   request for additional documentation is something that can

25   be worked off the line and is not something that we need to

Exhibit D

```
 1    get into for purposes of this meeting of Creditors today.

 2              To the extent it requires a filing of a contested

 3    matter or motion practice or any of the like, you -- you

 4    can decide what makes the sense for you and your client.

 5    But as -- as Ms. Jones did -- did indicate, I don't think

 6    it's appropriate for this 341 meeting to be an exercise in

 7    discovery for potential or pending litigation in other

 8    forums.

 9              MR. NALLEY:  Okay.  I'll move on.

10    BY MR. NALLEY:

11        Q.   Mr. Altro, if you'd look at the next page, Page

12    5, there's an entry for a cost in excess of billings on the

13    Breton Sound project for $1,439,000.  Is -- where -- is

14    that the net amount you're anticipating collecting from

15    that job after paying Tom's Salvage?

16        A.   No.  That is not.

17        Q.   Okay, can you tell me what that is?

18        A.   That is simply -- that is -- that is simply the

19    cost incurred that was recorded on the company's books at

20    the time of the petition related to this project.  And

21    it's -- it's a function of project accounting.  And at the

22    time of the petition, this was the amount that was on

23    the -- recorded on the books.  We expect to collect

24    approximately 4.4/4.5 million on this project.  And pay
```

Exhibit D

25    Tom's Marine and Salvage our contractual obligation out of

1    those proceeds.

2        Q.    Okay.  Do you know what they -- what amount that

3    contract is or how much you're looking to net or you're

4    anticipating netting from that project?

5             MS. JONES:  Again, Mr. Fox, I'm going to object.

6    This is -- there is a line of questioning here that belongs

7    appropriately in -- in either discovery or deposition or

8    what have you.  I would ask that -- that we stop this line

9    of questioning.

10            I think counsel has received everything he wants

11   and now he is -- well, let me rephrase -- everything he

12   deserves to have a 341 meeting.  He is obviously extremely

13   well-versed in this Debtor, and if he has information,

14   there's an appropriate way to do, and it's not a 341.  I'm

15   very close, Mr. Fox, to being where I was last time that I

16   will instruct to no further -- to -- to not answer any

17   further questions.

18            MR. FOX:  All right.  Thank you, Ms. Jones.  Mr.

19   Nalley --

20            MR. NALLEY:  (Inaudible) I'm just trying -- I'm

21   simply trying to figure out what the -- the net asset will

Exhibit D

22    be to the Debtor from that job that they have listen on --

23    so.

24          MR. FOX:  And -- and Mr. Nalley, I appreciate

25    that, and that, you know, it -- it is within a form of

                    ✦

1    question for the financial condition of the Debtor.  I

2    don't believe that Mr. Altro is in a position to answer

3    that question specifically for purposes of this 341 meeting

4    of Creditors.

5          And so to the extent you need to follow up

6    offline on that item, I encourage the parties to do so.

7    But I would ask you to move on to your -- your next line of

8    questioning and to, again, remember that to the extent

9    there -- there may be pending or -- or future litigation on

10    certain issues, that more fulsome discovery will be

11    available through those specific proceedings.

12          MR. NALLEY:  Okay.

13    BY MR. NALLEY:

14      Q.   Mr. Altro, if you could move on to Page 12, then,

15    of Document 54.  And particularly, Items 3.3 and 3.4 of

16    Creditors who have unsecured claims by Allison Marine

17    Contractors and Allison Marine Holdings.  Are those -- can

18    you tell me, are those amounts that are owed by JAB II to

19    those related entities, are those similar to what you were

20    describing for me earlier back on the accounts receivable,

21    just in the opposite direction?

22         A.   Correct.

23         Q.   Okay.  Moving to Page 16, Item 3.28, the entry

24    for NOAA for 340,000 on it, does that have -- do you know

25    what that is related to?

1          A.   I did at one point.  It is NOAA -- we -- we --

2     this is an accrued obligation.  We tried to estimate

3     amounts that would ultimately be owed to NOAA.  I think

4     NOAA's a little bit behind in their invoicing, so we made

5     an estimate of the liability due to NOAA.

6          Q.   Okay.  Is that related to any -- is that general

7     obligation or related to any particular project?

8          A.   Yeah, I -- I'd have to get back to you on -- on

9     if it was specific projects associated with the NOAA --

10         Q.   Okay.

11         A.   -- payable.

12         Q.   If we could now turn to Document 55, Page 1, and

13    addressing the -- the income for the year 2020.  And we

14    touched upon this briefly in the first session.  The -- and

15    you started -- you were explaining to me the difference on

16    the revenues and the cash, and I wasn't clear on it.  And

17    then we ran out of time, so addressing the year 2020, can

18    you tell me what the -- the gross revenue -- where that

19    gross revenue number of 14,341,000 comes from?

20         A.   Yeah, it's going to come from the company's --

21    how the company project accounts under -- the accounting

22    rules changed a tad bit a few years ago.  We now have a new

23    accounting standard for public and private companies called

24    AFC606.

25              Under AFC606, what's allowed is a -- a

1    methodology called -- under project account called

2    percentage of completion.  And under percentage of

3    completion, you're -- you're allowed to record certain

4    revenues based on your -- your costs and your estimated

5    margins.  And so there's a bit of a disconnect between cash

6    flows, balance sheet, and what you ultimately record as

7    revenue.

