# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

TURNKEY OFFSHORE PROJECT &ast;    **Civ. No. 2:21-cv-672 DPC**
SERVICES, LLC &ast;
                  &ast;    **MAG. JUDGE: Donna Phillips Currault**
VERSUS &ast;
                  &ast;
BRENT BOUDREAUX, &ast;
JAB ENERGY SOLUTIONS, LLC, &ast;
JAB ENERGY SOLUTIONS II, LLC, & &ast;
ALLISON MARINE HOLDINGS, LLC &ast;
**************************************

## DEFENDANT JAB ENERGY SOLUTIONS II, LLC'S MOTION
## TO MODIFY PRELIMINARY INJUNCTION

Defendant JAB Energy Solutions II, LLC ("JAB II") hereby moves (the "Motion") this Court to modify the preliminary injunction (the "Injunction") entered by this Court on August 10, 2021 pursuant to that certain *Order and Reasons* [Docket Do. 36] (the "PI Order") in light of a recent ruling in JAB II's bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). In support of this Motion, JAB II relies upon the Memorandum of Law being filed simultaneously herewith. For the reasons set forth in the Memorandum of Law, JAB II respectfully requests that the Injunction and PI Order be modified to allow JAB II to deposit the funds collected under the Settlement Order in escrow pending a further determination by the Bankruptcy Court regarding the proper ownership of the funds.

Dated: March 17, 2022           **MILES THOMAS LAW, LLC**

_____
Miles Channing Thomas, Esq. T.A. #31342
8011 Sycamore Street
New Orleans, LA 70118
(864-380-3838)
mthomas@milesthomaslaw.com

-and-


PACHULSKI STANG ZIEHL & JONES LLP
Laura Davis Jones (DE Bar No. 2436)
Maxim B. Litvak (CA Bar No. 215852)
Colin R. Robinson (DE Bar No. 5524)
919 North Market Street, 17th Floor
Wilmington, DE 19899-8705
Telephone:    302-652-4100
Facsimile:    302-652-4400
Email:        ljones@pszjlaw.com
            mlitvak@pszjlaw.com
            crobinson@pszjlaw.com


*Counsel to JAB Energy Solutions II, LLC*

DOCS_DE:238528.6 42899/001

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **TURNKEY OFFSHORE PROJECT** | * | **Civ. No. 2:21-cv-672 DPC** |
| **SERVICES, LLC** | * | |
| | * | **MAG. JUDGE: Donna Phillips Currault** |
| **VERSUS** | * | |
| | * | |
| **BRENT BOUDREAUX,** | * | |
| **JAB ENERGY SOLUTIONS, LLC,** | * | |
| **JAB ENERGY SOLUTIONS II, LLC, &** | * | |
| **ALLISON MARINE HOLDINGS, LLC** | * | |

**************************************

### MEMORANDUM OF LAW IN SUPPORT OF
### DEFENDANT JAB ENERGY SOLUTIONS II, LLC'S MOTION
### TO MODIFY PRELIMINARY INJUNCTION

Defendant JAB Energy Solutions II, LLC ("JAB II") submits this Memorandum of Law in support of its motion (the "Motion") to modify the preliminary injunction (the "Injunction") entered by this Court on August 10, 2021 pursuant to that certain *Order and Reasons* [Docket Do. 36] (the "PI Order") in light of a recent ruling in JAB II's bankruptcy case (the "Bankruptcy Case") pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").  In support of the Motion, JAB II respectfully states as follows:

### Facts Relevant to this Motion

The PI Order was entered prior to trial and a ruling on the substance of the complaint filed in this action by Plaintiff Turnkey Offshore Project Services, LLC ("TOPS").  The PI Order enjoins JAB II from "dissipating or transferring any such [Black Elk] funds received incident to the High Island Funding Term Sheet, as allocated for the HI A370 work in connection with the Black Elk bankruptcy proceedings … ."  PI Order at p. 33.  Subsequent to entry of the PI Order, JAB II commenced the Bankruptcy Case.  JAB II's assets are now subject to the jurisdiction of

the Bankruptcy Court.  JAB II's and TOPS' asserted rights to the funds related to the High Island Funding Term Sheet will be determined in an adversary proceeding before the Bankruptcy Court.

TOPS has appeared through its counsel numerous times in the Bankruptcy Court and has timely filed a proof of claim against JAB II (the "TOPS Claim") in the Bankruptcy Case, thereby submitting itself to the jurisdiction of the Bankruptcy Court.  The TOPS Claim asserts the same claims against JAB II as are alleged in this case.

JAB II recently sought and obtained Bankruptcy Court approval of a settlement agreement relating to the High Island Funding Term Sheet.   Although TOPS opposed JAB II's request for approval of the settlement and asserts a claim to the proceeds of the settlement, the Bankruptcy Court determined the settlement was reasonable and in the best interests of the JAB II bankruptcy estate and its creditors and entered an order approving the settlement on March 3, 2022 (the "Settlement Order").  A true and correct copy of the Settlement Order is attached hereto as **Exhibit A**.

The Settlement Order authorizes JAB II to enter into and effectuate the settlement. However, the Settlement Order expressly prohibits JAB II from making any payments or distributions of the amounts to be received in escrow under the settlement agreement pending further order of the Bankruptcy Court (other than paying a $700,000 Reefing Fee to the Texas Parks & Wildlife Department ("TPW") that is a required condition of the settlement).  As a result of the entry of the Settlement Order, JAB II will be able to collect *all* amounts that it is owed in connection with the High Island Funding Term Sheet, a net amount of approximately $4.9 million after payment of the Reefing Fee.  The proceeds will be held in escrow pending the Bankruptcy Court's determination of the competing interests asserted in those funds.[1]

---

[1] In addition to TOPS, JAB II's secured lenders assert that they have senior secured, first priority liens in the funds.

The Settlement Order also refers to this Court's Injunction by expressly stating that "…
nothing herein purports to alter or shall otherwise affect the Preliminary Objection."  At the
hearing during which the Bankruptcy Court announced its ruling on (i) JAB II's request for
approval of the settlement (which TOPS contested), and (ii) TOPS' motion to modify the
automatic stay to allow it to proceed with this litigation (which JAB II opposed), the Bankruptcy
Court suggested, after noting that he had spoken with this Court, that JAB II file a motion with
this Court to modify the Injunction to "cleanup" what are essentially dual injunctions.  A true
and correct copy of the transcript of the Bankruptcy Court hearing on February 25, 2022
("Bankr. Hrg. Tr.") is attached hereto as **Exhibit B**.  The Bankruptcy Court said that the parties
"might consider filing a motion in front of Judge Currault … asking that she modify her
injunction to comport with this order …" Bankr. Hrg. Tr. at p. 11.  By this Motion, JAB II is
following the Bankruptcy Court's suggestion.

JAB II's intent in filing this Motion is to ensure it can collect the funds relating to the
High Island Funding Term Sheet in an efficient and cost-effective way and place those funds
(after payment of a necessary $700,00 Reefing Fee to TPW) into escrow pending further order of
the Bankruptcy Court.  JAB II requested that TOPS agree to stipulate to the relief requested in
this Motion but did not receive a response.

## Relief Requested

JAB II respectfully requests that the Injunction and PI Order be modified to allow JAB II
to deposit the funds collected under the Settlement Order in escrow pending a further
determination by the Bankruptcy Court regarding the proper ownership of the funds.  This Court
has broad discretion to enforce its preliminary injunction, including the power to modify the
injunction to achieve its purpose. See *Brown v. Plata*, 563 U.S. 493, 542–43 (2011) ("The power

of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible.") (quoting *New York State Assn. for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983)); *Fid. Nat'l Title Ins. Co. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 752 (7th Cir.2005) ("[A] judge's power includes not only what he is expressly empowered to do but also such ancillary powers as are necessary and proper to his exercise of the explicitly conferred ones.")  Notably, the standard for modifying a preliminary injunction is particularly flexible: the Court may "revise a preliminary remedy" so long as it is "persuaded that [the] change ha[s] benefits for the parties and the public interest." *Commodity Futures Trading Comm'n v. Battoo*, 790 F.3d 748, 750 (7th Cir. 2015).

In essence, the Settlement Order serves the same purpose as the Injunction and PI Order and provides TOPS with the same level of protection.  JAB II is enjoined by the Settlement Order from taking essentially the same action that the Injunction prohibits.  Moreover, the Settlement Order actually enhances TOPS' position given that JAB II will collect the funds in which TOPS asserts a superior interest without the need for potentially costly and lengthy litigation against the third party payors.

As the Bankruptcy Court stated, "the [money] will sit there pending resolution of the merits of the ownership dispute."  The Bankruptcy Court also ruled (again following conversation with this Court) that it is appropriate to have the question of ownership of the funds "… resolved in an appropriate proceeding here [i.e., the Bankruptcy Court]." Bankr. Hrg. Tr. at p. 14.  In contrast to this proceeding, all of the parties that have asserted an ownership or security interest in the funds are before the Bankruptcy Court.[2]  JAB II intends to proceed promptly with an appropriate proceeding in the Bankruptcy Court to determine the ultimate issue of the

---

[2] JAB II's secured lenders are not parties to this proceeding but have appeared and submitted to the jurisdiction of the Bankruptcy Court.

ownership of the funds.  Simply put, the Injunction is no longer necessary to protect TOPS'
interests.

      For all the reasons stated above, JAB II respectfully requests that this Court modify the PI
Order and the Injunction so that JAB II may hold the funds collected relating to the High Island
Funding Term Sheet pending the Bankruptcy Court's determination of who owns those funds.


Dated: March 17, 2022                     **MILES THOMAS LAW, LLC**

                                          _____

                     Miles Channing Thomas, Esq. T.A. #31342
                     8011 Sycamore Street
                     New Orleans, LA 70118
                     (864-380-3838)
                     mthomas@milesthomaslaw.com

                     -and-


                     PACHULSKI STANG ZIEHL & JONES LLP
                     Laura Davis Jones (DE Bar No. 2436)
                     Maxim B. Litvak (CA Bar No. 215852)
                     Colin R. Robinson (DE Bar No. 5524)
                     919 North Market Street, 17th Floor
                     Wilmington, DE 19899-8705
                     Telephone:    302-652-4100
                     Facsimile:    302-652-4400
                     Email:         ljones@pszjlaw.com
                                        mlitvak@pszjlaw.com
                                      crobinson@pszjlaw.com


                     *Counsel to JAB Energy Solutions II, LLC*

DOCS_DE:238691.2 42899/001

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>JAB Energy Solutions, II, LLC,[1]<br><br>    Debtor. | Chapter 11<br><br>Case No. 21-11226 (CTG)<br><br>Jointly Administered<br><br>**Related Docket No. 149** |

## ORDER APPROVING DEBTOR'S SETTLEMENT AGREEMENT REGARDING DECOMMISSIONING OF HIGH ISLAND A370 PROJECT

Upon consideration of the *Debtor's Motion for Approval of Settlement Agreement Regarding Decommissioning of High Island A370 Project* [Docket No. 149] (the "Motion");[2] and the Court finding that: (a) the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; (b) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (c) notice of the Motion and the hearing was sufficient and proper; and (d) the legal and factual bases set forth in the Motion establish just cause for the relief granted herein;

**IT IS HEREBY ORDERED THAT:**

1.    The Motion is **GRANTED** as set forth herein.

2.    Pursuant to Bankruptcy Rule 9019, the Settlement Agreement is approved in its entirety.[3]

---

[1] The last four digits of the Debtor's U.S. tax identification number are 3625. The Debtor's mailing address is 19221 I-45 South, Suite 324, Shenandoah, TX 77385.

[2] A capitalized term used but not defined herein shall have the meaning ascribed to it in the Motion.

[3] A true and correct copy of the Settlement Agreement is attached hereto as **Exhibit 1**.

Exhibit A

3.      The Debtor is hereby authorized to take any and all actions necessary to effectuate the terms of this Order and the Settlement Agreement, including the payment of the Reefing Fee by the Escrow Agent (the "TPW Payment"); *provided*, *however*, that the Escrow Agent shall not make any payments or distributions other than the TPW Payment subject to further order of the Court.

4.      For the avoidance of doubt and notwithstanding any other provision of this Order, nothing herein shall prejudice or affect the right of the Debtor, Turnkey Offshore Project Services, LLC, Offshore Technical Solutions, LLC, the DIP Lender, or any other party in interest regarding any dispute related to or in connection with the Net Remaining Funds.

5.      For the avoidance of doubt and notwithstanding any other provision of this Order, nothing herein purports to alter or shall otherwise affect the Preliminary Injunction.

6.      This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order and the Settlement Agreement.

Dated: March 3, 2022

_____
CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

2

Exhibit A

# **Exhibit 1**

**Settlement Agreement**

DOCS_DE:237886.4

## HIGH ISLAND A370 COMPREHENSIVE
## DECOMMISSIONING RESOLUTION TERM SHEET

| | |
|---|---|
| Parties: | • Richard Schmidt (the "<u>Trustee</u>"), in his capacity as Trustee of the Black Elk Liquidation Trust and the Black Elk Litigation Trust (collectively, the "<u>Trust</u>")<br>• W&T Offshore, Inc. ("<u>W&T</u>")<br>• Burlington Resources Offshore, Inc. ("<u>Burlington</u>")<br>• Talos Energy Inc. ("<u>Talos</u>")<br>• JAB Energy Solutions II LLC ("<u>JAB</u>")<br>• Argonaut Insurance Company ("<u>Argo</u>")<br>• United States Bureau of Safety and Environmental Enforcement ("<u>BSEE</u>")<br>• Texas Parks and Wildlife Department ("<u>TPW</u>") |
| Reference OCS Lease: | High Island A370, OCS G-02434 (the "<u>Lease</u>") |
| Additional Defined Terms: | "<u>Approval Order</u>" means an order, in form and substance consistent with all of the terms of this Term Sheet Agreement and otherwise reasonably acceptable to each Party hereto, entered by the Delaware Bankruptcy Court in the JAB Chapter 11 approving JAB's entry into and consummation this Term Sheet Agreement.<br><br>"<u>Argo Bond</u>" means Argonaut Bond No. SUR0019139.<br><br>"<u>Black Elk Chapter 11</u>" means the chapter 11 case for Black Elk Energy Offshore Operations, LLC, Case No. 15-34287 in the Houston Bankruptcy Court.<br><br>"<u>Bond Cancellation Notice</u>" means a writing in form and substance reasonably acceptable to Argo to be delivered by W&T that confirms the full release and cancellation of the Argo Bond and that is substantially similar to the form of bond release letter attached hereto as Exhibit F.<br><br>"<u>BSEE Firm Commitment</u>" means a writing by BSEE that states a firm and irrevocable commitment of BSEE to, on or within three business days following TPW's delivery of the TPW Confirmation to the Escrow Agent, (i) approve the pending Site Clearance report submitted by JAB, and (ii) make all necessary online entries to the BSEE/BOEM database (being the data at https://www.data.boem.gov/leasing/leaseliability/default.aspx) for the Lease to reflect the satisfaction of all |

Exhibit A

decommissioning activities for the lease and a cost estimate reduction consistent with the completion of 100% of the well abandonment (T&A) scope of work as provided in the JAB MSA.

"BSEE Performance" means the completion of BSEE's performance of its actions required under the BSEE Firm Commitment.

"Closing Date" means the day that is the first business day following the expiration of fifteen (15) days after entry of the Approval Order on the court docket in the JAB Chapter 11, provided that no stay of the Approval Order is in effect on such date.

"Delaware Bankruptcy Court" means the United States Bankruptcy Court for the District of Delaware.

"Escrow Release Date" means the first business day upon which all Party payment, delivery and other obligations as provided herein (and as set forth at Escrow steps 1-5, below) have been satisfied.

"Escrow Agent" means _____.

"Escrow Agreement" means a customary escrow agreement to be entered into by and among the Parties hereto and the Escrow Agent that shall set forth the various receipts, deliveries and releases stated herein so as to accomplish the purpose of this Term Sheet Agreement, which Escrow Agreement shall be substantially in the form as attached hereto as Exhibit "D".

"Execution Date" means the last Party signature date as reflected on the signature pages to this Term Sheet Agreement.

"Funding Agreement" means that certain High Island A370 Funding Term Sheet between Trustee, W&T, Burlington, Talos, DOI, JAB, and Argo, a true and correct copy of which is attached hereto as Exhibit "A".

"Houston Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division.

2

Exhibit A

| | |
|---|---|
| | "JAB Chapter 11" means the chapter 11 case currently pending for JAB, Case No. 21-11226 in the Delaware Bankruptcy Court.<br><br>"JAB MSA" means that certain Master Services Agreement for Decommissioning Services, dated as of April 26, 2013, between JAB and Black Elk Energy LLC, and subsequently subject to, and amended by, that certain Acknowledgement of Assignment of Master Services Agreement between the Trustee and JAB, a true and correct copy of which is attached hereto as Exhibit "B".<br><br>"Net Remaining Funds" means the net cash balance remaining of the funding obligation delivery amounts as set forth in this Term Sheet Agreement held by the Escrow Agent, after payment of the Reefing Fee and the reasonable fee of the Escrow Agent as set forth in the Escrow Agreement.<br><br>"Reefing Agreement" means that certain Material Donation Agreement for Partially Removed Petroleum Structures, between Black Elk and TPW and relating to the Lease site.<br><br>"Reefing Fee" means the remaining net payment due to TPW under the Reefing Agreement in the amount of $878,243.00 or such lesser amount as agreed to as between TPW and JAB.<br><br>"Site Clearance" means and refers to the activities set forth at 30 C.F.R. §§ 250.1740-250.1743 and resulting verification that a site is clear of obstructions.<br><br>"Term Sheet Agreement" means this High Island A370 Comprehensive Decommissioning Resolution Term Sheet.<br><br>"TPW Confirmation" means a written confirmation by TPW directed to BSEE in a form reasonably acceptable to BSEE, Trustee, and JAB that the Reefing Fee has been received and that neither Black Elk nor the Trustee have any further performance or obligations owing under the Reefing Agreement. |
| Purpose of this Term Sheet Agreement: | The Parties have entered into this Term Sheet Agreement for this purpose of finalizing the decommissioning and other activities required as to the Lease site in accordance with the JAB MSA, including the platform work and site clearance, |

Exhibit A

| | |
|---|---|
| | so as to (1) obtain Site Clearance, (2) fully resolve and satisfy with TPW the Reefing Fee obligation, (3) cause the release/cancellation of the Argo Bond, (4) remit Net Remaining Funds to JAB pursuant to the JAB MSA, and (5) confirm the satisfaction and performance of all claims and obligations of each Party and the release of each Party from any further obligations relating to or associated with the Lease, including obligations under the Funding Agreement, the Reefing Agreement, the Argo Bond, and the JAB MSA.<br><br>This Term Sheet Agreement is intended to facilitate the consummation or the Funding Agreement and, unless expressly stated herein, shall not be interpreted to effect an amendment of the Funding Agreement; <u>provided that</u>, upon consummation of this Term Sheet Agreement, this Term Sheet Agreement shall, only to the extent inconsistent with the Funding Agreement, supersede the Funding Agreement and the Parties' obligations thereunder. |
| Parties' Obligations: | <u>Trustee</u>:<br>• The Trustee shall (1) coordinate the gathering of each Party's signature to this Term Sheet Agreement and deliver email notice to each Party (or its counsel) upon the occurrence of the Execution Date, and (2) deliver email notice to each Party (or its counsel) of the occurrence of the Closing Date.<br>• The Trustee shall deliver $445,000 to the Escrow Agent in full and final satisfaction of the Trust's funding obligation under the Funding Agreement within 7 days following satisfaction of BSEE Performance.<br><br><u>W&T</u>:<br>• W&T shall deliver $2,771,666 to the Escrow Agent in full and final satisfaction of its funding obligation under the Funding Agreement within 7 days following satisfaction of BSEE Performance.<br>• W&T shall deliver the Bond Cancellation Notice to the Escrow Agent within 7 days of the Closing Date.<br><br><u>Burlington</u>:<br>• Burlington has fully performed its obligations under the Funding Agreement and has no further obligations. |

4846-5199-1292

| | |
|---|---|
| | Talos:<br>• Talos shall deliver $1,196,874 to the Escrow Agent in full and final satisfaction of its funding obligation under the Funding Agreement within 7 days following satisfaction of BSEE Performance.<br><br>JAB:<br>• JAB shall seek and obtain entry of the Approval Order from the Delaware Bankruptcy Court in the JAB Chapter 11 by filing an appropriate approval motion as soon as reasonably practicable following the Execution Date.<br>• Subject to entry of the Approval Order by the Delaware Bankruptcy Court, JAB shall:<br>  o Immediately provide any consents or acknowledgements reasonably required or requested by any other Party to this Term Sheet Agreement to consummate the purpose of this Term Sheet Agreement.<br>  o Coordinate with the Trustee and the Escrow Agent in declaring the occurrence of the Escrow Release Date.<br><br>Argo:<br>• Argo shall deliver $1,262,872 to the Escrow Agent in the manner set forth in the Funding Agreement in full and final satisfaction of its funding obligation under the Funding Agreement within 7 days of the Closing Date.<br><br>TPW:<br>• TPW shall deliver to the Escrow Agent the TPW Confirmation within 7 days of the Closing Date.<br><br>BSEE:<br>• BSEE shall deliver to the Escrow Agent the BSEE Firm Commitment within 7 days of the Closing Date.<br>• Within three business days of receipt of the Escrow Agent's notice delivered per Escrow Step (5) below, BSEE shall accomplish BSEE Performance and deliver to the Escrow Agent notice of completion of BSEE Performance. |
| Escrow Steps: | The Escrow Agent shall be provided irrevocable |

5

Exhibit A

| | |
|---|---|
| | instructions in the Escrow Agreement to perform the following duties, deliveries and/or releases in the order set forth below: [1]

(1) Receive and accept into escrow, and simultaneously provide notice of each such receipt and acceptance to each Party, (a) the TPW Confirmation, (b) the BSEE Firm Commitment, (c) the Bond Cancellation Notice, and (d) $1,262,872 from Argo in accordance with Argo's funding commitment.
(2) Upon receipt of the items set forth in (1)(a) – (d) above, the Escrow Agent shall:
(a) Deliver the Reefing Fee to TPW in accordance with the payment instructions set forth in Exhibit "C-1", hereto.
(b) Release and deliver the TPW Confirmation to BSEE per the delivery instructions set forth in Exhibit "C-2", hereto.
(c) Release and deliver the BSEE Firm Commitment to all Parties per the delivery instructions set forth in Exhibit "C-2", hereto.
(d) Release and deliver the Bond Cancellation Notice to Argo per the delivery instructions set forth in Exhibit "C-2", hereto.
(e) Deliver notice to all Parties confirming the consummation of steps (a) through (d), above.
Steps 2(a)-2(d) shall occur simultaneously; provided however, that it is expressly understood that the reefing fee to TPW cannot be paid without the Bond Cancellation Notice being provided to Argo.
(3) Receive and accept into escrow, and simultaneously provide notice of each such receipt and acceptance to each Party, the funds delivered to escrow as provided in this Term Sheet Agreement by the Trustee, Talos, and W&T.
(4) Immediately upon the receipt of all payment obligations in step 3, declare the Escrow Release Date, and deliver the Net Remaining Funds to JAB in accordance with the payment instructions set forth in Exhibit "C-3", hereto.
(5) Deliver notice to all Parties (a) confirming the consummation of steps (1) through (4) above, and (b) terminating the escrow relationship. |
| Discharges and Releases: | The Approval Order shall specifically provide for the following discharges and releases upon the occurrence of the Escrow Release Date and the consummation of this Term Sheet Agreement: (1) the release and discharge as |

---

[1] Except for the receipts and acceptances in step 3, which may occur at any time, each prior step shall be fully completed before the next step action occurs.

