TURNKEY OFFSHORE PROJECT     *     NO:    2:21-cv-00672
 SERVICES, LLC ("TOPS")             *
                                      *     JUDGE AFRICK
VERSUS                         *
                                      *
JAB ENERGY SOLUTIONS, LLC     *     MAGISTRATE CURRAULT
 and BRENT BOUDREAUX,         *
* * * * * * * * * * * * * * * * * * * * * * * *

### OPPOSITION TO DEFENDANT JAB ENERGY SOLUTIONS II, LLC'S MOTION TO REOPEN CASE SOLELY TO PERMIT FILING OF MOTION TO MODIFY PRELIMINARY INJUNCTION

MAY IT PLEASE THE COURT:

As previously noted in its own motion to reopen and sever, TOPS acknowledges that this Court retains jurisdiction "to determine the applicability of the [bankruptcy] stay to litigation pending before [it], and to enter orders not inconsistent with the terms of the stay." *Blundell v. Home Quality Care*, 2017 WL 5889715, at *2 (N.D. Texas Nov. 29, 2017) (quoting *Picco v. Global Marine Drilling Co.*, 900 F.2d 846, 850 (5th Cir. 1990)). And while acknowledging that each federal district may promulgate its own rules governing the process for administratively closing and reopening a case, generally those rules are founded on a finding of good cause to reopen. Good cause to reopen a case has been found where "the parties wish to litigate the remaining issues that have become ripe for review." *Am. Family Mut. Ins. Co. v. Teamcorp, Inc.,* 835 F.Supp.2d 1083, 1086 (D.Colo.2011); *see also Crystal Clear Commc'ns, Inc. v. Sw. Bell Tel. Co.,* 415 F.3d 1171, 1176 (10th Cir.2005) ("Although the district court ordered the proceeding 'administratively close [d],' it is clear from the context of the order that the court contemplated continued litigation after completion of the administrative proceedings." (alteration in original)); *Frederick v. Hartford Underwriters Ins. Co.,* No. 11–CV–02306–RM–KLM, 2015

WL 1499662, at *1 (D.Colo. Mar. 27, 2015) ("Because administrative closure is a purely administrative act, it has no effect on the parties' rights or claims. While TOPS' current Motion to Reopen, as will be detailed below, is founded on a desire to litigate issues which, as a result of actions taken by JAB II in the Delaware Bankruptcy proceeding, have become ripe for review by this Court, TOPS objects to JAB II's Motion to Reopen because it is not founded on 'good cause' but rather is founded on a desire and attempt to essentially render this Court's Jurisdiction and its prior Temporary Restraining Order and Injunction meaningless.

In response to TOPS' earlier motion to reopen this matter JAB II objected, stating that:

> The Court's Stay Order provides that a motion to reopen may be filed "after the bankruptcy stay is terminated." (R. Doc. 48). Despite this clear edict, TOPS filed its Motion while fully cognizant that the bankruptcy stay has not been terminated. (R. Doc. 50, p.4)

JAB II went on to opine that "TOPS disregard for the Court's Stay Order alone requires that the Motion be denied." (R. Doc. 50, p.4) Yet now, in what can only be described as a blatant attempt to do an "end-run" around this Court's findings of fact and law that underpin its decision to enter an Injunction, JAB II seeks to have the court re-open this matter to allow it to file a motion to 'modify' the preliminary injunction by essentially dissolving it and functionally relinquishing jurisdiction over this entire claim to the Delaware Bankruptcy Court. JAB II seeks the "modification"

> "to permit JAB II to effectuate a settlement approved by the Bankruptcy Court (the "Settlement")." (R. Doc.55).

The Relief Requested by JAB II is:

> "JAB II respectfully requests that the Injunction and PI Order be modified to allow JAB II to deposit the funds collected under the Settlement Order in escrow pending a further determination by the Bankruptcy Court regarding the proper ownership of the funds." (R. Doc. 55-2, p.3)

It should be noted that when JAB II initially proposed this Settlement Agreement and filed it with the Delaware Bankruptcy Court, JAB II actually drafted its order to allow JAB II to not only transfer the Black Elk funds to Delaware, but also to allow JAB II to actually disperse the funds immediately upon receipt to its creditor GarMark ($3.7 million) and pay its related expenses including an estimated additional $600,000 in legal fees, thus bringing the legal and consultant fees in Delaware alone to approximately $1.3 million over and above the GarMark loan, thus essentially taking all of the High Island money to pay Allison Marine/JAB's bank loan and their lawyers! All of this JAB II attempted to do without even allowing TOPS a hearing on its entitlement to those funds. This maneuver, which fortunately TOPS was able to thwart so far, is the exact type of bad behavior that this Court found had been JAB II's established practice and which this Court's injunction was intended to prevent. Yet here they are again making yet another attempt at preventing this Court from being able to protect those funds until TOPS's equitable rights can be determined. Thus the established practice of JAB II to try to satisfy the bank debts of Allison Marine and its subsidiaries with the hard earned money of TOPS and its 100+ employees, while leaving them with nothing on the $8.5 million owed continues to this day.