8              So to the extent that you're incurring costs and

9    you do not revise your ultimate budgeted costs, you will

10    record a corresponding percentage of your costs incurred

11    over your total budgeted costs multiplied times the

12    contract revenue.  And that's what you'll record on a

Exhibit D

13    periodic basis, month-to-month, as you go through each of

14    your projects.

15          So what the company would have done in this year,

16    as it will through the year, it would have followed those

17    procedures, as I would guess your client, as well, because

18    I think they're very similar in nature.  And -- and the

19    resulting amount of revenue that was recording website the

20    14.3.  And then there would be some corresponding probably

21    balance sheet amounts that relate to either billings in

22    excess of costs or costs in excess of billings.

23    Q.   And do any of those -- does any of that

24    14,341,000 -- is it now been translated or worked its way

25    into your earlier schedule of accounts receivables?

                        ☗

1    A.   No, I mean we haven't -- I haven't looked back to

2    see if the 14.3 ultimately resulted in cash receipts.  Now,

3    for the purposes of the (inaudible) and schedules, we were

4    transmitting information from the company's general ledger

5    onto the standardized forms.

6    Q.   Okay.  And so do you know which projects those

7    revenues came from?  Is that -- I'm assuming you were

8    looking at individual corporate documents to come to that

9    total?

Exhibit D

10      A.   No, we --

11           MS. JONES:  This Laura Jones again.  I'm going to

12      -- I'm going to stop this line of questioning.  He more

13      than asked and answered.  Or you asked, and he more than

14      answered the questions at a -- for a 341 level and more

15      detailed than that, Mr. Nalley, as you know should be done

16      through the proper FRCP channels.  Mr. Fox, again, I'm

17      going to suggest that this 341 move along and that we not -

18      - and that we need to stop this level of deposition or

19      whatever Mr. Nalley is trying to do here.

20           MR. FOX:  Thank you, Ms. Jones.  This is Timothy

21      Fox for attorney of the Office of the United States

22      Trustee.

23           Mr. Nalley, can we move on to a different topic?

24      I -- I understand from Mr. Altro's answer that he provided

25      as much general detail as possible, and I don't think he

                            ⬆

1      can go line-by-line and tell you what's included in the

2      year 2020 gross revenue number.

3           MR. NALLEY:  That's fine.

4           MS. JONES:  And let me put on -- and let me put

5      on the record, Mr. Nalley -- excuse me.  I apologize.  Let

6      me just put on the record, this isn't a function of Mr.

Exhibit D

7    Altro not being able to -- being able to what have you,

8    answer questions.

9         We -- this -- my objection is clearly because

10   this is well beyond the scope of a 341 meeting.  We are now

11   in excess of three hours of a 341 meeting being spent on

12   one Creditor's questions that it's beyond reasonable.  And

13   again, we are getting close to my instructing the witness

14   to stop answering.

15        Mr. Nalley knows exactly what he's doing.  He

16   knows exactly why he's doing it.  But it is not fair or

17   appropriate under the 341 standards.  So, Mr. Nalley, I

18   would ask you to keep this at a 341 level.  If you are

19   unable to do that, I will instruct the witness to stop

20   answering very soon.

21   BY MR. NALLEY:

22        Q.   Mr. Altro, if you'd move to Page 11, please.

23        A.   Okay.

24        Q.   And, also, Page 12.  My question is going to be

25   directed to both of those pages.  I know it appears to

                    ⬆

                                               24

1    be -- I guess those are payroll payments made to insiders.

2    Am I reading that correctly?

3         A.   That is correct.

4      Q.    Okay.  I know that on December 18th, 2020, both

5      Mr. Woodrow (phonetic) and Mr. Bando (phonetic) received

6      amounts significantly more than the normal, weekly

7      payments.  And just given the timing, do you know whether

8      those were Christmas bonus payments?

9      A.    They were a combination of regular payroll and

10     bonus.

11     Q.    Okay.  All right.  If you would now move to Page

12     19 -- I'm sorry, Page 15 of 19.  And I think this -- I

13     think this may kind of end similarly what you were talking

14     about earlier, but since this appears to be -- am I -- am I

15     correct in understanding that Page 15 is a summary of the

16     compilation of Pages 16 to 19?

17     A.    Which 15?  Which -- what -- what -- what amount

18     on 15 are you looking at?

19     Q.    I was going to --

20     A.    (Inaudible).

21     Q.    I was going to go through -- I wasn't go through

22     each individual one.  I'm just trying to make sure I

23     understand what that is.  Is that the -- is that, like, a

24     cover spread of all the numbers included, then, on the

25     subsequent 16, 17, 18, and 19?

                          ⬆

Exhibit D

1    A.   No, the intercompany transfers, I believe, in the

2  last set of pages is 90 days prior.

3    Q.   Okay.  I'm misunderstanding it, then.

4    A.   (Inaudible) --

5    Q.   Let me ask you this.  If you look at Page 15, the

6  first entry due from AM Holdings, can you take me through

7  that line and just explain to me the numbers and how you

8  derived those?

9    A.   Again, these are on a gross basis.  You know, if

10  you need a more detailed explanation, I can probably put it

11  into writing on how we accumulate the due from AM Holdings

12  from the company's general ledger.  But again, these are

13  the sum of a number of transactions that have occurred

14  since the inception of the company, and they're really the

15  intercompany cash transactions.

16    Q.   Okay.  And --

17    A.   And if you look -- if -- if you look at the --

18  the detail, you'll see some of the entries, and you'll get

19  a flavor for the nature of what --

20    Q.   Okay.  (Inaudible) go through (inaudible) next

21  one.