4846-5199-1292

| | |
|---|---|
| | among the Trustee and JAB of any further obligations or liabilities owing under the JAB MSA, provided, however, such releases and discharges shall expressly exclude Claim No. 203 filed by JAB in the Black Elk Chapter 11, as may be amended, supplemented, or modified (or same opposed by the Trustee), (2) the release and discharge as among the Trustee and TPW of any further obligations or liabilities owing under the Reefing Agreement, (3) the termination and cancellation of the Argo Bond, and (4) the release and discharge of any claims against any party to the Funding Agreement arising from or in any way connected with the Lease, including the funding obligations set forth in the Funding Agreement.<br><br>BSEE further confirms that consummation of this Term Sheet Agreement shall result in the reduction of any "Regulatory Agency Claim" in the Black Elk Chapter 11 to $0. |
| Conditions Precedent to Closing Date: | The Closing Date shall not occur until the day that is the first business day following the expiration of fifteen (15) days following entry of the Approval Order by the Delaware Bankruptcy Court, and further provided that no stay of the Approval Order exists on such day. |
| Conditions Precedent to, and Occurrence of, Escrow Release Date: | The Escrow Release Date shall not occur until each of the following has occurred or such status exists: (1) the Closing Date has occurred; (2) each Party has unconditionally and irrevocably satisfied its pre-Escrow Release Date obligations as set forth in this Term Sheet Agreement; and (3) there exists no stay of the Approval Order issued by a court of competent jurisdiction. |
| Termination of this Term Sheet Agreement: | In the event that the Escrow Release Date does not occur within thirty (30) days following the Closing Date, or such other date as agreed to by the Parties, then any Party may terminate this Term Sheet Agreement by delivering email notice to the Escrow Agent and to each other Party (or counsel) declaring the termination of the Term Sheet Agreement for failure of timely-occurrence of the Escrow Release Date.<br><br>Upon termination of the Escrow Agreement by one of the Parties, the Escrow Agreement shall obligate the Escrow Agent to return to each Party its deliverable under this Term Sheet Agreement (provided that a Party had previously met |

7

Exhibit A

| | such deliverable obligation) as soon as practicable following receipt of a termination notice delivered by a Party. |
|---|---|
| Further Assurances: | Each Party agrees to perform such other actions that are reasonably necessary to achieve the consummation, and fulfill the purpose, of this Term Sheet Agreement. |
| Reservation of Rights: | In the event that this Term Sheet Agreement is terminated as provided above, then each Party reserves all rights regarding any matter addressed herein. |

[REMAINDER OF PAGE BLANK – SIGNATURES BEGIN ON NEXT PAGE]

8

Exhibit A

**AGREED**:

BY: **Black Elk Trustee**

By: _____
Name: _____
Title: _____

Dated: _____


BY: **W&T Offshore, Inc.**

By: _____
Name: _____
Title: _____

Dated: _____


BY: **Burlington Resources Offshore, Inc.**

By: _____
Name: _____
Title: _____

Dated: _____


BY: **Talos Energy, Inc.**

By: _____
Name: _____
Title: _____

Dated: _____


BY: **Argonaut Insurance Company**

By: _____
Name: _____
Title: _____

Dated: _____


BY: **United States Bureau of Safety and Environmental Enforcement**

By: _____
Name: _____
Title: _____

Dated: _____


9

Exhibit A

BY: **JAB Energy Solutions II LLC**       BY: **Texas Parks and Wildlife Department**


By: _____       By: _____
Name: _____       Name: _____
Title: _____       Title: _____

Dated: _____       Dated: _____

10

Exhibit A

# EXHIBIT A

High Island A370 Funding Term Sheet

High Island A370 Funding Term Sheet

| Parties: | Richard Schmidt, Black Elk trustee ("Trustee") W&T Offshore, Inc. ("W&T") Burlington Resources Offshore, Inc. ("Burlington") Talos Energy Inc. ("Talos") The United States Department of Interior ("DOI") JAB Energy Solutions II LLC ("JAB") Argonaut Insurance Company ("Argo") |
|---|---|
| OCS Lease: | High Island A370, OCS G-02434 (the "Lease") |
| Current JAB Funding Requirements: | Under the *Acknowledgment of Assignment of Master Services Agreement and Work Order* dated June 9, 2017, between Trustee and JAB (the "JAB Contract"), JAB has previously completed the well work associated with the Lease and platform work and site clearance remains. For the completed well work JAB has received payments totaling $3,221,295 and is owed $628,705. The Parties acknowledge the following funding structure under the JAB Contract: Well Work <br> • $243,705 attributable to Talos' working interest share <br> • $385,000 attributable to Fairways Offshore Exploration, Inc.'s ("Fairways") working interest share <br> Platform Work: $5,716,412 <br> • By Argonaut from HI A370 bond reduction and additional funds: $1,262,872 <br> • By W&T through non-operated escrow: $2,771,666 |

Exhibit A

| | |
|---|---|
| | • By Talos: $1,096,874<br>• By Fairways: $585,000 |
| Adjusted JAB Contract Funding Sources: | Subject to the Payment Conditions set forth below, funding requirements for the JAB Contract and the sources of payment to JAB shall be adjusted under this Term Sheet as follows:<br><br>Well Work<br>• W&T shall pay JAB $243,705 upon execution of this Term Sheet, for the Well Work previously performed by JAB, through its non-operated escrow.<br>• Upon receipt of a demand from Black Elk Trustee[1], Burlington shall use reasonable commercial efforts to call the Fairways private supplemental bond and make demand upon the surety to release the bond proceeds in the amount of $385,000 to JAB for Fairways' share of the completed Well Work. If the bond proceeds are received by Burlington, Burlington shall remit the proceeds to JAB within the later of: (a) ten business days of receipt of the bond proceeds or (b) three business days from confirmation of mobilization by JAB on location at the HI A370 platform for platform removal.<br><br>Platform Work<br>• W&T agrees to pay JAB $2,771,666 for the Platform Work through its non-operated escrow.<br>• Talos agrees to pay JAB $1,096,874 for the Platform Work.<br>• Argo remains committed to its funding amounts subject to surety bond release and cancellation.  Upon |

---

[1] The Trustee shall issue the demand to Burlington immediately upon execution of this Term Sheet, if such demand has not already been served on Burlington prior to execution of this Term Sheet.

|  | receipt of documentation acceptable to Argo confirming the full release and cancellation of Bond No. SUR0019139, **Argo will release collateral in the total amount of** $1,262,872 to JAB for the Platform Work, which payment shall satisfy the payment obligations of the Black Elk Liquidation Trust. |
|  | • The Fairways' share of the Platform Work in the total amount of $585,000 shall be funded from the following sources and paid to JAB upon completion of the Platform Work and site clearance:<br>○ $100,000 from Talos;<br>○ $40,000 discount from JAB;<br>○ $445,000 by the Black Elk Trustee from the Black Elk Litigation Trust, subject to release of the DOI Reserve Claim. |
| Additional Terms and Payment Conditions | **Timeliness:**<br>In accordance with article 2.6 of the JAB Contract, JAB shall use commercially reasonable efforts to commence the Platform Work within 14 days from the execution of this Term Sheet (the "Commencement Date") and shall diligently prosecute its obligations under the terms of the JAB Contract and use commercially reasonable efforts to complete the Platform Work and obtain site clearance by October 31, 2020.<br><br>**Time is of the Essence:**<br>• Time is of the Essence and JAB's willingness and ability to timely perform the Platform Work is a material inducement to the entry of this Term Sheet.<br>• To the extent that the JAB Contract is terminated after the Commencement Date, then JAB's right to payment for |

83650259v.1

| | |
|---|---|
| | any Platform Work under the terms of the JAB Contract (if any such right exists) will be expressly subordinate to the Parties' costs to complete the Platform Work in substitution of article 20.2 of the JAB Contract. |
| Further Assurances: | The Trustee, W&T, Burlington, and Talos agree that, to the extent that the JAB Contract is terminated, any amounts agreed to under this Term Sheet for the Platform Work, but not already paid, shall be made available to satisfy the expense of completing the Platform Work.  Trustee, W&T, Burlington, and Talos each must consent to any termination of the JAB Contract and selection of any successor contractor and successor contract to complete the Platform Work should the JAB Contract be terminated. |
| DOI Resolution: | In consideration for the funding commitments set out in this Term Sheet and subject to Bankruptcy Court approval, DOI agrees as follows:<br>• DOI confirms, as already agreed to and entered by the court in the Order Confirming the Third Amended Plan of Liquidation, that upon confirmation of site clearance of the Lease, **DOI's Reserve Claim in the Black Elk bankruptcy case in the amount of** $1,195,000 shall be reduced to $0.<br>• BSEE agrees to stay any and all enforcement actions related to the Lease for 90 days, unless there is a threat to health, safety, or the environment.<br>• BSEE further agrees to a 90 day stay of any pending appeals related to the Lease before the Interior Board of Land Appeals. |
| Settlement and Mutual Release: | All claims and causes of action, including any claims for indemnification, contribution, or |

| | |
|---|---|
| | subrogation, between and among Talos, Burlington, and W&T related to the JAB Contract, the HI A370 Operating Agreement, and this Term Sheet shall be released upon confirmation of site clearance by BSEE and payment by each party of the obligations set forth in this Term Sheet.<br><br>Each party's payment obligations shall be limited to the payment terms set out in this term sheet.  Upon payment in full of each payment obligation set forth in this Term Sheet, JAB shall release each paying party from any and all claims and causes of action related to the JAB Contract and work associated with HI A370.<br><br>Nothing herein shall constitute a release of the obligations arising under this Term Sheet. |
| Reservation of Rights: | The Parties reserve all rights, claims, and causes of action, including claims related to indemnity and subrogation, and claims under the Joint Operating Agreement for High Island A370 against Fairways.<br><br>Except for the stays agreed to herein by DOI, nothing herein shall preclude, bar or enjoin the United States of America, or its agencies, from taking any and all actions to: (i) enforce its police or regulatory powers; (ii) regulate and administer its federal programs; or (iii) assert any setoff or recoupment rights they may have. |

**AGREED:**

BY: **Black Elk Trustee**                           BY: **W&T Offshore, Inc.**

_____                            _____

BY: Richard Schmidt (Name)                          BY: _____ (Name)

Trustee (Title)                                     _____ (Title)

Dated: 9/14/2020                                    Dated: _____


BY: **Burlington Resources Offshore, Inc.**         BY: **Talos Energy, Inc.**

_____                            _____

BY: _____ (Name)                          BY: Robert D. Abendschein

_____ (Title)                             EVP and Head of Operations

Dated: _____                              Dated: _____


BY: **Argonaut Insurance Company**

_____

BY: _____ (Name)

_____ (Title)

Dated: _____

**AGREED:**

BY: **Black Elk Trustee**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

BY: **W&T Offshore, Inc.**

_~~William Williford~~_

BY:_William Williford_ (Name)

_Executive VP_ (Title)

Dated: _9/15/2020_

BY: **Burlington Resources Offshore, Inc.**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

BY: **Talos Energy, Inc.**

_____

BY: Robert D. Abendschein

EVP and Head of Operations

Dated: _____

BY: **Argonaut Insurance Company**

_____

BY:_____(Name)

_____ (Title)

Dated: _____

**<u>AGREED:</u>**

BY: **Black Elk Trustee**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

BY: **W&T Offshore, Inc.**

_____

BY:_____(Name)

_____ (Title)

Dated: _____

BY: **Burlington Resources Offshore, Inc.**



BY: _____Drew J. Brown_____(Name)

_____Attorney-in-fact_____ (Title)

Dated: _____Sep-14-2020_____

BY: **Talos Energy, Inc.**

_____

BY: <u>Robert D. Abendschein</u>

<u>EVP and Head of Operations</u>

Dated: _____

BY: **Argonaut Insurance Company**

_____

BY:_____(Name)

_____ (Title)

Dated: _____

83641155v.1

<span style="color:orange">Exhibit A</span>

**AGREED:**

BY: **Black Elk Trustee**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

BY: **W&T Offshore, Inc.**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

BY: **Burlington Resources Offshore, Inc.**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

BY: **Talos Energy, Inc.**

*R. D. abndschn*

BY: Robert D. Abendschein

EVP and Head of Operations

Dated: _9/14/2020_____

BY: **Argonaut Insurance Company**

_____

BY: _____(Name)

_____ (Title)

Dated: _____

**AGREED:**

BY: **Black Elk Trustee**

BY: _____ (Name)

_____ (Title)

Dated: _____

BY: **W&T Offshore, Inc.**

BY:_____ (Name)

_____ (Title)

Dated: _____

BY: **Burlington Resources Offshore, Inc.**

BY: _____ (Name)

_____ (Title)

Dated: _____

BY: **Talos Energy, Inc.**

BY: Robert D. Abendschein

EVP and Head of Operations

Dated: _____

BY: **Argonaut Insurance Company**

BY: _____ (Name)

_____ (Title)

Dated: Sept 15, 2020

83641155v.1

BY: **Department of Interior**

LARS HERBST   Digitally signed by LARS HERBST
              Date: 2020.09.15 15:55:37 -05'00'

BY: __Lars Herbst_____ (Name)

BSEE_Regional Director (Title)

Dated: _09/15/2020_____

BY: **JAB Energy Solutions II, LLC**

_____

BY: _____ (Name)

_____ _____ _____ (Title)

Dated: _____

83641155v.1

Exhibit A

BY: **Department of Interior**

_____

BY:_____(Name)

_____ (Title)

Dated: _____

BY: **JAB Energy Solutions II, LLC**

Brent Boudreau

BY: Brent Boudreaux (Name)

President (Title)

Dated: 9-14-20

83641155v.1

<span style="color:orange">**Exhibit A**</span>

# __EXHIBIT B__

JAB Master Services Agreement

4846-5199-1292

Final Execution Version

## ACKNOWLEDGEMENT OF ASSIGNMENT OF MASTER SERVICES AGREEMENT

This Acknowledgment of Assignment of Master Services Agreement by and between Richard Schmidt ("Trustee"), Trustee of the Black Elk Liquidating Trust (the "Trust"), and JAB Energy Solutions II, LLC ("JAB") is entered into this June 9, 2017.

## RECITALS

Whereas, Black Elk Energy LLC and JAB previously entered into that Master Services Agreement for Decommissioning Services dated April 26, 2013 (the "JAB MSA"). A true and correct copy of the JAB MSA is attached hereto as Exhibit "A".

Whereas, on August 11, 2015 (the "Petition Date"), four petitioning creditors filed an involuntary bankruptcy petition [Doc. No. 1] seeking an order for relief against Black Elk Energy Offshore Operations, LLC ("Black Elk" or the "Debtor") under chapter 7, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Court").

Whereas, on September 24, 2015, JAB filed its Joint Emergency Motion of JAB Energy Solutions II, LLC, and Merit Energy Company, LLC, to Compel Assumption (Or Shorten Time To Assume) Certain Plugging and Abandonment Agreements in Order to Comply With Regulations, Bridging Agreement, and 2015 Plugging and Abandonment Plan; For DIP Financing Protections; For Adequate Protection and/or Administrative Claim (the "JAB-Merit Motion") [Doc. No. 196].

Whereas, on September 29, 2015, the Court entered its order (the "JAB-Merit Order") approving the continuation of the P&A work pursuant to the JAB P&A Agreement (which is defined to include the JAB MSA) [Doc. No. 230].

Whereas, on July 13, 2016, the Court entered its Order Confirming Third Amended Plan of Liquidation of Black Elk Energy Offshore Operations, LLC Under Chapter 11 of the Bankruptcy Code (the "Confirmation Order") and approved the assignment of the P&A work to the Trusts pursuant to the terms of the JAB-Merit Order [Doc. No. 1204]. (See p. 20, para. 5) (giving the Trust and Trustee authority to effectuate the Plan) (See also p. 40, para. 47) (preserving the terms of the JAB-Merit Order).

Whereas, the Trustee wishes to engage JAB to perform certain additional P&A work subject to the assigned JAB MSA.

**Now, therefore:**

The Trustee and JAB each acknowledge that, pursuant to the Confirmation Order, all of the Debtor's rights and interests under the JAB MSA have been assigned to the Trust.

Further, the Trustee and JAB each acknowledge that any subsequent Work Order between the Trust and JAB shall be governed be the terms of the JAB MSA, including, but not limited to, the Work Order attached hereto as Exhibit "B".

-1-

Final Execution Version

| Black Elk Liquidating Trust | JAB Energy Solutions II, LLC |
|---|---|
| By: _____<br>Richard Schmidt, Trustee | By: _Brent Boudreaux_<br>Name: _Brent Boudreaux_<br>Title: _President_ |

-2-

Final Execution Version

**<u>Exhibit "A" to</u>**

**<u>Acknowledgement of Assignment of Master Services Agreement</u>**

**[Attach copy of Master Services Agreement for Decommissioning Services dated April 26, 2013]**

-3-

**\*\*NOTICE: THIS AGREEMENT CONTAINS PROVISIONS RELATING TO INDEMNITY,
RELEASE OF LIABILITY AND ALLOCATION OF RISK**

## MASTER SERVICES AGREEMENT FOR DECOMISSIONING SERVICES

This Master Services Agreement ("Agreement"), is entered into as of the 26th day of April, 2013 ("Effective Date"), by and between **JAB ENERGY SOLUTIONS II, LLC,** having its principal place of business at 262 North Sam Houston Parkway, Houston TX 77060 ("Contractor"), and **BLACK ELK ENERGY LLC,** having its principal place of business at 11451 Katy Freeway, Suite 500, Houston, Texas 77079 ("Company"). Contractor and Company may be referred to herein individually as a "Party" and collectively as the "Parties."

### RECITALS

WHEREAS, Company is the owner and operator of various hydrocarbon producing properties which during, and especially at the end of the producing properties' economic life, require the performance of Decommissioning Activities (as such term is defined below);

WHEREAS, Company wishes to engage Contractor as an independent contractor to perform certain work and/or furnish services and/or goods (all of the foregoing referred to herein as "Services") with respect to the performance of Decommissioning Activities, as requested by Company and agreed to by Contractor;

WHEREAS, Services to be provided by Contractor will be more fully described in a written Work Order (defined below) to be entered into between Company and Contractor and executed by duly authorized representatives of the Parties, on an as-needed basis; and

WHEREAS, Company and Contractor desire to set forth the general terms and conditions under which all such Services shall be performed and to which all such Work Orders will be subject.

### AGREEMENT

NOW, THEREFORE, in consideration of the covenants, contract, terms, provisions and conditions hereinafter set forth, the Parties do hereby mutually agree, each with the other:

## ARTICLE 1 - DEFINITIONS

1.1   An "Affiliate" of any person or entity is defined as any other person or entity directly or indirectly controlling, controlled by or under common control with such person or entity. The term "control" as used in this definition means the direct or indirect right to elect or cause to be elected a majority of the directors of a corporation, or corresponding managing body for other forms of business organizations, through the ownership of shares or other equity interests which carry full voting or operational control rights, as applicable, under all circumstances.

Exhibit A

1.2   "Claim" or "Claims" includes, but is not limited to, all claims, demands, lawsuits, actions, cross-actions, liabilities, obligations, costs, including expert party witnesses and other costs of investigating, evaluating and defending a lawsuit, expenses, remedies, and causes of action of any nature, whether in contract or in tort, or based upon fraud or misrepresentation, breach of duty or common law, or arising under or by virtue of any judicial decision, statute, or regulation, for past, present, future, known, and unknown personal injuries, property or economic damage, and all other losses and damages of any kind, including but not limited to the following:  all damages, (but expressly excluding any exemplary and/or punitive damages), all penalties of any kind, loss of consortium, damage to familial relations, ensuing death, loss of inheritance, loss of companionship, loss of society and affection, loss of enjoyment of life, and prejudgment and post judgment interests, costs, and attorneys' fees.  This definition further includes, but is not limited to, all elements of damages (excluding exemplary and/or punitive damages), all remedies, all claims, demands, and causes of action that are now recognized by law or that may be created or recognized in the future by any manner, including without limitation by statute, regulation, or judicial decision, and/or survivors, and/or third parties.

1.3   "Company Group" means Company, its joint venturers, lessors, its and their Affiliates, partners, members, and contractors of all tiers (excluding members of the Contractor Group), and its and their respective officers, directors, managers, employees, agents, representatives, insurers, and invitees (and specifically excluding employees on the payroll of any member of Contractor Group, despite that such persons may be considered a "borrowed servant" or "statutory employee" of a member of Company Group).

1.4   "Company's Premises" is defined in the broadest sense and includes, to the extent owned by or leased, permitted or licensed to any member of the Company Group, or is otherwise utilized in Company Group's business, all of the following: all land, property, buildings, structures, and installations where Services are performed and all cars, trucks, vessels, planes, helicopters and all other means of conveyance to and from such locations.

1.5   "Contractor Group" means Contractor, its Affiliates, members, and contractors and subcontractors of all tiers, and its and their respective officers, directors, managers, employees, agents, representatives, insurers, and invitees.

1.6   "Damage to Property" means damage to or loss or destruction of any owned, leased, rented, hired, or chartered property.

1.7   "Decommissioning Activities" means the plugging and abandonment of wells, the removal of platforms and/or facilities, the abandonment of pipelines, the site clearance and surface restorations activities, as well as related and ancillary activities which are required of the owner and/or operator of hydrocarbon producing properties, including, but not limited to the obligations generally described as "end of lease" obligations.

1.8   "Designated Decommissioning Activities" means those Decommissioning Activities which Contractor has agreed to perform in accordance with the terms of an applicable Work Order.

Exhibit A

1.9     "Environmental Liabilities" means all Claims arising out of or resulting from pollution or contamination (including, but not limited to property damage) of the earth, or lakes, streams and/or other bodies of water, or natural resources in the ground.

1.10    "Group" means Company Group or Contractor Group, as applicable given surrounding context

1.11    "Personal Injury" means any injury related to, resulting in or from, or in any way connected with or alleging bodily injury, personal injury, death, illness or disease, and including all damages, losses and costs related to or flowing therefrom, including, without limitation, loss of services, loss of wages, maintenance, cure or transportation, loss of consortium or society, and mental anguish and emotional distress.

1.12    "Rate Sheet" means rates, sums, and/or prices that Company and Contractor have previously agreed to for Services that Contractor can/may furnish.

1.13    "Subcontractor" shall mean any subcontractor of any tier engaged by Contractor to perform part of the Services under a Work Order.

1.14    "Third Party" means any person or entity not included in the definition of either Company Group or Contractor Group.

1.15    "Work Order" refers to any written agreement executed by duly authorized representatives of the Parties describing the Services to be performed by Contractor that is expressly made subject to the terms and conditions of this Agreement (standard form is attached hereto as Exhibit A).

1.16    "Work Order Effective Date" shall mean the date on which a Work Order shall be deemed effective, as defined in such Work Order.

1.17    Additionally, terms used throughout this Agreement which are in all capital letters and underlined shall have the definitions given to such terms as set forth above or elsewhere in this Agreement.

## ARTICLE 2 - CREATION OF THE ENFORCEABLE WORK ORDER

2.1     Work Order. Company or any Affiliate of Black Elk Energy, LLC (a "Black Elk Affiliated Company") which desires to engage the Services of Contractor shall do so pursuant to a Work Order (substantially in the form attached hereto as Exhibit A) executed by duly authorized representatives of the Parties, which each Party hereby agrees will be made subject to the terms and conditions of this Agreement (unless duly authorized representatives of the Parties otherwise agree in writing), and the Parties agree that Contractor will not provide Services to Company or any Black Elk Affiliated Company except under such a Work Order. Each Work Order creates a separate and distinct contract as between Contractor and the Company or Black Elk Affiliated Company executing such Work Order only, and no Third Party shall be entitled to the rights or burdened by the obligations created thereby, except as expressly set forth herein or in such Work Order.

Exhibit A

2.2   <u>Scope of Services</u>. In the event Company requests that Contractor perform certain Designated Decommissioning Activities / Services, and Contractor agrees to perform such Services, the Parties shall execute a Work Order describing in detail, as applicable:

    (a)    the Services to be performed by Contractor;

    (b)    the time and place for performance;

    (c)    the equipment, supplies, specifications and/or other technical data, if any, to be provided by Company;

    (d)    the rates to be paid to Contractor;

    (e)    the work product required;

    (f)    anticipated schedule; and

    (g)    any other information relevant to the full and complete understanding between the Parties as to the agreed-upon scope of Services (all of the foregoing, the "<u>Scope of Services</u>"). This Scope of Services may be revised as the Parties progress in the project to which such Scope of Services applies, provided that such revisions are agreed to in writing in the form of an amended Work Order that is executed by duly authorized representatives of both Parties.

2.3   <u>Service Obligation</u>. Contractor shall perform the Services set forth in the Work Order, in accordance with the specifications, schedule and any other requirements as more fully described in the applicable Work Order,. Contractor agrees, except as otherwise expressly provided in this Agreement or such Work Order, to:

    (a)    furnish the labor, supervision, materials, tools, equipment (including, without limitation, all necessary and appropriate safety equipment and fire-retardant clothing), utilities and services as more fully described in the applicable Work Order;

    (b)    secure those licenses and permits required for Contractor to perform the Services and provide any bond required by law in connection therewith; and

    (c)    report and pay those taxes and other charges applicable or incident to the Services furnished by Contractor under the Work Order (including, without limitation, payroll, income, sales, use, excise and occupational taxes and workers' compensation contributions and insurance premiums), but *provided, however*, that Contractor agrees that Company shall not be charged, and Contractor shall not remit to the applicable authority, any tax for which Company provides Contractor with a valid exemption documentation related to such tax.

2.4   <u>Not used</u>

Exhibit A

2.5   <u>Conflicts</u>. In the event of a conflict between any provision in this Agreement, on the one hand, and any Work Order, invoice, statement or any other type of document, on the other hand, the provisions of this Agreement shall govern. Any special condition(s) applicable to a particular Work Order which purports to revise any provision of this Agreement shall be conspicuously and expressly stated in such Work Order and, for ease of reference, numbered consecutively with the affected provision(s) in this Agreement.

2.6   <u>Diligent Performance</u>. Contractor shall use commercially reasonable efforts to commence work on or about the date for commencement of Services as set forth in the applicable Work Order, and shall thereafter diligently prosecute its obligations under such Work Order, using commercially reasonable efforts to complete its performance of the Services according to the schedule and within the time agreed upon in the Work Order. If required by Company, Contractor shall, at agreed intervals, provide Company Representative with a report showing salient features of progress of the Services, detailing the progress of the Services since the previous report.

2.7   <u>Not</u> used.

## ARTICLE 3 - PARTY REPRESENTATIVES

3.1   <u>Company Representative</u>. Company shall name a representative in the Work Order who shall have authority to act for and on behalf of Company with regard to all field, operational and safety matters related to the Work Order (the "<u>Company Representative</u>"). Company Representative may, by informing Contractor in writing, delegate such authority granted to him/her to one other individual who shall thereby have authority to act in his place, and further references herein to Company Representative shall be understood to mean Company Representative or his/her designee, *provided, however,* that in the event of a conflict between Company Representative and his/her designee, Company Representative shall control. Contractor will direct all field communications concerning the Services being provided or to be provided under the Work Order to Company Representative. Company Representative shall have the authority to monitor the proper and timely completion of the Services and to stop or suspend any portion of the Services if, in Company Representative's reasonable judgment, there is a material discrepancy between the manner in which such Services are being performed and the manner in which such Services were agreed to be performed in the Work Order, including, without limitation, in accordance with the instructions and specifications contained in the Scope of Services as set forth in the Work Order, or the activities of any member of Contractor Group has a materially adverse effect on other activities at the project site or otherwise render the project site unsafe for persons or property. Company Representative shall give immediate notice (verbally, if necessary, to be followed promptly with written notice) to Contractor Representative of any such work stoppage or suspension, setting forth the reason(s) for such stoppage or suspension, and including adequate details thereof to enable Contractor to timely remedy the situation. Company Representative shall, at all reasonable times, have reasonable and free access to, in so far as it is within Contractor's power, places of business where the Services are carried out, subject at all times to Contractor's safety, security and other relevant procedures, for the purpose of inspecting and checking the control, management and

Exhibit A

direction of the Services under, and in accordance with, the Work Order, including, without limitation, the inspection and checking of relevant documentation.

3.2 <u>Contractor Representative</u>. Contractor shall name a representative in the Work Order who shall have authority to act for and on behalf of Contractor on all matters related to the Work Order (the "<u>Contractor Representative</u>"). Contractor Representative may, by informing Company in writing, delegate such authority granted to him or her to one other individual who shall thereby have authority to act in his place, and further references herein to Contractor Representative shall be understood to mean Contractor Representative or his designee *provided, however*, that in the event of a conflict between Contractor Representative and his/her designee, Contractor Representative shall control. Company will direct all communications concerning the Services being provided or to be provided under the Work Order to Contractor Representative.

## ARTICLE 4 - EXTRA SERVICES; VARIATIONS

4.1 Except as expressly provided herein, Contractor shall not be entitled to any consideration for extra work performed unless such work shall have been previously authorized in writing by Company. Company shall have the right to order any variation to the Scope of Services, including additions, deletions, substitutions or any other alterations thereto. Variations shall not vitiate or invalidate the Work Order. Contractor shall, upon receipt of an order for a variation, promptly advise Company of:

    (a)    any effect thereof on the provisions of the Work Order or the performance of the Services; and

    (b)    Contractor's detailed estimate of the increase or decrease in the Work Order price, utilizing for such purpose Contractor's most cost-efficient pricing or such pricing as is otherwise agreed-upon between the Parties.

Variation orders shall be submitted to Contractor Representative in writing except that Company may give oral instructions for immediate implementation by Contractor where in Company's judgment the safety or integrity of the Services is at risk. In any such instance, Company shall promptly confirm its instructions in writing.