It is difficult to imagine a more flagrant disregard for a court's ruling than JAB II has demonstrated first in seeking approval of its proposed settlement with the Black Elk Bankruptcy Trustee as to funds that this Court has determined were specifically set aside by the Houston Bankruptcy Court as Administrative Expenses, to pay for the cost of the decommissioning and removal of HI A370, work which was ultimately performed not by JAB II but by TOPS, which are not an asset of the Debtor's estate, and as to which there is an existing Injunction which is completely disregarded and countermanded by the Settlement Agreement, and second, in asking

this Court to "Modify" its injunction by basically dissolving it and turning its jurisdiction over a prepetition contract dispute over to a Bankruptcy Court. [1]

It is also important to note at the outset that TOPS objected to the Bankruptcy Court's approval of JAB's proposed settlement of that claim, and that it has also filed an appeal (Exhibit A) of that Order.

## I. The Evolution of the "Settlement Agreement"

On February 10, 2022, the Debtor filed a Settlement Motion in Bankruptcy Court. (Exhibit B), as to which GarMark filed a Joinder (Exhibit C). According to that Motion, the Settlement Agreement purports to be a "resolution of all outstanding issues between the [parties] relating to the High Island Project." Settlement Motion ¶ 9. The Settlement Agreement fully incorporates the HI A370 Term Sheet Funding Agreement and "is intended to facilitate the consummation of the Funding Agreement." Settlement Agreement at 4. Under the terms of the Order approving the Settlement Agreement, (R. Doc. 55-2, p. 8) the Black Elk funds that were originally available will be reduced by the costs of escrow related to the Settlement Agreement and payment of the Reefing Fee. [2] While not contained in the Settlement Agreement itself, the Settlement Motion also provided that JAB II "intends to distribute the proceeds of the High Island Receivable, after payment of the Carve-Out . . ., to repay the DIP Facility." (Settlement Motion, Exhibit A, ¶ 9.) The DIP Facility,

---

[1] While in the Order approving the Settlement Agreement and in his oral reasons explaining it, the Bankruptcy Judge has conceded that the "ownership" issue of the funds allocated for payment of the cost of removal of the HI 370A platform should be an adversary proceeding, he also contemplates participation of a DIP Lender, GarMark, the debtor-in-possession lender and prepetition secured creditor who is coincidentally protected from being subjected to a Marshaling of Assets by an earlier approval of a DIP Financing Agreement. (See Exhibit D, Paragraph 6ii)

[2] The reefing fee is payable to the Texas Parks and Wildlife Department Artificial **Reef Program** and is listed in JAB II's Statement of Assets (Exhibit E) as a non-priority, unliquidated, disputed claim in the amount of $878,243.00. Since the filing of the Settlement Agreement, JAB II has purportedly "agreed on a highly beneficial resolution with TPW" pursuant to which TPW will accept a reduced reefing fee from the Debtor from $878,243 to $700,000 (the "Reefing Fee"), with the remainder treated as a general unsecured claim. Interestingly, on January 6, 2022 Allison Offshore Services II, LLC also agreed to a settlement of $700,000 with the Black Elk Bankruptcy Trustee of a nonpriority claim for $790,325.00, which it had filed as nonpriority claim #206 with the Black Elk Bankruptcy on January 15, 2016.

not surprisingly is GarMark, one of Allison Marine/JAB II's lenders. While that provision WAS NOT INCLUDED IN THE Order of Approval, clearly JAB II's Motion to Reopen is not seeking to resolve issues in this litigation that are now ripe for resolution. Rather, it is seeking to place the resolution of all the issues in this case into the hands of the Bankruptcy Court by gutting all sources of potential recovery against it by TOPS.

TOPS submits that JAB II's bad behavior has only gotten worse with time and the efforts of $1.3 million dollars of attorney and consultant fees, as its proposed Settlement Agreement would result in GarMark, as a financial lender to Allison and its subsidiaries getting paid in full, on its $3 million loan to Allison Marine et al as well as all of their attorneys and consultants, which is the same result they were hoping to effect with their JABCO proceeding, but which this Court prevented. As this Court knows, those High Island funds are ONLY available because JAB II fraudulently induced TOPS to do the work and then threatened TOPS with no payment unless TOPS completed the job, after TOPS learned of the deception. One can hardly imagine a more equitable claim than the efforts of TOPS and the other contractors who actually removed the platform under these circumstances, yet JAB II relentlessly pursues avenues to benefit the Allison creditors to the detriment of TOPS and the other contractors.