22    A.   -- is flowing through those balance --

23    Q.   And I just wanted to make sure I understood

24  the -- the first sheet.  If I -- and just to make sure --

25  and I apologize; I'm not an accountant.  But if I look at

1    that first entry for due from AM Holdings, and we got a

2    credit amount -- a positive credit amount, a positive debit

3    amount, and then a negative net amount, can you tell me

4    what amount is owed under this listing to JAB II from AM

5    Holdings?

6         A.   Yeah, so these are -- these are the actual

7    journal entries themselves.  So the -- the first one would

8    be a funding to Holdings, so that would have been

9    receivable related to -- or would have been a receivable

10   recorded on JAB's books and a related payable on Holdings'

11   books.  So that is, ultimately, the -- the nature of this.

12            And then if you go down to -- oh, I don't know --

13   seven or eight entries down, there was a consolidation

14   entry that was made to kind of true things up.  But it's --

15   but the detail is probably where you're going to probably

16   get your best information in terms of understanding the

17   nature of the transactions that were recorded in the

18   intercompany.

19        Q.   Okay.

20        A.   So for instance, I think Mr. -- Mr. Fox had asked

21   about the management fee, for instance.  That was a noncash

22   transaction.  Ultimately, that was recorded through the

23    intercompany, but there were -- there were -- that would

24    have been a rarity.  Most of the transactions that were

25    recorded in the intercompany were cash transactions.

1      Q.    Okay.  Let's use that -- that first entry of Page

2    16, if you would, the -- the due from AM Holdings, 414,000,

3    funding to Holdings.  When you say that's a cash

4    transaction, explain to me that the cash went from JAB II

5    to -- to AM Holdings?

6          MS. JONES:  Again, Mr. Fox, I'm going to

7    interrupt here.  This has been asked and answered for

8    purposes of a 341 meeting.  Further detail is -- should be

9    done appropriately through the Federal Rules.  I'm going to

10    instruct the witness not to answer, or we will be here for

11    the full day.

12      A.    It's fine.  Can I -- can I just add -- I'd just

13    like to add -- just let me just add, we -- we are preparing

14    an analysis of the intercompany and how the intercompany

15    ultimately is recorded in the company's general ledger for

16    the Unsecured Creditors Committee.  So there is, you know,

17    a document that we're preparing to help illuminate and

18    better explain in layman's terms how these transactions

19    flow through the company general ledger.

Exhibit D

20      Q.    That would be wonderful for those of us who are

21   layman on it.  If I might, I just -- I think if you -- if

22   you -- if the witness can answer this one question just for

23   this first entry, it will help me to understand the rest of

24   them, and I won't need to ask questions about the rest of

25   them.  But going back to that first entry on October 31st,

1    2020, on Page 16 of 19, you said it was a cash transaction.

2    Is that cash -- is that cash going from JAB II to AM

3    Holdings in that amount on that day?  Is that what you --

4    is that what you were saying?

5        A.    Without -- without testing it in detail, in

6    general, that is -- that would be the foundation of the

7    entry, yes.  But I haven't done the forensics, let's pull,

8    you know, the bank statements; let's look at, you know,

9    that this -- did -- was cash actually transferred here.  It

10   could have been in an accrual.  In general, the

11   intercompany is cash, but it could have been booked as an

12   accrual, as well.

13       Q.    Okay.  Thank you very much.  That helps.  In

14   general on that page, Page 16, I note that there are

15   multiple -- multiple (inaudible) -- you mentioned a couple

16   of them -- funding, consolidation, and transfer.  Rather

Exhibit D

17    than going through individual entries, can you just tell me

18    or explain to me what the difference is on this -- this

19    page as to what those -- those different entries -- those

20    different verbs mean from -- from your standpoint?

21         MS. JONES:  No, Mr. Nalley, we are -- we are not

22    going to do that during this 341 meeting.  I'm instructing

23    the witness not to answer.  I know he's more than willing

24    to, but, Mr. Fox, this has, again, gone well beyond the

25    scope of a 341 meeting.  We are not going to entertain this

                          ⌃

1     anymore.

2          I'm going to instruct the witness not to answer

3     this -- this line of questioning.  If there are some other

4     general, top-line questions you have from the schedules and

5     SOFAs (phonetic), Mr. Nalley, I permit the witness to

6     answer.  Otherwise, you are a very experienced litigator,

7     and you know exactly what you're doing.  And you know how

8     this should appropriately be done.  And again, I'm going to

9     instruct the witness not to answer.

10    BY MR. NALLEY:

11         Q.   Mr. Altor, moving on to Page 17 and 18 of it, I

12    noted -- you mentioned earlier the management fee.  I noted

13    the management fee increased from -- from 17.2 to 18.1

Exhibit D

14    between January and February.  Is it -- is this still

15    maintained the same?

16        A.    There's no agreement.  There's no agreement, so I

17    don't really have a foundation or -- on the amounts that

18    were ultimately recorded.  Again, as I'll reiterate, my

19    understanding through my inquiry and analysis is no cash

20    transferred related to this.  This was a book entry.

21            MR. FOX:  And, Mr. Nalley, this is Tim Fox, trial

22    attorney of the Office of the United States Trustee.  I'll

23    note that I did ask that same question during our initial

24    section -- or initial session, so if you could move on to

25    other topics, please.