## ARTICLE 5 - WARRANTY

5.1 <u>Standard of Performance</u>. By agreeing to provide Services for Company, Contractor represents that it understands the requirements that could be reasonably anticipated under the applicable Work Order and that it has the knowledge, expertise and skills to perform such Services. Contractor shall exercise commercially reasonable skill, care and diligence in the performance of the Services and shall perform the Services in accordance with standards set forth in the applicable Work Order.

5.2 <u>General Services</u>. Contractor warrants that the Services be performed in a good and workmanlike manner and in compliance with requirements and specifications set forth in the applicable Work Order. Contractor further warrants that its personnel will be properly and adequately trained to perform the Services competently and safely. Prior to

Exhibit A

Contractor's departure from the location at which the services are performed (if the Services are not performed at Contractor's premises), or the removal of the object of the Services from the Company's premises (if the Services performed at Contractor's premises), Contractor shall re-perform any nonconforming Services for which Contractor receives written notice, at Contractor's sole cost and expense, in accordance with the requirements of this Agreement and the applicable Work Order, or refund to Company that portion of the consideration that is attributable to the nonconforming Services. At Company's election, Contractor may elect to re-perform the nonconforming Services, Contractor shall promptly commence and complete such re-performance. If Contractor fails to commence or complete such re-performance within a reasonable period of time, then Company shall have the right to have the nonconforming Services re-performed by any other contractor (or by Company's own employees), and Contractor shall be responsible for all reasonable costs and expenses incurred as a result of such re-performance, up to a maximum of one hundred twenty-five percent (125%) of the amount that Contractor was paid for the non-conforming Services.

5.3   **Well Plugging and Abandonment Services** - Contractor warrants that all well plugging and abandonment services to be provided hereunder shall conform to the specifications set forth in the applicable Work Order and with all applicable Federal and state regulations. In the event that Contractor's well plugging and abandonment services fail to comply with the foregoing standard, then as Company's sole and exclusive remedy for such non-conformance, Contractor shall repair or re-perform such defective well plugging and abandonment services which are brought to Contractor's attention in writing prior to Contractor's departure from location where the services are performed. Contractor's warranty obligations hereunder shall not apply to the extent the non-conformity was caused by (a) abnormal well conditions, (b) damage to the Services caused by a party other than a member of Contractor Group (c) force majeure, or (d) incorrect, incomplete or inaccurate data, drawings, information or specifications provided by Company..

5.4   **Cutting Services** - Contractor warrants that all cutting services to be provided hereunder shall conform to the specifications set forth in the applicable Work Order. In the event that Contractor's cutting services fail to comply with the foregoing standard, then as Company's sole and exclusive remedy for such non-conformance and Contractor's sole obligation is limited to one re-performance of any non-conforming cutting services at no cost to Company when are brought to Contractor's attention in writing.

5.5   **Engineering Services** – In the event that any of the Services consist of engineering and design work or analysis ("Engineering Services"), Contractor warrants that such Engineering Services shall be performed in a good and workmanlike manner. Contractor shall use its best efforts to minimize error and produce Engineering Services that are accurate and reliable. Company agrees that its sole and exclusive remedy for any errors in the Engineering Services, when Contractor receives written notice of such error within twelve (12) months after the Engineering Services are completed, shall be the re-performance of any such Engineering Services and replacement of the results, or, in the event the errors cannot be corrected within a reasonable period of time, a refund of monies paid for the portion of the Engineering Services containing the error. In no event

7

*Exhibit A*

shall Contractor's total liability for any errors in any Engineering Services exceed the amount paid for Engineering Services containing the error.

5.6 **Products Warranty** – It is not anticipated that Contractor would provide any products in connection with the performance of the Services, however, in the event Contractor does provide any products in connection with the performance of the Services for which title transfers to Company, Contractor warrants that any and all products, equipment and materials provided by Contractor, are free from defects, comply with the applicable specifications set forth in the applicable Work Order. Contractor will promptly repair or replace at Contractor's sole cost and expense any products, equipment or materials that are defective or non-conforming. The products warranty shall be 12 months from the date on which the products, equipment and materials were delivered to Company. This warranty does not apply to (i) products, equipment and materials that have been modified or subjected to improper handling, storage, installation, operation or maintenance by Company or other parties on Company's behalf, including use of unauthorized replacement parts; (ii) component parts or materials not manufactured by Contractor, whether purchased by Contractor or furnished by Company, such parts or materials being subject to any applicable manufacturer's warranty; (iii) products, equipment and materials (or parts thereof) requiring replacement because of natural wear and tear; and (iv) the design of products, equipment and materials. Company's sole and exclusive remedy for breach of this warranty is expressly limited to the repair or replacement of any products, equipment and materials (or parts thereof) which prove to be defective or non-conforming during the warranty period and are returned to Contractor at the delivery point or a refund of the consideration attributable to the products, equipment and materials found to be defective or non-conforming during the warranty period. In no event however shall Contractor's liability for breach of this warranty exceed the amount of its invoice for the portion of the products, equipment and materials found to be defective or non-conforming

5.7 **Limitations** - EXCEPT AS IS OTHERWISE EXPRESSLY PROVIDED PURSUANT TO THE PROVISIONS OF THIS ARTICLE 5. CONTRACTOR MAKES NO WARRANTY OR GUARANTEE OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING NO IMPLIED WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR A PARTICULAR PURPOSE, REGARDING ANY PRODUCTS, EQUIPMENT AND MATERIALS PROVIDED AND/OR SERVICES, INCLUDING WELL PLUGGING AND ABANDONMENT AND CUTTING SERVICES, PERFORMED BY CONTACTOR UNDER THIS AGREEMENT.

## ARTICLE 6 - CONTRACTOR'S PERSONNEL

6.1 Properly Qualified Personnel. In the performance of the Services, Contractor shall employ only personnel which are properly qualified, in their respective occupation and trained in all appropriate safety procedures. Unless personnel are hired by any member of the Company Group as employees of said member of the Company Group or such personnel is not acting in its capacity as a member of the Contractor Group, personnel shall not be considered as employees of Company.

8

Exhibit A

6.2   <u>Dissemination of Contract Requirements: Respect for Safety</u>. Contractor shall ensure that all members of Contractor Group who are to manage, direct and/or supervise the Services are made aware of and comply with the provisions of this Agreement and the Work Order which are applicable to such parties and/or the Services to be provided and/or the actions that such Contractor Group members may take while providing such Services or while on Company's Premises. During the term of the Work Order, all members of Contractor Group performing Services on Company's Premises shall remain the responsibility of Contractor, *provided, however,* that all such members of Contractor Group shall remain at all times subject to the safety regulations and procedures applicable to Company's own employees, and all other members of Company Group who are on Company's Premises, and Contractor shall take appropriate steps to ensure compliance with such regulations and procedures. Contractor shall take care not to cause or exacerbate environmental problems at any of Company's Premises where Services are being provided.

6.3   <u>Removal of Contractor Personnel</u>. Company reserves the right to demand the immediate removal and/or timely replacement of any member of Contractor Group performing Services hereunder for non-compliance with the requirements of this Agreement or a Work Order. Contractor shall timely replace, at its own expense, any member of Contractor Group whose presence on Company's Premises is detrimental to the operations thereon. **CONTRACTOR ON BEHALF OF ITSELF AND CONTRACTOR GROUP SHALL RELEASE, INDEMNIFY, AND HOLD COMPANY GROUP HARMLESS FROM AND AGAINST ALL CLAIMS, LIABILITIES, DAMAGES, COSTS AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES), WHICH ARE ASSERTED AGAINST OR SUFFERED BY COMPANY GROUP AS A RESULT OF COMPANY'S EXERCISE OF THIS RIGHT. IN EXERCISING ITS RIGHTS HEREUNDER, COMPANY'S DISCRETION SHALL BE FINAL AND BINDING.**

6.4   <u>Independent Contractor</u>. The provisions of this <u>Article 6</u> are not intended to be inconsistent with Contractor's status as an independent contractor, as described in <u>Article 18</u>, below. Company's intent is to ensure a safe and healthy workplace for all personnel on Company's Premises, protection of the environment, and the performance of the Services in accordance with this Agreement and the applicable Work Order, and is not to provide the specific manner, means, and methods of performance for the Services, which shall at all times be the responsibility of Contractor.

6.5   <u>Worker's Compensation</u>. If this Agreement, any Work Order, or any Services provided come within the jurisdiction of any applicable Worker's Compensation legislation, Contractor agrees to not opt out of the applicable Worker's Compensation insurance program, even if legally permitted to do so, and furnish Company with a certificate of good standing.

## ARTICLE 7 - COMPANY OBLIGATION

7.1   <u>Service Fees</u>. In consideration of the performance of the Services in accordance with this Agreement and the applicable Work Order, Company shall pay Contractor at the rates,

Exhibit A

sums or prices ("Rates") to be agreed be agreed-upon and set forth in the applicable Work Order.

## ARTICLE 8 - INVOICES AND PAYMENT

8.1     Invoices. Contractor's charges in respect of the Services provided for a Company shall be submitted to the invoice address indicated in Article 32.1(c), below, in an invoice specific to that Company. Furthermore, each invoice shall:

(a)     clearly reference thereon: (i) the correct Company contact name (first and last name); and (ii) this Agreement and the applicable Work Order r; and

(b)     be supported by such documentation to adequately support the charges and adjustments, if any, stated therein and to satisfy the reasonable request, if any, of Company.

8.2     **INVOICES ARE TO BE SUBMITTED BY CONTRACTOR TO COMPANY IN A TIMELY MANNER, BUT IN NO EVENT LATER THAN SIX (6) MONTHS FROM THE END OF THE MONTH IN WHICH SERVICES WERE PERFORMED.**

8.3     **FURTHER, CONTRACTOR, ON BEHALF OF ITSELF AND CONTRACTOR GROUP, AGREES THAT THE STATUTE OF LIMITATIONS FOR AND IN CONNECTION WITH ANY CAUSE OF ACTION FOR BREACH OF THE PARTIES' OBLIGATIONS, AS DESCRIBED IN THIS ARTICLE 8, IS TWO (2) YEARS FROM THE DATE THAT THE CAUSE OF ACTION ACCRUED PURSUANT TO TEXAS LAW. THIS PROVISION EXPRESSLY REDUCES THE STATUTE OF LIMITATIONS TIME PERIOD FOR BREACH OF CONTRACT CLAIMS ARISING IN CONNECTION WITH THIS ARTICLE 8 FROM FOUR (4) YEARS TO TWO (2) YEARS.**

8.4     Contractor shall pay all salaries and wages of all its personnel.

8.5     Payment. Company shall pay the invoiced amount within thirty (30) *Sixty* days of receipt of the invoice, to the remittance address set forth on the invoice; *provided, however,* if Company disputes any invoice in whole or in part, Company shall advise Contractor of the amount in dispute and shall pay all undisputed invoice amounts owed by Company within thirty (30) days of receipt of the invoice, and advise Contractor in writing within twenty (20) days of receipt of the invoice of the details of any dispute. Contractor and Company shall work together in good faith to promptly resolve all invoice disputes. Company shall not be liable for, nor have charged against it, any amount owed to Contractor by another company.

Liens and Similar Charges.

Contractor shall ensure that no lien or other adverse claim will be filed by any member of Contractor Group against Company, any part of Company's Premises or any other

Exhibit A

property of Company or against the property where the Services are or were performed. If any such lien or adverse claim shall be filed by any member of Contractor Group, and so often as the same shall happen, Contractor shall, at its own expense, within ten (10) days after the filing thereof, cause the lien and/or adverse claim to be cancelled and removed Company shall be entitled to withhold payments due until such liens and/or adverse claims are cancelled and removed. **CONTRACTOR ON BEHALF OF ITSELF AND CONTRACTOR GROUP, FURTHER AGREES TO RELEASE AND INDEMNIFY COMPANY AGAINST ALL LIABILITIES, LOSSES, AND EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) OCCASIONED BY, RESULTING FROM, OR IN ANY WAY ARISING OUT OF SUCH LIENS AND/OR ADVERSE CLAIMS.** Notwithstanding the foregoing, this provision shall not preclude Contractor from asserting, and Company shall not be afforded indemnity with regard to, a lien on the property of Company to the extent, and only to the extent, Company fails to pay an amount owed to Contractor which is fully undisputed and greater than sixty (60) days overdue and for which notice of late payment has been afforded to Company at least fourteen (14) days prior to such filing.

8.6     No payment made under this Agreement shall constitute a waiver by Company of the performance by Contractor of any of Contractor's obligations hereunder and any payment withheld shall be without prejudice to any other rights and remedies available to Company.

## ARTICLE 9 - TAXES

9.1     In the event that Company is assessed or becomes liable for any taxes which should be payable by Contractor, Company may recover from Contractor a sum equivalent to the amount of taxes, penalty and interest paid by Company. Any increase or decrease in costs due to increase in non-creditable taxes over and above that identified in the Agreement shall be the sole responsibility of Contractor and shall not be deemed to be sufficient cause to adjust the Work Order Rates. Company shall not be responsible for any penalty or interest associated with Contractor's failure to include tax on invoices submitted for Services provided here under. Further, Contractor will reimburse Company for any penalty and/or interest that results from Contractor's failure to properly charge tax on invoices submitted for Services provided here under.

9.2     Contractor is exclusively responsible to pay sales and/or use taxes on any items or Services performed in the U.S. for which Contractor is statutorily liable. The Parties agree that "Sales and Use Taxes" include: sales taxes, sales taxes drawn as privilege taxes or occupation taxes, gross receipts taxes, and other taxes, as may be enacted from time to time that are connected to the Services provided for in this Agreement. Any sales tax based on or measured by the charges made for or the cash receipts from the rendering of the Services provided for in this Agreement in the U.S. for which Company is statutorily liable shall be billed to Company. Contractor is exclusively responsible for billing these Sales and Use Taxes and shall reimburse Company for any penalty or interest incurred as the result of Contractor's failure to bill Company Sales and Use Taxes. Sales and Use Taxes under this Agreement specifically exclude Company's and Contractor's federal, state and local income and payroll taxes. Company and Contractor agree to work together

11

to minimize Sales and Use Taxes. Any penalties or interest resulting from Contractor's failure to bill Sales and Use tax in accordance with a tax position agreed to by Contractor and Company will be the responsibility of Company.

9.3 **CONTRACTOR ON BEHALF OF ITSELF AND CONTRACTOR GROUP, SHALL INDEMNIFY, AND HOLD COMPANY HARMLESS FROM ANY LIABILITY, CLAIMS, DEMANDS, OR LITIGATION (INCLUDING COURT COSTS AND REASONABLE ATTORNEY'S FEES) FOR THE TAXES, INTEREST, AND ANY PENALTIES RELATING TO THE SUBJECT TAX AND ASSESSMENTS.**

## ARTICLE 10 - AUDITS

10.1 During the Services and for two (2) years after completion or termination of a Work Order, Company or its duly authorized representative shall have the right to audit at Contractor's office during normal business hours, and upon reasonable written notice, and, upon request, make, at Company's sole cost and expense, copies of any and all data electronically-stored on computers or portable mediums, and/or found on any paper of any kind in Contractor's books and records, but only to the extent such data relates to or is necessary to fully and adequately support:

    (a) all charges made by Contractor on Company pursuant to such Work Order based on unit rates and/or a reimbursable basis, for the avoidance of doubt, all charges related to a fixed and/or lump sum price shall not be subject to audit; and

    (b) Contractor's satisfaction of obligations owed to Company, to the extent capable of being verified by audit. Contractor shall reasonably co-operate with Company and/or its representatives in carrying out any such audit. Company will conduct any such audit in a manner reasonably planned to minimize any inconvenience caused by such audit.

## ARTICLE 11 - FORCE MAJEURE

11.1 <u>Obligations Suspended</u>. Except for the obligation to pay amounts properly due, and/or as may be specifically otherwise provided in the applicable Work Order, neither Party shall be liable for delays in performance or for non-performance occasioned or caused by Force Majeure. The term "<u>Force Majeure</u>" means any event beyond the reasonable control and foresight of the Party claiming to be affected thereby including, without limitation, acts of God, terrorism, war, fire, strikes of general application, lockouts or differences with workers, acts of the public enemy, insurrections, riots, or rules or regulations of any authority asserting jurisdiction or control, compliance with which makes continuance of operations impossible and/or hazardous. Strikes, lockouts or differences with workers which are limited to a Party's employees or other members of the Party's Group, including, but not limited to the employees of Contractor's Subcontractors, and inability of either Party to secure funds shall not be regarded as Force Majeure. Upon the occurrence of Force Majeure, the Party affected shall give

Exhibit A

prompt notice thereof to the other Party and shall, at its cost and expense, use commercially reasonable efforts to remove or mitigate its effects. Neither Party shall not be entitled to assert an event of Force Majeure in situations in which said events are caused by such Party's and any member of its Group's negligence, gross negligence or willful misconduct.

11.2    <u>Continuous Period of Force Majeure</u>. If a Force Majeure exists for a continuous period of fourteen (14) days, either Party shall be able to give notice to terminate the Work Order. In such event, Company shall pay Contractor for Services performed in accordance with this Agreement and the applicable Work Order up to the date of first notice of Force Majeure and in no circumstances shall Contractor be entitled to any prospective profits or any damages because of such termination, unless otherwise provided in the applicable Work Order or other written agreement executed by duly authorized representatives of the Parties.

## ARTICLE 12 - INSURANCE

12.1    <u>Required Insurance</u>. At all times during the Term and for so long thereafter as a Claim related to this Agreement or a Work Order is possible under applicable statutes of limitations, Contractor shall carry, at its own expense and with reputable insurance companies, who are authorized to do business in all jurisdictions where this Agreement and any applicable Work Order is performed, the following insurance requirements.

(a)    <u>Workers' Compensation and/or Occupational Disease Insurance</u>. ("<u>Workers' Compensation</u>") covering the employees of the Party for all compensation and other benefits required of the Party by the Workers' Compensation or other statutory insurance laws and requirements in all state(s) where this Agreement and the applicable Work Order is performed, in all states in all states where the Party is domiciled, including Alternate Employers Endorsement. For states where Workers' Compensation is statutorily required, upon the other Party's request, then each Party shall deliver or cause to be delivered to the other Party a certificate of good standing evidencing the each Party's compliance with all such requirements. All Workers' Compensation policies shall, to the extent of the liabilities assumed by the each Party under this Agreement, be endorsed as follows:

(i)    Waive all rights of subrogation against Companyand its Group when permitted by law.

(b)    <u>Employer's Liability</u> coverage with limits of one million dollars ($1,000,000) each accident, one million dollars ($1,000,000) disease each employee and one million dollars ($1,000,000) disease policy limit.

(c)    <u>Commercial General Liability</u> ("CGL"), with limits of one million dollars ($1,000,000) each occurrence and one million dollars ($1,000,000) aggregate per policy, covering damages resulting from bodily injury (including, without

Exhibit A

limitation, death) and property damage (including, without limitation, loss of use or occupancy). The CGL policy shall also include:

(i)     Products Hazard Coverage for any and all products provided or furnished by or on behalf of the each Party during the performance of this Agreement; and

(ii)    Completed Operations Hazard Coverage for any claim relating to defects or deficiencies in goods, products, and materials or services used or rendered by the each Party in connection with its performance of this Agreement.

(d)     <u>Such CGL insurance policy shall, to the extent of the liabilities assumed by the each Party under this Agreement, also be endorsed to:</u>

(i)     Cover Blanket Contractual Liability and Broad Form Property Damage;

(ii)    Name Company Group as an Additional Insured;

(iii)   Waive all rights of subrogation against Company Group;

(iv)    Provide that such insurance is primary with respect to any insurance carried by Company Group;

(v)     Provide Coverage for explosion, collapse, and underground hazards;

(vi)    Include appropriate territorial limits extension to cover all areas of operation; and

(vii)   State that the insuring Party will provide prior written notice of cancellation or material change in accordance with policy provisions.

(e)     <u>Commercial Auto Liability</u>, insurance covering "Any Auto" (owned, non-owned, or hired). Combined Single limit of one million dollars ($1,000,000) for the accidental injury or death of one or more persons or damage to or destruction of property as a result of each accident, and the policy shall, to the extent of the liabilities assumed by the insuring Party under this Agreement, be endorsed to:

(i)     Name the other Party and its Group as an Additional Insured;

(ii)    Waive all rights of subrogation as against the other Party and its Group;

(iii)   Provide that such insurance is primary with respect to any insurance carried by the other Party and its Group; and

(iv)    State that the insuring Party will provide prior written notice of cancellation or material change in accordance with policy provisions.

Exhibit A

(f)   Aircraft Liability Insurance (if applicable), for any aircraft owned, leased, or hired by a Party or any member of a Party's Group, carried by such Party, or the member of its Group, or the owner or operation of the aircraft, with policy limit of ten million dollars ($10,000,000) each occurrence, with such insurance policy endorsed to include coverage for passenger liability in the amount of one hundred thousand dollars ($100,000); and shall, to the extent of the liabilities assumed by the insuring Party under this Agreement

   (i)    Waive all rights of subrogation as against the other Party and its Group

   (ii)   Name the other Party and its Group as an Additional Insured

(g)   Professional Liability Insurance and/or Error and Omissions Liability, (if Contractor's Services fall under the category of professional/consulting/ engineering services), with a policy limit of at least one million dollars ($1,000,000.00) per claim, covering all loss or damage resulting from an error, omission, or negligent act in the performance of Contractor's professional/ consulting/and or engineering Services. This policy shall, to the extent of the liabilities assumed by Contractor under this Agreement, be endorsed to:

(h)   Waive all rights of subrogation as against Company Group.

(i)    Excess Liability Insurance, this policy shall be written on a "Following Form" basis and shall provide coverage in excess of the coverage required to be provided by Contractor Group for

   (i)    Employer's Liability;

   (ii)   Commercial General Liability; and

   (iii)  Commercial Auto Liability

(j)    Minimum Limits for Excess Liability Insurance:

   (i)    Ten million dollars ($10,000,000) each occurrence

   (ii)   Ten million dollars ($10,000,000) aggregate limit

(k)   The Excess Liability Policy shall be at least as broad as each underlying insurance policy described herein, including without limitation, and shall contain, to the extent of the liabilities assumed by the each Party under this Agreement the following endorsements:

   (i)    Name eachParty Group as an Additional Insured

   (ii)   Waive all rights of subrogation againseach Party and its Group

15

(iii)   Provide that such insurance is primary with respect to any insurance carried by each Party Group; and

(iv)   State that each Party will provide prior written notice of cancellation and material change in accordance with policy provisions

12.2   <u>Additional Required Insurance</u>. In addition to the insurance required under Section 12.1, above, the following insurance is required if a each Party's performance of this Agreement involves any of the following:

(i)   Operation or charter of any vessel or watercraft of any sort, including, without limitation, boats, barges, remote operated vehicles, and submersible vehicles of any kind (collectively, "Vessels");

(ii)   Activities which are or can be on, below or adjacent to the navigable waters of the United States or any of its states or territories (including, without limitation, divers, offshore welders and the like); or

(iii)   Activities directly involved in the decommissioning commissioning, operation, maintenance or construction of any of Company's Group's physical assets located offshore or in navigable waters.

(b)   <u>Worker's Compensation and/or Occupational Disease coverage insurance</u>, as required in Section 12.1 (a) above, that will pay claims for unseaworthiness and claims occurring under the U.S. Longshore Harbor Worker's Compensation Act (USL&H), the Jones Act, the Outer Continental Shelf Lands Act, the Death on High Seas Act, the Admiralty Extension Act, and the General Maritime Laws of the United States, including, without limitation, claims for transportation, wages, maintenance, and cure (TWM&C), with such insurance being endorsed, to the extent of liabilities assumed by the insuring Party under this Agreement, to:

(i)   Waive all rights of subrogation against the other Party Group and with all appropriate extensions to cover locations where this Agreement will be performed.

(c)   <u>Maritime Employer's Liability</u>, which covers all employees with limits of ten million dollars ($10,000,000) each accident / ten million dollars ($10,000,000) disease- each employee / and ten million dollars ($10,000,000) policy limit that will pay for claims for unseaworthiness and claims occurring under the General Maritime Laws of the United States, with such insurance policy being endorsed to:

(i)   State that the insuring Party will provide prior written notice of cancellation or material change in accordance with policy provisions

(d)   <u>Hull & Machinery Insurance</u>, covering each Vessel owned, chartered, or operated by Party in connection with the performance of this Agreement, with a

16

policy carried by such Party, or the member of its Group, or the owner or operation of the Vessel, limit equal to the agreed or declared value, and with adequate navigational limits. Where the Vessel engages in towing operations, this insurance policy shall include full Tower's Liability with the Sistership Clause un-amended. All Hull & Machinery Insurance shall, to the extent of the liabilities assumed by the insuring Party under this Agreement, be endorsed to:

(i)     Name the other Party and its Group as an Additional Insured, without limiting coverage liability "as owner" of the Vessel and to delete any "as owner" clause any other language purporting to limit coverage to liability of an insured "as owner" of the Vessel;

(ii)    Waive all rights of subrogation against the other Party and its Group;

(iii)   Delete any language limiting coverage for the other Party and its Group in the event of the applicability of any limitation of liability statute; and

(iv)   Provide an "In Rem" endorsement whereby claims "in rem" shall be treated as claims against the insuring Party.

(e)   Charterer's Legal Liability Insurance, providing coverage for liabilities arising out of the use of any chartered Vessel, carried by such Party, or the member of its Group, or the owner or operation of the Vessel with a minimum limit of ten million ($10,000,000) dollars for any claim, with such insurance policy being endorsed to the extent of the liabilities assumed by the insuring Party under this Agreement:

(i)     Waive all rights of subrogation against Company Group

(f)   Protection and Indemnity ("P & I") Insurance, covering all owned, operated, or chartered Vessels, with coverage being kept at all times current with International P & I Club rules, with a minimum limit of ten million ($10,000,000) dollars per occurrence, and said policy shall be endorsed to:

(i)     Name Company Group as an Additional Insured; and

(ii)    Waive all rights of subrogation as against Company Group

(g)   Pollution Liability Insurance, including cleanup and third party liabilities and to treat "in rem" actions against Contractor's Vessel as actions against Contractor, with a minimum policy limit of fifty million ($5,000,000) dollars each occurrence, and said policy shall be endorsed to

(i) waive all rights of subrogation as against the other Party and its Group.

(h)   Excess Liability Insurance, will be accepted to cover deficiencies in all above required liability insurance policies so that no gap in coverage whatsoever occurs and coverage hereunder shall be at least as broad as each underlying

Exhibit A

insurance policy described herein, including without limitation, the following endorsements:

(i)      Name Company Group as an Additional Insured

(ii)     Waive all rights of subrogation against Company Group

(iii)    Provide that such insurance is primary with respect to any insurance carried by Company Group; and

(iv)     State that Contractor will provide prior notice of cancellation in accordance with policy provisions

12.3   <u>Primary Insurance; Premiums</u>. All insurance required to be maintained by Contractor under this Agreement shall be regarded as primary insurance underlying any other applicable insurance otherwise available to any member of Company Group. Contractor shall be responsible for all premiums, surcharges, supplemental calls, penalty payments, deductibles, self-insured retentions, and all other costs for all insurance provided by or on behalf of Contractor.