In commenting on the proposed, and as of now still unsigned Settlement Agreement, the Bankruptcy Judge acknowledged a potential issue with Settlement Agreement: (R. Doc. 55-2, pp. 117-118)

> **Now, the one further complication is the possibility that consummating the transaction, even just bringing the money in and putting it in escrow, might be construed to run afoul of the injunction entered by Judge Currault. Essentially, once we have an order that I enter, it might be appropriate to file a motion in front of Judge Currault simply to say that -- or asking that she modify her injunction to comport with this order, and to the extent there's an**

**issue that needs to be cleaned up that way, that's a means by which you might consider cleaning it up.**

While TOPS vigorously objects to the reopening of this case for the sole purpose of modifying this Court's Temporary Restraining Order and Injunction to comport with the Order approving the Settlement Agreement among JAB II and the parties supplying the funds to pay the HI A370 Term Funding Sheet, (a full Opposition to the Motion To Modify is being filed as a separate document), to the extent that the Reopening of this case, notwithstanding the automatic stay order, has been sanctioned by the Bankruptcy Court as a possible means to "clean up" any issues that stand in the way of this Court modifying its Injunction, TOPS respectfully submits that this Court consider reopening the case to consider whether a determination of the ownership of the Black Elk Funds is a "core issue" in JAB II's Delaware Bankruptcy proceeding and whether the funds specifically allocated by the Black Elk Bankruptcy Court to fund the work done by contractors in the decommissioning of the HI A370 platform are in fact part of JAB II's estate such that the Automatic Stay is even applicable to this Court's jurisdiction over the disposition of those funds. TOPS submits that due to the recent Orders issued by the Bankruptcy court approving the DIP financing and the Settlement Agreement these issues have become ripe for determination by this court and provide just cause to reopen the case to allow this Court to effect the purpose of its injunction, and to resolve the underlying issues, equitable and otherwise.

TOPS prays that this Court not be lulled into JAB II's latest ploy to avoid paying TOPS and the other contractors, who actually performed the work for which the Black Elk funds were earmarked. As this Court is aware, the tortured path of JAB II's efforts started with its fraudulent retention of TOPS, then when found out, its threat that there would be no payment whatsoever if TOPS did not complete the job. After this lawsuit was filed, JAB II tried its JABCO maneuver, which this Court thwarted with its injunction; however, JAB II then moved to Bankruptcy Court

in Delaware, 1,000 miles from this Court and where it now attempts to reopen this case in order to basically disregard and nullify this Court's injunction, thus continuing the same bad behavior this Court was attempting to prevent with the injunction. One does not have to strain to see that JAB II is attempting to simply continue disregarding this Court's earlier order that the High Island funds be transferred to the EDLA clerk for safe keeping, pending further action by this Court to determine the equitable resolution of the ownership of those funds.

Notably, JAB II will be liquidated at the conclusion of the Delaware bankruptcy and GarMark would still have its secured claims against Allison Marine. Accordingly, the only parties to benefit from JAB II's efforts to divert the High Island funds to Delaware are Allison Marine and its other subsidiaries.

After JAB II boldly proclaimed at the injunction hearing with regard to their JABCO maneuver that this Court may not like it but there was nothing you could do about it, this Court issued its injunction and showed JAB II and Allison Marine that in fact this Court could do something to ensure an equitable result. Similarly, this Court is again presented with yet another maneuver by JAB II/Allison to divert the High Island funds from their intended purposes.

This Court should not condone JAB II's repeated efforts to avoid this Court's orders, and accordingly TOPSs requests that this Court deny JAB II's Motion to Reopen the case for the purpose of modifying the Injunction and allow it to allow it to abscond with the High Island funds under the guise of a Settlement Agreement, which on its face is a violation of this Court's injunction and just as importantly this Court's efforts to determine a fair and just resolution of the High Island funds.

Respectfully submitted,

NALLEY, DEW and MINER
A Professional Law Corporation


_____/s/ George Nalley_____
GEORGE J. NALLEY, JR.               (9883)
DONA J. DEW                          (1329)
Suite 100
2450 Severn Avenue
Metairie, LA  70001
(504) 838-8188
Attorneys for TOPS
george@nalley.com
dona@gnalley.com


## CERTIFICATE OF SERVICE

I do hereby certify that I have on this 29th day of March, 2022 served a copy of the foregoing

pleading on counsel for all parties to this proceeding by email, facsimile, and/or by mailing the

same by United States mail, properly addressed, and first class postage prepaid.


_____/s/George Nalley_____
NALLEY, DEW and MINER, APLC