                        ☝

1            MR. NALLEY:  I will do so.  Give me just a

2    minute.  I'm looking at some notes, and I may be just about

3    through.

4            MR. FOX:  Thank you, Mr. Nalley.

5            MR. NALLEY:  Mr. Altro, I believe that's all the

6    questions I have for you this morning.  I appreciate your

7    time.

8            MR. FOX:  Thank -- thank you, Mr. Nalley.

9            MR. ALTRO:  (Inaudible) Nalley.

10            MR. FOX:  I understand that co-counsel to TOPS,

Exhibit D

11    Mr. Barcelona, who also represents another Creditor, has

12    indicated he'd like to ask some questions of the Debtor.

13    Mr. Barsalona, are you on the line, and have you followed

14    my instructions to unmute?

15          MR. BARSALONA:  Good morning, Mr. Fox, this is

16    Joe Barsalona from Morris, Nichols, Arsht & Tunnell.  I'm

17    here, actually, on behalf of Off Shore Technical Solutions,

18    LLC, and not -- I will not be asking questions on behalf of

19    TOPS today.  Can everyone hear me okay?

20          MR. FOX:  Yes, Mr. Barsalona.

21          MR. BARSALONA:  Thank you.

22                    EXAMINATION

23    BY MR. BARSALONA:

24       Q.   Good morning, Mr. Altro.  How are you doing

25    today?

                                                    31


1        A.   Good.  How are you doing?

2        Q.   Good.  So the last time we spoke on the record at

3    October 25th -- or on October 25th, we discussed briefly

4    the High Island project receivable, which was mentioned in

5    your first day declaration.  Do you recall that

6    conversation?

7        A.   I have had many conversations on High Island,

Exhibit D

8    but -- and I remember you and I speaking about it briefly.

9        Q.   No problem.  So on October 25th, you stated that

10   one "component" of the High Island project receivable was a

11   document entitled The High Island A370 Funding Term Sheet.

12   Do you remember that?

13       A.   I do.

14       Q.   Sir, do you have access to the High Island

15   Funding Term Sheet at this moment?

16       A.   I don't think I do.

17       Q.   Okay.  I am emailing it to you now, along with

18   your counsel, as well as Mr. Fox.  Please let me know when

19   you have it available.

20       MS. JONES:  Mr. Barsalona -- Mr. Barsalona, this

21   is Laura Jones.  I appreciate that you may have questions

22   particular to your client and to particular documents.  We

23   are not going to use this as a deposition, and we are not

24   going to refer to ancillary documents.

25       You are very versed in 341.  If it's in the

⬆

1    schedules or statements or are general questions that need

2    to be followed up from the U.S. Trustee, I am more than

3    fine to use it for that context.  But no, we're not going

4    to start as you just did and start quoting the witness from

Exhibit D

5    earlier contexts, nor are we going to treat this as a

6    deposition.

7            So we will not be looking at the document that

8    you just referred to.  If you have something that you want

9    to ask about from the schedules and statements at a general

10   level appropriate for a 341 meeting, we will -- or I will

11   instruct Mr. Altro to respond to that question.  Otherwise,

12   please do not go down the path that we just endured for

13   four hours.

14           MR. BARSALONA:  Understood, Ms. Jones.  Thank

15   you.

16   BY MR. BARSALONA:

17       Q.   Mr. Altro, so turning back to that October 25th

18   discussion with respect to that term sheet -- and I'm not

19   going to ask you to look at the document -- but you did

20   state that you submitted an underwater survey to BSEE

21   already, correct?

22           MS. JONES:  And I -- and I apologize, counsel.

23   Let me ask this question.  The October 25 conversation, can

24   you refresh my recollection what context that was in?

25           MR. BARSALONA:  That was on the record in front

                           ↑

1    of His Honor with respect to the DIP motion.

Exhibit D

2          MS. JONES:  Okay, so this was not any -- this is

3     not anything with respect to the earlier 341.  Mr.

4     Barsalona, we are not going to use this as a deposition or

5     a discovery follow-up or a hearing follow-up.  If there are

6     questions in connection with the initial 341 that did not

7     get completed, which was the purpose of today's hearing --

8     or today's 341, be more than glad to have Mr. Altro respond

9     to that.  We are not going to do a follow-up from a

10    hearing.

11         MR. BARSALONA:  Understood.

12    BY MR. BARSALONA:

13         Q.   Mr. Altro, is the Funding Term Sheet I referred

14    to listed on the schedules and statements?

15         A.   I mean, what's on the schedules and statements

16    for High Island is the 5.6 million.

17         Q.   Understood.  But is the agreement listed as a

18    schedule G --

19         A.   No.

20         Q.   -- executory contract?

21         MS. JONES:  Mr. Barsalona, you obviously know the

22    answer to that question.  If it's on the schedules and

23    statements, please referring to it.  If it's not, please

24    let him know that it's not.

25         Q.   So Mr. Altro, it is not listed there.

                          ⬆

1        MS. JONES:  Thank you, counsel.

2    Q.  Please tell me why it is not listed as an

3 executory contract.

4        MS. JONES:  Okay.  And that calls for a legal

5 conclusion, Mr. Barsalona, as you know.  I will not ask the

6 witness to answer that question.

7    Q.  Mr. Altro, isn't it true that JAB must perform

8 some actions under the Funding Term Sheet in order to be

9 paid?