12.4   <u>Effect on Indemnity Obligations</u>. Except as required by applicable law, Contractor's compliance with the obligations under this Section shall in no way limit or replace the indemnity and other obligations of Contractor contained elsewhere in this Agreement.

12.5   <u>Compliance with Applicable Law</u>. If it is judicially determined that the monetary limits of the insurance required herein do not conform with applicable law, it is agreed that said insurance shall automatically be amended to conform to the minimum monetary limits and other provisions in such law.

12.6   <u>Required Notice of Cancellation or Change</u>. Insurance policies maintained by Contractor shall state that Contractor will provide prior notice of cancellation in accordance with policy provisions.

12.7   <u>Self-Insurance</u>. In the event Contractor desires to self-insure (in part or in whole) any risks for which insurance is herein required, notice of the same must be in writing and approved by Company. For purposes within this Section, self-insurance includes, but is not limited to, the self-assumption of any risk, including large deductible and "fronted" programs, for which insurance is otherwise available in the ordinary course of business for the Services contemplated hereunder and specifically includes the practice of utilizing "fronting" insurers and "fronted programs" involving large deductibles equal to or substantially equal to the limits of such insurance policies. It is also expressly agreed, notwithstanding Contractor's choice to self-insure, that if Contractor owes a defense and indemnity to any member of Company Group pursuant to this Agreement, Contractor will assume such defense and indemnity obligation just as if Contractor were fully insured by a financially sound third-party insurer on insurance forms customarily available.

Exhibit A

12.8    Insurance Certificates; Policies. As of the Effective Date, and on an annual basis thereafter until this Agreement is terminated, Contractor shall cause all of its insurance providers to deliver to Company a Certificate of Insurance, on the standard Acord form (or other standard form regularly accepted in the industry) certifying that all insurance policies required under this Agreement have been issued by Contactor's insurer and at the time of certificate issuance such policies are valid and effective, with all required endorsements evidenced on such certificate. If Contractor fails to provide Company with such Certificate of Insurance, Company may, terminate this agreement. Additionally, upon Company's or its representative's request, Contractor agrees to furnish to Company copies of any insurance policy required hereunder, including, without limitation, documentation evidencing all required endorsements thereto.

12.9    Certificate Holder.

"Black Elk Energy, LLC, its Partners, Subsidiaries, and Affiliates" must be named as Certificate Holder.

12.10   Subcontractors. Contractor shall require all its Subcontractors to provide statutory Worker's Compensation insurance coverage. To the extent not provided for by the Subcontractors and not covered by Contractor's insurance, deficiencies shall be the sole responsibility of Contractor.

12.11   Indemnities to Be Supported By Insurance. To the fullest extent required by certain applicable law and not prohibited by other applicable law, Contractor agrees to obtain and maintain, for the benefit of Company Group, as indemnitee, types and amounts of insurance coverage at least equal to the insurance requirements set forth in Article 12 of this Agreement, in each case to cover the entire scope of the release, indemnity, defense, and hold harmless obligations assumed in Article 13. All insurance required under this Article 12 are in support of Contractor's respective release, indemnity, defense, and hold harmless obligations is in addition to, and independent of, any other insurance requirements contained in this Agreement. Except as required by law, the amount of any insurance provided to support Contractor's indemnity obligation shall not limit such indemnity obligation.

Notwithstanding any other provision, for any Services provided by Contractor Group in the State of Texas or in the offshore waters adjacent thereto, Contractor and Company mutually agree to obtain insurance in an amount no less than _____ (dollars) in support of the indemnity obligations in this Contract. Notwithstanding any other provision, if Contractor Group will be providing Services to Company Group in the State of Louisiana or the offshore waters adjacent thereto, the Company contracting for such Services agrees to assume responsibility for Contractor's cost of additional insurance attributable to supporting the indemnity owed to Company Group in this agreement and carrying Company Group as an additional insured pursuant to the requirements herein.  The pro rata cost of extending such insurance protection to Company Group shall be separately itemized as an expense on the invoices for such Services. Reciprocally, Contractor agrees to assume responsibility for Company's cost of additional insurance attributable to supporting the indemnity owed to Contractor Group

19

Exhibit A

in this agreement and carrying Contractor Group as an additional insured pursuant to the requirements herein. The pro rata cost of extending such insurance protection to Contractor Group shall be separately itemized as a credit to Company on the invoices submitted by Contractor for such Services.

12.12 Endorsement Limitations. The Parties acknowledge and agree that the insurance and indemnity obligations assumed by the Parties in this Agreement are separate and distinct obligations. The Parties further acknowledge and agree that the additional insured endorsement, waiver of subrogation endorsement and primary insurance endorsement required of each Party under the Insurance provision in this Agreement are valid requirements imposed by this Agreement

Accordingly, the Parties agree that in the event and to the extent that a Party ("Indemnifying Party"), is contractually obligated to provide additional insured coverage, waiver of subrogation and/or primary insurance endorsements in favor of the other Party and its Group ("Indemnified Party"), such insurance policy coverage and endorsements are limited and restricted to the defense and indemnity obligations expressly assumed by the Indemnifying Party under this Agreement. The Parties further agree that an Indemnified Party shall not seek to obtain coverage under the Indemnifying Party's liability insurance for any indemnities and/or liabilities other than those obligations that the Indemnifying Party has expressly agreed to assume under this Agreement. Any attempt by an Indemnified Party to seek coverage under the Indemnifying Party's insurance for any indemnities and/or liabilities other than those for which the Indemnifying Party has expressly agreed to assume under this Agreement shall be considered a material breach of this Agreement, **and the Indemnified Party shall indemnify, defend and hold harmless the Indemnifying Party from and against any losses and/or damages (including reasonable legal fees and costs) resulting from any such breach.**

To the extent a conflict exists between the scope of coverage provided to the additional insured under the Indemnifying Party's liability insurance and the scope of coverage intended to be provided to the additional insured as reflected in this Agreement, the Parties agree that all conflicts shall be resolved in favor of the scope of coverage intended to be provided to the additional insured as reflected in this Agreement.

12.12 Louisiana Employees. With respect to a Work Orders which provide for Services to be performed in Louisiana (including, without limitation, its offshore waters), in all cases where Contractor's employees (defined to include Contractor's and its Subcontractor's direct, borrowed, special, or statutory employees) are covered by the Louisiana Workers' Compensation Act, La. R.S. 23:1021 et seq., Company and Contractor agree that all Services and operations performed by Contractor and Contractor's employees pursuant to any and all Work Orders are an integral part of and are essential to the ability of Company to generate Company's goods, products, and services for the purpose of La. R.S. 23:1061 (A) (1). Furthermore, Company and Contractor agree that Company is the statutory employer of Contractor's employees for purposes of La. R.S. 23:1061 (A) (3).

*However*, irrespective of Company's status as the statutory or special employer (as defined in La. R.S. 23:1031(C)) of Contractor's employees, Contractor shall remain primarily and fully responsible for the payment of Louisiana workers' compensation benefits to or for Contractor's employees, and shall not be entitled to seek contribution for any such payments from any member of Company Group.

## ARTICLE 13 - INDEMNITY OBLIGATIONS

13.1 **CONTRACTOR'S INDEMNITY OF COMPANY GROUP. CONTRACTOR SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS COMPANY GROUP, FROM AND AGAINST ANY AND ALL CLAIMS WHATSOEVER WHICH MAY BE BROUGHT AGAINST OR SUFFERED BY ANY MEMBER OF THE COMPANY GROUP OR WHICH ANY OF THEM MAY SUSTAIN, PAY OR INCUR IN CONNECTION WITH, ARISING OUT OF, OR WITH RESPECT TO:**

    (a)    **PERSONAL INJURY (INCLUDING ILLNESS, BODILY INJURY OR DEATH) OF ANY MEMBER OF THE CONTRACTOR GROUP, AND/OR**

    (b)    **LOSS, DAMAGE OR DESTRUCTION OF EQUIPMENT OR PROPERTY OWNED OR HIRED BY ANY MEMBER OF THE CONTRACTOR GROUP, AND/OR**

    (c)    **POLLUTION OR CONTAMINATION (INCLUDING, BUT NOT LIMITED TO PROPERTY DAMAGE, CONTROL, REMOVAL, RESTORATION AND CLEAN-UP OF ALL POLLUTION OR CONTAMINATION) WHICH ORIGINATES FROM THE PROPERTY OF ANY MEMBER OF THE CONTRACTOR GROUP,**

**ARISING IN CONNECTION WITH THIS AGREEMENT AND ANY APPLCIABLE WORK ORDER, AND REGARDLESS OF THE ACTUAL OR ALLEGED FAULT OF ANYONE, INCLUDING ANY MEMER OF THE COMPANY GROUP.**

**THIS PROVISION IS INTENDED TO DEFEND, INDEMNIFY AND INDEMNIFY MEMBERS OF THE COMPANY GROUP AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE OR FAULT INCLUDING BUT NOT LIMITED TO THE SOLE, JOINT, COMPARATIVE, CONCURRENT, ACTIVE, PASSIVE, OR GROSS NEGLIGENCE OF COMPANY GROUP.**

13.2 **COMPANY'S INDEMNITY OF CONTRACTOR GROUP. COMPANY SHALL DEFEND, INDEMNIFY, AND HOLD HARMLESS CONTRACTOR GROUP FROM AND AGAINST ANY AND ALL CLAIMS WHATSOEVER WHICH MAY BE BROUGHT AGAINST OR SUFFERED BY ANY MEMBER OF THE CONTRACTOR GROUP OR WHICH ANY OF THEM MAY SUSTAIN, PAY OR INCUR IN CONNECTION WITH, ARISING OUT OF OR WITH RESPECT TO**

Exhibit A

(a)   PERSONAL INJURY (INCLUDING ILLNESS, BODILY INJURY OR DEATH) OF ANY MEMBER OF THE COMPANY GROUP, AND/OR

(b)   LOSS, DAMAGE OR DESTRUCTION OF EQUIPMENT OR PROPERTY OWNED OR HIRED BY ANY MEMBER OF THE COMPANY GROUP, AND/OR

(c)   POLLUTION OR CONTAMINATION (INCLUDING, BUT NOT LIMITED TO PROPERTY DAMAGE, CONTROL, REMOVAL, RESTORATION AND CLEAN-UP OF ALL POLLUTION OR CONTAMINATION) WHICH ORIGINATES FROM THE PROPERTY OF ANY MEMBER OF THE COMPANY GROUP,

ARISING IN CONNECTION WITH THIS AGREEMENT AND ANY APPLCIABLE WORK ORDER, AND REGARDLESS OF THE ACTUAL OR ALLEGED FAULT OF ANYONE, INCLUDING ANY MEMER OF THE CONTRACTOR GROUP.

### 13.3   INDEMNITY FOR THIRD PARTY CLAIMS.

(a)   COMPANY SHALL INDEMNIFY, DEFEND, AND HOLD CONTRACTOR GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS OF ANY PERSON OR ENTITY FOR, RESULTING FROM OR ON ACCOUNT OF (i) PERSONAL INJURY (INCLUDING ILLNESS, BODILY INJURY OR DEATH) OF ANY THIRD PARTY OR (ii) LOSS, DAMAGE OR DESSTRUCTION TO PROPERTY OF ANY THIRD PARTY, TO THE EXTENT SUCH PERSONAL INJURY AND/OR LOSS, DAMAGE OR DESTRUCTION TO PROPERTY IS CAUSED BY OR OCCURS AS A RESULT OF THE FAULT, NEGLIGENCE, OF ANY DEGREE OR KIND, OR WILLFUL MISCONDUCT OF ANY MEMBER OF COMPANY GROUP.

(b)   CONTRACTOR SHALL INDEMNIFY, DEFEND, AND HOLD COMPANY GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS OF ANY PERSON OR ENTITY FOR, RESULTING FROM OR ON ACCOUNT OF (i) PERSONAL INJURY ( INCLUDING ILLNESS, BODILY INJURY OR DEATH) OF ANY THIRD PARTY OR (ii) LOSS, DAMAGE OR DESTRUCTION TO PROPERTY OF ANY THIRD PARTY, TO THE EXTENT SUCH PERSONAL INJURY AND/OR DAMAGE TO PROPERTY IS CAUSED BY OR OCCURS AS A RESULT OF THE FAULT, NEGLIGENCE, OF ANY DEGREE OR KIND, OR WILLFUL MISCONDUCT OF ANY MEMBER OF CONTRACTOR GROUP.

Exhibit A

**THIS DEFENSE AND INDEMNITY PROVISION IS INTENDED TO DEFEND AND INDEMNIFY CONTRACTOR GROUP AND COMPANY GROUP, RESPECTIVELY AGAINST THE CONSEQUENCES OF THEIR OWN NEGLIGENCE OR FAULT INCLUDING BUT NOT LIMITED TO THE SOLE, JOINT, COMPARATIVE, CONCURRENT, ACTIVE, PASSIVE, OR GROSS NEGLIGENCE OF CONTRACTOR AND COMPANY GROUP, RESPECTIVELY.**

13.4   **CONSEQUENTIAL LOSS AND PUNITIVE / EXEMPLARY DAMAGES.**

Notwithstanding any provision to the contrary elsewhere in the Agreement, **COMPANY SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS CONTRACTOR GROUP FROM COMPANY GROUP'S OWN CONSEQUENTIAL LOSS AND CONTRACTOR SHALL SAVE, INDEMNIFY, DEFEND AND HOLD HARMLESS COMPANY GROUP FROM CONTRACTOR GROUP'S OWN CONSEQUENTIAL LOSS.**

"Consequential Loss" means indirect losses and/or loss of production, loss of product, loss of use and loss of revenue, profit or anticipated profit, business interruption, and/or any indirect or consequential loss under applicable law, arising from or related to the performance of the Agreement and whether or not any such losses were foreseeable at the time of entering into the Agreement, and regardless of the actual or alleged fault of anyone, including any indemnified party.

13.5   Area Information. Company shall provide Contractor with accurate information, including maps and other drawings, regarding the location of both surface and subsurface property, structures and/or facilities in the area where the Services will be performed.  Contractor will reply on such information in performing the Services.  If Company fails to provide such information, or if the information provided by Company is inaccurate or incomplete, or changes in any manner after being furnished to Contractor, and except as otherwise provided herein regarding personal injury, illness of death, **COMPANY SHALL INDEMNIFY, DEFEND AND HOLD HARMLESS CONTRACTOR GROUP AND ITS VESSELS FROM ALL CLAIMS RESULTING THEREFROM.**

13.6   No Modifications.  The scope of the indemnity provisions in this Article 13 may not be altered, restricted, limited, or changed by any other provision of this Agreement, or any other document exchanged by the Parties, unless modified in writing, explicitly acknowledged and agreed to, and signed by duly authorized representatives of both Parties.

13.7   Survival Clause.  All indemnity obligations in this Agreement shall survive the termination of this Agreement, regardless of the cause or reason for termination

13.8   Representations and Warranties.

Company represents and warrants:

Exhibit A

(a)     that Company has drafted, prepared and reviewed this Agreement, including these indemnification obligations with its own counsel, or that Company has foregone such review at own option: and

(b)     that the forgoing indemnification obligations are clear and conspicuous.

Contractor represents and warrants:

(a)     that Contractor has reviewed these indemnification obligations with its own counsel, or that Contractor has foregone such at its own option; and

(b)     that the foregoing indemnification obligations are clear and conspicuous.

13.9    Reformation.  If it is judicially determined that an indemnity obligation assumed by either Party exceeds the maximum extent permitted by law, such indemnity obligation, and any related insurance obligation, shall automatically be amended so as to be effective to the maximum extent permitted by the law.

## ARTICLE 14 - INTELLECTUAL PROPERTY

14.1    With respect to patents, copyrights, proprietary rights, confidential know-how, and all other intellectual property rights (collectively, "Proprietary Rights"), neither Party shall have the right to use, whether directly or indirectly, other than for the purposes of the applicable Work Order, any such Proprietary Right provided by the other Party or its Group.

14.2    Where any potential patent or registerable right in any country in the world results from developments by Contractor which are based wholly on data, equipment, processes, substances and the like in the possession of Contractor at the applicable Work Order Effective Date, such rights shall vest in Contractor.

14.3    Except as provided in Section 14.2, Company reserves the sole right to seek patents or registerable rights in any country in the world on any item or idea arising out of or invented during the term of the applicable Work Order as a direct result of the Services. Contractor agrees to notify Company promptly of any potentially patentable or other registerable ideas conceived during the term of the Work Order. Contractor agrees to provide co-operation in all efforts by Company to obtain such patents or other registerable rights, and will be reimbursed a reasonable charge for the extra time and expense required. Company agrees to grant Contractor a royalty-free license either to use any patents or other registerable rights developed out of the Work Order or to permit a Subcontractor to manufacture or otherwise use the patents or other registerable rights for the ultimate use only of Contractor. Contractor shall promptly and fully reduce to writing and deliver to Company all ideas, conceptions, methods, techniques, systems, improvements, discoveries, inventions and other information, as well as any applications thereof (collectively, the "Intellectual Property Work Product"), which Contractor may make, discover, conceive or otherwise become aware of during the Term of this Agreement and for two years thereafter, which result from or are suggested by any Services which Contractor does or did for or on behalf of a Company pursuant to this

Exhibit A

Agreement and the same shall be the sole and exclusive confidential or intellectual property, as the case may be, of Company. Contractor hereby waives any moral rights that it may have respecting copyright in the Intellectual Property Work Product.

14.4   In the event a patent is obtained as a result of work carried out by Contractor's Subcontractor, the rights of Contractor described in <u>Section 14.3</u> shall be extended to that Subcontractor.

14.5   Notwithstanding the provisions of <u>Sections 14.3</u> and <u>14.4</u>, Company may at its sole discretion give Contractor a written release in respect of any such item or idea. Contractor agrees to grant Company a royalty-free, irrevocable, world-wide license to use any patent or other registerable right obtained by Contractor as a consequence thereof on any such item or idea.

14.6   Contractor warrants that all Services covered by this Agreement and the Work Orders and the sale or use of any of them will not infringe on any Proprietary Rights. In case Services provided by Contractor or their use are held to constitute an infringement and their use is enjoined, Contractor shall promptly secure for Company the right to continue using the affected work or materials, replace the work or materials with non-infringing work or materials, or if unable to do any of the foregoing, Contractor shall remove the infringing work or materials and refund all monies paid by or on behalf of Company therefore.

14.7   **CONTRACTOR SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS COMPANY GROUP FROM ALL CLAIMS FOR OR ARISING OUT OF ANY INFRINGEMENT OF ANY PROPRIETARY RIGHT WHICH ARISES OUT OF OR IN CONNECTION WITH CONTRACTOR'S SERVICES, EXCEPT WHERE SUCH INFRINGEMENT RESULTS FROM CONTRACTOR'S COMPLIANCE WITH DESIGNS AND/OR SPECIFICATIONS FURNISHED BY COMPANY, OR WITH INSTRUCTIONS GIVEN BY COMPANY, FOR THE PURPOSE OF DIRECTING THE MANNER IN WHICH CONTRACTOR SHALL PERFORM THIS AGREEMENT, THE APPLICABLE WORK ORDER AND/OR THE SERVICES.**

## ARTICLE 15 - CONFIDENTIAL INFORMATION

15.1   Contractor hereby covenants and agrees with Company that Contractor will not, either during or after the Term of this Agreement, reveal to any Third Party or use for Contractor's own purposes or for any purposes other than those of Company, any Confidential Information originated by or acquired by Contractor or to which Contractor may become privy in the course of providing Services for a Company. The term "<u>Confidential Information</u>" includes all technical, economic, financial, marketing or other information regarding Company or its Affiliates which is not common knowledge among competitors of Company or its Affiliates or others who might wish to possess such information or might find it useful, or any information which at any time may be communicated to Contractor (whether verbally or in writing and is, at the time, identified as confidential) as being Confidential Information, including, without limitation, any

Exhibit A

information covered by a third-party confidentiality agreement. All drawings, blue-prints, specifications dies, patterns, tools, etc., which are paid for by Company, i.e., whether supplied by Company or prepared or constructed by Contractor as a requirement for completion of Services which are paid for by Company, shall be the property of Company and information therefrom shall be considered Confidential Information and will not be disclosed to any other party without the prior written consent of Company, and upon completion of the relevant Services, or upon termination of this Agreement, the same shall be promptly delivered to Company unless otherwise agreed to in writing and signed by Company's authorized representative; however, Contractor may retain one copy of such Confidential Information for archive purposes.

(a)   Notwithstanding any of the foregoing, these restrictions shall not apply to Confidential Information: (i) that is or becomes public information or otherwise generally available to the public through no act or fault of Contractor or any member of Contractor Group; (ii) that is, prior to disclosure hereunder, already in the possession of Contractor or any member of Contractor Group and was not received by Contractor or such Contractor Group member directly or indirectly from a Company or its Affiliates subject to a confidentiality agreement; or (iii) that is hereafter rightfully received by Contractor from a third party whose disclosure of such information is lawful and not in breach of any contract; *provided, however,* that (a) specific Confidential Information shall not be deemed to be within the exceptions of the preceding provision merely because it is embraced by more general information within such exceptions, and (b) information that is subject to a third-party confidentiality agreement which restricts Company's disclosure of same shall not be deemed within the foregoing exceptions unless allowed under such third-party confidentiality agreement, provided that Company makes Contractor aware that such information is subject to such third-party confidentiality agreement.

(b)   Notwithstanding any of the foregoing, the Parties do not intend for any obligations of confidentiality contained herein to limit disclosure in any way that would cause it to be treated as a "confidential transaction" under Treasury Regulation 1.6011-4(b) (3).   Pursuant to Treasury Regulation 1.6011-4(b)(3)(iii), either Party may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) relating to such tax treatment and tax structure.

(c)   Contractor shall ensure that all members of Contractor Group likewise protect the confidentiality and Company's and/or its Affiliates' ownership of the Confidential Information.

(d)   **BREACH OF CONFIDENTIALITY. CONTRACTOR HEREBY AGREES TO AND SHALL INDEMNIFY, DEFEND, AND HOLD COMPANY GROUP HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS OF ANY ENTITY, INCLUDING, WITHOUT**

Exhibit A

**LIMITATION, COMPANY GROUP, FOR, RESULTING FROM OR ON ACCOUNT OF CONTRACTOR'S BREACH OF THIS ARTICLE 15.**

(e)   The requirements of this <u>Article 15</u> shall survive the termination or completion of any applicable Work Order for a period of five (5) years after such termination or completion.

## ARTICLE 16 - HEALTH, SAFETY AND THE ENVIRONMENT

16.1   <u>Compliance with Laws, Observance of Generally Known Safety Principles</u>. While on Company's Premises and while performing any aspect of the Services, Contractor agrees to, and shall cause all members of Contractor Group to, comply with all applicable federal, state and local laws and regulations. Contractor shall cause all members of Contractor Group to be cognizant of safety concerns and to observe generally known safety principles, e.g., prohibiting smoking and limiting the use of fire and ignition sources in areas where hydrocarbon products and vapors are likely to be found, in addition to following all guidelines set by Company, and provided to Contractor in writing, and limiting certain activities (including, without limitation, the aforementioned smoking and use of fire and ignition sources) to such locations and occasions as are designated by Company Representative. Contractor shall cause all equipment used by any member of Contractor Group to be in a safe operational condition and subject at all times to Company's inspection.

16.2   <u>Company's HS&E Policies and Procedures</u>. Contractor shall observe and comply with, and shall cause all members of Contractor Group to observe and comply with, Company's health, safety and environment policies and procedures, as such may be amended from time to time, which shall be provided, in writing, by Company Representative.  It shall be the responsibility of Company to provide the aforementioned policies and procedures and, upon receipt, Contractor will ensure that its personnel comply with said policy, regulations and procedures.

16.3   <u>Site Conditions</u>. Contractor agrees that members of Contractor Group may be required by Company to attend meeting to review health, safety and environment policies and procedures before entering Company's Premises. It shall be Contractor's responsibility to establish with Company which members of Contractor Group must attend such meetings and to ensure attendance by same.

16.4   <u>Contractor Group's Standard HS&E Policies and Procedures</u>. Contractor shall ensure that all members of Contractor Group carry out its and their own standard policies and procedures with regard to health, safety and the environment, including, without limitation, the strict obligation to report unsafe working conditions, hazards, dangerous incidents, accidents and hazardous material releases and contamination.

16.5   <u>Compliance with Company's Safety Order is Mandatory</u>. Contractor shall cause all members of Contractor Group to obey and comply with any and all written instructions and orders given to them by Company Representative or any officer of Company in all matters relating to safety. **Contractor shall instruct each member of Contractor**

Exhibit A

**Group that, if any such Contractor Group member feels an unsafe working environment is caused or exacerbated by Company's instructions and/or orders, such Contractor Group member shall report same to his Contractor Group supervisor. Upon such notice by any Contractor Group member, Contractor shall give immediate verbal notice of same to Company, with subsequent written notice sent to:**

Black Elk Energy, LLC

_____

_____

16.6   Not used

16.7   **Not used**

16.8   **Not used**

16.9   Without relieving Contractor of its obligations hereunder, it is agreed that Company may take part, to any degree it deems necessary, in the control and removal of any pollution or contamination.  To the extent that Contractor is liable under Section 13.1.(c); Contractor shall reimburse Company for the costs of such removal operations upon receipt of an invoice for same from Company. Initiation of response operations by either Party shall not be construed as an admission or assumption of liability.

16.10   Notice of Environmental Event. Contractor shall immediately upon knowledge of any pollution or contamination event at or near Company's Premises, give verbal notice to Company Representative, with written notice to be timely provided after such event becomes known to Contractor.

## ARTICLE 17 - NON-DISCRIMINATION; DRUGS, ALCOHOL AND FIREARMS

17.1   Contractor shall comply and shall cause all its subcontractors to comply with those laws, rules, and regulations described on Exhibit B attached hereto which is incorporated herein by reference.

17.2   Contractor agrees to comply with and be bound by Company's Policy against Drugs, Alcohol and Firearms a copy of which is attached as Exhibit C hereto and made a part hereof.  Further, Contractor shall advise its employees and any of its Subcontractors' employees of said policy and will cause such persons to comply therewith.

## ARTICLE 18 - INDEPENDENT CONTRACTOR

18.1   Contractor shall perform the Services as an independent contractor, providing the manner, means, and methods of performance of the Services, subject to the health, safety and environmental restrictions set forth herein, as applicable. No member of Contractor Group will be considered a servant, agent, or employee of Company or any of its Affiliates, and no member of Contractor Group is entitled to receive unemployment insurance or workers compensation benefits from Company or any of its Affiliates as a

Exhibit A

result of this Agreement or any Services provided. With regard to all members of Contractor Group, Contractor shall be responsible for ensuring the payment of:

(a)     all employment taxes and worker's compensation insurance premiums related to the Services; and

(b)     all federal and state income tax on any money earned pursuant to the Services, and Company will not be responsible for withholding or remitting income taxes related to Contractor's Services.