10       MS. JONES:  Again, calls for a legal conclusion.

11 I have instructed the witness not to answer.

12    Q.  Is some performance required under the Funding

13 Term Sheet, to your understanding, sir?

14       MS. JONES:  Mr. Altro, let me ask it this -- let

15 me help counsel here a little bit.  He is referring to a

16 Term Sheet that you may or may not know is in existence.

17 If you have a factual understanding, if there is some

18 performance as you may understand that word that may be

19 remaining on that contract, please respond.  If you do not

20 understand the question or you don't know the answer,

21 please just let us know that.

22    A.  The -- the -- the only thing that I know is that

23 the performance on High Island was complete, and subsequent

24    performance, there was damage or -- or suspected damage

25    done by TOPS in sinking their tankers, which caused BSEE to

                                                             ⌃

1     ask that an underwater survey be completed, which that was

2     what we did at BSEE's request with an understanding that

3     BSEE wouldn't provide site clearance until that underwater

4     survey was complete.

5         Q.   You understand the Funding Term Sheet to be

6     subject to termination by JAB?

7              MS. JONES:  Again, calls for a legal conclusion.

8     Mr. Fox, Mr. Barsalona is falling into the path of Mr.

9     Nalley of trying to use a 341 for their individual

10    discovery or other litigation desires.  And Mr. Fox, I'm

11    going to instruct the witness not to answer this line of

12    question.  He continues to ask legal questions, and this is

13    obviously separate and apart litigation.

14             MR. FOX:  Thank you, Ms. Jones.  This is, again,

15    Tim Fox with the Office of the United States Trustee.  Mr.

16    Barsalona, can you move on to a different topic that's

17    related to the financial condition of the Debtor?

18             MR. BARSALONA:  Understood, and I'm going to move

19    on to questions related to the DIP budget, which go

20    directly to the financial condition of the Debtor, if you

Exhibit D

21    don't mind, sir.

22    BY MR. BARSALONA:

23        Q.   As you may recall, on the DIP budget that was

24    approved under the final DIP order, there are for payors

25    listed on that budget for the High Island project.  Do you

⬆

1    recall that?

2        A.   Yes.

3        Q.   Okay.  And did you assist in putting that budget

4    together, sir?

5        A.   Yes.

6        Q.   Okay.  So you are familiar with this content.

7        A.   Yes.

8        Q.   Okay.

9             MS. JONES:  Mr. Barsalona, if you have a question

10    with respect to the DIP budget, I would ask that you

11    answer -- ask it.  This is not a court hearing.  We do not

12    have a judge.  We do not need cross examination.  This is

13    my way of -- on the record, again, Ms. Jones -- saying if

14    there are questions that are appropriate for 341, I would

15    ask counsel to ask them.  If it's something he separately

16    wants to do with respect to further motions practice with

17    the Court or further other litigation with the Court, then

18    that would be the appropriate context to do that.

19          MR. BARSALONA:  Mr. Fox, this goes directly to

20    the Debtor's assets.  Over 65 percent of the Debtor's

21    entire estate are made up of the funding from this project.

22    And (inaudible) one of the payors --

23          MS. JONES:  (Inaudible) --

24          MR. BARSALONA:  -- under the budget are

25    applicable to the Debtor's assets and financial condition.

                              ⬆

1    I am just asking those questions, sir.

2          MR. FOX:  Mr. Barsalona, as I indicated, this is

3    Tim Fox, trial attorney with the Office of the United

4    States Trustee.  I'm not a judge and not here to make

5    rulings on objections to questions and the like.  But if

6    you've got questions that relate to the financial condition

7    of the Debtor, please ask those.  Be mindful that this is

8    not a substitute for other legal proceedings that may

9    require discovery in the form of contested matter or

10   adversary proceeding to be brought in the Chapter 11 case.

11         But if you've got questions that relate to the

12   financial condition, please ask those.  Ms. Jones' rights

13   are reserved, and she can assert as necessary on behalf of

14   the Debtor any objections or proceed in the manner that she

**Exhibit D**

15  outlines during her earlier statement.  But again, this is

16  a 341 meeting and not a substitute for other discovery.

17  So, Mr. Barsalona, please just ask your question and be

18  mindful of Ms. Jones' previous statement.  And, Ms. Jones,

19  should you need to make another statement, please do so.

20  BY MR. BARSALONA:

21      Q.   Mr. Altro, who is Argonaut Insurance Company?

22      A.   It is a company that, I believe, bonded the

23  project.

24      Q.   Do you understand Argonaut to be listed as payor

25  1 that DIP budget?

                    ⬆

1      A.   I don't -- I -- I can't recall off the top of my

2  head right now.

3      Q.   Okay.  It appears --

4      A.   Possibly, yeah.

5      Q.   -- from -- from that budget that the payment from

6  Argonaut is estimated to be received -- or anticipated to

7  be received the week of December 3rd.  Does that sound

8  correct to you?

9      A.   Yes.

10      Q.   Okay.  Did you have any discussions with Argonaut

11  related to this payment timing?

                                                 Exhibit D

12      A.   I had a brief discussion with Argonaut counsel as

13   to whether they have heard anything regarding site

14   clearance from BSEE.   And the answer that I received from

15   Argonaut was no.

16      Q.   On that conversation -- during that conversation,

17   did you speak about the estimated timing of December 3rd?

18      A.   I did not.

19      Q.   Okay.  Who is the Black Elk trustee, to your

20   knowledge?

21      A.   Mr. -- I believe -- Schmidt (phonetic).

22      Q.   Okay.  And to your knowledge, is that the entity

23   that is listed as payor 2 under the DIP budget?