In the event that Contractor's employee or its Subcontractor's employees are deemed to be Company employees by any government authority, Contractor shall reimburse Company for any corresponding taxes or fees paid by Company.

18.2    No member of Contractor Group shall have authority to make any representations for Company or to bind Company in any way by virtue of this Agreement or any Work Order, except as may be otherwise expressly provided in a Work Order. This Agreement does not establish a joint venture, partnership, or any other type of business association between the Parties, nor shall any Work Order. The Parties acknowledge that the arrangements hereunder are nonexclusive and Company shall be free to use other contractors for similar services as Contractor typically provides, and Contractor shall be free to provide similar services to other clients and/or customers..

18.3    Except as otherwise expressly provided in this Agreement, and any applicable Work Order,  neither Party, or member of its Group, shall not be responsible for the acts or omission of the other Party or member of its Group.

## ARTICLE 19 - COMPLIANCE WITH LAWS AND REGULATIONS

19.1    Each Party shall comply with all federal, state, and local laws, rules and regulations including but not limited to worker's compensation, social security, federal, state, and local income tax withholdings, unemployment insurance, the Occupational Safety and Health Act, the Immigration Reform and Control Act of 1986, the Americans with Disabilities Act, and all laws affecting employment, business opportunities, and the environment which are now or may in the future become applicable to the Party and/or the Party's business, equipment, and employees and/or the performance of this Agreement.

19.2    Each Party shall furnish the other Party evidence of compliance as such Party may reasonably require at any time.

## ARTICLE 20 - SUSPENSION OR TERMINATION OF SERVICES

20.1    Company shall have the right to suspend the progress of Services or any part thereof at any time for Company's convenience.  In the event a Company suspends all or any part of the Services, such Company shall compensate Contractor for all reasonable costs incurred as a result thereof (including, but not limited to, the cost to demobilize and re-mobilize Contractor Group's personnel and equipment), except where such suspension

Exhibit A

arises out of Contractor's breach of this Agreement or the applicable Work Order. During such suspension Contractor shall use commercially reasonable efforts to re-deploy its personnel. In the event that the suspension continues for more than fourteen (14) days, Contractor shall have the right, but not the obligation, to terminate the applicable Work Order, and in such case, Contractor shall be entitled to payment for the Services performed in accordance with the terms of this Agreement and the applicable Work Order prior to such termination, plus costs reasonably incurred by Contractor as a result of such termination, including the cost to de-mobilize Contractor Group's personnel and equipment.

20.2   If Contractor fails at any time to fully comply with any obligations under the applicable Work Order, Company may, at its option, provide Contractor with written notice of such breach; in the event that Contractor fails to timely commence, and there after diligently pursue, action to remedy such failure,  Company may, by written notice to Contractor, terminate the applicable Work Order. In the event of termination due to Contractor's default, Contractor shall be entitled to payment only for the Services performed in accordance with the terms of this Agreement and the applicable Work Order prior to such termination. Any additional costs reasonably incurred by Company as a direct result of such termination shall be recoverable from Contractor, however, in no event shall Contractor be liable for any additional costs in excess of twenty-five percent (25%) of the amount that Contractor would have been paid had it completed the Work terminated.

## ARTICLE 21 - PUBLICITY

21.1   No member of Contractor Group shall publish or permit to be published (either alone or in conjunction with any other entity) any information, article, photograph, or other material of any kind relating to a Work Order, or Company's or its Affiliates' respective businesses generally, without Company's prior written approval, which approval shall not be unreasonably withheld, conditioned or delayed. Such approval when given shall apply to only the circumstance for which such approval was given and no other.

Notwithstanding the foregoing, upon approval, Contractor may identify Company as a client or customer.

## ARTICLE 22 - WAIVER

22.1   No waiver by any Party of any provision of this Agreement or any Work Order shall be binding unless expressly confirmed in a writing which is executed by a duly authorized representative of the Party granting the waiver. Further, any such waiver shall apply only to the matter to which it expressly relates and shall not apply to any subsequent or other matter, non-compliance or breach, whether of a similar or dissimilar kind.

## ARTICLE 23 - ASSIGNMENTS AND SUBCONTRACTORS

23.1   Neither Party may assign or transfer this Agreement or any Work Order, without obtaining the previous written consent of the other Party, which consent shall not be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Company

Exhibit A

may assign this Agreement and any Work Order after written notice to Contractor under the following circumstances or conditions:

(a)    the assignment is to an Affiliate of Company; or

(b)    the assignment is to any person or entity succeeding to all or substantially all of Company's assets.

The assigning Party shall not be relieved of any obligation, liability or responsibility under the Agreement and/or Work Order assigned.

## ARTICLE 24 - GOVERNING LAW AND VENUE

24.1    **THIS AGREEMENT SHALL BE GOVERNED BY AND INTERPRETED IN ACCORDANCE WITH GENERAL MARITIME LAWS OF THE UNITED STATES, BUT IF THE GENERAL MARITIME LAWS OF THE UNITED STATES ARE NOT APPLICABLE, THE LAWS OF THE STATE OF TEXAS (EXCLUSIVE OF ANY PRINCIPLES OF CONFLICTS OF LAWS WHICH WOULD DIRECT APPLICATION OF THE SUBSTANTIVE LAWS OF ANOTHER JURISDICTION) SHALL GOVERN.** VENUE FOR ANY AND ALL CAUSES OF ACTION THAT ARISE UNDER THIS AGREEMENT SHALL BE IN HARRIS COUNTY, TEXAS.

## ARTICLE 25 - THIRD-PARTY BENEFICIARIES

25.1    This Agreement and each Work Order is for the benefit of the respective Parties and nothing herein or in such Work Order is intended to benefit any other entity not a Party hereto or thereto, and no such entity shall have any rights, remedies, or claims hereunder or thereunder, except as actually expressed hereunder or thereunder.

## ARTICLE 26 - ENTIRE AGREEMENT; AMENDMENTS

26.1    As between Contractor and each individual Company, this Agreement and any applicable Work Order between Contractor and such Company together contain the entire agreement with respect to the subject matter of this Agreement and such Work Order. No representations, understandings, or commitments, either written or oral, which are alleged to be applicable to such Work Order will have any force or effect with respect to such Work Order, except modifications or amendments to either this Agreement or to such Work Order which are agreed to in writing by duly authorized representatives of Contractor and Company.

## ARTICLE 27 - NOT USED

## ARTICLE 28 - SEVERABILITY

28.1    If any provision of this Agreement or any Work Order is held invalid or unenforceable, such invalidity or unenforceability shall not affect in any way the validity or enforceability of any other provision of this Agreement or any Work Order. In the event

31

Exhibit A

any provision is held invalid or unenforceable, the Parties shall attempt to agree on a valid or enforceable provision that will be a reasonable substitute for such provision, in light of the intent of this Agreement and/or the applicable Work Order and, on so agreeing, shall incorporate such substitute provision in this Agreement or the applicable Work Order. If no such agreement is reached between the Parties, the invalid or unenforceable provision shall be deemed automatically stricken, but only to the extent necessary to make the affected terms and conditions valid and enforceable.

**ARTICLE 29 - NOT USED**

.

**ARTICLE 30 - TERM AND TERMINATION**

30.1 The term of this Agreement ("Term") shall begin on the Effective Date and shall continue thereafter until such time as Contractor or a Company shall cause termination hereof by providing at least thirty (30) days prior written notice to the other Party. Company shall have the right to terminate this Agreement and/or the Services in whole or in part, without cause, at any time by notice in writing to Contractor. Upon receipt of any such notice, Contractor shall cease all Services, if applicable, as provided in said notice. If Company's notice of termination of the Agreement, requires Contractor to cease all Services, said Services and the Agreement shall be terminated effective as of the date the notice is received by Contractor.

If at the time of a termination of the Agreement, there exists any outstanding Work Order(s) between Contractor and Company, Company at its sole discretion may require Contractor to continue work under the terms and conditions of the Agreement for so long, and only so long, as it takes for the Services under such existing Work Order(s) to be fully completed, but provided, further, that any termination of this Agreement or any Work Order shall not affect the continuing effectiveness of those terms which by their nature should reasonably be expected to survive such termination, including, without limitation, the payment provisions, indemnity provisions, and confidentiality provisions. Each Work Order will become effective upon execution or as otherwise set forth in such Work Order.

In the event that Company decides to terminate this Agreement during Contractor's performance of Services under a Work Order by exercising its right to terminate one or all outstanding Work Orders, the total settlement price through the date of cancellation shall be valued at rates and prices consistent with the amounts applicable to the Services or, if on a cost reimbursable basis, consistent with the time and material rates under this Agreement. In no event shall Contractor be entitled to anticipated profits or any damages because of such termination Contractor will not be permitted to terminate this Agreement while any Services under outstanding Work Order(s) are not complete.

**ARTICLE 31 - NOT USED**



Exhibit A

## ARTICLE 32 - NOTICES

32.1   Notices, statements, payments, insurance certificates, and other communications under this Agreement or a Work Order must be in writing and delivered by:

(a)   United States first class, certified, or registered mail, postage prepaid;

(b)   Express delivery service;

(c)   Hand-delivery; or to the relevant Party's address as follows, or such other address as the relevant Party may designate from time to time by giving fifteen (15) days prior written notice to the other Party; or

(d)   Electronic Mail which can produce a written copy, provided that acknowledgement of receipt of the electronic mail notice is obtained

To Company:

All notices regarding this Agreement and/or any Work Order, to:

Black Elk Energy, LLC
11451 Katy Freeway, Ste. 500
Houston, TX 77079
Attn: Joe Matthews
Facsimile:
E-mail: jmatthews@blackelkenergy.com

To Contractor:

All notices regarding this Agreement and/or any Work Order shall be sent to:

JAB Energy Solutions II, LLC
_____
Attn:_____
Facsimile:_____
E-mail:_____

## ARTICLE 33 - COUNTERPARTS

33.1   This Agreement and any Work Order may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The signature of a Party delivered by facsimile or by a pdf. format document sent electronically, to be followed by original signatures in due course, shall be deemed the original signature of such Party.

33

Exhibit A

## ARTICLE 34 - BINDING EFFECT

34.1   All rights conferred by this Agreement shall be binding upon, inure to the benefit of, and be enforceable by or against the respective successors and assigns of the Parties hereto.

## ARTICLE 35 - ETHICAL BUSINESS PRACTICES

35.1   Contractor shall disclose in writing and assist Company in identifying any financial transactions between any employee of Company, including family members, and Contractor, its officers, directors, shareholders/owners and employees.

## ARTICLE 36 - HEADINGS

36.1   The titles to each of the various sections in this Agreement and/or any Work Order are included for convenience of reference only and shall have no effect on, or be deemed as part of the text of this Agreement.

## ARTICLE 37 - SURVIVAL

37.1   **THE INDEMNIFICATION PROVISIONS STATED HEREIN SHALL SURVIVE THE TERM OF THIS AGREEMENT.**

37.2   Except as otherwise provided herein warranties, covenants, obligations, commitments, and compliance with laws as defined in the above terms and conditions shall survive termination or cancellation of this Agreement, regardless of the reason for such termination or cancellation, and shall continue in full force and effect.

## ARTICLE 38 - EXHIBIT A

38.1   Exhibits and attachments to this Agreement include the following, which are incorporated herein by this reference.

Exhibit A — Form of Work Order
Exhibit B — Non-Discrimination Provisions
Exhibit C — Policy Against Drugs, Alcohol and Firearms

Exhibit A

IN WITNESS WHEREOF, the duly authorized representatives of the Parties have caused this Agreement to be executed as of the Effective Date first written above.

COMPANY:

**BLACK ELK ENERGY, LLC**

By: _____

Name: J.D. Matthews

Title: Vice President - Land

CONTRACTOR:

**JAB ENERGY SOLUTIONS II, LLC**

By: _____

Name: _____

Title: _____

## EXHIBIT A
## FORM OF WORK ORDER

Work Order # _____

entered into pursuant to Master Service Agreement # _____

the terms and conditions of which are incorporated herein by this reference.

Date: _____, 2013

| COMPANY *(Provide full legal name)*: | CONTRACTOR *(Provide full legal name and address)*: |
|---|---|
| _____ | _____ |
| Company Representative:_____ | Contractor Representative:_____ |

Services under this Work Order are to be provided:

LOCATIONS:_____

START DATE:_____  COMPLETION DATE: _____

## SCOPE OF SERVICES

*(If additional documentation is attached, indicate so and reference the Work Order # on each attached document)*

1.  Detailed Description of Services *(including, but not limited to, equipment and personnel to be provided by Contractor, and  incidental goods, if any, Contractor will deliver)*:

2.  Company's specifications *(attached hereto and made a part hereof )* identified and described as follows:

3.  Company-provided equipment, consumables *(all assumed Contractor-provided unless otherwise stated)*:

4.  Special Provisions and/or Conditions that supplement and/or modify the terms of the Agreement as follows:

**NO WORK SHALL BE COMMENCED FOR COMPANY OR ON COMPANY PROPERTY UNTIL DULY AUTHORIZED REPRESENTATIVES OF BOTH PARTIES SIGNED THIS WORK ORDER AND EACH PARTY HAS PROVIDED TO THE OTHER PARTY A CERTIFICATE OF INSURANCE.**

Exhibit A

| COMPANY: | CONTRACTOR: |
|---|---|
| Signature: _____ | Signature: _____ |
| Printed Name: _____ | Printed Name: _____ |
| Authorized Representative of Company or its General Partner or Manager, as applicable | Authorized Representative of Contractor or its General Partner or Manager, as applicable |

Exhibit A

## EXHIBIT B
## NON-DISCRIMINATION PROVISIONS

1.    Compliance with Applicable Laws:

A.    Compliance Generally:

This Agreement shall be performed by Contractor in compliance with all applicable laws, proclamations, orders, rules, and regulations, including without limitation, Executive Order No. 11246 signed by the President of the United States of America on September 24, 1965, as amended, and the rules, regulations, and orders issued thereunder.

B.    Executive Order No. 11246:

During the performance of this Agreement and to the extent required by Executive Order No. 11246 or any contract between Contractor and any government contracting agency, Contractor agrees to comply with the Equal Opportunity clause set forth in section 60-1.4 of title 41 of the Code of Federal Regulations issued pursuant to Executive Order No. 11246, such regulations being incorporated herein by reference (as permitted by section 60-1.4(d) of said Regulations) as if set out in full at this point and the term "Contractor" as used therein shall be deemed to be references to Contractor.

C.    Certification of Non-Segregated Facilities:

Contractor certifies that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained.  Contractor agrees that a breach of this certification is a violation of the Equal Opportunity clause required by Executive Order No. 11246 of September 24, 1965.

As used in this certification, the term "segregated facilities" includes facilities which are segregated by explicit directive or are in fact segregated on the basis of race, creed, color, or national origin, because of habit, local custom, or otherwise.

Contractor further agrees and understands that a breach of the assurances contained herein subjects it to the provisions of the Order of the Secretary of Labor at 41 CFR 60, dated May 28, 1968, and the provisions of the Equal Opportunity clause enumerated in applicable contracts.

Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for specific time periods) it will obtain identical certifications from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal

Exhibit A

Opportunity clause; that it will retain such certifications in its file; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for specific time periods).

### NOTICE TO PROSPECTIVE SUBCONTRACTORS OF REQUIREMENT FOR CERTIFICATIONS OF NON-SEGREGATED FACILITIES

A certification of Non-Segregated Facilities, as required by the May 9, 1967, Order on Elimination of Segregated Facilities, by the Secretary of Labor (32 Fed. Reg. 7439, May 19, 1967), must be submitted prior to the award of a subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity clause.  The certification may be submitted either for each subcontract or for all subcontracts during a period. (i.e. quarterly, semiannually or annually)

(Note: Whoever knowingly and willfully makes any false, fictitious or fraudulent representation may be subject to criminal prosecution under 18 U.S.C. § 1001.)

2.   Affirmative Action for Disabled Veterans and Veterans of the Vietnam Era (41 CFR 60-250) (Applicable only to contracts for $10,000 or more.):

The Affirmative Action clause prescribed in section 60-250 of title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by Section 60-250.22 of said Regulations) as if set out in full at this point.  If Contractor (i) has 50 or more employees and (ii) this contract is for $50,000 or more, then, within 120 days from the effectiveness of this contract, Contractor shall prepare and maintain an affirmative action program at each establishment which shall set forth Contractor's policies, practices, and procedures in accordance with section 60-250.6 of said Regulations.

3.   Affirmative Action for Handicapped Workers (41 CFR 60-741.4) (Applicable only to contracts for $2,500 or more.):

The Affirmative Action clause prescribed in section 60-741.4 of title 41 of the Code of Federal Regulations is incorporated herein by reference (as permitted by section 60-741.22 of said Regulations) as if set out in full at this point.  If Contractor (i) has 50 or more employees and (ii) this contract is for $50,000 or more, then, within 120 days from the effectiveness of this contract, Contractor shall prepare and maintain an affirmative action program at each establishment which shall set forth Contractor's policies, practices and procedures in accordance with section 60-250.6 of said Regulations.

Exhibit A

4.    Minority Business Enterprises (Federal Procurement Regulations 1-1.13):

A.    Utilization of Minority Business Enterprises (Applicable only to contracts which may exceed $10,000):

(1)    It is the policy of the Government that minority business enterprises shall have the maximum practicable opportunity to participate in the performance of government contracts.

(2)    Contractor agrees to use its best efforts to carry out this policy in the award of its subcontracts to the fullest extent consistent with the efficient performance of this contract.  As used in this contract, the term "minority business enterprise" means a business at least 50% of which is owned by minority group members or, in the case of a publicly-owned businesses at least 51% of the stock of which is owned by minority group members. For the purposes of this definition, minority group members are African American, Spanish-speaking American persons, American-Orientals, American-Indians, American-Eskimos, and American-Aleuts.  Contractor may rely on written representations by subcontractors regarding their status as minority business enterprises in lieu of an independent investigation.

(3)    Minority Business Enterprises Subcontracting Program (Applicable only to contracts which may exceed $500,000 and which offer substantial subcontracting possibilities.)

(4)    Contractor agrees to establish and conduct a program which will enable minority business enterprises (as defined in the clause entitled "Utilization of Minority Business Enterprises") to be considered fairly as subcontractors and suppliers under this contract.  In this connection, Contractor shall:

(a)    Designate a liaison officer who will administer Contractor's minority business enterprises program.

(b)    Provide adequate and timely consideration of the potentialities of known minority business enterprises in all "make-or-buy" decisions.

(c)    Assure that known minority business enterprises will have an equitable opportunity to compete for subcontracts, particularly by arranging solicitations, time for the preparation of bids, quantities, specifications, and delivery schedules so as to facilitate the participation of minority business enterprises.

(d)    Maintain records showing (i) procedures which have been adopted to comply with the policies set forth in this clause, including the establishment of a source list of minority business enterprises, (ii)

40

Exhibit A

awards to minority business enterprises on the source list, and (iii) specific efforts to identify and award contracts to minority business enterprises.

(e)    Include the Utilization of Minority Business Enterprises clause in subcontracts, which offer substantial minority business enterprises subcontracting opportunities.

(f)    Cooperate with the Contracting Officer in any studies and surveys of Contractor's minority business enterprises procedures and practices that the Contracting Officer may from time to time conduct.

(g)    Submit periodic reports of subcontracting to known minority business enterprises with respect to the records referred to in subparagraph (d) above in such form and manner and at such time (not more often than quarterly) as the Contracting officer may prescribe.

(5)    Contractor further agrees to insert in any subcontract hereunder which may exceed $500,000 provisions which shall conform substantially to the language of this clause, including this paragraph (2), and to notify the Contracting officer of the names of such subcontractor

Exhibit A

# EXHIBIT C
# POLICY AGAINST DRUGS, ALCOHOL AND FIREARMS

This policy is required in order to insure a safe workplace for all employees and visitors to Company property.

I.      Illegal and Unauthorized Items

1.      All Contractor employees, agents and/or invitees and employees, agents and/or invitees of its subcontractors, hereinafter, ("Contractor Personnel") are notified that drugs, narcotics, drug paraphernalia, alcohol and other mind-affecting substances and firearms are not permitted on any Company property, including barges, vessels, platforms and helicopters owned by others under hire to Company.

2.      Contractor Personnel that are found in possession of these unauthorized items will be subject to disciplinary action up to and including dismissal.

3.      Contractor Personnel that are found in possession of these items will be immediately removed from Company property, including such barges, vessels, platforms and helicopters under hire, and transported to shore by the quickest available transportation at their expense.  Their employers will be notified that they will not be allowed on Company property in the future and the reason for this action.

4.      The use and possession of illegal and unauthorized items represent not only a safety threat to Company property, but more importantly, to personnel, oilfield operations, particularly offshore, and require everyone's attention to safety, and personnel under the influence of drugs and alcohol are not only a threat to themselves, but all personnel.

Consequently, all Contractor Personnel are expected to report to their supervisor any knowledge they have of any personnel possessing unauthorized items.  Failure to report this activity is considered a failure to perform your job satisfactorily and may be grounds for dismissal.

II.     Searches and Inspections

1.      Company reserves the right to have authorized personnel, conduct searches or inspections of Contractor Personnel's personal effects, lockers, baggage, and quarters including barges, vessels and helicopters, for the purpose of determining if any employees are in possession of any illegal or unauthorized items.

2.      Any Contractor Personnel who refuses to submit to a search will be subject to disciplinary action up to and including immediate discharge.

Exhibit A

**Exhibit "B" to**

**Acknowledgement of Assignment of Master Services Agreement**

**WORK ORDER**

This Work Order dated June 9, 2017, between Black Elk Liquidating Trust ("**Company**") and JAB Energy Solutions II, LLC ("**Contractor**" or "**JAB**"), is issued under the provisions of that certain Master Services Agreement For Decommissioning Services between Black Elk Energy LLC and JAB, dated April 26, 2013 (the "**JAB MSA**").

1.      _Terms and Conditions._  The terms and conditions of the JAB MSA, as amended by this Work Order, will control this Work Order. As a condition precedent to this Work Order becoming binding, not later than Tuesday, June 13, 2017, Company and Contractor shall obtain from Argonaut Insurance Company, W&T Offshore, Inc., and Energy XXI GOM, LLC, by written representation from counsel, approval of the form of the Work Order, including, but not limited to the Payment Terms set forth in Schedule A hereto.

2.      _Scope of Services to be Provided._  The Company has issued a notice of default to Montco, has terminated its services agreement with Montco, and now retains JAB to complete all of the work that Montco failed to complete.  The scope of work (the "**Work**") to be provided by Contractor to Company under this Work Order and compensation for performing such Work shall be determined in accordance with the JAB MSA, as amended by this Work Order.

3.      _Special provisions_.

          The JAB MSA is, for the purposes of this Work Order, amended as follows:

          a.      The "Company" for the purposes of this Work Order is the Black Elk Liquidating Trust.

          b.      Company's representative for this Work Order is: Joe Bruno.

          c.      Contractor's representative for this Work Order is:  Brent Boudreaux.

          d.      All notices regarding the JAB MSA and/or this Work Order shall be sent to:

- To Company:

  Black Elk Liquidating Trust
  5126 Westerdale Dr.
  Fulshear, TX 77441
  Attention:  Joe Bruno
  E-Mail: jbruno@blackelkenergy.com

  With copy to counsel:

  Okin Adams LLP
  1113 Vine St., Suite 201
  Houston, TX 77002
  Attention:  David Curry
  Email:
  dcurry@okinadams.com

- To Contractor:

  JAB Energy Solutions II, LLC

-4-

262 North Sam Houston Parkway East
Suite 230
Houston, Texas 77060
Attention: Brent Boudreaux
E-Mail: boudreaux@jabenergysolutions.com

e. Any other special provisions applicable to this Work Order which are mutually agreed to by Company and Contractor or listed or described on the attached Schedule A.

f. The payment terms set forth in this Work Order supersede the payment terms set forth in the JAB MSA, including Section 8 thereof.

ACCEPTED:        ISSUED:

JAB Energy Solutions II, LLC:    Black Elk Liquidating Trust

By: _Brent Boudreaux_     By: _____
Name: _Brent Boudreaux_    Name: _Richard Schmidt_
Title: _President_      Title: _Trustee_
Date: June 8, 2017      Date: June 9, 2017

-5-

Exhibit 11

## Schedule A to Work Order dated effective June 9, 2017

**A.    CONTRACT TERMS**

The following shall take precedence over any conflicting or inconsistent terms contained in the JAB MSA and supersedes any other agreements between Company and Contractor with respect to the services and scope of work contemplated by this Work Order.

This contract ("**Work Order**" or "**Contract**") shall continue in effect until the earlier of (i) Contractor's complete and satisfactory performance of the Work pursuant to the terms of this Contract and the JAB MSA, or (ii) the earlier termination of this Contract due to an Event of Default as defined in accordance with Section A.8. below. Upon the termination of this Contract, all rights and obligations based on breach or performance prior to such termination and all rights and obligations which are continuing in nature, including, without limitation, all rights and obligations in connection with the information, records and audit provisions, the indemnity provisions, and the confidentiality provisions hereof shall survive.

1.    This Work Order (being the pricing set forth in this Work Order for Contractor's completion of all of the Work) is based on the understanding that Contractor will have sole and unhindered access to the site subject, however, to any necessary governmental/regulatory authorizations or permits.

2.    This Work Order is based on Contractor taking ownership of the platform components "on the hook", Contractor will offload and dispose of ALL platform components.

3.    This Work Order is based on all governmental laws and regulations issued by the appropriate authorities having jurisdiction over Contractor and its work as of the date of this Work Order.

4.    Contractor does not accept damages to wells and platforms which occur after the date of this Work Order and prior to the removal that materially change the scope of work as set forth herein; provided, (i) any such damages are not caused in whole or in part by any member of the Contractor Group, and (ii) at the earliest practical time after commencement of Work discovering that such a condition exists, Contractor will immediately document such condition, provide written notice to the Company, and stop work until further instruction from the Company.

5.    This Work Order is based on the tubular in the well bores having integrity and that rigless P&A techniques can be utilized to plug the wells. Contractor's bid does not include the use of a drilling rig or snubbing unit to plug the wells.

6.    Contractor shall promptly commence the scope of work set forth in Section C. upon execution of this Work Order.

-6-

7.     Contractor will (i) timely pay its vendors, contractors and subcontractors and (ii) not assert any claims against the Trustee or any other party (whether a bond surety referenced herein, a co-owner or prior owner of any of the oil and gas properties of concern) for any amounts over and above the amounts set for on Exhibit "A-1" for the designated locations and scope of work set forth in Section C., unless the parties hereto otherwise agree in writing for Contractor to perform extra work outside of the scope of this Contract.