24      A.   What is the amount?

25      Q.   $445,000.

1      A.   Yes.

2      Q.   Okay.  And that payment is, also, estimated or

3   anticipated to be paid the week of December 3rd.  Does that

4   sound right?

5      A.   Yes.

6      Q.   Have you spoken to Mr. Schmidt about payment

7   during the week of December 3rd?

8      A.   No.

Exhibit D

9      Q.    Have you any discussions -- have you had any

10   discussion with Mr. Schmidt at all?

11          MS. JONES:  I'm going to interrupt.  Mr.

12   Barsalona, you know exactly what you're doing.  Maybe I can

13   help you and rephrase the question.  Mr. Altro, I believe

14   what counsel is trying to get to -- and although he's very

15   tempted to start making this a contested DIP matter, which

16   I'm not going to permit, I think it may be helpful for all

17   Creditors on the phone to -- if you can recall the DIP

18   budget that is not in front of you and it is not a subject

19   for the 341 meeting, when you listed the four payors, did

20   you do so to the best of your facts and -- and knowledge at

21   the time of -- of assisting in preparation of that budget?

22          MR. ALTRO:  Yes, I consulted with company

23   management to understand how the sequencing might come in

24   from the various payors, which ones would pay sooner rather

25   than later.  And again, it was originally determined in

                            ↑

1    terms of the timing with an expectation that once the site

2    survey was complete that we would move expeditiously to

3    site clearance.

4           MS. JONES:  Mr. Barsalona, that is all I'm going

5    to let the witness answer -- answer with respect to that.

Exhibit D

6    If you have further questions with respect to the DIP, the

7    particularities of the DIP budget, who talked to whom, what

8    they talked about, and what have you, please use the

9    Federal Rules of Civil Procedures as adopted by our local

10   bankruptcy practice, and we will be more than glad to work

11   with you.

12           MR. BARSALONA:  Understood, understood.

13   BY MR. BARSALONA:

14       Q.   Okay.  So with that in mind, I will turn to the

15   schedules now, Docket Number 54, sir, which I believe you

16   did sign; is that correct?

17       A.   Yes.

18       Q.   Okay.  I'm going to turn to Page 7 of 20 on

19   Schedule AD.  The bottom of that page, Part 11, lists a

20   couple of causes of action in 74.  The first entry states,

21   Black Elk Energy Bankruptcy Case, you know, X and the

22   nature of claim is general unsecured claim number 203.  Can

23   you explain what that is?

24       A.   To the best of my knowledge, that is the Black

25   Elk bankruptcy and the amount that JAB Energy II was owed

                        ⬆

1    at the time of the Black Elk Inc. bankruptcy and the claim

2    that was filed -- the general unsecured claim that was

Exhibit D

3    filed with the Black Elk bankruptcy.

4         Q.   To your knowledge, does this claim have any

5    impact on the amount the Debtor is expected to receive from

6    the Black Elk trustee in this proceeding?

7         A.   No.

8         Q.   Do you know the expected timing of the resolution

9    of that claim?

10        A.   No.

11        Q.   Okay.  The second entry in Item Number 74 lists a

12   claim against Black Elk Liquidating Trust for $445,000.

13   What does this mean, sir?

14        A.   That is -- that is related to High Island.

15        Q.   Does this mean that the $445,000 payment under

16   the Funding Term Sheet is subject to a claims resolution

17   process?

18             MS. JONES:  That calls for a legal conclusion

19   that we're not going to get into today.  We've already

20   referenced that the Term Sheet is not before Mr. Altro, and

21   it is, also, not the subject of a 341 meeting.  Again, Mr.

22   Barsalona, you're starting to stray.  I would ask that you

23   ask within the 341 context.

24             MR. BARSALONA:  I'll get back on track, Ms.

25   Jones.  I apologize.

Exhibit D

```
 1          MS. JONES:  No, thank you very much.  I

 2   appreciate that.

 3   BY MR. BARSALONA:

 4       Q.   Mr. Altro, do you know what steps the Debtor does

 5   need to take to obtain this payment?

 6       A.   Which -- which one?

 7       Q.   The one we just spoke about, the claim against

 8   the Black Elk Liquidating Trust.  If you don't know, that's

 9   okay, but --

10       A.   The 45?

11       Q.   Yeah.

12       A.   And are -- are -- the steps -- the steps that we

13   are currently undertaking, which was to resolve our issues

14   with BSEE, the enforcement agency, in tracking the

15   clearance and ultimately, once site clearance comes

16   through, we will have a clear path to collect.

17       Q.   And do you expect those steps to be completed by

18   the week of December 3rd?

19       A.   No, at this point.

20       Q.   Okay.  Turning to the next page, Page 8 of 20,

21   Item 74 lists potential causes of action against one of my

22   other clients, against TOPS, for a breach of contract

23   damage (inaudible).  Do you see that?

24       A.   I do.
```

Exhibit D

Q.   Okay.  I'm not going to go into the specifics

                        ♠

1    here because I understand it's a legal conclusion, but to

2    your knowledge, has that claim been lodged yet?

3              MS. JONES:  I'm sorry, I don't know what that --

4    I don't know what that question means.  I apologize, and

5    maybe Mr. Altro does.  But again, for the record, this is

6    Laura Jones.  I'm not sure what the intention of that

7    question is.  When you say a claim has been lodged, I'm not

8    sure what that means.