8.     In substitution for the termination provisions of JAB MSA 30.1, Company and Contractor agree that Company may elect to terminate the JAB MSA and this Work Order by written notice to Contractor in the Event of Default. "Event of Default" shall mean the occurrence of any event set forth below which, following delivery of a written notice of default to Contractor from Company, Contractor fails to cure within sixty (60) days, in which case this Contract may be terminated by Company:
a.     Contractor neglects to supply a sufficiency of properly skilled workmen, materials, or equipment of the proper quality and quantity;
b.     Contractor fails to prosecute the Work or any portion thereof in an efficient, workmanlike, skillful, diligent and careful manner;
c.     Contractor fails to comply, in any material respect, with any of the terms of this Contract;
d.     Contractor fails to promptly pay any undisputed bills for labor and/or materials supplied by parties claiming by, through or under Contractor in connection with the performance of the Work and thereby causes or suffers a lien to be filed upon any property in which Company has an interest, and Contractor fails to secure the release of the lien within sixty (60) days after receipt of written notice of the lien claim from Company.

9.     In substitution for the provisions of JAB MSA 13.5, Company and Contractor agree that prior to commencing Work at a platform or facility (collectively, "**Facility**"), Contractor will obtain the most current site maps available from Oceaneering, covering such Facility in order to locate both surface and subsurface property, terrain, structures and/or facilities. Contractor will provide such site maps to Company requesting its further verification and, if appropriate, correction, based upon Company's review of available information in its possession.  If the information contained in the site maps, as reviewed by Company, is later determined to be inaccurate or incomplete, which results in damages to property of Third Party(s) caused by Contractors or its subcontractors' placement of its anchor(s), or the setting down of Contractor's or its subcontractors' vessel(s) at the work site in reliance on such inaccurate or incomplete information, Company shall be liable for any and all charges and/or costs for any such damage to property, structures and/or facilities, including all environmental liability, as well as any additional costs reasonably incurred by Contractor resulting from such inaccurate or incomplete site map information.  Notwithstanding the foregoing terms of this Section A.9., in the event that Contractor's failure to conduct the Work in accordance with the specifications set forth in the Contract causes or contributes to any of the charges and/or costs for damage to property, structures and/or facilities, including, without limitation, environmental liability, as contemplated in this Section A.9., Contractor shall be liable and responsible to the extent such charges, costs and liability are

-7-

attributable to its failure to conduct the Work in accordance with the terms and provisions of this Contract.

**B.    PAYMENT TERMS**

Well Abandonment, Pipeline Abandonment, Platform Removal Work and Site Clearance.

1.    Contractor shall be paid by Company 100% of the well abandonment (T&A) scope of work set forth in Exhibit "A-1"  as soon as reasonably practicable after Contractor provides Company, with a copy to Argonaut Insurance Company ("**Argonaut**"), Westchester Fire Insurance Company ("**Westchester**") and any non-operating working interest owner(s) and predecessor(s), as applicable, with a copy of the related EOR(s) as filed with and accepted by BSEE sufficient to show completion of such scope of work, including evidence that the BSEE/BOEM database (being the data at https://www.data.boem.gov/leasing/leaseliability/default.aspx) for the lease block of concern reflects a cost estimate reduction consistent with the completion of 100% of the well abandonment (T&A) scope of work.  Notwithstanding anything else contained herein, Contractor expressly acknowledges that in no event will Argonaut and/or Westchester (as applicable) release bond collateral for utilization by Company to pay Contractor, to be allocated on a property-by-property basis (such term as used herein is with respect to cost allocations set forth on Exhibit "A-1" on a platform by platform basis or, as applicable, with respect to thirteen wells on HI A-370A or ten wells drilled from VR 124 H and bottomed on VR 119), prior to receipt of documentation and/or correspondence, acceptable to Argonaut and/or Westchester, confirming a corresponding reduction and/or cancellation of applicable bonds.

2.    Contractor shall be paid by Company 50% of the platform removal scope of work set forth in Exhibit "A-1" as soon as reasonably practicable following approval by BSEE that said work has been successfully completed, as evidenced by documentation reasonably required by Company, with a copy to Argonaut, Westchester, W&T Offshore, Inc., and any non-operating working interest owner(s) or predecessor(s), as applicable, including, without limitation, evidence that the BSEE/BOEM database for the lease block of concern reflects a BSEE assessment consistent with Contractor's work completed.   Notwithstanding anything else contained herein, Contractor expressly acknowledges that Argonaut and/or Westchester (as applicable) will not release any bond collateral for utilization by Company to pay Contractor, to be allocated on a property-by-property basis, prior to receipt of documentation and/or correspondence, acceptable to Argonaut and/or Westchester, confirming a corresponding reduction and/or cancellation of applicable bonds.

3.    Contractor shall be paid the remaining 50% of the platform removal scope of work as soon as reasonably practicable following BSEE approval of the Final Site

-8-

Final Execution Version

Clearance Report, together with evidence that the BSEE/BOEM database for the lease block of concern reflects a BSEE assessment reduction consistent with Contractor's work completed.  Notwithstanding anything else contained herein, Contractor expressly acknowledges that in no event will Argonaut and/or Westchester (as applicable) release any bond collateral for utilization by Company to pay Contractor, to be allocated on a property-by-property basis, prior to receipt of documentation and/or correspondence, acceptable to Argonaut and/or Westchester, confirming a corresponding reduction and/or cancellation of applicable bonds.

4.      Company agrees that it shall promptly execute bond riders and any other documents necessary to reduce the bonds, as applicable to the scope of work, in order to permit timely payments to Contractor by Company with collateral from the applicable bond sureties, escrow accounts and any non-operating interest owner.  Likewise, Company agrees to timely tender appropriate Authority for Expenditures ("**AFE**") consistent with the scope and pricing set forth in this Work Order in advance of commencing Work to applicable non-operating interest owners, and upon completion of the Work set forth in each such AFE, promptly tender invoices to the parties as provided for in this Work Order (and its attachments).  Company shall also assign to Contractor any rights it has to payment from the applicable bond sureties, escrow accounts and any non-operating interest owner relating to the scope of work set forth in Exhibit "A-1," attached hereto, subject to all terms and conditions hereof.

5.      Contractor expressly acknowledges that involvement of the applicable bond sureties, predecessors, and non-operating interest owners identified in the payment accommodations set forth above and/or below is strictly for the purposes of streamlining payments and expeditiously accomplishing the full completion of the scope of work identified herein.  Accordingly, nothing contained herein shall be construed as extending or otherwise enforcing this Work Order or the JAB MSA, or any obligations arising thereunder, to and/or against any parties other than Company and Contractor.  In addition, Company acknowledges that it has identified specific sources of funds from specific entities as identified on Exhibit "A-1" for its share of decommissioning liabilities and Contractor acknowledges Company's limitations to access funds therewith to support Company's obligations hereunder. Company further acknowledges that its specific identified and expected payment sources are strictly limited to the specific accommodations expressly provided in Exhibit "A-1" and that it has been advised that all sources of funds are specific to each entity and each entity has expressly disclaimed any accommodation in addition to its specific accommodations as noted therein.

6.      Payments to Contractor will be made on a property-by-property basis upon completion of the scope of work and in accordance with Sections B.1., 2. and 3. above, as follows:

A.   East Cameron 160A: In accordance with Sections B.1., 2. and 3. above, and following the receipt of verification of the completion of the platform removal, and site clearance on East Cameron Area Block 160, Contractor's invoices will be paid by release of funds from the Black Elk Merit Escrow (the "Merit Escrow") as that term is used in that certain Order Authorizing Continued Use Cash Collateral and Approving Stipulation (the "Merit Order"), entered as Docket No. 609 entered in the United States Bankruptcy Court for the Southern District of Texas in re: Black Elk Energy Offshore Operations, LLC (the "Black Elk Bankruptcy").

Upon satisfaction of the foregoing release conditions, Merit will authorize release from the Merit Escrow up to the total amount of $2,675,000 in the milestones set forth in Sections B.1., 2. and 3. above in connection with reduction(s) to or cancellation without residual liability of Travelers Bond No. 106026130. Nothing herein shall alter, amend, or impair the Merit Order.

B.   Galveston 424: In accordance with Sections B.1., 2. and 3. above, and following the receipt of verification of the completion of the platform removal, and site clearance on Galveston Area Block 424, Argonaut will release collateral to Company for payment to Contractor up to the total amount of $2,125,000 in connection with reduction(s) to or cancellation without residual liability of Argonaut Bond Nos. SUR0032522 and SUR0032464. Final cancellation without residual liability of Argonaut Bond No. SUR0032464 shall not occur unless and until the BSEE/BOEM database reflects a cost estimate of $0 with respect to GA 424.

C.   West Cameron 580A: In accordance with Sections B.1., 2. and 3. above, and following the receipt of verification of the completion of the platform removal, and site clearance on West Cameron Area Block 580, Argonaut will release collateral to Company for payment to Contractor up to the total amount of $2,675,000[1] in connection with reduction(s) to or cancellation without residual liability of Argonaut Bond Nos. SUR0032489 and SUR0032519.

D.   High Island A370: In accordance with Sections B.1., 2. and 3. above, and following the receipt of verification of the completion of all plugging and abandonment, decommissioning work, platform removal, and site clearance on High Island Area Block A370, Contractor's invoices will be paid as follows: (i) Argonaut will release collateral to Company for payment to Contractor up to the total amount of $4,005,997[2] in connection with reduction(s) to or cancellation without residual liability of Argonaut Bond No. SUR0019139; (ii) W&T will authorize release to Company for payment to Contractor in the total amount of $2,771,666 from its non-operated escrow account to pay for costs of final platform removal and site

---

[1] Subject to Argonaut's continuing efforts/discussion with Maritech to fill payment gap.
[2] This financial accommodation relates solely to HI A370 and shall not be interpreted or construed as Argonaut's agreement to contribute more than the lesser of the penal sum of the applicable Argonaut bond(s) or a proportionate share of turnkey pricing on any other property referenced in the Work Order.

-10-

clearance; (iii) Energy Resources Technology GOM, LLC ("ERT") will directly pay Contractor the total amount of $1,818,750; and (iv) Fairways Offshore Exploration, Inc. ("Fairways") will directly pay Contractor the total amount of $970,000.  Each invoice will be paid in accordance with Exhibit "A-3".

E.       Vermilion 119, Platforms D and G and VR 124 H Well Abandonment:  In accordance with Sections B.1., 2. and 3. above, and following the receipt of verification of the temporary plugging and abandonment of the remaining ten (10) wells at VR 124 H with bottomhole locations on Block 119, Vermilion Area, and decommissioning work, platform removal, and site clearance on Vermilion Area Block 119, Platforms D and G, Contractor's invoices will be paid as follows:  (i) Argonaut will release collateral to Company for payment to Contractor up to the total amount of $3,244,808.50 in connection with reduction(s) to or cancellation without residual liability of Argonaut Bond No. SUR0002569; and (ii) Westchester will release collateral to Company for payment to Contractor up to the total amount of $3,244,808.50 in connection with reduction(s) to or cancellation without residual liability of Westchester Bond No. KO8977847, For clarity, the above pricing includes the ten (10) wells at VH 124 H that bottom hole at VR 119. Each invoice will be paid in accordance with Exhibit "A-2".

F.       Vermilion 124, Platforms E, H and I:  In accordance with Sections B.1., 2. and 3. above, and following the receipt of verification of completion of all the permanent well abandonment at VR 124 H, decommissioning work, platform removal, and site clearance on Vermilion Area Block 124, Platforms E, H and I, Contractor's invoices will be paid in the aggregate as follows: (i) Argonaut will release collateral to Company for payment to Contractor up to the total amount of $1,362,500 in connection with reduction(s) to or cancellation without residual liability of Argonaut Bond No. SUR0002567; (ii) Westchester will release collateral to Company for payment to Contractor up to the total amount of $3,203,022.50 in connection with reduction(s) to or cancellation without residual liability of Westchester Bond Nos. KO8977847 and KO8977884; and (iii) W&T will authorize release to Company for payment to Contractor in the total amount of $1,840,522.50 from its non-operated escrow account for payment of final platform removal and site clearance invoices.  Each invoice will be paid in accordance with Exhibit "A-2".

Notwithstanding anything to the contrary set forth in this Section B., following Westchester's release of collateral with respect to Vermilion 119, Platforms D and G, and Vermilion 124, Platforms E, H and I as set forth above, the remaining collateral in the amount of $1,097,167.50  with respect to Westchester Bond Nos. K08977847 and K08977884 shall be released to Energy XXI GOM, LLC ("**EXXI**") upon the cancellation of such bonds without residual liability of Westchester.  This paragraph is included for notice purposes only and shall not be construed as a waiver by Liquidating Trust or the Black Elk Litigation Trust of any

-11-

claims or defenses to claims that either trust may hold as to Westchester or Energy XXI GOM, LLC.

## C.   SCOPE OF WORK

**General**

1.  Contractor will perform the Services identified in this Work Order including, without limitation, those identified below for each of the various locations:

- **EC 160** A-Aux, 8-pile platform (conductors have been severed and removed by others at 15' BML)

  1.  If required, prepare and submit to BSEE all required platform removal and pipeline abandonment permit applications and use all reasonable efforts to pursue such permit approvals from BSEE.
  2.  Prepare all work scope procedures in accordance with all governmental and BSEE regulations.
  3.  Mobilize to site platform prep crews and prep platform for removal operations.
  4.  Abandon pipeline segment #
  5.  Mobilize equipment and personnel to site for removal work.
  6.  Remove platform jacket, decks per BSEE regulations.
  7.  Transport to shore jackets, decks.
  8.  Offload and dispose of jackets, decks.   Dispose of all NORM and asbestos per the regulations.
  9.  Explosives shall be utilized to sever jacket piles, unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
  10. Mobilize and perform site clearance per the approved permit.
  11. Prepare and submit all completion documents and submit to BSEE.

- **GA 424**, 4-pile platform (conductors have been severed and removed by others at 15' BML)

  1.  If required, prepare and submit to BSEE all required platform removal and pipeline abandonment permit applications and use all reasonable efforts to pursue such permit approvals from BSEE.
  2.  Prepare all work scope procedures in accordance with all governmental and BSEE regulations.
  3.  Mobilize to site platform prep crews and prep platform for removal operations.
  4.  Abandon pipeline tube turn of segment # 14467.
  5.  Mobilize equipment and personnel to site for removal work. Sever tube turn at jacket.
  6.  Remove platform jacket, decks per BSEE regulations.

-12-

7. Transport to shore jackets, decks.
8. Offload and dispose of jackets, decks.  Dispose of all NORM and asbestos per the regulations.
9. Explosives shall be utilized to sever jacket piles, unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
10. Mobilize and perform site clearance per the approved permit.
11. Prepare and submit all completion documents and submit to BSEE.

- **WC 580 A**, 4-pile platform (conductors have been severed and removed by others at 15' BML)

1. If required prepare and submit to BSEE all required platform removal permit applications and use all reasonable efforts to pursue such permit approvals from BSEE.
2. Prepare all work scope procedures in accordance with all governmental and BSEE regulations.
3. Prepare when applicable jacket reef applications and submit for approval.
4. Mobilize to site platform prep crews and prep platform for removal operations.
5. Mobilize equipment and personnel to site for removal work.
6. Remove platform jacket, decks per BSEE regulations. Reef jackets where applicable and approved. Reef donations are included where applicable.
7. Transport to shore jackets, decks.
8. Offload and dispose of jackets, decks and conductors.  Dispose of all NORM and asbestos per the regulations.
9. Explosives shall be utilized to sever jacket piles unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
10. Mobilize and perform site clearance per the approved permit.
11. Prepare and submit all completion documents and submit to BSEE.

- **HI A 370 A**, 8-pile platform and 13 wells

1. Prepare and submit all required APMs for the well abandonment and use all reasonable efforts to pursue such permit approvals from BSEE.
2. Mobilize and abandon 13 wells per approved APM.
3. Prepare and submit to BSEE all required platform removal and pipeline abandonment permit applications and use all reasonable efforts to pursue such permit approvals from BSEE
4. Prepare all work scope procedures in accordance with all governmental and BSEE regulations.
5. Prepare when applicable jacket reef applications and submit for approval.
6. Mobilize to site platform prep crews and prep platform for removal operations.
7. Mobilize equipment and personnel to site for removal work.

-13-

Exhibit 1

Final Execution Version

8. Remove platform jacket, decks and conductors per BSEE regulations. Reef jackets where applicable and approved. Reef donations are included where applicable. Abandon riser of segment # 9054 at the platform end.
9. Transport to shore jackets, decks and conductors.
10. Offload and dispose of jackets, decks and conductors. Dispose of all NORM and asbestos per the regulations.
11. Explosives shall be utilized to sever jacket piles and conductors unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
12. Mobilize and perform site clearance per the approved permit.
13. Prepare and submit all completion documents and submit to BSEE.

- **VR 124** H, 10-pile platform

  1. Prepare and submit all required APMs for the well abandonments, and use all reasonable efforts to pursue approval of APMs from BSEE, together with any other required authorizations or approvals .
  2. Mobilize and abandon 10 wells per approved APM.
  3. Prepare and submit to BSEE all required platform removal and pipeline abandonment permit applications and use all reasonable efforts to pursue such permit approvals from BSEE
  4. Prepare all work scope procedures in accordance with all governmental and BSEE regulations.
  5. Prepare when applicable jacket reef applications and submit for approval.
  6. Mobilize to site platform prep crews and prep platform for removal operations.
  7. Mobilize equipment and personnel to site for removal work.
  8. Remove platform jacket, decks and conductors per BSEE regulations. Abandon tube turns of line segments 7132 and 7762 at the platform end.
  9. Transport to shore jackets, decks and conductors.
  10. Offload and dispose of jackets, decks and conductors. Dispose of all NORM and asbestos per the regulations.
  11. Explosives shall be utilized to sever jacket piles and conductors unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
  12. Mobilize and perform site clearance per the approved permit.
  13. Prepare and submit all completion documents and submit to BSEE.

- **VR 119** D, 6-pile platform, and G, 4-pile platform, (conductors have been severed and removed by others at 15' BML)

  1. If required prepare and submit to BSEE all required platform removal permit applications and use all reasonable efforts to pursue such permit approvals from BSEE.
  2. Prepare all work scope procedures in accordance with all governmental and BSEE regulations.

-14-

3. Prepare when applicable jacket reef applications and submit for approval.
4. Mobilize to site platform prep crews and prep platform for removal operations.
5. Mobilize equipment and personnel to site for removal work.
6. Remove platform jacket, decks per BSEE regulations.  Abandon tube turns of line segments 7132, 7762 and 8267 at the VR 119 D platform.
7. Transport to shore jackets, decks.
8. Offload and dispose of jackets, decks and conductors.  Dispose of all NORM and asbestos per the regulations.
9. Explosives shall be utilized to sever jacket piles unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
10. Mobilize and perform site clearance per the approved permit.
11. Prepare and submit all completion documents and submit to BSEE.

- **VR 124** E and I, 2 each 4-pile platforms (conductors have been severed and removed by others at 15' BML)

1. If required prepare and submit to BSEE all required platform removal permit applications and use all reasonable efforts to pursue such permit approvals from BSEE.
2. Prepare all work scope procedures in accordance with all governmental and BSEE regulations.
3. Prepare when applicable jacket reef applications and submit for approval.
4. Mobilize to site platform prep crews and prep platform for removal operations.
5. Mobilize equipment and personnel to site for removal work.
6. Remove platform jacket, decks per BSEE regulations. Abandon tube turn of line segment 8267 at VR 119 E platform.
7. Transport to shore jackets, decks.
8. Offload and dispose of jackets, decks and conductors.  Dispose of all NORM and asbestos per the regulations.
9. Explosives shall be utilized to sever jacket piles unless governmental regulations prohibits the use of explosives. Abrasives or mechanical cutting tools will be secondary means of severing.
10. Mobilize and perform site clearance per the approved permit.
11. Prepare and submit all completion documents and submit to BSEE.

2. Upon the commencement of Work pursuant to this Work Order, daily reports will be provided electronically by Contractor to Company and, upon request, provided by Contractor to any third party associated with the payment accommodations under Section B., and as reflected on Exhibit "A-1".

-15-

Final Execution Version

### Exhibit "A-1" to
### Schedule A

**[Attach the Spreadsheet prepared by Looper Goodwine]**

-16-

EXHIBIT "A-1" to Schedule A

| ACQ | Operated | LOCATION BLOCK (FIELD) Platform | Non-Op | WD ft | PF WI | TYPE | COND | PLATFORM REMOVAL | TOTAL Well T&A | TOTAL GROSS | NET TO BEEOO | Lease by Lease | Expected Funds from Argonaut | Expected Funds from W&T | Expected Funds from Westchester | Expected Funds from Travelers | Expected Funds from Fairways | Expected Funds From ERT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Merit | BEE | EC 160 A | N/A | | 100.00% | 8 pile | 0 | $2,675,000 | $0 | $2,675,000 | $2,675,000 | $2,675,000 | $ - | $ - | $ - | $2,675,000 | $ - | $ - |
| Nippon | BEE | GAL 424 | N/A | | 100.00% | 4 pile | 0 | $2,125,000 | $0 | $2,125,000 | $2,125,000 | $2,125,000 | $2,125,000 | $ - | $ - | $ - | $ - | $ - |
| Maritech | BEE | WC 580 A | N/A | 200 | 100.00% | 4 pile | 0 | $2,675,000 | $0 | $2,675,000 | $2,675,000 | $2,675,000 | $2,675,000[1] | $ - | $ - | $ - | $ - | $ - |
| W&T | BEE | HI A370 A (Wells) | W&T | 350 | 71.25% | 8-Pile | 13 | $0 | $3,850,000 | $3,850,000 | $2,743,125 | $2,743,125 | $2,743,125 | $2,771,666 | $ - | $ - | $385,000 | $721,875 |
| W&T | BEE | HI A370 A | W&T | 350 | 71.25% | 8-Pile | 13 | $5,850,000 | $0 | $5,850,000 | $4,168,125 | $4,168,125 | $1,262,872 | | $ - | $ - | $585,000 | $1,096,875 |
| W&T | BEE | VR 124 H (Wells) | EXXI | 73 | 50.00% | 4-pile | 10 | $0 | $2,675,000 | $2,675,000 | $1,337,500 | $1,337,500 | $1,337,500 | $ - | $1,337,500 | $ - | $ - | $ - |
| W&T | BEE | VR 119 D | EXXI | 71 | 50.00% | 4-pile | 0 | $2,000,297 | $0 | $3,814,617 | $1,000,149 | $1,907,309 | $1,907,309 | $ - | $1,907,309 | $ - | $ - | $ - |
| W&T | BEE | VR 119 G | EXXI | 69 | 50.00% | 4-pile | 0 | $1,814,320 | $0 | | $907,160 | | | | | | | |
| W&T | BEE | VR 124 E | EXXI | 70 | 50.00% | 4-pile | 0 | $2,201,250 | $0 | | $1,100,625 | | | | | | | |
| W&T | BEE | VR 124 H | EXXI | 73 | 50.00% | 4-pile | 10 | $2,494,079 | $0 | $6,406,045 | $1,247,040 | $3,203,023 | $1,362,500 | $1,840,523 | $3,203,023 | $ - | $ - | $ - |
| W&T | BEE | VR 124 I | EXXI | 70 | 50.00% | 4-pile | 0 | $1,710,716 | $0 | | $855,358 | | | | | | | |
| | | | | | | TOTALS: | | $23,545,662 | $6,525,000 | $30,070,662 | $20,834,081 | $20,834,081 | $13,413,305 | $4,612,189 | $6,447,831 | $2,675,000 | $970,000 | $1,818,750 |

[1] Subject to additional discussion with Maritech.

**Sources of funds allocated to Fairways and ERT subject to additional discussion with said entities.**

Exhibit A

Final Execution Version

## Exhibit "A-2" to
## Schedule A

### A.    VR-124 DETAILED PAYMENT SCHEDULE

**1.    VR-124 H Wells Invoice**                                         **$2,675,000**

Billed to Company
Payable as follows:

a.    50% by Argonaut from VR-119 bond reduction            $1,337,500

b.    50% by Westchester/EXXI from VR-119 bond reduction   $1,337,500

- Payment Trigger: Receipt of EOR(s) as filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for VR-119 reflects a cost estimate reduction consistent with the completion of all well T&A.

**2.    VR-124 E Platform Invoice**                                     **$2,201,250**

Billed to Company
Payable as follows in two equal invoices:

a.    First invoice:
    i.      50% by Argonaut from VR-124 bond reduction        $550,313
    ii.     50 % by Westchester as directed by EXXI            $550,313
    iii.    TOTAL of first invoice                             $1,100,626

b.    Second invoice:
    i.      50% by release from W&T Escrow                     $550,312
    ii.     50% by Westchester / EXXI                          $550,312
    iii.    TOTAL of second invoice                            $1,000,624

- Payment Trigger: Receipt of completion report filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for VR-124 reflects a cost estimate reduction consistent with (i) the completion of all platform removal work, as applicable, for initial invoice, and (ii) final site clearance for the second invoice.

**3.    VR-124 I Platform Invoice**                                     **$1,710,716**

Billed to Company
Payable as follows in two equal invoices:

a.    First invoice:
    i.      50% by Argonaut from VR-124 bond reduction        $427,679
    ii.     50 % by Westchester / EXXI                         $427,679

-17-

Exhibit 11

Final Execution Version

| | | |
|---|---|---:|
| | iii. | TOTAL of first invoice | $855,358 |

b. Second invoice:
| | | |
|---|---|---:|
| i. | 50% by release from W&T Escrow | $427,679 |
| ii. | 50% by Westchester / EXXI | $427,679 |
| iii. | TOTAL of second invoice | $855,358 |

- <u>Payment Trigger</u>: Receipt of completion report filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for VR-124 reflects a cost estimate reduction consistent with (i) the completion of all platform removal work, as applicable, for initial invoice, and (ii) final site clearance for the second invoice.

## 4.  <u>VR-124 H Platform Invoice</u>  **$2,494,079**

Billed to Company
Payable as follows in two equal invoices:

a. First invoice:
| | | |
|---|---|---:|
| i. | 50% by Westchester / EXXI | $623,520 |
| ii. | By Argonaut from bond reduction | $384,508 |
| iii. | By release from W&T Escrow | $239,012 |
| iv. | TOTAL of first invoice | $1,247,040 |

b. Second invoice:
| | | |
|---|---|---:|
| i. | 50% by Westchester / EXXI | $623,520 |
| ii. | 50% by release from W&T Escrow | $623,519 |
| iii. | TOTAL of second invoice | $1,247,039 |

- <u>Payment Trigger</u>: Receipt of completion report filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for VR-124 reflects a cost estimate reduction consistent with (i) the completion of all platform removal work, as applicable, for initial invoice, and (ii) final site clearance for the second invoice.