9              MR. BARSALONA:  Sure.  So this is the Schedules

10   AB, which are assets of the Debtor here, and you're

11   alleging that this a potential causes of action against

12   TOPS.  I am just curious of whether or not this potential

13   asset has been pursued.

14             MS. JONES:  And Mr. Altro, I will let you answer

15   that as a very top-level -- obviously, counsel represents

16   TOPS, so he is more than aware, so I will let you answer

17   your factual understanding.  I think he's saying of whether

18   you have filed a claim in some court somewhere.

19       A.   I will -- I will simply restate what I said

20   earlier.  We are aware that TOPS caused the damage to -- or

21   the -- or the suspected damage to the reef at High Island,

Exhibit D

22  which precipitated the need to engage SeaTrepid to go out

23  and conduct a second site survey as requested by BSEE.  So

24  we -- again, we do not know to the extent that there is

25  additional costs that may be lodged against JAB Energy II

1  for any damages, we are still awaiting that information

2  from -- from BSEE, which may come in concert with site

3  clearance or not at all.  So we don't really have a lot of

4  information.  We do know that we've incurred costs, both

5  internally and with third parties to deal with the damage

6  caused by TOPS.

7  BY MR. BARSALONA:

8      Q.   Understood.  Thank you.  Page 10 of 20 on

9  Schedule D.  Let me know when you're there.

10     A.   Schedule D, okay.

11     Q.   Items 2.1 and 2.2 lists the Debtors to Senior

12  Secured Creditors; is that correct?

13     A.   Yes.

14     Q.   And in Column B, the amount of the value of

15  collateral that supports this claim for both Creditors is

16  listed at a $5.6 million figure.  Do you see that?

17     A.   Yes.

18     Q.   Why did the Debtor not include the value expected

19    from the Breton Sound project in this numbers?

20          MS. JONES:  I'm going to instruct the witness not

21    to answer.  Calls -- calls for attorney/client privilege

22    and in his thought process, and we're not going through

23    that.

24          MR. BARSALONA:  All right.  I will move on, then.

25    BY MR. BARSALONA:

1      Q.   On Page 15 of 20, Schedule EF, and 3.19 is my

2    client, Offshore Technical Compliance is actually Offshore

3    Technical Supply.  And the basis for this claim is listed

4    as litigation.  Do you see that?

5      A.   Yes.

6      Q.   What do you mean by that?

7      A.   This was the term based on advice from counsel,

8    so that is how we liquidate -- that's how we annotated it

9    here in litigation.

10      Q.   But to your knowledge, other subcontractors

11    listed in here, including TOPS, were listed as trade debt;

12    is that correct?

13          MS. JONES:  He just answered the question, that

14    he did so on the advice of counsel, so you'll need to move

15    on, Mr. Barsalona.

16          MR. BARSALONA:  Understood.

17   BY MR. BARSALONA:

18          Q.   On that same page, Item 3.25, lists a general

19   unsecured claim of Texas Parks and Wildlife Department

20   Artificial Reef Program.  Do you see that, at the bottom of

21   the page?

22          A.   Yes.

23          Q.   Now, I understand from that discussion that we

24   had back on October 25th that BSEE was taking the position

25   that this claim needed to be paid in order for compliance

                          ⬆

1    to be met.  Do you recall that?

2          A.   Yes.

3          MS. JONES:  Again -- again, Mr. Barsalona, you're

4    starting to refer to court hearings and what have you.  Mr.

5    Altro, do you recall that type of statement at an October

6    25 hearing?

7          MR. ALTRO:  I do, and I want to -- I want to

8    clarify that we have not had direct communication with BSEE

9    regarding whether that they require this to be paid.  So I

10   want to make sure that this was clear.  This is our own

11   internal assumption.

12   BY MR. BARSALONA:

Exhibit D

13      Q.   Okay.  And is -- so -- so that the record is
14 clear, it is JAB's position that this -- the claim does not
15 need to be paid in order for site clearance to be received?
16           MS. JONES:  I totally instruct the witness not to
17 answer.  Mr. Barsalona, you know that calls for a legal
18 conclusion.  We are not going to answer this line of
19 questions.  Please move on.
20           MR. BARSALONA:  Understood.
21 BY MR. BARSALONA:
22      Q.   Page 17 of 20, Schedule G.  If you could turn to
23 Item 2.2, sir.
24      A.   Yes.
25      Q.   Okay.  And this is the acknowledgement of

                        ⬆

1 assignment of master services agreement and work order
2 dated June 19th, 2017, with the Black Elk trustee; is that
3 correct?
4      A.   Correct.
5      Q.   Has the Debtor moved to assume this contract?
6           MS. JONES:  Again, I will put on the record,
7 we're getting very far afield from the 341 context.  Mr.
8 Barsalona, please check the docket.
9      Q.   Do you anticipate filing a motion to assume this

Exhibit D

10    contract, sir?

11         MS. JONES:  I instruct the witness not to answer

12    that question.  That calls for attorney/client privilege.

13    Q.   (Inaudible) listed on Schedule G as an executory

14    contract, have you estimated the cure costs under this

15    contract, sir?

16         MS. JONES:  Mr. Altor, if you know what the term

17    cure means, I have no problem with you answering that

18    question, if you know -- if you know or have a thought

19    factually on that.  My guess is this is all maybe tied up

20    in your attorney/client privilege, so I would advise you to

21    be careful.