➢ **<u>Summary of VR-124 Total Sources</u>**

c. VR-124 Wells
| | | |
|---|---|---:|
| i. | Argonaut | $1,337,500 |
| ii. | Westchester / EXXI | $1,337,500 |
| iii. | TOTAL | **$2,675,000** |

d. VR 124 Platforms
| | | |
|---|---|---:|
| i. | Argonaut | $1,362,500 |
| ii. | W&T Escrow | $1,840,523 |
| iii. | Westchester / EXXI | $3,203,023 |
| **iv.** | TOTAL | **$6,406,046** |

-18-

### B.      VR-119 DETAILED PAYMENT SCHEDULE

**5.  VR-119 D Platform Invoice**                                              **$2,000,297**

Billed to Company
Payable as follows in two equal invoices:

a.    First invoice:
    i.    50% by Argonaut from VR-119 bond reduction                 $500,074.25
    ii.   50% by Westchester as directed by EXXI from VR-119 bond reduction  $500,074.25

b.    Second invoice:
    i.    50% by Argonaut from VR-119 bond reduction                 $500,074.25
    ii.   50% by Westchester as directed by EXXI from VR-119 bond reduction  $500,074.25

- <u>Payment Trigger</u>: Receipt of completion report filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for VR-119 reflects a cost estimate reduction consistent with (i) the completion of all platform removal work, as applicable, for initial invoice, and (ii) final site clearance for the second invoice.

**6.  VR-119 G Platform Invoice**                                              **$1,814,320**

Billed to Company
Payable as follows in two equal invoices:

a.    First invoice:
    i.    50% by Argonaut from VR-119 bond reduction                 $453,580
    ii.   50 % by Westchester as directed by EXXI                    $453,580

b.    Second invoice:
    i.    50% by release from Argonaut from VR-119 bond reduction    $453,580
    ii.   50% by Westchester as directed by EXXI from VR-119 bond reduction  $453,580

- <u>Payment Trigger</u>: Receipt of completion report filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for VR-119 reflects a cost estimate reduction consistent with (i) the completion of all platform removal work, as applicable, for initial invoice, and (ii) final site clearance for the second invoice.

➢   **Summary of VR-119 Total Sources**

- VR-119 Platforms
  - Argonaut                                                   $1,907,308.50
  - Westchester / EXXI                                         <u>$1,907,308.50</u>
  - **TOTAL**                                                  **$3,814,617**

**Exhibit "A-3" to**
**Schedule A**

**HI A 370 DETAILED PAYMENT SCHEDULE**

1.  **HI A 370 A (13) Wells Invoice**                                                    **$3,850,000**

    Billed to Company
    Payable as follows:

    a.    71.25% by Argonaut from HI A370 bond reduction    $2,743,125

    b.    18.75% by contribution from ERT    $721,875

    c.    10% by contribution from Fairways    $385,000

- Payment Trigger: Receipt of EOR(s) as filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for HI A370 reflects a cost estimate reduction consistent with the completion of all well T&A.

2.  **HI A 370 A Platform Invoice**                                                    **$5,850,000**

    Billed to Company
    Payable as follows in two invoices:

    a.    First invoice :
        i.    By Argonaut from HI A370 bond reduction & add'l funds[1]    $1,262,872
        ii.    By W&T Offshore, Inc. through non-operated escrow funds    $821,191
        iii.    By contribution from ERT    $548,437
        iv.    By contribution from Fairways    $292,500
        v.    TOTAL of first invoice    $2,925,000

    b.    Second invoice:
        i.    By W&T Offshore, Inc. through non-operated escrow funds    $1,950,475[2]
        ii.    By contribution from ERT    $548,437
        iii.    By contribution from Fairways    $292,500
        iv.    TOTAL of second invoice    $2,791,412

- Payment Trigger: Receipt of completion report as filed with and accepted by BSEE sufficient to demonstrate completion of the work and evidence that the BOEM/BSEE database for HI A370 A reflects a cost estimate reduction consistent with (i) the completion of all platform removal work and removal of associated wells and pipelines, as applicable, for initial invoice, and (ii) final site clearance for the second invoice.

➤ **Summary of HI A370 Total Sources**

- HI A370 Wells
  - ▪ Argonaut     $2,743,125
  - ▪ ERT     $721,875
  - ▪ Fairways     <u>$385,000</u>
  - ▪ **TOTAL**     **$3,850,000**

- HI A370 Platforms
  - ▪ Argonaut     $1,262,872
  - ▪ W&T Offshore, Inc.     $2,771,666
  - ▪ ERT     $1,096,875
  - ▪ Fairways     <u>$585,000</u>
  - ▪ **TOTAL**     **$5,716,413**[2]

[1]  This financial accommodation relates solely to HI A370 and shall not be interpreted or construed as Argonaut's agreement to contribute more than the lesser of the penal sum of the applicable Argonaut bond(s) or a proportionate share of turnkey pricing on any other property referenced in the Work Order.

[2]  Includes a $133,588 contribution by JAB to Black Elk's proportionate share of the platform work per agreement amongst JAB, Argonaut, and W&T Offshore, Inc.

Exhibit 41

# **EXHIBIT C-1**

TPW Payment Receipt Instructions

[To be provided]

# **EXHIBIT C-2**

## Parties' Delivery Receipt Instructions/Address for All Communication Deliveries Under Term Sheet Agreement

### [To be provided]

Delivery of any required notice or communication to each Party shall be effected as follows:

To the Trustee:

        Via U.S. mail, postage prepaid:
                Richard Schmidt
                615 Leopard Street, Suite 635
                Corpus Christi, Texas 78401

                With a copy to counsel:
                John J. Sparacino
                McKool Smith, PC
                600 Travis Street, Suite 7000
                Houston, Texas 77002

                    and

        Via E-mail:
                rss@judgerss.com
                jsparacino@mckoolsmith.com

To W&T:

        Via U.S. mail, postage prepaid:
                Philip Eisenberg
                Bradley C. Knapp
                Locke Lord LLP
                600 Travis Street, Suite 2800
                Houston, Texas 77002
                peisenberg@lockelord.com
                bknapp@lockelord.com

To Talos:

        Via U.S. mail, postage prepaid:
                Deborah Huston
                VP & Deputy General Counsel
                Talos Energy
                333 Clay Street, Suite 3300
                Houston, TX 77002

                    and

1

Exhibit A

Via E-mail:
>deborah.huston@talosenergy.com


To JAB:

Via U.S. mail, postage prepaid:
>Albert Altro, Chief Restructuring Officer
>JAB Energy Solutions II, LLC
>19221 I-45 South, Suite 324,
>Shenandoah, TX 77385

>With a copy to counsel:

>Laura Davis Jones
>Colin R. Robinson
>Pachulski Stang Ziehl & Jones
>919 North Market Street, 17th Floor
>Wilmington, DE 19801

>>and

Via E-mail:
>albertaltro@traversellc.com
>ljones@pszjlaw.com
>crobinson@pszjlaw.com

To Argo:

Via U.S. mail, postage prepaid:
>Argo Group US
>Attn: Robert G. Lavitt
>PO Box 469011
>San Antonio, TX 78246

>With a copy to counsel:
>Lindsey M. Johnson
>Looper Goodwine P.C.
>650 Poydras Street, Suite 2400
>New Orleans, LA 70130

>>and

2

Exhibit A

Via E-mail:
>  Surety.Claims@ArgoSurety.com
>  ljohnson@loopergoodwine.com

To BSEE:

Via U.S. mail, postage prepaid:
>  Bureau of Safety and Environmental Enforcement
>  1201 Elmwood Park Blvd.
>  New Orleans, LA 70123-2394

and

Via E-mail:
>  daniel.martin@usdoj.gov
>  eric.andreas@sol.doi.gov

To TPW:

Via U.S. mail, postage prepaid:
>  Texas Parks and Wildlife Department
>  Artificial Reef Program
>  4200 Smith School Rd.
>  Austin, TX 78744-3291
>  Attention:  Dale Shively

and

Via E-mail:
>  dale.shively@tpwd.texas.gov
>  julian.martinez@tpwd.texas.gov

To Burlington:

Via U.S. mail, postage prepaid:
>  Philip Eisenberg
>  Bradley C. Knapp
>  Locke Lord LLP
>  600 Travis Street, Suite 2800
>  Houston, Texas 77002
>  plocke@lockelord.com
>  bknapp@lockelord.com

3

# **EXHIBIT C-3**

Fund Delivery Instructions for Net Remaining Funds to JAB

[To be provided]

# **EXHIBIT D**

Escrow Agreement

[To be provided]

# **EXHIBIT F**

Form of Bond Cancellation Notice

[To be provided]

4846-5199-1292

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6

7  JAB ENERGY SOLUTIONS II, LLC,      Case No.

8        Debtor.               21-11226 (CTG)

9  - - - - - - - - - - - - - - - - - - - -x

10

11

12         United States Bankruptcy Court

13         824 North Market Street

14         Wilmington, Delaware

15

16         February 25, 2022

17         2:00 PM

18

19

20  B E F O R E:

21  HON. CRAIG T. GOLDBLATT

22  U.S. BANKRUPTCY JUDGE

23

24  ECR OPERATOR:   SEAN MORAN

25

Exhibit B

1

2    Debtor's Motion for Approval of Settlement Agreement Regarding

3    Decommissioning of High Island A370 Project [Filed: 2/4/22]

4    (Docket No. 149)

5

6    Turnkey Offshore Project Services, LLC's and Offshore Technical

7    Solutions, LLC's (I) Preliminary Objection to Debtor's Motion

8    for Approval of Settlement Agreement Regarding Decommissioning

9    of High Island A370 Project [Docket No. 149] and (II)

10   Cross-Motion for Entry of an Order Modifying the Automatic Stay

11   [Filed: 2/17/22] (Docket No. 160).

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sharona Shapiro

Exhibit B

```
 1
 2   A P P E A R A N C E S: (All present by video or telephone)
 3   PACHULSKI STANG ZIEHL & JONES
 4        Attorneys for Debtor
 5   BY:  LAURA DAVIS JONES, ESQ.
 6        COLIN R. ROBINSON, ESQ.
 7        MAXIM B. LITVAK, ESQ.
 8
 9
10   MORRIS NICHOLS ARSHT & TUNNEL LLP
11        Attorneys for Turnkey Offshore Product Services, LLC &
12        Offshore Technical Solutions, LLC
13   BY:  JOSEPH C. BARSALONA, II, ESQ.
14        MATTHEW B. HARVEY, ESQ.
15        BRIAN LOUGHNANE, ESQ.
16
17
18   MORRISON COHEN LLP
19        Attorneys for CastleGate Credit Opportunities Fund, LLC
20   BY:  DAVID J. KOZLOWSKI, ESQ.
21
22
23
24
25
```

Exhibit B

1

2  STEPTOE & JOHNSON LLP

3      Attorneys for GarMark SBIC Fund II, LLC

4  BY:   JEFFREY M. REISNER, ESQ.

5      KERRI A. LYMAN, ESQ.

6

7

8  LOCKE LORD LLP

9      Attorneys for Energen Resources

10  BY:   BRAD C. KNAPP, ESQ.

11      PHILIP EISENBERG, ESQ.

12

13

14  BAYARD, P.A.

15      Attorneys for CastleGate Credit Opportunities Fund, LLC

16  BY:   ERIN R. FAY, ESQ.

17

18

19  LUGENBUHL, WHEATON, PECK, RANKIN & HUBBARD

20      Attorneys for Official Committee of Unsecured Creditors

21  BY:   BENJAMIN W. KADDEN, ESQ.

22      COLEMAN L. TORRANS, ESQ.

23

24

25

Exhibit B

```
 1
 2   LOOPER GOODWINE P.C.
 3         Attorneys for Argonaut Insurance Company
 4   BY:   PAUL J. GOODWINE, ESQ.
 5
 6
 7   UNITED STATES DEPARTMENT OF JUSTICE
 8         Office of the United States Trustee
 9   BY:   DANIEL MARTIN, ESQ.
10         TIMOTHY J. FOX, JR., ESQ.
11
12
13   NALLEY AND DEW, APLC
14         Attorneys for Turnkey Offshore Project Services, LLC
15   BY:   GEORGE J. NALLEY, JR., ESQ.
16
17
18   RICHARD W. MARTINEZ, APLC
19         Attorney for Turnkey Offshore Project Services
20   BY:   RICHARD W. MARTINEZ, ESQ.
21
22
23   BOHMAN NORSE, LLC
24         Attorneys for Offshore Technical Solutions, LLC
25   BY:   MARTIN BOHMAN, ESQ.
```

Exhibit B

6

1

2  LAW OFFICES OF JOYCE, LLC

3          Attorneys for Official Committee of Unsecured Creditors

4  BY:   MICHAEL JOYCE, ESQ.

5

6

7  MCKOOL SMITH

8          Special Counsel for Black Elk Trustee

9  BY:   JOHN J. SPARACINO, ESQ.

10

11

12  SNOW & GREEN LLP

13          Attorneys for Allison Marine Holders

14  BY:   KENNETH GREEN, ESQ.

15

16

17  OFFICE OF THE ATTORNEY GENERAL

18          Attorneys for Texas Parks & Wildlife Department

19  BY:   LAYLA MILLIGAN, AAG

20

21

22

23

24

25

Exhibit B

7

1

2   ALSO PRESENT:

3         ALBERT ALTRO, Chief Restructuring Officer

4         LINDSEY JOHNSON, Argonaut

5         STEVEN C. PICKHARDT, GarMark Advisors L.L.C

6         ROCKY HENDERSON, Turnkey Offshore Project Services, LLC

7         UDAY GORREPATI, ABI Project

8         BYRON I. SPROULE, GarMark Advisors, L.L.C.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

1               P R O C E E D I N G S

2          THE COURT:  Good afternoon.  At least good afternoon

3   here on the East Coast.  This is Judge Goldblatt.  We are on

4   the record,  In re Jab Energy Solutions, which is case number

5   21-11226.

6          You all heard the preliminary observations yesterday,

7   so I don't think I need to repeat those.  What I do need to do,

8   though, is apologize to everyone for the on-again, off-again

9   timing.  I had earlier asked that this be set an hour earlier.

10  That was a mistake on my part, so we reset it.  I don't mean to

11  impose all of my errors on everyone else's calendar.  So my

12  apologies there.  That is a hundred percent my fault.  I wish I

13  could find someone else to blame, but I can't find anyone else

14  who's responsible for that mistake other than me.

15         So I had a very helpful conversation yesterday, late

16  yesterday, with Judge Currault, and between my reflection on

17  the issues, review of the case law to which the parties had

18  pointed to me, and that conversation, I feel like I am in a

19  position to rule on the two questions that I think are before

20  me to rule.

21         Before I do, as much as I love to hear myself talk,

22  let me pause and ask if there's anything that anyone would like

23  to address before I do that.

24         MR. LITVAK:  No, Your Honor, not from the debtors'

25  perspective.  This is Max Litvak, Pachulski Stang Ziehl &

Exhibit B

1    Jones, on behalf of the debtor.  We have nothing further to

2    report.

3            THE COURT:  Okay.  Mr. Barsalona?  I think you might

4    be muted.  I'm sorry, Mr. Barsalona.  So I can't hear you.  I

5    don't know if anyone else can.

6            MR. BARSALONA:  Good afternoon, Your Honor.

7            THE COURT:  Oh.

8            MR. BARSALONA:  Can you hear me now?

9            THE COURT:  Now I can.  Thank you.  Yes.

10            MR. BARSALONA:  I'm dialed in through the phone

11    because I'm having connection issues, so apologies for that.

12    There was a double muting on my end.  Nothing further from TOPS

13    and OTS, Your Honor.

14            THE COURT:  Okay.  All right.  So I'm going to report

15    on where I am, both as a result of my reflection on the record,

16    the case law, and it is informed, I will acknowledge, by the

17    conversation I had with Judge Currault.

18            I'll take the two issues, sort of, one at a time.

19    First is the motion to approve the settlement.  That's governed

20    by the Martin factors coming out of the Third Circuit decision

21    In re Martin, 91 F.3d 389 (3d Cir. 1996).  Those factors are:

22    the probability of success in the litigation; the difficulties

23    in collection; the complexity, expense, inconvenience and delay

24    of the litigation; and the paramount interest of creditors.

25            Applying that standard, and in light of the record

Exhibit B

1   before me, as I said yesterday, I'm satisfied that those

2   standards are met.  The only meaningful issue with respect the

3   traditional application of the Martin standards is that the

4   settlement involves the payment of the reefing fee of 700,000

5   dollars.  Otherwise, it reflects collection in full of the

6   amounts due.  It will generate a net receivable of 4.9 million

7   dollars.

8          No one has objected, in particular, to the payment of

9   the 700,000 dollars as the reefing fee, under the

10  circumstances.  And in any event, I'm satisfied that it's

11  appropriate, sort of, by analogy to the doctrine of critical

12  vendor, or one could call it the doctrine of necessity, or

13  however one wants to think about the notion that sometimes in

14  bankruptcy we pay pre-petition creditors prior to confirmation

15  of a plan in order to maximize value.  Sometimes we permit

16  that, and I'm satisfied that, applying those standards, that

17  payment is appropriate.

18          I've considered the various arguments.  I'm aware that

19  there are not signature pages before me.  I am satisfied, based

20  on the record that is before me, that what we've got here is

21  parties that are prepared to go forward with a transaction

22  subject to clearing some number of hurdles.  I don't believe

23  any of those hurdles renders this advisory or conjectural or

24  speculative or what have you.  I think we've got a transaction

25  that is sufficiently real, that it's properly put before the

Exhibit B

1   Court for approval, and I think it meets that approval.

2          Now, the one further complication is the possibility

3   that consummating the transaction, even just bringing the money

4   in and putting it in escrow, might be construed to run afoul of

5   the injunction entered by Judge Currault.  I'm not in any

6   position to give folks legal advice, but it does seem to me

7   that that issue might be addressed by the filing of a motion to

8   modify the injunction in front of Judge Currault.

9          I think that what we have here is just a technical

10  matter of cleanup, and I think that issue can be addressed that

11  way.  If the parties want to proceed immediately, without

12  getting that relief, that's up to you.  But you also might

13  consider filing a motion in front of Judge Currault.

14  Essentially, once we have an order that I enter, it might be

15  appropriate to file a motion in front of Judge Currault simply

16  to say that -- or asking that she modify her injunction to

17  comport with this order, and to the extent there's an issue

18  that needs to be cleaned up that way, that's a means by which

19  you might consider cleaning it up.

20         I want to be -- there's one other issue that Mr.

21  Barsalona raised with a form of order, which is, at least as I

22  understood his point, it was concern about whether the money

23  was really held in something that is actually in escrow.  And

24  so I just want to be clear about one thing.  I'm hopeful the

25  parties can work this out, though I'm prepared to resolve a

Exhibit B

1   dispute if I need to.

2           Deciding that this transaction can go forward is

3   entirely without prejudice to who wins the dispute over who

4   owns the money.  And if TOPS prevails in that dispute, the 4.9

5   million dollars has got to go to TOPS.  And what we have to do

6   is set this up in a way in which folks are procedurally

7   satisfied that that will work.

8           With the superb counsel we have, I don't have any

9   doubt that counsel will be able to do that, but I want to make

10  sure that the intent is clear.  And if there are issues on how

11  it's done, let me know, and I'm happy to address it.

12          So far, are there questions about what I've said to

13  date?

14          MR. LITVAK:  Your Honor, the only question I would

15  have -- Max Litvak on behalf of the debtor -- is that I presume

16  that this money -- it's actually 5.6 million -- would

17  actually -- what I'm hearing is that the Court would approve

18  the settlement, and the money would actually come into the

19  escrow, go to the escrow agent.  I'm happy to talk to Mr.

20  Barsalona offline if there is some particular concern.  But

21  then 700,000 of it would be distributed by the escrow agent to

22  pay the TPW reefing fee, and then the remaining 4.9 million,

23  once it comes in, would remain in escrow.  And certainly the

24  debtor has no intention of distributing a penny of it until we

25  get further order from the Court.

Exhibit B

 1         THE COURT:  Right.  That's exactly what I intend.  And
 2    that the 4.9 will sit there pending resolution of the merits of
 3    the ownership dispute.  And the only point I was intending to
 4    address is Mr. Barsalona, if I understood him correctly, raised
 5    concerns about the manner in which the order provided that that
 6    money would be held and whether it was really in escrow or
 7    whether it was secure.  And however you work it out is fine
 8    with me.  But it should be held in a manner that gives
 9    reasonable comfort that it will be secure pending resolution of
10    the ownership dispute.
11         MR. LITVAK:  Understood.  Thank you, Your Honor.
12         THE COURT:  Okay.  That then brings me to the motion
13    for relief from stay, which is really the question of who
14    should decide the ownership question.
15         The leading case there is probably Judge Balick's
16    decision In re Rexene Products Co., which is at 141 B.R. 574
17    (Bankr. D. Del. 1992).
18         The standard involves the articulation of the
19    following three factors:  whether there's any great prejudice
20    to either the bankruptcy estate or the debtor that would result
21    from continuation of the civil litigation in another forum;
22    whether the hardship to the nonbankruptcy party, by maintenance
23    of the stay, considerably outweighs the hardship to the debtor
24    of leaving the stay in place; and whether the creditor has a
25    probability of prevailing on the merits.

 1         That articulation of the standards emerges primarily

 2    in the context of where there is a pre-petition claim that's

 3    been asserted against the estate, where someone wants to

 4    continue pursuit of that claim in another forum, though I think

 5    the basic principles remain applicable.

 6         The cases also talk about things, and I think these

 7    all do tie to one or another of the factors, in some form or

 8    fashion, things like, okay, how far along is this case in the

 9    other forum?  How do principles of judicial economy weigh in

10    the balance?  To what extent has another court invested

11    substantial resources in coming up to speed and in

12    understanding the matter?  To what extent should principles of

13    comity or deference counsel in favor of deferring to another

14    court's resolution of a matter, and the like.

15         In view of the record in front of me, and I will

16    acknowledge, in part, coming out of the conversation I had with

17    Judge Currault, I've concluded to deny the motion for relief

18    from stay.  I believe that the consideration of all of the

19    factors I identified above counsel in favor of having the

20    question of ownership of these funds resolved in an appropriate

21    proceeding here.

22         I have a few thoughts on that that I'd like to convey.

23    I said earlier, and I, as a general matter, mean it, that the

24    question of whether something should be an adversary or a

25    contested matter is not something that I usually get terribly

Exhibit B

 1   worked up over.  It is true that Rule 7001 says what it says.

 2          I do believe that, under these circumstances, where

 3   there is a pending piece of civil litigation in another court

 4   that would have ended in a judgment, if it were permitted to

 5   proceed, it makes sense here to have a piece of civil

 6   litigation that will end in a judgment to resolve any ambiguity

 7   about the effect of whatever ruling is reached here.  So I

 8   think that proceeding by way of adversary is more appropriate

 9   than just filing a motion.

10          In terms of who the parties are, or what have you, I

11   leave that, obviously, to the parties.  I do appreciate that

12   there clearly are parties who can participate here, in some

13   form or fashion, who wouldn't have been parties in Louisiana,

14   like the lenders who have an interest -- an arguable interest

15   in the funds.

16          In terms of -- well, in the first instance, I propose

17   the parties talk about who they would like to be the plaintiff

18   and who should be the defendant.  It doesn't really matter.  I

19   think this is about declaratory relief about ownership of the

20   funds.  And so I don't think it matters a great deal who sues

21   whom.

22          I appreciate there's also the dispute that is now in

23   Louisiana, and could very well remain in Louisiana, about suits

24   against nondebtors.  I leave to all of you the question of

25   whether there would or wouldn't be jurisdiction over those

Exhibit B

1  matters here.  Again, that's for the parties to puzzle through.
2  I'm not here to tell you how to assert your litigation.  If the
3  judgment is that none of the parties wants to assert such a
4  claim here, it could obviously all be heard later.  If the
5  parties choose to proceed in a way so that it's all done at
6  once, that's fine, and if not, then not.

7          I am hugely sensitive to the concerns about the cost.
8  That's true, frankly, on behalf of both parties.  I heard
9  evidence yesterday both that this is a, as I think Mr. Litvak
10 put it, a thin case, and there was evidence in support of that.
11 And I heard testimony from the principal of TOPS regarding the
12 cost of litigating here.

13         I want to do what I can do to drive this as
14 efficiently as possible.  So consistent with procedural
15 fairness to folks, it's been my experience that the longer the
16 schedule you set the more work that the lawyers do in the time
17 available.  So I would propose that -- I'm going to let you
18 work out a schedule yourselves, in the first instance, and only
19 intervene if there's a dispute.  But my guidance is relatively
20 faster, because I believe things that are faster are cheaper.
21 I don't intend to be inhumane, but I think quicker is better
22 than slower.

23         I don't know whether you need to do discovery or
24 whether the discovery previously done, both on this motion and
25 in Louisiana, is sufficient.  Certainly, I would encourage you

Exhibit B

1  strongly to endeavor to avoid duplication.  Whatever has been
2  done already doesn't need to be done again.  I'm happy for you
3  to propose whatever kind of schedule you want.  And I also
4  think you should have a conversation about whether you believe
5  that teeing this up for a resolution by summary judgment is
6  either more efficient or less efficient, or cheaper or more
7  expensive, than just getting briefs in and trying the case.  I
8  don't know the answer to that question; I don't intend to put a
9  thumb on the scale.  But whatever you decide would be efficient
10  is fine with me.

11         So I think those are the observations that I have.  So
12  for those reasons, I will deny the motion to stay, and an
13  appropriate order should be settled that so provides that.  You
14  can do it -- it is the same piece of paper as -- well, you can
15  do it however makes sense.  Maybe we've got two motions, so we
16  should have two separate orders.  But I'd encourage you to talk
17  to each other and see if you can settle an order -- settle both
18  of those orders reflecting these points.

19         So that's what I've got.  I'm happy to address any
20  questions that any party-in-interest may have.

21         MR. LITVAK:  Your Honor, thank you very much for those
22  rulings.  They're really much appreciated, and especially so
23  quickly after the substantive hearing yesterday.

24         And Your Honor, it's Max Litvak on behalf of the
25  debtor, just for the record.

Exhibit B

1          I did want to ask, did the Court have any comments to

2    the form of order that we submitted on the settlement

3    agreement?

4          THE COURT:  So I guess, Mr. Litvak, I did not, other

5    than that I heard Mr. Barsalona's concern, if I understood it,

6    about whether that order needed to provide something further

7    regarding the manner in which the funds would be held in the

8    meantime.  So I encourage you to talk about that.  I may have

9    entirely misunderstood.  But if there's some reasonable ask

10   that would provide comfort to TOPS that the money is in fact

11   going to be available to it, if and when it were to prevail in

12   the adversary, I'd ask that you give consideration to working

13   with him on that.