22    A.   I understand what cure means, and no.

23    Q.   You have not done such a calculation?

24    A.   No.

25    Q.   Okay.  And do you understand that this JAB

             ⬆

1    contract is a component of the Funding Term Sheet we

2    mentioned earlier today?

3         MS. JONES:  Again, counsel, you're getting so far

4    afield from a 341.  Even I'm starting to get lost.  So I'm

5    going to instruct the witness not to answer.

6    Q.   Okay.  Last question on this contract, sir.

```
 7    Considering that it is an executory contract, do you agree

 8    that JAB II retains the ability as of today to assume,

 9    reject, or terminate this contract?

10         MS. JONES:  Now, counsel, again, wow.  Loaded

11    question, assuming a legal answer in that as -- as you

12    know, it's executory -- or whatever your comment was -- so,

13    one, has a legal conclusion built it.  Secondly, more

14    important, calls for a legal conclusion.  This will not be

15    answered.

16         MR. BARSALONA:  Understood.

17    BY MR. BARSALONA:

18    Q.   I just have some final, miscellaneous questions,

19    if you don't mind, sir.  And then we'll be done here.  Just

20    take five -- five minutes.  I don't believe Mr. Fox asked

21    this question the first day of the 341, but please correct

22    me if I'm wrong, but to your knowledge, what is the

23    reorganizational purpose of this case?

24         MS. JONES:  Again, Mr. Altro, I would ask you to

25    answer that in what you understand in layman's terms of
```

                                                    49

```
 1    where you see the case going.  To the extent your answer

 2    would involve attorney/client privilege, I would ask you to

 3    be very careful.
```

Exhibit D

4    A.   The -- yeah, the -- the primary purpose, as it

5    was in the assignment, was to collect on the -- complete

6    the outstanding projects and collect on the receivables and

7    then assess claims and judicate claims in the ordinary

8    course and -- and ultimately make distribution.

9    Q.   Okay.  And in repeated filings by you the first

10   day declaration and other statements made by the Debtors,

11   you have mentioned that a liquidating plan is contemplated.

12   Is that still the plan as of today?

13       MS. JONES:  To the extent that does not call for

14   you to give attorney/client privilege, Mr. Altro, I am fine

15   with your answering at a -- at your understanding of -- of

16   what your intent -- spectral intent is at this point.

17       A.   We have made no conclusions as to the next steps

18   so still to be determined.

19       Q.   Okay.  Considering all the issues related to the

20   Debtor that are wrapped up the Southern District of Texas,

21   has the Debtor thought about a motion to change venue here?

22       MS. JONES:  Obviously talks about -- calls for a

23   legal conclusion and calls for attorney/client privilege.

24   Mr. Barsalona, I think we're done with this line of

25   questioning.

                              ⬆

Exhibit D

1          MR. BARSALONA:  You got me there, Ms. Jones.

    2    Okay, I am done.  Thank you, sir.

    3          MR. FOX:  Mr. Barsalona --

    4          MS. JONES:  (Inaudible) Barsalona.

    5          MR. FOX:  -- to confirm, that -- that concludes

    6    your examination?

    7          MR. BARSALONA:  That is correct, Mr. Fox.  Thank

    8    you for your time.

    9          MR. FOX:  No problem.  At this point in time, if

   10    there are any other Creditors present on this telephonic

   11    341 meeting of Creditors that would like to examine the

   12    Debtor, please go ahead and send me an email at

   13    timothy.fox@usdoj.gov so that I can send you unmuting

   14    instructions.  We'll leave the call open for two minutes,

   15    till 11:45 Eastern Time for those emails to make their way

   16    to me.  Again, that's timothy.fox@usdoj.gov.

   17          If I don't hear from anybody by 11:45 Eastern

   18    Time, we'll go ahead and conclude this 341 meeting of

   19    Creditors in the JAB Energy Solutions II LLC bankruptcy

   20    case.  I will put a more formal statement on the record to

   21    conclude the record after my time period for -- for further

   22    interest in examining the Debtor has elapsed.  I just want

   23    to, again, thank all the parties for working through these

   24    issues, which can be difficult when we're in person but

   25    even more challenging when -- when operating in a

Exhibit D

 1   telephonic context, so thank you, all, for -- for making

 2   this go as smoothly as possible.

 3         Okay, I have 11:45 Eastern Time, and I've not

 4   received any further communications from parties indicating

 5   they wish to examine the Debtor.  So at this time, I'm

 6   going to conclude this telephonic 341 meeting of Creditors.

 7   Again, this is the JAB II Energy LLC bankruptcy case, case

 8   number 21-11226, Judge Goldblatt presiding.  Today's date

 9   is November the 12th, 2021, and the time is, again,

10   approximately 11:45 a.m. Eastern Time.  The petition date

11   for this Debtor was September the 7th, 2021, and the

12   initial 341 commenced on October 15th, 2021.  Thank you all

13   for your participation today.  Have a great weekend and

14   please stay safe and healthy.  We are officially off the

15   record now.

16         (End of Audio Recording.)

17

18

19

20

21

22

Exhibit D

23

24

25

1                    CERTIFICATE

2

        I, Wendy Sawyer, do hereby certify that I was
3
authorized to and transcribed the foregoing recorded
4
proceedings and that the transcript is a true record, to
5
the best of my ability.
6

7

8
        DATED this 16th day of November, 2021.
9

10

11
        _____
12
WENDY SAWYER, CDLT
13

14

15

16

17

18

19

Exhibit D

20

21

22

23

24

25