14         MR. LITVAK:  We will, Your Honor.  Thank you.

15         THE COURT:  Okay.  Anyone else have anything that I

16   should consider?  I otherwise trust that the parties could talk

17   and seek to settle orders as appropriate?

18         MR. LITVAK:  Absolutely.  Absolutely, Your Honor.

19   Thank you.  Thank you very much for your time.

20         THE COURT:  Okay.  Well, thanks again to all of you.

21   Again, my apologies for the scheduling confusion, and I hope

22   folks are able to work through these issues.  If not, please

23   don't hesitate to reach out to chambers.  If you need me to get

24   on a call to resolve something, I'm happy to do what my job is

25   to do.  So with that, thank you very much.  And we're

Exhibit B

JAB ENERGY SOLUTIONS II, LLC                                  19

1    adjourned.

2            MR. LITVAK:  Thank you, Your Honor.

3            MR. BARSALONA:  Thank you, Your Honor.

4        (Whereupon these proceedings were concluded at 2:19 PM)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

1

2                              **I N D E X**

3                             RULINGS

4                                         Page     Line

5    Motion to approve the settlement is        11

6    granted, as set forth on the record.

7    Motion for relief from stay is denied.     17

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Exhibit B

1

2                         C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    *Sharona Shapiro*

8                                          March 1, 2022

9    _____        _____

10   SHARONA SHAPIRO (CET-492)              DATE

11   AAERT Certified Transcriber CET-492

12

13   eScribers, LLC

14   7227 N. 16th Street, Suite #207

15   Phoenix, AZ 85020

16   (602) 623-0885

17   operations@escribers.net

18

19

20

21

22

23

24

25

Exhibit B

## A

**AAG (1)**
6:19
**ABI (1)**
7:7
**able (2)**
12:9;18:22
**above (1)**
14:19
**Absolutely (2)**
18:18,18
**acknowledge (2)**
9:16;14:16
**actually (4)**
11:23;12:16,17,18
**address (4)**
8:23;12:11;13:4;
17:19
**addressed (2)**
11:7,10
**adjourned (1)**
19:1
**adversary (3)**
14:24;15:8;18:12
**advice (1)**
11:6
**Advisors (2)**
7:5,8
**advisory (1)**
10:23
**afoul (1)**
11:4
**afternoon (3)**
8:2,2;9:6
**Again (4)**
16:1;17:2;18:20,
21
**against (2)**
14:3;15:24
**agent (2)**
12:19,21
**agreement (1)**
18:3
**ALBERT (1)**
7:3
**Allison (1)**
6:13
**along (1)**
14:8
**ALTRO (1)**
7:3
**ambiguity (1)**
15:6
**amounts (1)**
10:6
**analogy (1)**
10:11
**APLC (2)**
5:13,18
**apologies (3)**
8:12;9:11;18:21

**apologize (1)**
8:8
**applicable (1)**
14:5
**application (1)**
10:3
**Applying (2)**
9:25;10:16
**appreciate (2)**
15:11,22
**appreciated (1)**
17:22
**appropriate (7)**
10:11,17;11:15;
14:20;15:8;17:13;
18:17
**approval (2)**
11:1,1
**approve (2)**
9:19;12:17
**Argonaut (2)**
5:3;7:4
**arguable (1)**
15:14
**arguments (1)**
10:18
**articulation (2)**
13:18;14:1
**assert (2)**
16:2,3
**asserted (1)**
14:3
**Attorney (2)**
5:19;6:17
**Attorneys (10)**
4:3,9,15,20;5:3,14,
24;6:3,13,18
**available (2)**
16:17;18:11
**avoid (1)**
17:1
**aware (1)**
10:18

## B

**balance (1)**
14:10
**Balick's (1)**
13:15
**Bankr (1)**
13:17
**bankruptcy (2)**
10:14;13:20
**Barsalona (9)**
9:3,4,6,8,10;11:21;
12:20;13:4;19:3
**Barsalona's (1)**
18:5
**based (1)**
10:19
**basic (1)**
14:5

**BAYARD (1)**
4:14
**behalf (4)**
9:1;12:15;16:8;
17:24
**BENJAMIN (1)**
4:21
**better (1)**
16:21
**Black (1)**
6:8
**blame (1)**
8:13
**BOHMAN (2)**
5:23,25
**both (5)**
9:15;16:8,9,24;
17:17
**BR (1)**
13:16
**BRAD (1)**
4:10
**briefs (1)**
17:7
**bringing (1)**
11:3
**brings (1)**
13:12
**BYRON (1)**
7:8

## C

**calendar (1)**
8:11
**call (2)**
10:12;18:24
**can (11)**
9:5,8,9;11:10,25;
12:2;15:12;16:13;
17:14,14,17
**case (7)**
8:4,17;9:16;13:15;
14:8;16:10;17:7
**cases (1)**
14:6
**CastleGate (1)**
4:15
**certainly (2)**
12:23;16:25
**chambers (1)**
18:23
**cheaper (2)**
16:20;17:6
**Chief (1)**
7:3
**choose (1)**
16:5
**Cir (1)**
9:21
**Circuit (1)**
9:20
**circumstances (2)**

**10:10;15:2**
**civil (3)**
13:21;15:3,5
**claim (3)**
14:2,4;16:4
**cleaned (1)**
11:18
**cleaning (1)**
11:19
**cleanup (1)**
11:10
**clear (2)**
11:24;12:10
**clearing (1)**
10:22
**clearly (1)**
15:12
**Co (1)**
13:16
**Coast (1)**
8:3
**COLEMAN (1)**
4:22
**collection (2)**
9:23;10:5
**comfort (2)**
13:9;18:10
**coming (3)**
9:20;14:11,16
**comity (1)**
14:13
**comments (1)**
18:1
**Committee (2)**
4:20;6:3
**Company (1)**
5:3
**complexity (1)**
9:23
**complication (1)**
11:2
**comport (1)**
11:17
**concern (3)**
11:22;12:20;18:5
**concerns (2)**
13:5;16:7
**concluded (2)**
14:17;19:4
**confirmation (1)**
10:14
**confusion (1)**
18:21
**conjectural (1)**
10:23
**connection (1)**
9:11
**consider (3)**
11:13,19;18:16
**considerably (1)**
13:23
**consideration (2)**
14:18;18:12

**considered (1)**
10:18
**consistent (1)**
16:14
**construed (1)**
11:4
**consummating (1)**
11:3
**contested (1)**
14:25
**context (1)**
14:2
**continuation (1)**
13:21
**continue (1)**
14:4
**conversation (5)**
8:15,18;9:17;
14:16;17:4
**convey (1)**
14:22
**correctly (1)**
13:4
**cost (2)**
16:7,12
**Counsel (5)**
6:8;12:8,9;14:13,
19
**COURT (16)**
8:2;9:3,7,9,14;
11:1;12:17,25;13:1,
12;14:10;15:3;18:1,
4,15,20
**court's (1)**
14:14
**Credit (1)**
4:15
**creditor (1)**
13:24
**Creditors (4)**
4:20;6:3;9:24;
10:14
**critical (1)**
10:11
**Currault (7)**
8:16;9:17;11:5,8,
13,15;14:17

## D

**DANIEL (1)**
5:9
**date (1)**
12:13
**deal (1)**
15:20
**debtor (6)**
9:1;12:15,24;
13:20,23;17:25
**debtors' (1)**
8:24
**decide (2)**
13:14;17:9

**Deciding (1)**
12:2
**decision (2)**
9:20;13:16
**declaratory (1)**
15:19
**defendant (1)**
15:18
**deference (1)**
14:13
**deferring (1)**
14:13
**Del (1)**
13:17
**delay (1)**
9:23
**deny (2)**
14:17;17:12
**DEPARTMENT (2)**
5:7;6:18
**DEW (1)**
5:13
**dialed (1)**
9:10
**difficulties (1)**
9:22
**discovery (2)**
16:23,24
**dispute (7)**
12:1,3,4;13:3,10;
15:22;16:19
**distributed (1)**
12:21
**distributing (1)**
12:24
**doctrine (2)**
10:11,12
**dollars (4)**
10:5,7,9;12:5
**done (5)**
12:11;16:5,24;
17:2,2
**double (1)**
9:12
**doubt (1)**
12:9
**drive (1)**
16:13
**due (1)**
10:6
**duplication (1)**
17:1

**E**

**earlier (3)**
8:9,9;14:23
**East (1)**
8:3
**economy (1)**
14:9
**effect (1)**
15:7

**efficient (3)**
17:6,6,9
**efficiently (1)**
16:14
**EISENBERG (1)**
4:11
**either (2)**
13:20;17:6
**Elk (1)**
6:8
**else (4)**
8:13,13;9:5;18:15
**else's (1)**
8:11
**emerges (1)**
14:1
**encourage (3)**
16:25;17:16;18:8
**end (2)**
9:12;15:6
**endeavor (1)**
17:1
**ended (1)**
15:4
**Energen (1)**
4:9
**Energy (1)**
8:4
**enter (1)**
11:14
**entered (1)**
11:5
**entirely (2)**
12:3;18:9
**ERIN (1)**
4:16
**errors (1)**
8:11
**escrow (7)**
11:4,23;12:19,19,
21,23;13:6
**especially (1)**
17:22
**ESQ (16)**
4:4,5,10,11,16,21,
22;5:4,9,10,15,20,
25;6:4,9,14
**Essentially (1)**
11:14
**estate (2)**
13:20;14:3
**even (1)**
11:3
**event (1)**
10:10
**everyone (2)**
8:8,11
**evidence (2)**
16:9,10
**exactly (1)**
13:1
**expense (1)**
9:23

**expensive (1)**
17:7
**experience (1)**
16:15
**extent (3)**
11:17;14:10,12

**F**

**F3d (1)**
9:21
**fact (1)**
18:10
**factors (5)**
9:20,21;13:19;
14:7,19
**fairness (1)**
16:15
**far (2)**
12:12;14:8
**fashion (2)**
14:8;15:13
**faster (2)**
16:20,20
**fault (1)**
8:12
**favor (2)**
14:13,19
**FAY (1)**
4:16
**fee (3)**
10:4,9;12:22
**feel (1)**
8:18
**few (1)**
14:22
**file (1)**
11:15
**filing (3)**
11:7,13;15:9
**find (2)**
8:13,13
**fine (3)**
13:7;16:6;17:10
**First (3)**
9:19;15:16;16:18
**folks (4)**
11:6;12:6;16:15;
18:22
**following (1)**
13:19
**form (4)**
11:21;14:7;15:13;
18:2
**forum (3)**
13:21;14:4,9
**forward (2)**
10:21;12:2
**FOX (1)**
5:10
**frankly (1)**
16:8
**front (4)**

11:8,13,15;14:15
**full (1)**
10:5
**Fund (2)**
4:3,15
**funds (4)**
14:20;15:15,20;
18:7
**further (5)**
9:1,12;11:2;12:25;
18:6

**G**

**GarMark (3)**
4:3;7:5,8
**GENERAL (2)**
6:17;14:23
**generate (1)**
10:6
**GEORGE (1)**
5:15
**gives (1)**
13:8
**Goldblatt (1)**
8:3
**good (3)**
8:2,2;9:6
**GOODWINE (2)**
5:2,4
**GORREPATI (1)**
7:7
**governed (1)**
9:19
**great (2)**
13:19;15:20
**GREEN (2)**
6:12,14
**guess (1)**
18:4
**guidance (1)**
16:19

**H**

**happy (5)**
12:11,19;17:2,19;
18:24
**hardship (2)**
13:22,23
**hear (3)**
8:21;9:4,8
**heard (5)**
8:6;16:4,8,11;18:5
**hearing (2)**
12:17;17:23
**held (4)**
11:23;13:6,8;18:7
**helpful (1)**
8:15
**HENDERSON (1)**
7:6
**hesitate (1)**

18:23
**Holders (1)**
6:13
**Honor (11)**
8:24;9:6,13;12:14;
13:11;17:21,24;
18:14,18;19:2,3
**hope (1)**
18:21
**hopeful (1)**
11:24
**hour (1)**
8:9
**HUBBARD (1)**
4:19
**hugely (1)**
16:7
**hundred (1)**
8:12
**hurdles (2)**
10:22,23

**I**

**identified (1)**
14:19
**II (1)**
4:3
**immediately (1)**
11:11
**impose (1)**
8:11
**inconvenience (1)**
9:23
**informed (1)**
9:16
**inhumane (1)**
16:21
**injunction (3)**
11:5,8,16
**instance (2)**
15:16;16:18
**Insurance (1)**
5:3
**intend (3)**
13:1;16:21;17:8
**intending (1)**
13:3
**intent (1)**
12:10
**intention (1)**
12:24
**interest (3)**
9:24;15:14,14
**intervene (1)**
16:19
**into (1)**
12:18
**invested (1)**
14:10
**involves (2)**
10:4;13:18
**issue (5)**

Min-U-Script®                    eScribers, LLC | (973) 406-2250                    (2) Deciding - issue
                          operations@escribers.net | www.escribers.net
                                                                                    Exhibit B

Case 2:21-cv-00672-DPC   Document 55-2   Filed 03/17/22   Page 130 of 132
JAB Energy Solutions II, LLC
Case No. 21-11226 (CTG)

February 25, 2022

10:2;11:7,10,17,20
**issues (5)**
8:17;9:11,18;
12:10;18:22

**J**

**Jab (1)**
8:4
**JEFFREY (1)**
4:4
**job (1)**
18:24
**JOHN (1)**
6:9
**JOHNSON (2)**
4:2;7:4
**Jones (1)**
9:1
**JOYCE (2)**
6:2,4
**JR (2)**
5:10,15
**Judge (9)**
8:3,16;9:17;11:5,
8,13,15;13:15;14:17
**judgment (4)**
15:4,6;16:3;17:5
**judicial (1)**
14:9
**jurisdiction (1)**
15:25
**JUSTICE (1)**
5:7

**K**

**KADDEN (1)**
4:21
**KENNETH (1)**
6:14
**KERRI (1)**
4:5
**kind (1)**
17:3
**KNAPP (1)**
4:10

**L**

**late (1)**
8:15
**later (1)**
16:4
**LAW (3)**
6:2;8:17;9:16
**lawyers (1)**
16:16
**LAYLA (1)**
6:19
**leading (1)**
13:15
**least (2)**

8:2;11:21
**leave (2)**
15:11,24
**leaving (1)**
13:24
**legal (1)**
11:6
**lenders (1)**
15:14
**less (1)**
17:6
**light (1)**
9:25
**LINDSEY (1)**
7:4
**litigating (1)**
16:12
**litigation (6)**
9:22,24;13:21;
15:3,6;16:2
**LITVAK (12)**
8:24,25;12:14,15;
13:11;16:9;17:21,
24;18:4,14,18;19:2
**LLC (9)**
4:3,15;5:14,23,24;
6:2;7:5,6,8
**LLP (3)**
4:2,8;6:12
**LOCKE (1)**
4:8
**longer (1)**
16:15
**LOOPER (1)**
5:2
**LORD (1)**
4:8
**Louisiana (4)**
15:13,23,23;16:25
**love (1)**
8:21
**LUGENBUHL (1)**
4:19
**LYMAN (1)**
4:5

**M**

**maintenance (1)**
13:22
**makes (2)**
15:5;17:15
**manner (3)**
13:5,8;18:7
**Marine (1)**
6:13
**MARTIN (5)**
5:9,25;9:20,21;
10:3
**MARTINEZ (2)**
5:18,20
**matter (6)**
11:10;14:12,14,23,

25;15:18
**matters (2)**
15:20;16:1
**Max (3)**
8:25;12:15;17:24
**maximize (1)**
10:15
**may (2)**
17:20;18:8
**Maybe (1)**
17:15
**MCKOOL (1)**
6:7
**mean (2)**
8:10;14:23
**meaningful (1)**
10:2
**means (1)**
11:18
**meantime (1)**
18:8
**meets (1)**
11:1
**merits (2)**
13:2,25
**met (1)**
10:2
**MICHAEL (1)**
6:4
**might (6)**
9:3;11:4,7,12,14,
19
**MILLIGAN (1)**
6:19
**million (4)**
10:6;12:5,16,22
**mistake (2)**
8:10,14
**misunderstood (1)**
18:9
**modify (2)**
11:8,16
**money (7)**
11:3,22;12:4,16,
18;13:6;18:10
**more (4)**
15:8;16:16;17:6,6
**motion (9)**
9:19;11:7,13,15;
13:12;14:17;15:9;
16:24;17:12
**motions (1)**
17:15
**much (5)**
8:21;17:21,22;
18:19,25
**muted (1)**
9:4
**muting (1)**
9:12
**myself (1)**
8:21

**N**

**NALLEY (2)**
5:13,15
**necessity (1)**
10:12
**need (6)**
8:7,7;12:1;16:23;
17:2;18:23
**needed (1)**
18:6
**needs (1)**
11:18
**net (1)**
10:6
**nonbankruptcy (1)**
13:22
**nondebtors (1)**
15:24
**none (1)**
16:3
**NORSE (1)**
5:23
**notion (1)**
10:13
**number (2)**
8:4;10:22

**O**

**objected (1)**
10:8
**observations (2)**
8:6;17:11
**obviously (2)**
15:11;16:4
**off-again (1)**
8:8
**Office (2)**
5:8;6:17
**Officer (1)**
7:3
**OFFICES (1)**
6:2
**Official (2)**
4:20;6:3
**offline (1)**
12:20
**Offshore (4)**
5:14,19,24;7:6
**on-again (1)**
8:8
**once (3)**
11:14;12:23;16:6
**one (8)**
9:18;10:8,12,13;
11:2,20,24;14:7
**only (4)**
10:2;12:14;13:3;
16:18
**Opportunities (1)**
4:15

**order (10)**
10:15;11:14,17,
21;12:25;13:5;
17:13,17;18:2,6
**orders (3)**
17:16,18;18:17
**Otherwise (2)**
10:5;18:16
**OTS (1)**
9:13
**out (6)**
9:20;11:25;13:7;
14:16;16:18;18:23
**outweighs (1)**
13:23
**over (3)**
12:3;15:1,25
**ownership (5)**
13:3,10,14;14:20;
15:19
**owns (1)**
12:4

**P**

**PA (1)**
4:14
**Pachulski (1)**
8:25
**pages (1)**
10:19
**paper (1)**
17:14
**paramount (1)**
9:24
**Parks (1)**
6:18
**part (2)**
8:10;14:16
**participate (1)**
15:12
**particular (2)**
10:8;12:20
**parties (14)**
8:17;10:21;11:11,
25;15:10,11,12,13,
17;16:1,3,5,8;18:16
**party (1)**
13:22
**party-in-interest (1)**
17:20
**PAUL (1)**
5:4
**pause (1)**
8:22
**pay (2)**
10:14;12:22
**payment (3)**
10:4,8,17
**PC (1)**
5:2
**PECK (1)**
4:19

**pending (3)**
13:2,9;15:3
**penny (1)**
12:24
**percent (1)**
8:12
**permit (1)**
10:15
**permitted (1)**
15:4
**perspective (1)**
8:25
**PHILIP (1)**
4:11
**phone (1)**
9:10
**PICKHARDT (1)**
7:5
**piece (3)**
15:3,5;17:14
**place (1)**
13:24
**plaintiff (1)**
15:17
**plan (1)**
10:15
**please (1)**
18:22
**PM (1)**
19:4
**point (2)**
11:22;13:3
**pointed (1)**
8:18
**points (1)**
17:18
**position (2)**
8:19;11:6
**possibility (1)**
11:2
**possible (1)**
16:14
**prejudice (2)**
12:3;13:19
**preliminary (1)**
8:6
**prepared (2)**
10:21;11:25
**pre-petition (2)**
10:14;14:2
**PRESENT (1)**
7:2
**presume (1)**
12:15
**prevail (1)**
18:11
**prevailing (1)**
13:25
**prevails (1)**
12:4
**previously (1)**
16:24
**primarily (1)**

**14:1**
**principal (1)**
16:11
**principles (3)**
14:5,9,12
**prior (1)**
10:14
**probability (2)**
9:22;13:25
**probably (1)**
13:15
**procedural (1)**
16:14
**procedurally (1)**
12:6
**proceed (3)**
11:11;15:5;16:5
**proceeding (2)**
14:21;15:8
**proceedings (1)**
19:4
**Products (1)**
13:16
**Project (4)**
5:14,19;7:6,7
**properly (1)**
10:25
**propose (3)**
15:16;16:17;17:3
**provide (2)**
18:6,10
**provided (1)**
13:5
**provides (1)**
17:13
**pursuit (1)**
14:4
**put (3)**
10:25;16:10;17:8
**putting (1)**
11:4
**puzzle (1)**
16:1

**Q**

**quicker (1)**
16:21
**quickly (1)**
17:23

**R**

**raised (2)**
11:21;13:4
**RANKIN (1)**
4:19
**re (3)**
8:4;9:21;13:16
**reach (1)**
18:23
**reached (1)**
15:7

**real (1)**
10:25
**really (5)**
11:23;13:6,13;
15:18;17:22
**reasonable (2)**
13:9;18:9
**reasons (1)**
17:12
**receivable (1)**
10:6
**record (6)**
8:4;9:15,25;10:20;
14:15;17:25
**reefing (3)**
10:4,9;12:22
**reflecting (1)**
17:18
**reflection (2)**
8:16;9:15
**reflects (1)**
10:5
**regarding (2)**
16:11;18:7
**REISNER (1)**
4:4
**relatively (1)**
16:19
**relief (4)**
11:12;13:13;
14:17;15:19
**remain (3)**
12:23;14:5;15:23
**remaining (1)**
12:22
**renders (1)**
10:23
**repeat (1)**
8:7
**report (2)**
9:2,14
**reset (1)**
8:10
**resolution (4)**
13:2,9;14:14;17:5
**resolve (3)**
11:25;15:6;18:24
**resolved (1)**
14:20
**Resources (2)**
4:9;14:11
**respect (1)**
10:2
**responsible (1)**
8:14
**Restructuring (1)**
7:3
**result (2)**
9:15;13:20
**review (1)**
8:17
**Rexene (1)**
13:16

**RICHARD (2)**
5:18,20
**right (2)**
9:14;13:1
**ROCKY (1)**
7:6
**rule (3)**
8:19,20;15:1
**ruling (1)**
15:7
**rulings (1)**
17:22
**run (1)**
11:4

**S**

**same (1)**
17:14
**satisfied (5)**
10:1,10,16,19;12:7
**SBIC (1)**
4:3
**scale (1)**
17:9
**schedule (3)**
16:16,18;17:3
**scheduling (1)**
18:21
**secure (2)**
13:7,9
**seek (1)**
18:17
**seem (1)**
11:6
**sense (2)**
15:5;17:15
**sensitive (1)**
16:7
**separate (1)**
17:16
**Services (3)**
5:14,19;7:6
**set (3)**
8:9;12:6;16:16
**settle (3)**
17:17,17;18:17
**settled (1)**
17:13
**settlement (4)**
9:19;10:4;12:18;
18:2
**signature (1)**
10:19
**simply (1)**
11:15
**sit (1)**
13:2
**slower (1)**
16:22
**SMITH (1)**
6:7
**SNOW (1)**

**6:12**
**Solutions (2)**
5:24;8:4
**someone (2)**
8:13;14:3
**sometimes (2)**
10:13,15
**sorry (1)**
9:4
**sort (2)**
9:18;10:11
**SPARACINO (1)**
6:9
**Special (1)**
6:8
**speculative (1)**
10:24
**speed (1)**
14:11
**SPROULE (1)**
7:8
**standard (2)**
9:25;13:18
**standards (1)**
10:2,3,16;14:1
**Stang (1)**
8:25
**STATES (2)**
5:7,8
**stay (5)**
13:13,23,24;
14:18;17:12
**STEPTOE (1)**
4:2
**STEVEN (1)**
7:5
**strongly (1)**
17:1
**subject (1)**
10:22
**submitted (1)**
18:2
**substantial (1)**
14:11
**substantive (1)**
17:23
**success (1)**
9:22
**sues (1)**
15:20
**sufficient (1)**
16:25
**sufficiently (1)**
10:25
**suits (1)**
15:23
**summary (1)**
17:5
**superb (1)**
12:8
**support (1)**
16:10
**sure (1)**

12:10

16

**T**

talk (7)
    8:21;12:19;14:6;
    15:17;17:16;18:8,16
Technical (2)
    5:24;11:9
teeing (1)
    17:5
terms (2)
    15:10,16
terribly (1)
    14:25
testimony (1)
    16:11
Texas (1)
    6:18
thanks (1)
    18:20
thin (1)
    16:10
Third (1)
    9:20
though (3)
    8:8;11:25;14:4
thoughts (1)
    14:22
three (1)
    13:19
thumb (1)
    17:9
tie (1)
    14:7
timing (1)
    8:9
TIMOTHY (1)
    5:10
TOPS (5)
    9:12;12:4,5;16:11;
    18:10
TORRANS (1)
    4:22
TPW (1)
    12:22
traditional (1)
    10:3
transaction (4)
    10:21,24;11:3;
    12:2
true (2)
    15:1;16:8
trust (1)
    18:16
Trustee (2)
    5:8;6:8
trying (1)
    17:7
Turnkey (3)
    5:14,19;7:6
two (4)
    8:19;9:18;17:15,

**U**

UDAY (1)
    7:7
under (2)
    10:9;15:2
understood (4)
    11:22;13:4,11;
    18:5
UNITED (2)
    5:7,8
Unsecured (2)
    4:20;6:3
up (7)
    11:12,18,19;12:6;
    14:11;15:1;17:5
usually (1)
    14:25

**V**

value (1)
    10:15
various (1)
    10:18
vendor (1)
    10:12
view (1)
    14:15

**W**

wants (3)
    10:13;14:3;16:3
way (5)
    11:11,18;12:6;
    15:8;16:5
weigh (1)
    14:9
WHEATON (1)
    4:19
Whereupon (1)
    19:4
who's (1)
    8:14
Wildlife (1)
    6:18
wins (1)
    12:3
wish (1)
    8:12
without (2)
    11:11;12:3
work (6)
    11:25;12:7;13:7;
    16:16,18;18:22
worked (1)
    15:1
working (1)
    18:12

**Y**

yesterday (6)
    8:6,15,16;10:1;
    16:9;17:23

**Z**

Ziehl (1)
    8:25

**1**

141 (1)
    13:16
1992 (1)
    13:17
1996 (1)
    9:21

**2**

2:19 (1)
    19:4
21-11226 (1)
    8:5

**3**

389 (1)
    9:21
3d (1)
    9:21

**4**

4.9 (4)
    10:6;12:4,22;13:2

**5**

5.6 (1)
    12:16
574 (1)
    13:16

**7**

700,000 (3)
    10:4,9;12:21
7001 (1)
    15:1

**9**

91 (1)
    9:21